**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **MARRIOTT INTERNATIONAL, INC.** | : | |
| 7750 Wisconsin Avenue | : | |
| Bethesda, Maryland 20814 | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| **v.** | : | |
| | : | |
| **SPERLING KENNY NACHWALTER,** | : | |
| **LLC** | : | Civil Action No. |
| 321 North Clark Street, 25th Floor | : | |
| Chicago, Illinois 60654 | : | |
| | : | |
| & | : | |
| | : | |
| **HILLIARD, MARTINEZ & GONZALES,** | : | |
| **LLP, d/b/a HILLIARD LAW** | : | |
| 719 S. Shoreline Boulevard, Suite 100 | : | |
| Corpus Christi, Texas 78401 | : | |
| | : | |
| Defendants. | : | |

## <u>COMPLAINT</u>

Plaintiff Marriott International, Inc. ("Marriott") brings this Complaint against Sperling Kenny Nachwalter, LLC ("Sperling Kenny") and Hilliard, Martinez & Gonzales, LLP, d/b/a Hilliard Law ("Hilliard") and alleges as follows:

## INTRODUCTION

1.    This action arises from Defendants' breach of the fundamental professional duties that anchor our justice system. That system requires steadfast loyalty to clients "free from conflicts of interest." *Stephens v. Branker*, 570 F.3d 198, 208 (4th Cir. 2009). A lawyer is "legally and ethically required to be loyal to client interests, as distinct from his [or her] own." *Nat'l Sec. Couns. v. CIA*, 811 F.3d 22, 30 (D.C. Cir. 2016). The "very nature of the court as an institution" makes these rules essential. *United States v. Shaffer Equip.*, 11 F.3d 450, 461–62 (4th Cir. 1993).

2.    Courts have an "independent interest" in ensuring the integrity of adjudicative proceedings. *See United States v. Bundy*, 2008 WL 4133857, at *3 (D. Md. Sept. 2, 2008). When lawyers create a conflict of interest "such as clearly to call in question the fair and efficient administration of justice," the lawyers must be disqualified. *Gross v. SES Americom*, 307 F. Supp. 2d 719, 723 (D. Md. 2004); *see also* Model Rules of Pro. Conduct (A.B.A. 1983) ("Model Rules") r. 1.7 cmt. 15; Maryland Attys.' Rules of Pro. Conduct ("MARPC") r. 19-301.7 cmt. 15.

3.    The Defendant law firms, Hilliard and Sperling Kenny, egregiously violated basic principles against lawyers representing clients with conflicts of interest. Their conduct compromised—from the very beginning—the integrity of nearly 7,000 cases in a mass arbitration against Plaintiff Marriott International.

4.    Hilliard and Sperling Kenny made identical assertions on behalf of each of their purported clients: Marriott's website uses standard website technology, including the Meta (Facebook) Pixel. These pixel technologies share website visitors' data with third parties like

Facebook. They claim the existence of pixels on Marriott's website means Marriott is guilty of violating criminal statutes against wiretapping, including the California Invasion of Privacy Act (CIPA). Marriott therefore owes every California resident who voluntarily visited its site at least $20,000 in statutory damages that are the equivalent of civil penalties.

5.      But Hilliard and Sperling Kenny concealed that they used the *same pixels* in a *far more invasive manner* while soliciting *their own clients* to bring claims against Marriott. On their attorney-advertisement websites, they used pixels (including the Meta Pixel and tracking technologies that Marriott does not use) to collect information prospective clients submitted while seeking legal representation—and share it with third parties. Hilliard and Sperling Kenny then used that data to target social media ads at California residents and direct them to those solicitation websites. The cycle continued until Hilliard and Sperling Kenny had amassed thousands of claimants for a mass arbitration against Marriott.

6.      Their conduct is not just peak hypocrisy; it also created grave conflicts of interest between those claimants and their counsel. Under Hilliard and Sperling Kenny's own theory of liability, their clients could assert the same claims against their own counsel that they are prosecuting against Marriott. And by their account, Hilliard and Sperling Kenny are guilty of the same criminal violations they allege against Marriott. That is like a prosecutor pursuing charges while committing the same alleged crime. The rules of ethical attorney conduct and disqualification exist for this very purpose—to "ensur[e] that a litigant's claims or defenses are not refracted through the multifaceted prism of an attorney's conflicts." *CytImmune Scis., Inc. v. Paciotti*, 2017 WL 57213, at *7 (D. Md. Jan. 5, 2017).

7.      Hilliard and Sperling Kenny also made themselves necessary witnesses in their clients' cases. Their testimony about their own use of pixels during attorney-client communications

with those same claimants bears on the credibility of their clients' claims, ████████ ████████████████████████, and the viability of defenses such as notice and consent that both they and Marriott would predictably raise. *See* Model Rules r. 3.7(a); MARPC r. 19-303.7(a).

8.      Hilliard and Sperling Kenny similarly put their own nearly 7,000 purported clients in an untenable position where answering questions about their counsel's conduct will be adverse to their claims. Can any of them credibly articulate a material difference between their own counsel's use of these technologies and Marriott's use of them? Their failure to do so would weigh strongly against their claims against Marriott in the mass arbitration.

9.      Defendants' resulting dual roles as advocates and witnesses whose conduct is adverse to their clients' interests pose a substantial risk of prejudice to both their clients and to Marriott. That prejudice violates basic rules of attorney ethics and calls into question the integrity of the arbitration process. *See* Ann. Model Rules of Pro. Conduct § 3.7 (10th ed. 2023); *see also* 69 Am. Jur. *Trials* 411, § 23 (1998) (testimony is "prohibited" under Model Rules r. 3.7 where the lawyer "was an actor whose participation in the underlying matter is material.").

10.      Hilliard and Sperling Kenny knew about these conflicts. Marriott raised them in writing before they filed the mass arbitration. At that point, they should have dropped the claims, recognizing that their own practices demonstrate the claims' lack of merit. **Exhibit A** (A. Terepka Mar. 26, 2025, Ltr.).

11.      Responsible, ethical counsel would have considered terminating their representation so their clients could obtain new counsel without these conflicts of interest. *Klupt v. Krongard*, 126 Md. App. 179, 209 (1999) (quoting Charles W. Wolfram, *Modern Legal Ethics* § 7.5.2(c), at 383–84 (1986)) (failing to withdraw "when it first became apparent that the lawyer would be required to testify" violates professional rules). Unconflicted counsel could offer advice

about whether to pursue the same claims against Hilliard and Sperling Kenny that they are alleging against Marriott on behalf of their purported clients. Hilliard and Sperling Kenny could never give such advice without a disqualifying conflict of interest. They would be advising their nearly 7,000 clients about whether they should sue their own lawyers.

12. Despite these glaring conflicts that Marriott raised in writing, Hilliard and Sperling Kenny did not remove themselves as counsel so their clients could obtain the benefit of unconflicted, loyal counsel. Nor did they notify the arbitrator of the existence of a conflict. Hilliard and Sperling Kenny instead ignored the conflicts their own conduct created. They put their own financial interests above their clients' interests. And they proceeded to file thousands of claims against Marriott, seeking to coerce it into a mass settlement that would personally enrich Hilliard and Sperling Kenny.

13. Marriott has been raising these issues to Defendants in writing for nearly a year. But Hilliard and Sperling Kenny have flippantly ignored their severe, disqualifying conflicts of interest and have never provided a meaningful response. They simply accused Marriott of making a "'you do it too' argument." That misses the point. Marriott is not doing what Defendants do. Their websites use pixels in an invasive manner that disregards their clients' privacy choices and violates attorney-client confidentiality. Marriott does not do that. To be clear, Marriott firmly believes that its use of pixels is entirely lawful and that its conduct does not violate any law. *See, e.g.*, *Doe v. Eating Recovery Center*, 809 F. Supp. 3d 1109, 1118–19 (N.D. Cal. 2025).

14. Setting that aside, attorneys are different. They are subject to sacrosanct rules of professional ethics that hold attorneys to the highest standards of loyalty to their clients. Defendants—two law firms—have violated those rules here. They lured their own clients to make meritless claims that Marriott "betray[ed]" them by using pixels they claim are a crime. All the

while, Hilliard and Sperling Kenny concealed from their clients that they used the same pixels in a more invasive way when their clients were seeking legal advice from them.

15.     Defendants' ethical violations created a direct, disqualifying conflict of interest, as the following question illustrates: Could Hilliard and Sperling Kenny advise their clients that they think they can pursue the same claims *against their own counsel* that they are pursuing against Marriott?

16.     The unethical conflicts Hilliard and Sperling Kenny created are "such as clearly to call in question the fair and efficient administration of justice." *Gross*, 307 F. Supp. 2d at 723. Their "substantive centrality to the issues in the case should have compelled [them] to back out at the beginning." *Abrishamian v. Wash. Med. Grp., P.C.*, 216 Md. App. 386, 407–08 (2014). And Claimants' "right to retain counsel . . . does not permit retaining an attorney with a potential conflict of interest raising the appearance of impropriety." *SEC v. Merrill*, 2019 WL 430853, at *4 (D. Md. Feb. 1, 2019). Defendants have ignored these basic rules of ethical attorney conduct.

17.     Marriott now files this suit in this Court because "the decision on attorney disqualification [is] one for the court and not for the arbitration panel." *SITEL v. Stonebridge Life Ins.*, 2007 WL 9780537, at *3 (D. Md. July 23, 2007) (quoting *Action Air Freight v. Pilot Air Freight*, 769 F. Supp. 899, 901 (E.D. Pa. 1991)). It is the "'court's responsibility to focus on the preservation of the integrity of the arbitration process.'" *Id.* And arbitration proceedings on the merits "have not yet begun, so deciding the issue of attorney disqualification will not disrupt the arbitration." *Id.* Defendants' violations created untenable conflicts of interest that require their disqualification from the arbitration proceedings and other appropriate relief.

18.     Marriott will soon file a motion to disqualify Defendants as counsel in the underlying mass arbitration. Its motion will include extensive support from a preeminent expert

on attorney ethics whose testimony establishes that Hilliard and Sperling Kenny's conduct created egregious conflicts of interest for which the only remedy is disqualification.

## PARTIES

19.　　Plaintiff Marriott International, Inc. is a corporation organized under the laws of Delaware, with its principal place of business at Bethesda, Maryland.

20.　　Defendant Hilliard, Martinez & Gonzales, LLP, d/b/a Hilliard Law is a Texas limited liability partnership with its principal office at 719 S. Shoreline Boulevard, Suite 100, Corpus Christi, Texas. The partners of Hilliard, Martinez & Gonzales, LLP, d/b/a Hilliard Law are Robert C. Hilliard, Catherine Hilliard, T. Christopher Pinedo, Gonzalo Joseph Barrientos, Benjamin R. O'Connor, Bradford P. Klager, Alex Hilliard, and Bonnie Rickert, all of whom are citizens of the State of Texas.

21.　　Defendant Sperling Kenny Nachwalter, LLC is a limited liability company with its principal office at 321 North Clark Street, 25th Floor, Chicago, Illinois, 60654. Each member of Sperling Kenny is a citizen of the States of Texas, Illinois, or Florida. The members of Sperling Kenny are Richard Alan Arnold, James T. Almon, John P. Bjork, William J. Blechman, Robert D. Cheifetz, Phillip F. Cramer, Michael G. Dickler, Steven C. Florsheim, Jeffrey T. Foreman, Eugene J. Frett, David P. Germaine, Joshua B. Gray, Scott F. Hessell, Elizabeth B. Honkonen, Eamon P. Kelly, Liza Laughlin, Mitch Macknin, Allison G. Margolies, Claire P. Murphy, Anna T. Neill, Douglas H. Patton, Scott E. Perwin, Michael A. Ponzoli, Samuel J. Randall, Lauren C. Ravkind, Matthew H. Rice, Alberto Rodriguez, Jerry Santangelo, Trevor Scheetz, Blake Sercye, Nathan A. Shev, Greg Shinall, Daniel A. Shmikler, Martin Sinclair, Matthew T. Slater, Timothy Sperling, Jonathan Stratton, and Joseph M. Vanek.

## JURISDICTION AND VENUE

22.    This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1332(a) because this is a civil action in which the amount in controversy exceeds $75,000, and there is complete diversity of citizenship.

23.    The amount in controversy exceeds $75,000, exclusive of interest and costs. Marriott seeks relief that would prevent Defendants from representing nearly 7,000 claimants in a mass arbitration they initiated against Marriott.

24.    The economic value of that relief is measured, in part, by Defendants' financial interest in continuing that representation, including the contingency, statutory, and cost-based fees they expect to recover across thousands of arbitrations. Even the most conservative valuation places the amount in controversy far above the jurisdictional threshold: to fall below the jurisdictional threshold of $75,000, Defendants would need to be seeking less than $11.10 per claimant in fees—an amount lower than the arbitration fees alone. Defendants are seeking much more. They seek "at least $20,000" in statutory damages alone for each of their nearly 7,000 purported clients, in addition to punitive damages and attorneys' fees.

25.    Accordingly, the jurisdictional threshold under 28 U.S.C. § 1332(a) is satisfied.

26.    This Court has personal jurisdiction over Defendants because they purposefully directed their conduct toward Marriott in Maryland, knowing that Marriott maintains its principal place of business in Bethesda, Maryland. Defendants intentionally solicited their clients to bring claims against Marriott, sent demand letters, mass-arbitration threats, and thousands of arbitration filings to Marriott's headquarters (including several bankers boxes full of demands); targeted Marriott's Maryland-based legal and business personnel; and undertook actions expressly calculated to impose substantial financial and operational burdens on Marriott in Maryland. As

described in detail below, Defendants also expressly aimed attorney-advertising websites and social-media advertisements soliciting clients at Marriott in Maryland.

27.    Marriott sustained the harms resulting from Defendants' conflicted representation—including the initiation and threatened initiation of thousands of meritless arbitration demands—in this State, where Marriott evaluated, responded to, and was forced to incur costs associated with Defendants' conduct. By intentionally directing these acts at a Maryland-based corporation and causing foreseeable injury in Maryland, Defendants have established the requisite minimum contacts with this forum, and the exercise of personal jurisdiction comports with due process.

28.    Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to this action occurred in Maryland. Marriott is headquartered in Bethesda, Maryland, and the harms resulting from Defendants' conflicted representation—including the initiation and threatened initiation of thousands of mass-arbitration demands—were felt at Marriott's principal place of business within this District. Defendants directed their threats, correspondence, and mass-arbitration filings to Marriott's headquarters in Maryland, where Marriott investigated, evaluated, and responded to the alleged claims.

29.    Additionally, this District is the proper venue to bring this action because Marriott's Terms of Use, pursuant to which Claimants have filed the underlying mass arbitration, contains a choice of law and venue provision that designates Maryland as the forum state. Moreover, the mass arbitration is currently being administered with no physical forum by AAA employees located in various states.

30.    Assignment to the Southern Division is proper under Local Rule 501.4 because the events giving rise to the claims occurred in Montgomery County, Maryland, and Marriott

maintains its headquarters and principal place of business there. The injury to Marriott—including the legal, financial, and operational harms arising from Defendants' conflicted representation and mass-arbitration tactics—was centered in and sustained within the Southern Division.

**FACTUAL ALLEGATIONS**

**A.    Marriott's Website Respects Privacy Choices**

31.    Marriott operates one of the world's leading hospitality businesses. Through its website, Marriott.com, guests can research destinations, search for rooms, book stays, and manage reservations across more than 30 brands and over 9,700 properties in 143 countries and territories. Like virtually all modern consumer websites, Marriott.com uses standard third-party website technologies, including cookies and pixels, to support routine functions such as analytics and advertising.

32.    Marriott is transparent about these practices and takes visitors' privacy preferences seriously. Its privacy policies inform visitors that the website uses "Cookies and Similar Technologies," including "pixel tags" for advertising, analytics, and related purposes. The policies explain how these technologies operate and offer users clear privacy controls, including through browser settings and Marriott's "Tracking Preferences" and "Privacy Center" pages. Marriott also recognizes and honors universal opt-out signals some visitors install on their browsers.

33.    Visitors consent to Marriott's privacy policies by using its website. *See, e.g., Calhoun v. Google*, 349 F.R.D. 588, 595–98 (N.D. Cal. 2025) (consent to privacy policy with relevant disclosures defeats CIPA claims). Those who complete a transaction on Marriott's website also expressly consent by agreeing to its terms, which incorporate the privacy policies. *See id.*

10

**B.      Plaintiff-Side Firms File a Wave of Meritless CIPA Claims**

34.      In recent years, certain plaintiff-side firms have filed a wave of claims against businesses with consumer-facing websites under the California Invasion of Privacy Act (CIPA), a 1967 statute that criminalizes physically "tapping" telephone wires to eavesdrop on conversations. These firms claim that the routine use of widely adopted website technologies like cookies and pixels amounts to criminal "wiretapping" within the meaning of that decades-old statute. Using these claims, these firms have mass-produced thousands of lawsuits and arbitrations alleging that something as simple as a voluntary visit to a company's website exposes the company to criminal liability and tens of thousands of dollars in statutory damages for each voluntary website visit.[1]

35.      Recent federal authority has rejected that theory. For example, a federal court dismissed such allegations in *Doe v. Eating Recovery Center*, explaining that CIPA "was drafted

---

[1] Firms bringing frequent CIPA claims "primarily focus on sending a high volume of templated demand letters that are designed to trigger costly settlements before a case is filed." Allison Grande, *4 Firms Fueling Website Tracking Claims, Cyber Insurer Says*, Law360 (Nov. 5, 2025), https://www.law360.com/articles/2407428/4-firms-fueling-website-tracking-claims-cyber-insurer-says (quotations omitted). "[Their] playbook appears to involve sending the same demand letter to multiple businesses," which "often outline allegations concerning violations of [CIPA] based on the use of tracking technologies provided by TikTok, LinkedIn, X, and data brokers (among others)." *Id.* But "CIPA is a criminal statute that was enacted nearly 60 years ago to address telegraph and telephone wiretapping. CIPA's terms 'tap', 'wire,' 'in transit' and 'read' were conceived for analog line interception, not encrypted browser-to-server interactions." David Wheeler, *Privacy Ruling Shows How CIPA Conflicts With Modern Tech*, Law360 (Jan. 30, 2026), https://www.law360.com/articles/2432218/privacy-ruling-shows-how-cipa-conflicts-with-modern-tech (footnotes omitted). Following *Doe v. Eating Recovery Center*, "Plaintiffs must show true in-transit interception, which is technically incompatible with how pixels operate." *Id.* Nevertheless, "California Invasion of Privacy Act litigation continues accelerating. CIPA exposure can reach $5,000 per violation, or three times actual damages, so plaintiffs often litigate without needing to prove monetary loss. Across the country, plaintiffs firms filed approximately 4,000 online privacy and tracking lawsuits in 2024 – a dramatic increase from prior years – targeting session replay tools, social media pixels and analytics technologies." Camilo Artiga-Purcell, *California's New Privacy Laws Demand Preparation From Cos.*, Law360 (Feb. 12, 2026), https://www.law360.com/articles/2439003/california-s-new-privacy-laws-demand-preparation-from-cos- (footnotes omitted).

with very different technology in mind" and "does not map properly onto the internet." 809 F. Supp. 3d at 1117. Because CIPA is a penal statute to which the rule of lenity applies, all "courts should generally resolve CIPA's many ambiguities in favor of the narrower interpretation." *Id.* at 1112. The court therefore held that pixels did not constitute interception "while in transit" under CIPA. *Id.* at 1117.

36.     And rightly so. Pixels are merely requests to a website visitor's browser to voluntarily share anonymized, encrypted metadata about a visit. The Third and Ninth Circuits have thus likewise held that technologies like the Meta Pixel do not intercept communications within the meaning of CIPA. *See Cole v. Quest Diagnostics*, 2025 WL 3172640, at *3 (3d Cir. Nov. 13, 2025); *Karwowski v. Gen Digit.*, 2025 WL 3002610, at *2 (9th Cir. Oct. 27, 2025) (mem.).

**C.     Hilliard and Sperling Kenny File an Abusive Mass Arbitration**

37.     Hilliard and Sperling Kenny nevertheless filed nearly 7,000 amended arbitration demands against Marriott with the American Arbitration Association ("AAA"), ██████████ ████████████████████████████

38.     ████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████

39.     What Hilliard and Sperling Kenny concealed, however, is that they used the same pixels in online interactions with the same individuals—namely, their own clients.

40.     Hilliard and Sperling Kenny recruited nearly 7,000 purported clients with attorney-advertising websites soliciting claims against Marriott. Those websites used the very same pixels, including the Meta Pixel, that Hilliard and Sperling Kenny allege are a crime. Using client information collected with and transmitted to social media companies through those pixels, Hilliard and Sperling Kenny targeted social media ads at California residents. Those ads directed prospective clients to submit information through webforms designed to capture the bare minimum information necessary to complete the AAA's claimant-intake spreadsheet.

41.     ███████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
████████████████████████

42.     ███████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
█████████████████████████████████

43.     ███████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
██████████

44.     While mass arbitration can sometimes serve legitimate purposes, it is prone to abuse when attorneys "solicit claimants via social media and conduct little or no investigation before filing claims" in order "to magnify threatened attorneys' fees" with "a large pool of claimants."

Heckman & Townsend, "Class and Mass Arbitration," *The College of Commercial Arbitrators Guide to Best Practices in Commercial Arbitration*, at 462 (5th ed. 2025).

45.    Circuit courts have increasingly recognized the potential for such tactics to distort arbitration into a coercive settlement mechanism rather than a forum for adjudicating bona fide disputes. *See, e.g.*, *Jones v. Starz Ent.*, 129 F.4th 1176, 1183 (9th Cir. 2025); *see also Wallrich v. Samsung*, 106 F.4th 609, 614 (7th Cir. 2024). That is so because firms like Defendants are using mass arbitrations to impose millions in fees regardless of the merits of the underlying claims.

46.    Here, if this mass arbitration proceeds, Marriott could be forced to pay millions in arbitration fees before a single merits arbitrator is appointed. In that context, filing thousands of baseless ▬▬▬▬▬▬▬ demands constitutes an intentional abuse of the arbitration process "geared more toward racking up procedural costs to the point of forcing [Marriott] to capitulate to a settlement than proving the allegations of [CIPA violations] to seek appropriate redress on the merits." *Jones*, 129 F.4th at 1183.

47.    Defendants' abuse does not end there. By employing pixels during online communications with their clients while simultaneously alleging that Marriott's use of pixels is a crime, Hilliard and Sperling Kenny created incurable conflicts of interest and made themselves necessary and adverse witnesses in their clients' cases.

48.    This matter therefore involves a quintessential abusive mass arbitration built on meritless claims and disqualifying conflicts. Marriott now brings this suit to stop that abuse and protect the integrity of the arbitration process.

**D.    Hilliard and Sperling Kenny Create Disqualifying Conflicts of Interest by Using the Same Pixels on Their Clients—While Disregarding Their Privacy Choices**

49.    Hilliard and Sperling Kenny used the Meta Pixel and similar technologies on their client-solicitation websites to collect information that prospective clients submitted while seeking

legal representation. The pixels transmitted that information to third parties like Facebook. They then used their clients' data to target social media ads at California residents and direct them to sites like their "Money Team Law Firm" webpage promoted by celebrity boxer Floyd Mayweather:



50.    The Money Team website invited visitors to bring meritless claims in response to allegations that Marriott "broke the law by capturing" their "personal information without [their] knowledge or consent" and "betray[ed] the trust of those who relied on them." It urged visitors to "JOIN THE FIGHT!" against Marriott so Hilliard and Sperling Kenny could "Step into the Ring and Stand Up for Your Right to Privacy!"



51.    Hilliard, Sperling Kenny, or agents acting on their behalf installed a piece of code on the Money Team website called PixelYourSite Professional. That tool is designed to manage the Meta Pixel, Google Analytics, Google Ads remarketing tags, Pinterest tags, Bing tags, TikTok tags, and similar scripts. The Money Team website's code confirms that it used the Meta Pixel, TikTok pixel, Google Tag Manager, and similar technologies.

52.    These pixels did not just capture and share innocuous metadata about website visits. They disclosed the *contents* of prospective clients' webform submissions. As a result, the pixels transmitted client names, contact information, and the substance of requests for legal assistance to third parties.

53.    Unlike Marriott's website, Hilliard and Sperling Kenny's solicitation webpages neither offered visitors privacy-preference controls nor honored universal opt-out signals.

54.    Hilliard and Sperling Kenny thus used the same pixels they allege Marriott used, conduct they claim is not just a "betrayal" of trust, but a crime. And they did so in a far more invasive manner that disregarded user opt-out signals, during privileged attorney-client communications. *See* MARPC r. 19-301.6(a) (prohibiting a lawyer from revealing "information relating to the representation of a client"); *id.* r. 19-301.18(b) (applying confidentiality rule to prospective clients); *see also* Restatement § 60(2) (discussing use and disclosure of client information for the lawyer's pecuniary gain).

55.    Under the legal theory they advance against Marriott, their own conduct is subject to the same potential civil and criminal liability they allege on behalf of their purported clients. That is like a prosecutor pursuing charges against a defendant while the prosecutor was committing the same alleged crime. That overlap creates a direct and disqualifying conflict of interest.

56.    The conflict is unavoidable, as this question demonstrates: Have Hilliard and Sperling Kenny advised their clients that they think their clients could assert the same claims against their own counsel? Regardless of the answer, Hilliard and Sperling Kenny created a direct, disqualifying conflict of interest. *See, e.g.*, Model Rules r. 1.7(a) (Rule against concurrent conflicts of interest, including those that involve the lawyer's conduct); MARPC r. 19-301.7 (same).

57.    A concurrent conflict exists where there is a significant risk that a lawyer's own personal interests will materially limit their representation. *See* Model Rules r. 1.7(a)(2); MARPC r. 19-301.7(a)(2). A personal-interest conflict is particularly acute where the "probity" of a lawyer's own conduct is implicated because counsel may be unable to give clients detached advice or pursue all reasonable strategies. *See* Model Rules r. 1.7 cmt. 10; MARPC r. 19-301.7 cmt. 10.

58.    Here, Hilliard and Sperling Kenny's practices place the probity of their conduct squarely at issue. Model Rules r. 1.7 cmt. 10; MARPC r. 19-301.7 cmt. 10.

59.    That conduct also creates a substantial risk that Hilliard and Sperling Kenny's personal and professional interests will "materially impair" their ability to represent their clients. Restatement (Third) of the Law Governing Lawyers § 125 cmt. c (2000). Hilliard and Sperling Kenny face incentives to narrow their factual investigation into pixels, frame legal arguments about disclosure and consent in ways that minimize scrutiny of their own practices, and avoid discovery into their own solicitation websites—positions that may not align with their clients' best interests, which instead "would be materially and adversely affected by the lawyer's own interests" in avoiding liability. 7 Am. Jur. 2d § 182.

60.    Hilliard and Sperling Kenny's use of pixels on their websites soliciting clients to bring claims against Marriott alleging that such pixels are a crime created a foreseeable risk that

17

Hilliard and Sperling Kenny's own practices would become the subject of discovery and evidentiary proceedings in the underlying arbitrations.

61.     Under these circumstances, the conflict Hilliard and Sperling Kenny created is neither theoretical nor waivable. It strikes at their ability to provide detached advice, pursue discovery without self-interest, and litigate thousands of proceedings without their own conduct becoming an adverse and distracting issue. *See Klupt*, 126 Md. App. at 210; Model Rules r. 1.7 cmt. 15; MARPC r. 19-301.7 cmt. 15 (conflict nonconsentable where a lawyer could not reasonably conclude that he or she will be able to provide competent and diligent representation).

**E.    Hilliard and Sperling Kenny Make Themselves Material Witnesses**

62.     Hilliard and Sperling Kenny also made themselves material witnesses in their clients' cases. Their own use of the same pixels during client-intake communications makes their conduct directly relevant to discovery and proof in the underlying proceedings. That created an impermissible advocate-witness conflict. Model Rules r. 3.7(a); MARPC r. 19-303.7(a).

63.     Hilliard and Sperling Kenny's use of identical technology on their own websites is a factual issue that will require testimony from the individuals who selected, approved, configured, and installed those technologies. The only witnesses with direct, first-hand knowledge of those issues are Hilliard and Sperling Kenny's attorneys and those acting under their direction. *See* 69 Am. Jur. *Trials* 411, § 23 (explaining that testimony is "necessary" under Rule 3.7 "if the lawyer is the sole witness on the matter being testified, or is a tie-breaking witness, or was an actor whose participation in the underlying matter is material").

64.     In each of the nearly 7,000 arbitrations, one or more attorneys or agents of Hilliard and Sperling Kenny are material witnesses to establish key facts about their use of pixels, including: whether they used pixels to recruit a particular claimant; whether they shared a

particular claimant's client-intake pixel data; what pixels they used; what triggered each pixel; how the pixels functioned; what information they transmitted; whether and to what extent any transmitted information was encrypted; what disclosures (if any) a particular claimant received notice of or consented to; and whether Hilliard and Sperling Kenny contend that their own practices differ in any meaningful way from the conduct they attribute to Marriott.

65.    Equally important is the untenable position Hilliard and Sperling Kenny have created for their nearly 7,000 clients. Their clients must answer questions about their own counsel's conduct, and the answers may be adverse to their claims. For example, Hilliard and Sperling Kenny's clients must answer whether they can credibly articulate a material difference between their own counsel's use of these technologies and Marriott's use of them. Their inability to do so would be strong evidence against their claims against Marriott. The "substantial conflict" created by Defendants' conduct in making themselves necessary witnesses whose testimony will be "materially adverse" to the client's interest presents a conflict that is not waivable. MARPC r. 19-303.7 cmt. 6; Restatement § 108(3) cmt. f; *see also Klupt*, 126 Md. App. at 209.

66.    Unconflicted counsel who had not done what Hilliard and Sperling Kenny did would avoid this untenable conflict between client and counsel. Such counsel could provide conflict-free advice about whether to pursue pixel-privacy claims against Marriott, Hilliard and Sperling Kenny, both, or neither.

67.    The foreseeable overlap between Hilliard and Sperling Kenny's role as advocates and their role as necessary fact witnesses whose conduct their own clients must answer for will complicate discovery, generate motion practice, and risk distorting the evidentiary record across thousands of proceedings. Model Rules r. 1.7 cmt. 15, 3.7 cmt. 1; MARPC r. 19-301.7 cmt. 15 & cmt. 1; Ann. Model Rules of Pro. Conduct § 3.7 ("attorney-witness may not be a fully objective

witness, causing harm to the client's cause, or the trier of fact may grant undue weight to the attorney's testimony, unfairly disadvantaging the opposing party"). That harm cannot be cured if the arbitrations proceed with Hilliard and Sperling Kenny as claimants' conflicted counsel.

**F.    Hilliard and Sperling Kenny Proceed Despite Knowing of These Conflicts**

68.    Hilliard and Sperling Kenny proceeded with the mass arbitration despite knowing that their conduct created disqualifying conflicts of interest and made them necessary witnesses. That's because Marriott explained these issues to Defendants in writing before they filed the mass arbitration.

69.    On December 20, 2024, Hilliard and Sperling Kenny sent a demand letter to Marriott claiming to represent thousands of California residents who had visited Marriott's website and whose information Marriott "surreptitiously relayed, transmitted, and otherwise shared" to third parties through "pieces of electronic code" like the Meta Pixel. The letter alleged violations of CIPA and other laws and demanded that Marriott "cease and desist" its use of pixels. *See* **Exhibit B** at 3–5 (O'Connor Jan. 16, 2025, Ltr.). It further claimed that Marriott's Terms of Use "purport to require" users to submit "any dispute arising out of or related to the Sites" to arbitration before the AAA. Hilliard and Sperling Kenny sought discussions about a "global resolution" and threatened to file a mass arbitration if Marriott did not agree to resolve the purported claims. *Id.*

70.    Hilliard and Sperling Kenny sent a follow-up letter on January 16, 2025, stating that they continued to amass claimants. **Exhibit B** at 1–2. They repeated the CIPA allegations, demanded statutory damages of at least $5,000 per claimant, and threatened to "begin filing [their] clients' respective arbitration demands with the AAA pursuant to Marriott's Terms of Use" unless Marriott agreed to a mass settlement by the end of the month.

71.     After receiving Hilliard and Sperling Kenny's letters and reviewing the threatened arbitration demands, Marriott investigated their claims.

72.     On March 26, 2025, Marriott's counsel responded in writing, advising that Marriott had "confirmed that your clients have no viable claims against Marriott" and requesting that Hilliard and Sperling Kenny refrain from filing the threatened mass arbitration. *See* **Exhibit A**.

73.     For example, Marriott explained that its investigation showed that a substantial portion of the claimants had no arbitration agreement with Marriott at all. Marriott further explained that many other claimants had expressly consented to the alleged data-sharing practices by agreeing to Marriott's privacy policies, often repeatedly over many years when booking rooms.

74.     Marriott also explained that its investigation revealed that Hilliard and Sperling Kenny were using the very pixels they claimed were a crime on the websites they were using to solicit claimants.

75.     As Marriott explained, Hilliard and Sperling Kenny's use of pixels was indistinguishable from—and indeed, far more invasive than—the conduct they attribute to Marriott. Their websites urged visitors to submit information and file claims against Marriott on the premise that Marriott "broke the law by capturing" personal information "without . . . knowledge or consent" and "betray[ed] the trust" of consumers, even as their own websites used pixel technologies to collect and share data about those same individuals while they were seeking legal representation.

76.     Marriott further explained that, even though Defendants' conduct did not violate CIPA for the reasons described in the letter, it raised serious concerns because Defendants' solicitation websites appeared to transmit client and prospective-client information to third parties in connection with requests for legal representation.

77.    Marriott also identified additional websites operated by or on behalf of Hilliard Law—including Hilliard's own firm website—that appeared to use similar pixel technologies.

78.    Marriott told Defendants that their conduct had "created a direct, disqualifying conflict of interest." Marriott asked Defendants: "Will you advise your purported clients that you think they can pursue the same claims against your firm that you say they can pursue against Marriott?" **Exhibit A** at 7.

79.    Because Hilliard and Sperling Kenny's conduct made them foreseeable fact witnesses, Marriott advised them that it had preserved evidence concerning these practices and reminded Defendants of their obligation to do the same, "particularly because there may be relevant data about these websites that [Marriott] cannot locate or preserve." **Exhibit A** at 7.

80.    Marriott further explained that Hilliard and Sperling Kenny's threatened filing of thousands of arbitration demands—imposing millions of dollars in arbitration fees on Marriott regardless of the merits—would constitute "an abuse of the arbitration process" designed to coerce settlement rather than adjudicate bona fide disputes.

81.    Under these circumstances, Hilliard and Sperling Kenny's "substantive centrality to the issues in the case should have compelled [them] to back out at the beginning." *Abrishamian*, 216 Md. App. at 407–08. Responsible attorneys would have at least considered transferring their clients' cases to unconflicted counsel.

82.    Hilliard and Sperling Kenny proceeded anyway. ████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████

**G.    Hilliard and Sperling Kenny's Abusive Mass Arbitration Remains Pending**

83.    That mass arbitration remains pending, and Marriott has already been forced to devote substantial resources to responding to it.

84.    ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████

85.    Absent judicial intervention, Marriott will continue to incur substantial and escalating costs defending meritless claims in proceedings fundamentally tainted by Defendants' ethical conflicts and their role as necessary witnesses. The Court should disqualify Hilliard and Sperling Kenny and enjoin their continued prosecution of the mass arbitration.

## CLAIMS FOR RELIEF

**Count I: Disqualification of Conflicted Counsel to Redress Ongoing Harm to Adjudicative Proceedings**

86.    Marriott repeats and realleges the foregoing paragraphs.

87.    This Count is brought as a claim to redress the harm to Marriott arising from Defendants' conflicted participation in ongoing adjudicative proceedings that directly affect Marriott's rights. "[T]he decision on attorney disqualification [is] one for the court and not for the arbitration panel," *SITEL*, 2007 WL 9780537, at *3 (quoting *Action Air Freight*, 769 F. Supp. 899, 901), especially because such decisions "invoke the inherent power of courts" that are "based on common law principles that largely preceded the development of formal codes of professional conduct." *Lloyd v. Baltimore Police Dep't*, 729 F. Supp. 3d 494, 500 (D. Md. 2024) (quoting Hazard, *et al.*, *Law of Lawyering* § 11.13.2).

88.   Defendants violated settled law for multiple independent reasons.

89.   As discussed above, Defendants are necessary witnesses in the same mass arbitration they are prosecuting against Marriott—and they knew that before filing the mass arbitration. Because Defendants were "clearly aware before the fact of the potential conflict between [their] roles as advocate and witness," the "burden shifts" to Defendants "to avoid disqualification." *Klupt*, 126 Md. App. at 207–08 (quotations omitted).

90.   And because Defendants used the same tracking technologies they claim are a crime on their advertising websites to solicit their clients for a mass arbitration against Marriott, they have an incurable conflict of interest. By proving their clients' claims, Defendants would be proving claims—and alleged criminal liability—against themselves.

91.   The remedy for these violations, and the others discussed above, is disqualification.

### Count II: Declaratory Judgment

92.   Marriott repeats and realleges the foregoing paragraphs.

93.   Marriott seeks declaratory relief to clarify the parties' rights as necessary to effectuate the equitable relief sought in Count I.

94.   The Declaratory Judgment Act and the Maryland Uniform Declaratory Judgments Act provide the courts with the authority to declare the rights and other legal relations of the parties where an actual controversy exists. 28 U.S.C. § 2201; Md. Code Ann., Cts. & Jud. Pro. § 3-409(a).

95.   An actual, present, and substantial controversy exists between Marriott and Defendants regarding Defendants' ability to lawfully represent the nearly 7,000 individuals on whose behalf Defendants have initiated mass arbitration demands against Marriott.

96.   This controversy is immediate and non-speculative because Defendants chose to file a mass arbitration even though they knew about the disqualifying conflicts discussed above.

That mass arbitration is currently pending, although it is at the preliminary stages with no merits arbitrators appointed. No merits rulings have been made.

97.     As alleged above, Defendants used tracking technologies on their own client-solicitation websites to recruit claimants for the very privacy-based claims they now assert against Marriott. Under Defendants' own theory of liability, their conduct mirrors the conduct they characterize as unlawful when undertaken by Marriott. Defendants' conduct created several disqualifying conflicts of interest, violated the fundamental rules requiring loyal advocacy, and put nearly 7,000 claimants in an untenable position where answering questions about their own counsel's conduct will be adverse to their claims against Marriott in the mass arbitration.

98.     Because the conflict is non-waivable in these circumstances, continued representation of the nearly 7,000 claimants by Defendants is impermissible.

99.     This conflict also threatens the fair and efficient administration of the mass arbitrations at issue. Courts have recognized that they bear an essential responsibility to ensure that attorneys preserve public confidence in the integrity of the process. Defendants' conflicted representation violates settled law.

100.    Marriott seeks a declaration under 28 U.S.C. § 2201 resolving the parties' adverse legal interests and clarifying their rights and obligations. Such relief will serve a useful purpose in settling the legal issues presented and will terminate the uncertainty and controversy giving rise to this action.

101.    Specifically, Marriott seeks a declaration that:

(a) Defendants have a conflict of interest that precludes them from representing claimants in the underlying mass arbitration;

(b) Defendants may not continue to represent the nearly 7,000 claimants whose arbitration demands they have filed or threatened to file; and

(c) Any further representation of those claimants by Defendants would violate applicable rules and undermine the fair administration of the arbitration proceedings.

102.    Declaratory relief is proper because the controversy is concrete, immediate, and real; the parties have adverse legal interests; and the requested declaration will conclusively determine the parties' rights with respect to Defendants' conflict and disqualification, including (a) whether Marriott is required to defend thousands of proceedings advanced by counsel who are conflicted; and (b) whether Defendants' continued prosecution is incompatible with the requirements to protect the integrity of proceedings affecting Marriott.

### Count III: Injunctive Relief

103.    Marriott repeats and realleges the foregoing paragraphs.

104.    Federal courts have inherent authority to regulate the conduct of attorneys, including the power to disqualify attorneys whose conflicts of interest threaten the fairness, integrity, or efficiency of proceedings connected to the Court's jurisdiction. *See Shaffer Equip.*, 11 F.3d at 461–62. That authority includes the power to issue injunctive relief when violations endanger the integrity of proceedings connected to the Court's jurisdiction, including related arbitral proceedings.

105.    As alleged above, Defendants used tracking technologies on their own client-solicitation websites to recruit claimants for the very privacy-based claims they now assert against Marriott. Under Defendants' own theory of liability, their conduct mirrors the conduct they characterize as unlawful when undertaken by Marriott. Defendants' conduct created several

disqualifying conflicts of interest, violated the fundamental rules requiring loyal advocacy, and put nearly 7,000 claimants in an untenable position where answering questions about their own counsel's conduct will be adverse to their claims against Marriott in the mass arbitration.

106.    Although Hilliard and Sperling Kenny's clients have also suffered harm from their counsel's conduct, Marriott seeks injunctive relief to redress its own concrete injuries arising from Defendants' conflicted prosecution of thousands of arbitration demands.

107.    The continued representation of the nearly 7,000 claimants by conflicted counsel threatens irreparable harm to Marriott, including the risk of tainted arbitral proceedings, distorted claims adjudication, and the coercive use of massive filing fees and procedural leverage (such as the ongoing costs associated with the mass arbitration proceedings). These harms are occurring now: ███████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████

108.    Monetary damages cannot remedy these harms. The injuries at issue concern the propriety of counsel's representation, the integrity of mass arbitration proceedings, and the protection of thousands of individuals' rights to unconflicted representation, none of which can be adequately remedied at law. Moreover, the costs and disruptions at issue, including front-loaded arbitration fees, accelerated defense costs, and procedural unfairness cannot be unwound after thousands of proceedings move forward.

109.    The injunctive relief Marriott seeks will directly redress these harms by preventing Defendants from continuing to prosecute the arbitration demands while operating under an incurable conflict, thereby maintaining the status quo and protecting Marriott from the continued

coercive imposition of front-loaded arbitration costs and from the risk that thousands of proceedings will be shaped, managed, or adjudicated under the direction of conflicted counsel.

110.    Marriott is therefore entitled to injunctive relief under Rule 65 of the Federal Rules of Civil Procedure, both to preserve the status quo pending adjudication of this action and to permanently enjoin Defendants from continuing conflicted representation.

111.    Marriott also seeks permanent injunctive relief under 28 U.S.C. § 2202, which authorizes "further necessary or proper relief" to enforce and give full effect to the declaratory judgment sought in Count II.

## PRAYER FOR RELIEF

WHEREFORE, Marriott respectfully requests that the Court enter judgment in its favor and grant the following relief:

1.    A declaration pursuant to 28 U.S.C. § 2201 that:

    a.    Defendants have a conflict of interest that precludes them from representing claimants in the underlying mass arbitration;

    b.    Defendants may not continue to represent the nearly 7,000 claimants whose arbitration demands they have filed or threatened to file; and

    c.    Defendants' continued representation of those individuals would violate applicable rules and undermine the fair and efficient administration of the related arbitration proceedings.

2.    Temporary, preliminary, and permanent injunctive relief pursuant to Rule 65 of the Federal Rules of Civil Procedure, 28 U.S.C. § 2202, and the Court's inherent authority:

    a.    Immediately enjoining Defendants from further prosecuting, advancing, or participating as counsel in any pending arbitration proceedings against

Marriott on behalf of the nearly 7,000 claimants referenced above, and staying those proceedings as necessary pending resolution of this action;

b.    Permanently enjoining Defendants from representing, directly or indirectly, any of those claimants in any arbitration, litigation, or other proceeding against Marriott; and

c.    Requiring Defendants to withdraw as counsel from all pending arbitration demands they have filed or caused to be filed on behalf of those claimants so those claimants may have the opportunity to obtain loyal, unconflicted counsel.

3.   Marriott's attorneys' fees for this action and for defending the underlying mass arbitration.

4.   Such other and further relief—legal or equitable—as the Court deems just, proper, and necessary to protect the integrity of the proceedings and the rights of all affected parties.

*[Signature on following page.]*

Dated: March 3, 2026

**WATSTEIN TEREPKA LLP**

*/s/ James Ruley*

Alex Terepka (*pro hac vice* forthcoming)
James Ruley (Bar No. 1712140150)
Logan Leonard (*pro hac vice* forthcoming)
Rebecca Rhym (*pro hac vice* forthcoming)
**WATSTEIN TEREPKA LLP**
75 14th Street NE, Ste. 2600
Atlanta, Georgia 30309
(213) 839-3317
alex@wtlaw.com
jruley@wtlaw.com
lleonard@wtlaw.com
rrhym@wtlaw.com

*Attorneys for Plaintiff*
*Marriott International, Inc.*

# Exhibit A

**WATSTEIN**
**TEREPKA** LLP

Alex Terepka
Alex@wtlaw.com
213-839-3317

March 26, 2023

<u>**VIA EMAIL**</u>
Benjamin R. O'Connor
Hilliard Law
719 S. Shoreline Blvd.
Corpus Christi, TX 78401
boconnor@hilliard-law.com

      **Re:    Your Threat to Bring a Mass Arbitration Against Marriott**

Ben,

      We write to respond to the CIPA claims outlined in your letters dated December 10, 2024, and January 16, 2025, and your draft arbitration demand. We have investigated and have confirmed that your clients have no viable claims against Marriott. We therefore request that you refrain from filing the threatened mass arbitration.

      Your letters and draft demand assert that Marriott's website collected your clients' personal information through "pieces of electronic code," including the Meta Pixel, and shared that information with "one or more companies, including Meta/Facebook" without their consent, allegedly violating the California Invasion of Privacy Act ("CIPA"). You further contend that these claims are subject to arbitration under Marriott's Terms of Use.

      Based on this, you threaten to initiate nearly 4,000 individual arbitration demands, which would impose millions of dollars in arbitration fees on Marriott regardless of the merits of your client's claims. That is an intentional abuse of the arbitration process "geared more toward racking up procedural costs to the point of forcing [Marriott] to capitulate to a settlement than proving the allegations of [CIPA violations] to seek appropriate redress on the merits." *Jones v. Starz Ent., LLC*, 2025 WL 649705, at *6 (9th Cir. Feb. 28, 2025).

      Your threat to file a mass arbitration is especially abusive because you are representing purported clients who have no good faith basis to assert any claims against Marriott in arbitration. For example, many do not have an enforceable arbitration agreement with Marriott. They thus have no good faith basis to initiate any arbitration. A preliminary review of the list of purported clients you sent shows that for a substantial portion of them, Marriott has no record that they interacted with the company in a way that could create an enforceable arbitration agreement (such as making a hotel reservation or joining Marriott's loyalty program). *See, e.g., Watkins v. Carr*, 2018 WL 10741730, at *3-4 (D. Md. Jan. 12, 2018) (no arbitration agreement formed where "website users not required to click on the link to the page containing terms of use, nor required to

---

**Atlanta**
1055 Howell Mill Road, 8th Floor
Atlanta, GA 30318

**Los Angeles**
515 S. Flower Street, 19th Floor
Los Angeles, CA 90071

**Miami**
218 NW 24th Street, 3rd Floor
Miami, FL 33127

 **www.wtlaw.com**

 Alex@wtlaw.com

 213-839-3317

read or assent to the terms of use in order to have access to website content"). This group of purported clients may not have interacted with the company at all or even visited its website.

That is just one example of your purported clients that have no good faith basis to assert claims against Marriott. Another example includes former Marriott guests, loyalty program members, or both, who consented to the alleged information sharing. Consent defeats all of the alleged claims. *Maghen v. Quicken Loans*, 680 F. App'x 554, 556 (9th Cir. 2017) (unpublished) (affirming denial of CIPA claim where plaintiff "demonstrated his consent" to conduct at issue); *Moledina v. Marriott Int'l,* 635 F. Supp. 3d 941, 953 (C.D. Cal. 2022) (dismissing CIPA claims based on plaintiff's consent). Many of your purported clients consented to Marriott's Privacy Statement (available at https://www.marriott.com/about/privacy.mi) in a variety of ways, like making hotel reservations or joining the rewards program.

Marriott's Privacy Statement provides: "[Marriott] may use Advertising Partners and other third-party advertising companies to serve advertisements on [its] Websites, Apps, and other websites regarding both Marriott and third-party goods and services that may interest you when you access and use the Online Services[.] To serve such advertisements, these companies place or recognize a unique cookie on your browser (including through use of pixel tags)." The Privacy Statement also informed your purported clients that "[Marriott collects] data through third-party services and products . . . which use cookies and technologies to collect and analyze data about use of the Online Services. These services also collect Data regarding the use of other websites, apps, and online resources." *Id.* The Privacy Statement further notified your purported clients that Marriott "disclose[s] Personal Data and Other Data to third-party service providers, including, for example, companies that provide website hosting, automated chat functionalities or AI-powered technologies, data analysis, payment processing, order fulfillment, information technology and related infrastructure provision, customer service, email delivery, marketing auditing, and other services."

Accordingly, prior Marriott hotel guests and loyalty program members consented to the alleged sharing of their data via Meta Pixel and other technologies long before their claims could have arisen. They thus have no viable claims under CIPA. *Smith v. Facebook, Inc.*, 745 F. App'x 8, 9 (9th Cir. 2018) (unpublished) (affirming dismissal of CIPA claim on consent grounds); *In re Yahoo Mail Litig.*, 7 F. Supp. 3d 1016, 1028–32 (N.D. Cal. 2014) (dismissing federal wiretap claim on consent grounds). In fact, many of your purported clients have made dozens of reservations over the years, consenting to Marriott's privacy policies at least as many times along the way. And many enrolled in Marriott's loyalty program years ago, again consenting to Marriott's privacy policies. These purported clients have no good faith basis to claim that Marriott "secretly install[ed] and us[ed] pixels and other technologies within its Site" (Demand ¶ 7); that it "surreptitiously relays Information to other companies" (*id.* ¶ 5); or that it "misl[ed] users as to whether and how it shares, or permits others to intercept, their Information" (*id.* ¶ 48)—especially where they consented to such information sharing over and over again. The same holds true for any of your purported clients who consented even once.

In sum, most—if not all—of your purported clients have no good faith basis to assert claims against Marriott in arbitration. They either have (a) no arbitration agreement with Marriott or (b) consented to any alleged information sharing by making reservations, joining the rewards program, and more before their claims arose.

March 26, 2025
Page 3 of 7

Next, the claims also fail because no interception occurred while the information was in transit. *See, e.g., Griffith v. TikTok, Inc.*, 2024 WL 5279224, at *10 (C.D. Cal. Dec. 24, 2024) (granting summary judgment to defendant on that basis); *Esparza v. Gen Digital Inc.*, 2024 WL 655986, at *4 (C.D. Cal. Jan. 16, 2024) (dismissing CIPA claim on that basis) (collecting cases).

The above confirms that you have no good faith basis to proceed with an abusive mass arbitration because your purported clients have no claims. But there is more. Your firm is doing far worse than you allege to its own purported clients. Your websites soliciting clients use the same pixels your purported clients allege violate CIPA. To take one example of such a website, your firm is using "The Money Team Law Firm" website promoted by famous boxer Floyd Mayweather to solicit clients to bring claims against Marriott. Below is a screenshot of part of that webpage.



There is no doubt that this is your firm's webpage because you included pictures of you and your team farther down on the same page, as shown in the screenshot below:



March 26, 2025
Page 4 of 7

Your webpage's source code indicates that your firm uses PixelYourSite Professional, which touts itself as "probably the most complex tracking tool for WordPress, managing the Facebook Pixel (now the Meta Pixel), Google Analytics, Google Ads Remarketing, Pinterest Tag, Bing Tag, the TikTok Tag, and virtually any other script." *See* https://www.pixelyoursite.com. PixelYourSite allows users to "[t]rack multiple tags with a single plugin," including "Meta Pixel (formerly the Facebook Pixel), Facebook Conversion API (CAPI), Google Analytics, Google Ads Remarketing, Pinterest, Bing, TikTok Tag with API, and ANY script." *See* https://www.pixelyoursite.com/plugins/pixelyoursite-professional.



March 26, 2025
Page 5 of 7

Your webpage's source code has these pixels, as shown below. For example, here's the Meta pixel code:



Here's the TikTok pixel code:



March 26, 2025

Page 6 of 7

And here's another Meta pixel code and Google tag manager code:



In other words, your Money Team website uses the same pixels that you claim violate CIPA. Your demand alleges that "Marriott built into its Site one or more pieces of code, including one called the 'Meta Pixel,' that monitored and intercepted communications submitted by Claimant and others to Marriott using the Site." Demand ¶ 4. It further contends that "[b]y secretly installing and using pixels and other technologies within its Site, Marriott is (1) wiretapping its users itself, (2) facilitating wiretapping and eavesdropping of its users' Information, or (3) both." *Id.* ¶ 7.

By the terms of your own demand, your firm's conduct is far worse than what you claim Marriott did, for multiple independent reasons. You are luring people to make meritless claims that Marriott "broke the law by capturing" their "personal information without [their] knowledge or consent" and "betray[ed] the trust of those who relied on them." *See* https://legalsettlementexperts.com/marriott-v2/. Yet your Money Team website is using the same "pixels and other technologies" you contend are somehow a "betrayal" of trust.

Worse still, your webpage's pixels are sharing data about your purported clients with third parties *while they are requesting legal advice* from you. That does not violate CIPA for the reasons discussed above. But it does violate the Rules of Professional Conduct because your websites are using pixels to share client information with third parties. *See, e.g.*, Tex. Comm. Prof'l Ethics, Op. 673 (2018) (concluding that even inadvertently identifying clients without their consent during an informal lawyer-to-lawyer consultation for the benefit of such clients may violate the Texas Disciplinary Rules of Professional Conduct); Ill. R. Prof'l Conduct 1.6 ("A lawyer shall not reveal

March 26, 2025
Page 7 of 7

information relating to the representation of a client unless the client gives informed consent . . . .”); ISBA Advisory Ops. Prof’l Conduct No. 97-01 (“No person who engages the services of a lawyer would assume that the lawyer would then offer their name to outside entities as potential customers. Many users of legal services would not want it known that they need legal services. Thus, it would be a breach of confidentiality.”).

Your conduct has also created a conflict of interest, as this question illustrates: Will you advise your purported clients that you think they can pursue the same claims against your firm that you say they can pursue against Marriott? Regardless of the answer, you have created a direct, disqualifying conflict of interest. *See, e.g.*, ABA Model Rule 1.7(a) (Rule against concurrent conflicts of interest, including those that involve the lawyer’s conduct).

Your Money Team website is just one example of your firm using pixels. We found at least one other website of yours soliciting clients, www.privacyviolationclaim.com, doing the same thing. And your firm’s website, www.hilliard-law.com, appears to have used pixels and similar technologies, as well. We have preserved information about these websites. You are required to do the same, particularly because there may be relevant data about these websites that we cannot locate or preserve.

Your websites soliciting clients explain how you have nearly 4,000 purported clients with meritless claims. Based on the significant number of individuals with no reservation history at Marriott, it appears you are accepting as a purported client anyone who fills out a web form with no vetting or verification. That confirms your threat to bring a mass arbitration is improperly “geared more toward racking up procedural costs to the point of forcing [Marriott] to capitulate to a settlement than proving the allegations of [CIPA violations] to seek appropriate redress on the merits.” *Jones*, 2025 WL 649705, at *6.

These are just some of the deficiencies in the draft arbitration demand that Marriott has identified so far. We understand you may not have had all of this information when you threatened to initiate a mass arbitration. However, you now have enough information to know that there is no good-faith basis to further pursue this action against Marriott. *See, e.g.*, AAA MA-2 (mass arbitration filings “must include an affirmation” from claimant’s counsel “that the information provided for each individual case is true and correct”); Fed. R. Civ. Proc. 11(b) (attorney must certify that claims “not being presented for any improper purpose,” such as “needlessly increase[ing] the cost of litigation”). We therefore request that you refrain from filing the threatened mass arbitration, such that our client does not have to incur any further expenses associated with this matter. Marriott reserves all rights to seek an award of its attorneys’ fees and costs incurred in this matter, and to assert counterclaims.

Sincerely,

*/s/ Alex Terepka*

Alex Terepka

cc:    Trevor Scheetz (tscheetz@sperlingkenny.com)
       Ryan Watstein (ryan@wtlaw.com)
       Abigail Howd (ahowd@wtlaw.com)

# Exhibit B



# HILLIARD
### LAW

January 16, 2025

<u>**Via U.S. Mail and Email**</u>

Marriott Law Department
Marriott International, Inc.
Attn: Rena Reiss, General Counsel
rena.reiss@marriott.com
10400 Fernwood Road
Department 52/923.30
Bethesda, MD 20817

> **RE:   *Notice of Claims Regarding Marriott's Breach of Customer Data Privacy***

Ms. Reiss/To Whom It May Concern:

I write to follow up on my prior correspondence, mailed on December 20, 2024. A copy of that letter is enclosed. As set forth therein, my firm represents more than 3,200 individuals (the number has risen since my last letter and continues to do so) who intend to assert claims against Marriott International, Inc. ("Marriott"). Our clients are California residents who used Marriott's online platform (the "Website"). Unbeknownst to our clients, and while they were using the Website, Marriott surreptitiously relayed, transmitted, and otherwise shared their personal information to and with a number of social media and advertising companies. Marriott's actions violated the law, including the California Invasion of Privacy Act, Cal. Penal Code § 630 *et seq.* ("CIPA"). Notably, under CIPA, our clients are entitled to recover $5,000 for each instance in which Marriott surreptitiously and without consent relayed their information to others, and we and our clients are informed and believe that Marriott committed several violations against each of our clients.

Marriott's Terms of Use purport to require our clients to submit their disputes for resolution via arbitration before the American Arbitration Association. We intend to do so in short order. But before we do so, we are reaching out to ask whether Marriott would like to discuss a resolution of our clients' claims without the need for litigation. **Please advise whether Marriott would like to discuss resolution of our clients' claims. If we do not hear from Marriott about any such discussion by <u>January 31, 2025</u>, we will begin filing our clients' respective arbitration demands with the AAA pursuant to Marriott's Terms of Use.** For the avoidance of doubt, our clients do not concede that Marriott's arbitration terms are valid or enforceable, and our clients reserve all rights.

By this and my prior letter, we also demand that Marriott cease and desist from relaying our clients' personal information to other companies without our clients' consent. And we again ask that Marriott preserve, and not destroy, any and all documents, records, information and other materials that may bear on our clients' claims.



Again, on behalf of our clients, we hope to hear from you soon in an effort to resolve our clients' claims without the need for formal proceedings.

Sincerely,

Benjamin R. O'Connor
Hilliard Law
boconnor@hilliard-law.com
312-858-6555

Enclosure



**HILLIARD**
LAW

December 20, 2024

<u>V<small>IA</small> U.S. M<small>AIL</small></u>

Marriott Law Department
Marriott International, Inc.
Attn: Rena Reiss, General Counsel
10400 Fernwood Road
Department 52/923.30
Bethesda, MD 20817

> **RE:   *Notice of Claims Regarding Marriott's Breach of Customer Data Privacy***

Ms. Reiss/To Whom It May Concern:

Our firm represents in excess of 2,200 clients who have used Marriott International Inc.'s ("Marriott") online platform (the "Website"). Our clients are California residents who, among other things, used Marriott's Website to search for and make reservations at one or more Marriott properties. We have come to learn that—unbeknownst to our clients, and without their consent— Marriott surreptitiously relayed, transmitted, and otherwise shared their personal information to and with a number of social media and advertising companies. Marriott's conduct violates California and federal law, and our clients seek compensation from Marriott for its illegal conduct.

Specifically, we believe that Marriott designed the Website in a way that includes one or more pieces of electronic code that caused our clients' personal information to be relayed, without their knowledge or consent, to one or more other companies, including but not limited to Meta/Facebook (the "Conduct"). Our clients used the Marriott Website and, upon information and belief, were subjected to this Conduct. Marriott's Conduct is a violation of the law, including without limitation the California Invasion of Privacy Act, Cal. Penal Code § 630 *et seq.* ("CIPA"). Marriott's Conduct also constitutes common-law negligence.

Importantly, Section 631 of CIPA forbids interception of communications without the consent of all parties. The relevant provision reads in full:

> Any person who, by means of any machine, instrument, or contrivance, or in any other manner, intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively, or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system, or who willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or who uses, or attempts to use, in any manner, or for any purpose, or to



communicate in any way, any information so obtained, or *who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section*, is punishable by a fine not exceeding two thousand five hundred dollars ($2,500), or by imprisonment in the county jail not exceeding one year, or by imprisonment pursuant to subdivision (h) of Section 1170, or by both a fine and imprisonment in the county jail or pursuant to subdivision (h) of Section 1170.

Cal. Penal Code § 631(a) (emphasis added). CIPA also forbids aiding, agreeing with, employing, or conspiring with any person to unlawfully cause or permit interception of communications by someone else without the consent of all parties thereto. *See id.* Marriott's Conduct described above constitutes such aiding, agreeing with, employing, or conspiring with another person—the companies to whom our clients' information was relayed, transmitted, or otherwise sent—to unlawfully cause or permit interception of such communication without our clients' consent. The programming underlying Marriott's Website also constitutes an improper "pen register" and/or "trap-and-trace" device, and Marriott's Conduct violates CIPA in this regard as well. *See* Cal. Penal Code §§ 638.50–638.51.

Under CIPA, our clients are entitled to recover $5,000 for each instance in which Marriott surreptitiously and without consent relayed their information to others. *See* Cal. Penal Code § 637.2(a). We and our clients are informed and believe that Marriott has committed several violations against each of our clients, and we anticipate that the precise number of violations can be identified through discovery, if needed, which we expect will confirm that Marriott may have committed more violations—perhaps myriad more—against certain or all of our clients.

Marriott's Terms of Use purport to require our clients to submit "any dispute arising out of or related to the Sites" for resolution via arbitration before the American Arbitration Association. We are prepared to litigate—and, if needed, try—our clients' claims, whether in arbitration or otherwise. Before we file claims on behalf of our clients, we are reaching out to ask whether Marriott would like to discuss a resolution of our clients' claims. **Please advise whether Marriott would like to discuss resolution of our clients' claims.**

By this letter, we also demand that Marriott cease and desist from relaying our clients' personal information to other companies without our clients' consent. We also ask that Marriott preserve, and not destroy, any and all documents, records, information and other materials that may bear on our clients' claims.

On behalf of our clients, we hope to hear from you soon in an effort to resolve our clients' claims without the need for formal proceedings.



Sincerely,

Benjamin R. O'Connor
Hilliard Law
boconnor@hilliard-law.com
312-858-6555