### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MARYLAND
### SOUTHERN DIVISION

| | | |
|---|---|---|
| **MARRIOTT INTERNATIONAL, INC.** | : | |
| 7750 Wisconsin Avenue | : | |
| Bethesda, Maryland 20814 | : | |
| Montgomery County | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| **SPERLING KENNY NACHWALTER,** | : | **Civil Action No. 1:26-cv-900-MJM** |
| **LLC** | : | |
| 321 North Clark Street, 25th Floor | : | |
| Chicago, Illinois 60654 | : | |
| | : | |
| & | : | |
| | : | |
| **HILLIARD, MARTINEZ & GONZALES,** | : | |
| **LLP, d/b/a HILLIARD LAW** | : | |
| 719 S. Shoreline Boulevard, Suite 100 | : | |
| Corpus Christi, Texas 78401 | : | |
| | : | |
| Defendants. | : | |

### MARRIOTT'S MOTION TO DISQUALIFY DEFENDANTS[1]

Plaintiff Marriott International, Inc. ("Marriott") moves the Court to disqualify Defendant law firms Sperling Kenny Nachwalter, LLC ("Sperling Kenny") and Hilliard, Martinez & Gonzales, LLP, d/b/a Hilliard Law ("Hilliard") from their representation of claimants in *Individual Claimants v. Marriott International, Inc.*, AAA Case No. 01-25-0003-2151, a mass arbitration proceeding currently pending before the American Arbitration Association (AAA). The accompanying Memorandum in Support sets forth the legal and factual basis for this Motion.

---

[1] Defendant Sperling Kenny has obtained counsel, who indicated by email on March 11 that they would accept service for their client. Defendant Hilliard Law also has obtained counsel, who similarly indicated by email on March 16 that they would accept service for their client.

**MARRIOTT'S MEMORANDUM OF LAW
IN SUPPORT OF ITS MOTION TO DISQUALIFY DEFENDANTS**

**TABLE OF CONTENTS**

I.  INTRODUCTION ................................................................................................1

II.  FACTUAL BACKGROUND ...........................................................................5

    A.  Marriott's Website Respects Privacy Choices ........................................5

    B.  Plaintiff-Side Firms File a Wave of Meritless CIPA Claims ..................5

    C.  Hilliard and Sperling Kenny File an Abusive Mass Arbitration.............7

    D.  Hilliard and Sperling Kenny Create Disqualifying Conflicts by Using the Same Pixels on Their Clients—While Disregarding Their Privacy Choices ..........9

    E.  Hilliard and Sperling Kenny Make Themselves Material Witnesses ....................13

    F.  Hilliard and Sperling Kenny Proceed Despite Knowing of These Conflicts ........15

    G.  Marriott Seeks Disqualification While the Abusive Mass Arbitration Is Just Beginning ..........................................17

III.  LEGAL STANDARD ......................................................................................18

    A.  Courts' Inherent Authority to Ensure the Integrity of Arbitration Proceedings ....18

    B.  Standing to Raise Conflicts of Interest ................................................19

    C.  Standard Governing Motions to Disqualify .........................................20

IV.  ARGUMENT ..................................................................................................21

    A.  The Court Should Disqualify Hilliard and Sperling Kenny Under the Attorney-Witness Rule (Rule 3.7)..........................21

    B.  The Court Should Disqualify Hilliard and Sperling Kenny Under the Material-Limitation Rule (Rule 1.7) ......................25

V.  CONCLUSION ................................................................................................29

I.      INTRODUCTION

This action arises from Defendants' breach of the fundamental professional duties that anchor our justice system. That system requires steadfast loyalty to clients "free from conflicts of interest." *Stephens v. Branker*, 570 F.3d 198, 208 (4th Cir. 2009). A lawyer is "legally and ethically required to be loyal to client interests, as distinct from his [or her] own." *Nat'l Sec. Couns. v. CIA*, 811 F.3d 22, 30 (D.C. Cir. 2016). The "very nature of the court as an institution" makes these rules essential. *United States v. Shaffer Equip.*, 11 F.3d 450, 461–62 (4th Cir. 1993).

The Defendants are two law firms, Hilliard and Sperling Kenny, that egregiously violated basic principles against counsel representing clients with conflicts of interest. They solicited thousands of consumers to bring California Invasion of Privacy Act (CIPA) claims against Marriott based on Marriott.com's alleged use of standard website technology, including the Meta Pixel. Their attorney-advertising websites claimed Marriott "broke the law by capturing" website visitors' "personal information without [their] knowledge or consent" and "betray[ed] the trust of those who relied on them." They urged visitors to "JOIN THE FIGHT!" against Marriott so Hilliard and Sperling Kenny could "Step into the Ring and Stand Up for Your Right to Privacy!"

But Hilliard and Sperling Kenny concealed a critical fact from their clients: They used *the same pixels* "with more invasive configurations" in online interactions with the same individuals—*their own clients*. *See* **Exhibit 1**, Decl. of Ron Schnell ("Schnell Decl.") ¶¶ 20–25. On their attorney-advertisement websites, they used pixels that shared with third parties information prospective clients submitted while seeking legal representation, including their names, contact information, and descriptions of their claims. Hilliard and Sperling Kenny also used the information their clients submitted to target social media ads at other California residents and draw even more consumers to their solicitation websites. In this way, Hilliard and Sperling Kenny amassed thousands of claimants for a mass arbitration against Marriott.

1

Hilliard and Sperling Kenny's conduct created a disqualifying conflict under settled law, as this question illustrates: Did they tell their clients that, under their own theory of liability, their clients could bring the same claims against them—their own counsel? That is like a prosecutor pursuing charges while committing the same alleged crime. The rules of ethical attorney conduct and disqualification exist for this very purpose: to "ensur[e] that a litigant's claims or defenses are not refracted through the multifaceted prism of an attorney's conflicts." *CytImmune Scis. v. Paciotti*, 2017 WL 57213, at *7 (D. Md. Jan. 5, 2017).

Marriott explained these issues to Hilliard and Sperling Kenny, repeatedly and in writing, before they filed. That "should have compelled [them] to back out at the beginning." *Abrishamian v. Wash. Med. Grp., P.C.*, 216 Md. App. 386, 407–08 (2014). But Hilliard and Sperling Kenny did not withdraw to allow their clients to seek unconflicted counsel. They instead filed nearly 7,000 copy-paste demands accusing Marriott ██████████████████████████ ████████████████████████████ **Exhibit 2**, Decl. of Alex Terepka ("Terepka Decl.") Ex. A, Amended Demand ¶¶ 6–7. Across those thousands of demands, Hilliard and Sperling Kenny included no claimant-specific facts other than the claimant's name—an intentional abuse of the arbitration process "geared more toward racking up procedural costs to the point of forcing [Marriott] to capitulate to a settlement than proving the allegations of [CIPA violations] to seek appropriate redress on the merits." *Jones v. Starz Ent.*, 129 F.4th 1176, 1183 (9th Cir. 2025).

To be clear, Marriott firmly believes its use of pixels is entirely lawful and that its conduct does not violate any law. *See, e.g.*, *Doe v. Eating Recovery Center*, 809 F. Supp. 3d 1109, 1118–19 (N.D. Cal. 2025); *see also Arndt v. Gov't Emp. Ins.*, 750 F. Supp. 3d 518 (D. Md. 2024) (Maddox, J.) (dismissing website tracking claims because there was no injury to support standing). But

attorneys are different. They are subject to sacrosanct rules of professional ethics that hold attorneys to the highest standards of loyalty to their clients. Defendants—two law firms—violated those rules here. They lured their own clients to make meritless claims that Marriott "betray[ed]" them by using pixels they claim are a crime. All the while, Hilliard and Sperling Kenny concealed from their clients that they used the same pixels in a more invasive way when their clients were seeking legal advice from them.

Hilliard and Sperling Kenny's conduct compromised the integrity of nearly 7,000 cases in the mass arbitration from the very beginning. Hilliard and Sperling Kenny could never give their clients unconflicted advice about whether to pursue claims against their own lawyers. That poses a direct and unwaivable conflict of interest. *See* **Exhibit 3**, Decl. of Michael McCabe, Jr. ("McCabe Decl.") ¶¶ 108–09, 126, 171, 186.

Hilliard and Sperling Kenny also made themselves "necessary witnesses" in their clients' cases. *Id.* ¶¶ 178–88. Their testimony about their own attorney-advertising websites bears on the credibility of their clients' claims, the propriety of the equitable remedies they demand, and the viability of defenses such as notice and consent that both they and Marriott would predictably raise. *See id.* ¶¶ 186–87; Model Rule 3.7(a); Maryland Rule 19-303.7(a).

Hilliard and Sperling Kenny thus put their own nearly 7,000 purported clients in an untenable position: They "must answer questions about their own counsel's conduct, and the answers may be adverse to their claims." McCabe Decl. ¶ 188. Can any of them "credibly articulate a material difference between their own counsel's use of these technologies and Marriott's use of them"? *Id.* Their failure to do so would weigh strongly against their claims against Marriott in the mass arbitration. *See id.*

Defendants' resulting dual roles as advocates and witnesses whose testimony is adverse to

their clients' interests pose a substantial risk of prejudice to both their clients and to Marriott. *See id.* ¶¶ 186–87. That prejudice violates basic rules of attorney ethics and calls into question the integrity of the arbitration process. *See id.* ¶ 96; Ann. Model Rules of Prof. Conduct § 3.7 (10th ed. 2023); *see also* 69 Am. Jur. *Trials* 411, § 23 (1998) (testimony is "prohibited" under Model Rule 3.7 where the lawyer "was an actor whose participation in the underlying matter is material.")

Marriott now seeks to disqualify Defendants as counsel in the mass arbitration. Marriott seeks that relief here because "the decision on attorney disqualification [is] one for the court and not for the arbitration panel." *SITEL v. Stonebridge Life Ins.*, 2007 WL 9780537, at *3 (D. Md. July 23, 2007) (citing *Action Air Freight v. Pilot Air Freight*, 769 F. Supp. 899, 901 (E.D. Pa. 1991)). That is especially true here because it is undisputed that Marriott and Defendants never entered any agreement "designating attorney disqualification as a matter for arbitration." *Id.*

Marriott also filed this action and this motion at an early stage of the mass arbitration. The AAA is still deciding whether Claimants have met the threshold requirements to initiate arbitration. The AAA has not begun to adjudicate the merits of even one of the nearly 7,000 demands.

As discussed in detail below, the unethical conflicts Hilliard and Sperling Kenny created are "such as clearly to call in question the fair and efficient administration of justice." *Gross*, 307 F. Supp. 2d at 723. The rules do "not permit retaining an attorney with a potential conflict of interest raising the appearance of impropriety." *SEC v. Merrill*, 2019 WL 430853, at *4 (D. Md. Feb. 1, 2019). Defendants have ignored these basic rules against conflicted representation by perpetrating the same alleged "crime" on their own clients they say Marriott committed. Marriott's motion to disqualify should be granted.

4

## II.    FACTUAL BACKGROUND

### A.    Marriott's Website Respects Privacy Choices

Marriott operates one of the world's leading hospitality businesses. Through its website, Marriott.com, guests can research destinations, search for rooms, book stays, and manage reservations across more than 30 brands and over 9,700 properties in 143 countries and territories. Like virtually all modern consumer websites, Marriott.com uses standard third-party website technologies, including cookies and pixels, to support routine functions such as analytics and advertising.

Marriott is transparent about these practices and takes visitors' privacy preferences seriously. Its privacy policies inform visitors that the website uses "Cookies and Similar Technologies," including "pixel tags" for advertising, analytics, and related purposes. The policies explain how these technologies operate and offer users clear privacy controls, including through browser settings and Marriott's "Tracking Preferences" and "Privacy Center" pages. Marriott also recognizes and honors universal opt-out signals some visitors install on their browsers.

Visitors consent to Marriott's privacy policies by using its website. *See, e.g., Calhoun v. Google*, 349 F.R.D. 588, 595–98 (N.D. Cal. 2025) (consent to privacy policy with relevant disclosures defeats CIPA claims). Those who complete a transaction on Marriott's website also expressly consent by agreeing to its terms, which incorporate the privacy policies. *See id.*

### B.    Plaintiff-Side Firms File a Wave of Meritless CIPA Claims

In recent years, certain plaintiff-side firms have filed a wave of claims against businesses with consumer-facing websites under the California Invasion of Privacy Act (CIPA), a 1967 statute that criminalizes physically "tapping" telephone wires to eavesdrop on conversations. These firms claim that the routine use of widely adopted website technologies like cookies and pixels amounts to criminal "wiretapping" within the meaning of that decades-old statute. Using these claims, these

5

firms have mass-produced thousands of lawsuits and arbitrations alleging that something as simple as a voluntary visit to a company's website exposes the company to criminal liability and tens of thousands of dollars in statutory damages for each voluntary website visit.

Firms bringing frequent CIPA claims "primarily focus on sending a high volume of templated demand letters that are designed to trigger costly settlements before a case is filed." Allison Grande, *4 Firms Fueling Website Tracking Claims, Cyber Insurer Says*, Law360 (Nov. 5, 2025), https://www.law360.com/articles/2407428/4-firms-fueling-website-tracking-claims-cyber-insurer-says (quotations omitted). "[Their] playbook appears to involve sending the same demand letter to multiple businesses," which "often outline allegations concerning violations of [CIPA] based on the use of tracking technologies provided by TikTok, LinkedIn, X, and data brokers (among others)." *Id.* But "CIPA is a criminal statute that was enacted nearly 60 years ago to address telegraph and telephone wiretapping. CIPA's terms 'tap,' 'wire,' 'in transit' and 'read' were conceived for analog line interception, not encrypted browser-to-server interactions." David Wheeler, *Privacy Ruling Shows How CIPA Conflicts With Modern Tech*, Law360 (Jan. 30, 2026), https://www.law360.com/articles/2432218/privacy-ruling-shows-how-cipa-conflicts-with-modern-tech (footnotes omitted).

Recent federal authority has rejected that theory. For example, a federal court dismissed such allegations in *Doe v. Eating Recovery Center*, explaining that CIPA "was drafted with very different technology in mind" and "does not map properly onto the internet." 809 F. Supp. 3d at 1117. Because CIPA is a penal statute to which the rule of lenity applies, all "courts should generally resolve CIPA's many ambiguities in favor of the narrower interpretation." *Id.* at 1112. The court therefore held that pixels did not constitute interception "while in transit" under CIPA. *Id.* at 1117.

6

And rightly so. Pixels are merely requests to a website visitor's browser to voluntarily share anonymized, encrypted metadata about a visit. The Third and Ninth Circuits have thus likewise held that technologies like the Meta Pixel do not intercept communications within the meaning of CIPA. *See Cole v. Quest Diagnostics*, 2025 WL 3172640, at *3 (3d Cir. Nov. 13, 2025); *Karwowski v. Gen Digit.*, 2025 WL 3002610, at *2 (9th Cir. Oct. 27, 2025) (mem.); *Arndt*, 750 F. Supp. 3d 518.

### C.    Hilliard and Sperling Kenny File an Abusive Mass Arbitration

Hilliard and Sperling Kenny nevertheless filed nearly 7,000 amended arbitration demands against Marriott with the American Arbitration Association ("AAA"),

What Hilliard and Sperling Kenny concealed, however, is that they used the same pixels "with more invasive configurations" in online interactions with the same individuals—namely, their own clients. *See* Schnell Decl. ¶¶ 20–25. Hilliard and Sperling Kenny recruited nearly 7,000 purported clients with attorney-advertising websites soliciting claims against Marriott. Those websites used the very same pixels, "including the Meta Pixel," that Hilliard and Sperling Kenny allege are a crime. *See id.* Using client information collected with and transmitted to social media

companies through those pixels, Hilliard and Sperling Kenny targeted social media ads at California residents. *See* Terepka Decl. Ex. F. Those ads directed prospective clients to submit information through webforms designed to capture the information necessary to complete the AAA's claimant-intake spreadsheet. *See id.*

Hilliard and Sperling Kenny conducted no meaningful, claimant-specific investigation beyond their automated webform-intake process, as the demands demonstrate. Aside from the claimant's name, the demands include zero claimant-specific allegations. ████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████

The demands also include claimants with unusable contact information and, on their face, appear to include fictitious names and vexatious litigants whom the AAA bars from participation in its proceedings.[2] ████████████████████████████████████████████ ████████████████████████████████████ The demands do not even allege facts establishing that a single claimant entered into an enforceable arbitration agreement with Marriott. Such defective filings are particularly abusive when used for mass arbitrations. Filing thousands of copy-paste arbitrations imposes on respondents arbitration fees—often totaling millions of dollars—just to appoint arbitrators before any of the merits of the claims are adjudicated. *See, e.g.*, *Jones*, 129 F.4th at 1179 (7,300 demands imposed more than $12 million "in initiation fees alone"); *see generally* Heckman & Townsend, "Class and Mass Arbitration," *The College of Commercial Arbitrators Guide to Best Practices*, at 456–57 (5th ed. 2025).

---

[2] *See Am. Arb. Ass'n Int'l Centre for Dispute Resolution Standards of Conduct for Parties & Representatives*, AAA/ICDR, https://www.icdr.org/sites/default/files/document_repository/AAA_ICDR_Standards_of_Conduct_Parties_and_Representatives_0.pdf (last visited Mar. 25, 2026).

While mass arbitration can sometimes serve legitimate purposes, it is prone to abuse when attorneys "solicit claimants via social media and conduct little or no investigation before filing claims" in order "to magnify threatened attorneys' fees" with "a large pool of claimants." *Id.* at 462. Circuit courts have increasingly recognized the potential for such tactics to distort arbitration into a coercive settlement mechanism rather than a forum for adjudicating bona fide disputes. *See, e.g.*, *Jones*, 129 F.4th at 1183; *see also Wallrich v. Samsung*, 106 F.4th 609, 614 (7th Cir. 2024). That is so because firms like Defendants are using mass arbitrations to impose millions in per-claimant arbitration fees regardless of the merits of the underlying claims.

Here, if this mass arbitration proceeds, Marriott could be forced to pay millions in arbitration fees before a single merits arbitrator is appointed. In that context, filing thousands of baseless and defective copy-paste demands constitutes an intentional abuse of the arbitration process "geared more toward racking up procedural costs to the point of forcing [Marriott] to capitulate to a settlement than proving the allegations of [CIPA violations] to seek appropriate redress on the merits." *Jones*, 129 F.4th at 1183.

Defendants' abuse does not end there. By employing pixels during online communications with their clients while simultaneously alleging that Marriott's use of pixels is a crime, Hilliard and Sperling Kenny created incurable conflicts of interest and made themselves necessary and adverse witnesses in their clients' cases.

This matter therefore involves a quintessential abusive mass arbitration built on meritless claims and disqualifying conflicts of interest.

**D.      Hilliard and Sperling Kenny Create Disqualifying Conflicts by Using the Same Pixels on Their Clients—While Disregarding Their Privacy Choices**

Hilliard and Sperling Kenny used the Meta Pixel and similar technologies on their client-solicitation websites to collect information that prospective clients submitted while seeking legal

representation. *See* Schnell Decl. ¶¶ 20–25. The pixels transmitted that "user-submitted form information" and other data to third parties like Facebook. Schnell Decl. ¶¶ 32–40, 48–49, 53–56, 60. Hilliard and Sperling Kenny then used their clients' data to target social media ads, *see* Terepka Decl. Exs. C & F,  at California residents and direct them to sites like their "Money Team Law Firm" webpage promoted by celebrity boxer Floyd Mayweather:





The Money Team website solicited visitors to bring meritless claims in response to allegations that Marriott "broke the law by capturing" their "personal information without [their] knowledge or consent" and "betray[ed] the trust of those who relied on them." It urged visitors to "JOIN THE FIGHT!" against Marriott so Hilliard and Sperling Kenny could "Step into the Ring and Stand Up for Your Right to Privacy!"

Marriott's preeminent computer science expert, Ron Schnell, analyzed the source code of Defendants' websites. That analysis demonstrates that Hilliard and Sperling Kenny used a piece of code on the Money Team website called PixelYourSite Professional. *See* Schnell Decl. ¶ 48. That tool is designed to manage the Meta Pixel, Google Analytics, Google Ads remarketing tags, Pinterest tags, Bing tags, TikTok tags, and similar scripts. *See id.* The Money Team website's code confirms that it used the Meta Pixel, TikTok pixel, Google Tag Manager, and similar technologies. *See* Schnell Decl. ¶¶ 20–25, 44–51.

These pixels did not just capture and share innocuous metadata about website visits. They disclosed the *contents* of prospective clients' "complete form submission data." *See* Schnell Decl. ¶¶ 37, 40. As a result, the pixels transmitted "user-entered" client names, contact information, and the substance of requests for legal assistance to third parties. *See* Schnell Decl. ¶¶ 23, 37, 40. Unlike Marriott's website, Hilliard and Sperling Kenny's solicitation webpages neither offered visitors privacy-preference controls nor honored universal opt-out signals. *See* Schnell Decl. ¶¶ 7, 22, 24–25, 42–43, 50, 57–58, 61–63.

Hilliard and Sperling Kenny thus used the same pixels they allege Marriott used, conduct they claim is not just a "betrayal" of trust, but a crime. *See* Schnell Decl. ¶¶ 6, 8, 20–25, 63. And they did so with "more invasive configurations" that disregarded user opt-out signals, during privileged attorney-client communications. *See* Schnell Decl. ¶¶ 6, 20–25, 63; McCabe Decl.

11

¶¶ 117–24 (discussing rule that "[e]ven when no client-lawyer relationship ensues, a lawyer who has learned information from a prospective client shall not use or reveal that information"); Maryland Rule 19-301.6(a) (prohibiting a lawyer from revealing "information relating to the representation of a client"); Maryland Rule 19-301.18(b) (applying confidentiality rule to prospective clients); *see also* Restatement (Third) of the Law Governing Lawyers ("Restatement") § 60(2) (2000) (discussing use and disclosure of client information for the lawyer's pecuniary gain).

Under the legal theory Hilliard and Sperling Kenny advance against Marriott, their own conduct is subject to the same potential civil and criminal liability they allege on behalf of their purported clients. McCabe Decl. ¶¶ 107–14, 124–128. That is like a prosecutor pursuing charges against a defendant while the prosecutor was committing the same alleged crime. The overlap creates a direct and disqualifying conflict of interest, as Marriott's preeminent conflicts expert, Michael McCabe, demonstrates in his declaration. *See id.*

The conflict is unavoidable, as this question demonstrates: Have Hilliard and Sperling Kenny advised their clients that they think their clients could assert the same claims against their own counsel? *See* McCabe Decl. ¶¶ 152–53, 157, 160 ("the lawyers for Claimants were required under their duty to communicate to disclose their own culpability"), 169–71. Regardless of the answer, Hilliard and Sperling Kenny created a direct, disqualifying conflict of interest. *See id.* ¶¶ 108–15, 125–129; *see, e.g.*, Model Rule 1.7(a) (rule against concurrent conflicts of interest, including those that involve the lawyer's conduct); Maryland Rule 19-301.7 (same).

Hilliard and Sperling Kenny's personal interest in avoiding liability and reputational risk prevents their clients from receiving disinterested advice about whether they should pursue claims against their own counsel. *See* McCabe Decl. ¶¶ 104, 128; Model Rule 1.7(a)(2); Maryland Rule

19-301.7(a)(2). That conflict is particularly acute because the "probity" of Hilliard and Sperling Kenny's own conduct is in serious question. *See* McCabe Decl. ¶ 151; Model Rule 1.7 cmt. 10; Maryland Rule 19-301.7 cmt. 10. After all, under their own theory, Hilliard and Sperling Kenny could face *criminal* liability. *See* Model Rule 1.7 cmt. 10; Maryland Rule 19-301.7 cmt. 10; McCabe Decl. ¶¶ 115, 138, 151.

Hilliard and Sperling Kenny thus face conflicts to avoid facts, legal arguments, and discovery about their use of pixels, disclosure of their use of pixels, and consent to use those pixels in ways that minimize scrutiny of their own practices—positions that do not align with their clients' best interests. *See* McCabe Decl. ¶¶ 108, 129. That disqualifying conflict means they cannot give detached advice, pursue discovery without self-interest, and litigate thousands of proceedings without their own conduct becoming an adverse and distracting issue.

### E.     Hilliard and Sperling Kenny Make Themselves Material Witnesses

As Marriott's conflicts expert also explains, Hilliard and Sperling Kenny made themselves material witnesses in their clients' cases. *See* McCabe Decl. ¶¶ 178–87. Their own use of the same pixels during client-intake communications makes their conduct directly relevant to discovery and proof in the underlying proceedings. That created an impermissible advocate-witness conflict. *See id.* ¶¶ 190–91. Model Rule 3.7(a); Maryland Rule 19-303.7(a).

Hilliard and Sperling Kenny's use of identical technology on their own websites is a factual issue that will require testimony from the individuals who selected, approved, configured, and installed those technologies. *See* McCabe Decl. ¶ 180. The only witnesses with direct, first-hand knowledge of those issues are Hilliard and Sperling Kenny's attorneys and those acting under their direction. *See id.* ¶¶ 180–84; 69 Am. Jur. *Trials* 411, § 23 (explaining that testimony is "necessary" under Rule 3.7 "if the lawyer is the sole witness on the matter being testified, or is a tie-breaking witness, or was an actor whose participation in the underlying matter is material").

13

In each of the nearly 7,000 arbitrations, one or more attorneys of Hilliard and Sperling Kenny are material witnesses to establish key facts about attorney-advertising websites they are responsible for, including: who approved their many websites with pixels on them; how they used those technologies and what information they shared with third parties; what decisions they made concerning data collection and sharing; what disclosures they chose to include or omit about those practices; and whether Hilliard and Sperling Kenny contend that their own practices differ in any meaningful way from the conduct they attribute to Marriott. *See* McCabe Decl. ¶¶ 180–84.

Equally important is the untenable position Hilliard and Sperling Kenny have created for their nearly 7,000 clients, who must provide answers about their own counsel's conduct—answers that may be adverse to their claims. *Id.* ¶ 188. "For example, Hilliard and Sperling Kenny's clients must answer whether they can credibly articulate a material difference between their own counsel's use of these technologies and Marriott's use of them." *Id.* Their inability to do so would be strong evidence against their claims against Marriott. *See id.* The "substantial conflict" created by Defendants' conduct is not waivable. *See* McCabe Decl. ¶¶ 139–41, 145–48, 151, 176; Maryland Rule 19-303.7 cmt. 6; Restatement § 108(3) cmt. f; *see also Klupt*, 126 Md. App. at 209. Unconflicted counsel who had not done what Hilliard and Sperling Kenny did would avoid this untenable conflict between client and counsel. *See* McCabe Decl. ¶¶ 109, 129, 192. Such counsel could provide independent, conflict-free advice about whether their clients should pursue pixel-privacy claims against Marriott, Hilliard and Sperling Kenny, both, or neither. *See id.* ¶¶ 142–43.

The foreseeable overlap between Hilliard and Sperling Kenny's role as advocates and their role as necessary fact witnesses whose conduct their own clients must answer for will complicate discovery, generate motion practice, and risk distorting the evidentiary record across thousands of proceedings. *See* McCabe Decl. ¶¶ 179–84; Model Rule 1.7 cmt. 15, 3.7 cmt. 1; Maryland Rule

14

19-301.7 cmts. 1, 15; Ann. Model Rules of Prof. Conduct § 3.7 ("attorney-witness may not be a fully objective witness, causing harm to the client's cause, or the trier of fact may grant undue weight to the attorney's testimony, unfairly disadvantaging the opposing party"). That harm cannot be cured if the arbitrations proceed with Hilliard and Sperling Kenny as claimants' conflicted counsel.

**F.      Hilliard and Sperling Kenny Proceed Despite Knowing of These Conflicts**

Hilliard and Sperling Kenny proceeded with the mass arbitration despite knowing that their conduct created disqualifying conflicts of interest and made them necessary witnesses. That's because Marriott explained these issues to Defendants in writing before they filed the mass arbitration.

Hilliard and Sperling Kenny sent a demand letter to Marriott claiming to represent thousands of California residents who had visited Marriott's website and whose information Marriott "surreptitiously relayed, transmitted, and otherwise shared" to third parties through "pieces of electronic code" like the Meta Pixel. The letter alleged violations of CIPA and other laws and demanded that Marriott "cease and desist" its use of pixels. *See* Terepka Decl. Ex. B at 3–5 (O'Connor Dec. 20, 2024, Ltr.). It further claimed that Marriott's Terms of Use "purport to require" users to submit "any dispute arising out of or related to the Sites" to arbitration before the AAA. Hilliard and Sperling Kenny sought discussions about a "global resolution" and threatened to file a mass arbitration if Marriott did not agree to pay to settle the purported claims. *Id.*

Hilliard and Sperling Kenny sent a follow-up letter, stating that they continued to amass claimants. Terepka Decl. Ex. B at 1–2. They repeated the CIPA allegations, demanded statutory damages of at least $5,000 per claimant, and threatened to "begin filing [their] clients' respective arbitration demands with the AAA pursuant to Marriott's Terms of Use" unless Marriott agreed to a mass settlement by the end of the month.

After receiving Hilliard and Sperling Kenny's letters and reviewing the threatened arbitration demands, Marriott investigated their claims. On March 26, 2025, Marriott's counsel responded in writing, advising that Marriott had "confirmed that your clients have no viable claims against Marriott" and requesting that Hilliard and Sperling Kenny refrain from filing the threatened mass arbitration. *See* Terepka Decl. Ex. C at 1. For example, Marriott explained that its investigation showed that a substantial portion of the claimants had no arbitration agreement with Marriott, and thus no basis to initiate an arbitration. *Id.* at 1–2. Marriott further explained that many other claimants had no basis to proceed because they expressly consented to the alleged data-sharing practices by agreeing to Marriott's privacy policies. *Id.* at 2–3.

Marriott also explained that its investigation revealed that Hilliard and Sperling Kenny were using the very pixels they claimed were a crime on the websites they were using to solicit claimants. *Id.* at 3–6. Hilliard and Sperling Kenny's use of pixels, the letter continued, was more invasive than the conduct they attribute to Marriott. *Id.* at 6. Their websites urged visitors to submit information and file claims against Marriott on the premise that Marriott "broke the law by capturing" personal information "without . . . knowledge or consent" and "betray[ed] the trust" of consumers, even as their own websites used pixel technologies to collect and share data about those same individuals while they were seeking legal representation. *Id.*

Marriott further explained that, even though Defendants' conduct did not violate CIPA for the reasons described in the letter, it raised serious concerns because Defendants' solicitation websites appeared to transmit client and prospective-client information to third parties in connection with requests for legal representation. *Id.* at 6–7. Marriott also identified additional websites operated by or on behalf of Hilliard Law—including Hilliard's own firm website—that appeared to use similar pixel technologies. *Id.* at 7. Marriott told Defendants that their conduct had

16

"created a direct, disqualifying conflict of interest." *Id.* Marriott asked Defendants: "Will you advise your purported clients that you think they can pursue the same claims against your firm that you say they can pursue against Marriott?" *Id.*  They have never answered that question.

Because Hilliard and Sperling Kenny's conduct made them foreseeable fact witnesses, Marriott advised them that it had preserved evidence concerning these practices and reminded Defendants of their obligation to do the same, "particularly because there may be relevant data about these websites that [Marriott] cannot locate or preserve." *Id.* Marriott further explained that Hilliard and Sperling Kenny's threatened filing of thousands of arbitration demands—imposing millions of dollars in arbitration fees on Marriott regardless of the merits—would constitute "an abuse of the arbitration process" designed to coerce settlement rather than adjudicate bona fide disputes.

Under these circumstances, Hilliard and Sperling Kenny's "substantive centrality to the issues in the case should have compelled [them] to back out at the beginning." *Abrishamian*, 216 Md. App. at 407–08. Responsible attorneys would have at least considered transferring their clients' cases to unconflicted counsel.

Hilliard and Sperling Kenny proceeded anyway. They filed nearly 7,000 defective, copy-paste arbitration claims, ████████████████████████████████████████ ████████████████████████████████████████████ They then amended the demands on October 22, 2025, ███████████████████████████████████

### G.    Marriott Seeks Disqualification While the Abusive Mass Arbitration Is Just Beginning

Marriott seeks the disqualification of Hilliard and Sperling Kenny at an early stage of the underlying mass arbitration. The AAA has not yet decided whether the Claimants have met the threshold requirements to initiate arbitration. Marriott filed the complaint here before briefing on

17

those threshold requirements was complete. The AAA has not begun adjudicating the merits of a single demand, and no merits arbitrators have been appointed. After filing this action, Marriott promptly sought a stay to ensure that the federal court can decide disqualification before any ruling on whether Claimants may even initiate the arbitration cases. Marriott's request for a stay of the AAA proceeding pending the results of this action is currently pending.

Absent judicial intervention, Marriott will continue to incur substantial and escalating costs defending meritless claims in proceedings fundamentally tainted by Defendants' ethical conflicts and their role as necessary witnesses. The Court should disqualify Hilliard and Sperling Kenny as counsel in the mass arbitration.

## III.    LEGAL STANDARD

### A.    Courts' Inherent Authority to Ensure the Integrity of Arbitration Proceedings

Courts have an "independent interest" in ensuring the integrity of adjudicative proceedings. *See United States v. Bundy*, 2008 WL 4133857, at \*3 (D. Md. Sept. 2, 2008).[3] Thus, "the decision on attorney disqualification [is] one for the court and not for the arbitration panel." *SITEL*, 2007 WL 9780537, at \*3 (citing *Action Air Freight*, 769 F. Supp. 899, 901). That is especially true here because it is undisputed that Marriott and Defendants do not have any agreement "designating attorney disqualification as a matter for arbitration." *Id.* The court therefore "ha[s] jurisdiction over [a] motion to disqualify counsel." *Id.*

Federal courts have "inherent authority" to manage the conduct of attorneys appearing before them "for conduct deemed inconsistent with ethical standards." *Zachair v. Driggs*, 965 F. Supp. 741, 749 (D. Md. 1997) (quotations omitted); *see also Chambers v. NASCO*, 501 U.S. 32,

---

[3] Maryland law applies. *See* Maryland Attorneys' Rules of Professional Conduct ("Maryland Rules") 19-308.5(b); *see also Attorney Grievance Comm'n v. Tatung*, 258 A.3d 234 (Md. App. Ct. 2021).

18

43 (1991) ("Courts of justice are universally acknowledged to be vested, by their very creation, with power to impose . . . submission to their lawful mandates[,] . . . governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs[.]"); *Plant Genetic Sys. v. Ciba Seeds*, 933 F. Supp. 514, 517 (M.D.N.C. 1996) ("A motion to disqualify an attorney is addressed to the discretion of the district court . . . .").

It is the "court's responsibility to focus on the preservation of the integrity of the arbitration process." *SITEL*, 2007 WL 9780537, at *3; *see also W.R. Grace v. Gracecare*, 152 F.R.D. 61, 65 (D. Md. 1993) (court's power to disqualify attorneys derives in part from "the necessity to preserve public confidence in the fairness and integrity of judicial proceedings"); *see also* Model Rules of Pro. Conduct (A.B.A. 1983) ("Model Rules") 1.7 cmt. 15; Maryland Attys.' Rules of Pro. Conduct ("Maryland Rules") 19-301.7 cmt. 15. In exercising its supervisory authority, courts in this district "resolve all doubts in favor of disqualification" and "with a view of preventing the 'appearance of impropriety.'" *Buckley*, 908 F. Supp. at 304; *W.R. Grace*, 152 F.R.D. at 65 (quoting *United States v. Clarkson*, 567 F.2d 270, 273 n.3 (4th Cir. 1977)).

## B.     Standing to Raise Conflicts of Interest

This Court has held that parties have "standing"—and, indeed, an "obligation"—to raise conflicts requiring "disqualification of their opponents' attorneys." *CytImmune*, 2017 WL 57213, at *5 n.6 (granting opposing party's motion to disqualify). "[A]ny member of the bar aware of the facts justifying a disqualification of counsel is obligated to call it to the attention of the court." *Clarkson*, 567 F.2d at 271 n.1. The Fourth Circuit has likewise held that the "propriety" of an adversary's "filing [a] motion to disqualify cannot be questioned." *Id.* (citing *Estates Theatre v. Columbia Pictures Indus.*, 345 F. Supp. 93, 98 (S.D.N.Y. 1972) (rejecting argument that opposing party lacked "standing to raise the conflict of interest question" because it implicated "a matter of public interest involving the integrity of the Bar")). "In fact, a lawyer's adversary will often be in

19

the best position to discover unethical behavior"—particularly when attorneys conceal conflicts from their clients. *In re Gopman*, 531 F.2d 262, 265 (5th Cir. 1976) (cited with approval in *Clarkson*, 567 F.2d at 272 n.1).

### C.     Standard Governing Motions to Disqualify

When considering a motion to disqualify opposing counsel, Maryland courts undertake a multistep inquiry: first, whether the movant has identified a specific violation of a Rule of Professional Conduct; second, whether the attorneys violated the rule; and third, whether the violation supports disqualification. *Klupt v. Krongard*, 126 Md. App. 179, 203 (1999). While Hilliard and Sperling Kenny's conduct implicates several Rules of Professional Conduct, two independently require disqualification here: Rule 1.7, which governs conflicts of interest, and Rule 3.7, which prohibits an attorney from acting as both advocate and necessary witness in the same proceeding. Model Rule 1.7(a)(2), 3.7; Maryland Rule 19-301.7(a)(2), 19-303.7.

Courts disqualify counsel when the conflicts at issue are "such as clearly to call in question the fair and efficient administration of justice." *Gross v. SES Americom*, 307 F. Supp. 2d 719, 723 (D. Md. 2004). Where counsel's adverse interests materially limit their representation and where counsel's own conduct makes them necessary witnesses in their clients' cases, their conflicts vitiate the integrity of the proceedings and require disqualification. *See* Maryland Rule 1.7 cmt. 10 (conflict exists where the "probity" of counsel "is in serious question").

When an attorney "is so clearly aware before the fact of the potential conflict between his roles as advocate and witness, then the scrutiny usually applied to an opposing party's motion for disqualification is unnecessary, and the burden shifts to the attorney[s] in question." *Klupt*, 126 Md. App. at 207.

20

## IV.    ARGUMENT

The Court should bar Hilliard and Sperling Kenny's further participation in the underlying mass arbitration. Their violations of core ethical rules governing the legal profession created conflicts of interest that "call in question the fair and efficient administration of justice." *Gross*, 307 F. Supp. 2d at 723.

### A.    The Court Should Disqualify Hilliard and Sperling Kenny Under the Attorney-Witness Rule (Rule 3.7)

By using the same pixels at issue in their clients' claims during online interactions with those same clients, Hilliard and Sperling Kenny made themselves necessary witnesses under Rule 3.7. Their conduct's "substantive centrality" to their clients' allegations requires disqualification.

Rule 3.7 prohibits a lawyer from "act[ing] as an advocate at a trial in which the lawyer is likely to be a necessary witness" unless (A) the testimony relates to an uncontested issue or to the nature and value of the lawyer's services, or (B) disqualification would work a substantial hardship on the clients. Maryland Rule 19-303.7(a). This Rule protects not only the client, but also the opposing party and "the integrity of the judicial system as a whole." Ann. Model Rules of Prof. Conduct § 3.7 (10th ed. 2023).

The advocate-witness rule serves several important purposes. It prevents confusion when a lawyer simultaneously functions as both advocate and witness. It avoids the risk that the lawyer's role as counsel will improperly bolster their credibility. And it protects the fairness of the proceedings by ensuring that the factfinder evaluates testimony on equal footing. *See id.* (collecting cases); *see also E.E.O.C. v. Bardon*, 2010 WL 323067, at *1 (policy behind Rule 3.7 is that combining the roles of lawyer and witness "can prejudice the tribunal and the opposing party and can also involve a conflict of interest between the lawyer and client"); Maryland Rule 3.7 cmt. 2 (the dual role is prejudicial and causes confusion because "[i]t may not be clear whether a statement

21

by an advocate-witness should be taken as proof or as an analysis of the proof").

A lawyer's testimony is "necessary" if the attorney "was an actor whose participation in the underlying matter is material." 69 Am. Jur. *Trials* 411, § 23. In other words, a lawyer is a necessary witness when they possess material information about disputed factual issues and their testimony is "unobtainable elsewhere." *See* Ann. Model Rules of Prof. Conduct § 3.7.

Here, Hilliard and Sperling Kenny solicited clients, threatened Marriott with a mass arbitration, and filed thousands of arbitration demands—all premised on the allegation that Marriott unlawfully used technology like the Meta Pixel to share website visitors' information with third parties. *See* Terepka Decl. Ex. B. Yet Hilliard and Sperling Kenny used the *same* technologies on their attorney-advertising websites to recruit claimants for that mass arbitration. Schnell Decl. ¶¶ 20–25; McCabe Decl. ¶¶ 104–05. The source code confirms Hilliard and Sperling Kenny used the Meta Pixel, TikTok Pixel, and similar tools to "transmit" to third parties "complete form submission data" that prospective clients provided while filling out webforms seeking representation—including "user-entered" names, contact information, and the substance of requests for legal assistance. *See* Schnell Decl. ¶¶ 23, 37, 40; McCabe Decl. ¶¶ 117, 120. By engaging in conduct intertwined with the core factual issues in the arbitration—during online interactions with the same individuals (their clients)—Hilliard and Sperling Kenny made themselves necessary witnesses in their clients' cases. *See Klupt*, 126 Md. App. at 207–08.

*Klupt v. Krongard* is instructive. There, counsel who had represented a party in earlier litigation was later advised, shortly after a related fraud action began, that he would be a critical witness regarding the underlying events. *Id.* at 191–92, 207. Counsel nevertheless entered an appearance on behalf of the opposing side in that fraud action—even though the fraud claims in that case put counsel's own prior conduct at issue. *Id.* at 191–92. The court disqualified counsel,

and the Court of Special Appeals affirmed. In affirming, the court explained that although disqualification motions are typically scrutinized when brought by an opposing party, counsel's knowledge from the outset that he would likely be a witness concerning disputed events presented an "overriding factor." *Id.* at 207. In those circumstances, the court held, the usual skepticism toward disqualification motions disappears and the burden shifts to the attorney to demonstrate that disqualification should not be granted. *Id.*

The appellate court reaffirmed that principle in *Abrishamian*, in which it upheld disqualifying an attorney because the case's central dispute turned on a conversation between the attorney and another witness. 216 Md. App. 386, 397–98, 407–08 (2014). Because that placed the attorney's credibility directly at issue, the court held that his conduct's "substantive centrality to the issues in the case should have compelled him to back out at the beginning." *Id.* at 407–08.

Here, Hilliard and Sperling Kenny's conduct is far more egregious than that at issue in *Klupt* and *Abrishamian*. In those cases, counsel became necessary witnesses because they happened to be involved in events underlying the dispute. *Klupt*, 126 Md. App. 207; *Abrishamian*, 216 Md. App. at 407–08. Hilliard and Sperling Kenny, by contrast, were not merely witnesses to peripheral events. *See* McCabe Decl. ¶¶ 178–84. They engineered the conflict themselves by soliciting clients for pixel claims against Marriott while using pixels in a far more invasive and ethically impermissible manner in interactions with the same individuals (their clients).

As in *Klupt* and *Abrishamian*, Hilliard and Sperling Kenny's knowledge of these conflicts from the beginning merits disqualification. They should have known about their own conduct on their own advertising websites that created the conflict. Setting that aside, Marriott expressly raised the issue before they filed the demands, asking whether Hilliard and Sperling Kenny would advise their clients that, under their own CIPA-liability theory, they could bring claims against their own

counsel. *See* Terepka Decl. Ex. C. Defendants' "substantive centrality to the issues in the case should have compelled [them] to back out at the beginning," before they filed the Demands. *Abrishamian*, 216 Md. App. at 407–08.

But Hilliard and Sperling Kenny did not back out at the beginning. And because they were "clearly aware before the fact of the potential conflict between [their] roles as advocate and witness," the "scrutiny usually applied to an opposing party's motion for disqualification is unnecessary." *Id.* (quoting *Klupt*, 126 Md. App. at 207). Instead, the "burden shifts to the attorney[s] in question" to avoid disqualification. *Id.*

Hilliard and Sperling Kenny cannot meet their burden against disqualification here. They proceeded to file thousands of arbitration demands, knowing their own conduct remained intertwined with the central issues in dispute. Hilliard and Sperling Kenny's "substantive centrality to the issues in the case" is thus even more pronounced than in the cases discussed above. *Id.* at 407. Having placed their own conduct at issue in their clients' cases, Hilliard and Sperling Kenny cannot avoid the consequences of the advocate-witness rule. Courts routinely disqualify counsel on these grounds. *See, e.g.*, *id.* at 407–08; *Klupt*, 126 Md. App. at 207–08; *Rakityanskaya v. Blevins*, 2021 WL 3468067, at *2–3 (Md. Ct. Spec. App. Aug. 6, 2021) (disqualifying attorney from entire civil case asserting malicious prosecution and similar claims because the attorney had represented the client in the underlying criminal proceedings and would be a necessary witness in the civil trial); *Bardon*, 2010 WL 323067, at *2 (disqualifying defendant's attorney because he had been involved in the company's internal investigation of the employee's complaint and would be a necessary witness).

The Court should grant Marriott's motion to disqualify for this reason alone.

24

**B.    The Court Should Disqualify Hilliard and Sperling Kenny Under the Material-Limitation Rule (Rule 1.7)**

Another reason independently requires disqualification: Hilliard and Sperling Kenny's conduct created serious ethical conflicts that materially limit their ability to represent their clients.

Rule 1.7 prohibits representation where "there is a significant risk that the representation of one or more clients will be materially limited by . . . a personal interest of the lawyer." Maryland Rule 19-301.7(a)(2). A lawyer cannot represent a client where the conflict is "so substantial" as to "materially impair the lawyer's ability to consider alternative courses of action that might otherwise be available to the client, to discuss all relevant aspects of the subject matter of the representation with the client, or otherwise provide effective representation to the client." Restatement § 125 cmt. c. In addition to conflicts that create direct adversity, courts also disqualify lawyers whose personal or professional interests are likely to interfere with their independent professional judgment or foreclose courses of action that they should pursue. Maryland Rule 19-301.7 cmt. 4.

Defendants created such a conflict here—one that they've known about at least since March 26, 2025. *See* Terepka Decl. Ex. C. As explained above, Hilliard and Sperling Kenny's claims against Marriott are premised on the theory that Marriott uses technologies like the Meta Pixel to share website visitors' information with third parties. *See* Terepka Decl. Ex. B. Yet Hilliard and Sperling Kenny used the same technologies on client-solicitation websites for the mass arbitration. Schnell Decl. ¶¶ 20–25; McCabe Decl. ¶ 106. Under their own CIPA-liability theory, Hilliard and Sperling Kenny's conduct exposes them to the same criminal liability. McCabe Decl. ¶¶ 130, 137. Their conduct raises the possibility that some of their clients could assert claims against Hilliard and Sperling Kenny based on the same allegations they bring against Marriott. *Id.* ¶¶ 105–06; *see also id.* ¶ 153 ("at least some portion of the clients are themselves the victims of

25

their counsels' own conduct by their counsels' own legal theory"). Defendants had an ethical responsibility to evaluate these risks and advise their clients accordingly. *Id.* ¶¶ 108, 170–71.

But Defendants can't provide that unconflicted advice. Their own personal interests—avoiding liability and reputational harm—materially limit their ability to represent their clients. *Id.* ¶¶ 115, 128–29. An attorney cannot give detached advice about whether a client should pursue claims against the lawyer's own firm or about litigation strategies that could expose the lawyer to liability. *Id.* ¶¶ 147–48, 151–53; Maryland Rule 19-301.7 cmt. 10.

These conflicts prejudice Claimants and Marriott and taint the integrity of the arbitral proceedings. As discussed above, Hilliard and Sperling Kenny made themselves necessary witnesses in the proceedings. The comments to Maryland's Rules provide that where there is "substantial conflict" between the client's and the lawyer's testimony, "the representation involves a conflict of interest that requires compliance with Rule 19-301.7." Maryland Rule 19-303.7 cmt. 6; *see also* Restatement § 108 cmt. f (where the lawyer will give testimony that is "materially adverse" to the client's position, "a conflict exists between the lawyer's duty to testify truthfully and the client's interest in avoiding adverse testimony").

Here, Hilliard and Sperling Kenny's testimony presents precisely that dilemma. McCabe Decl. ¶ 187 ("[Hilliard and Sperling Kenny's] testimony may undermine the credibility of their clients' own claims, and may give support to affirmative defenses."). If they minimize what their websites did to their clients, that may prejudice their clients' claims against Marriott. If it is legal for Hilliard and Sperling Kenny to use pixels on attorney-client communications on their websites, how is it a "crime" for Marriott to use the same pixels? Alternatively, if their testimony confirms that the technologies function in the manner alleged, it would suggest that their own clients may possess the same claims against Defendants that Defendants now assert against Marriott. In either

26

event, Defendants are in a conflicted position: temper testimony to protect the representation but undermine the claim, or testify fully and potentially jeopardize the representation.

Maryland courts have recognized that such circumstances create a disqualifying conflict under Rule 1.7. In *Klupt*, after concluding that counsel's participation as a witness violated Rule 3.7, the court also held that the attorney's participation in the previous lawsuit created an independent conflict under Rule 1.7. 126 Md. App. at 209. As the court explained, "[a] lawyer's interest in testifying truthfully but adversely to his client must inherently conflict with the client's own interests." *Id.* at 209–210.

Similarly, in *Attorney Grievance Commission of Maryland v. Kane*, the Court of Appeals held that an attorney violated Rule 1.7 by continuing to represent clients after being named as a co-defendant in litigation arising from the same conduct. 465 Md. 667, 713 (2019). The court explained that the attorney had a "real incentive to lessen his liability" even if doing so exposed his clients to greater liability. *Id.* The same principle applies here: Hilliard and Sperling Kenny's interest in avoiding even questions about their own conduct materially limits their ability to represent their clients with unconflicted professional judgment.

Despite knowing the conflicts of interest they created, they filed nearly 7,000 amended arbitration demands against Marriott. Hilliard and Sperling Kenny have never answered whether they "at the very least communicate[d] with all Claimants" about their "right to bring CIPA and the related claims in the Demand not only against Marriott but against Counsel as well for engaging in the same conduct." McCabe Decl. ¶ 152.

Hilliard and Sperling Kenny's conduct violates still more professional obligations. Under Rule 1.4, an attorney has a duty to keep their clients "reasonably informed about the status of the matter" and to "promptly" inform their clients "of any decision or circumstance with respect to

27

which the client's informed consent is required." Maryland Rule 19-301.4(a); *see also* Restatement § 122 cmt. c. Thus, "the lawyers for Claimants were required under their duty to communicate to disclose their own culpability," even if "Claimants' Counsel believed that the statements in the March 26 letter were not true." McCabe Decl. ¶¶ 160, 169. "The clients were and are entitled to know about these allegations, and counsel could use that communication as an opportunity to either assuage their clients' concerns or otherwise to explain the matter such that the clients could make informed decisions about the representation." *Id.* ¶ 170. But Hilliard and Sperling Kenny have never answered whether they communicated these conflicts to any of their thousands of clients— and their conflicted interests mean they have strong reasons to try to avoid communicating this issue to their clients. Unconflicted counsel, by contrast, would have no such problem. Without a conflict, their interests would be aligned with their clients to communicate fully and truthfully about all relevant facts and all potential claims, including potential claims against Hilliard and Sperling Kenny. *Id.* ¶¶ 128–29; Maryland Rule 19-301.7 cmt. 8.

Hilliard and Sperling Kenny's conduct also implicates Rule 1.6, which prohibits the use and disclosure of confidential client information, Maryland Rule 19-301.6(a), especially "for the lawyer's personal enrichment" or "personal gain." Restatement § 60(2) & cmt. j. Information prospective clients provide while seeking legal representation—including names, contact information, and the substance of requests for legal assistance—constitutes "information relating to the representation" that lawyers must maintain as confidential unless they obtain informed consent to share it. McCabe Decl. ¶¶ 117–20 (collecting authority); *see also* 7 Am. Jur. *Attorneys at Law* § 138 ("The identity of an attorney's clients is sensitive personal information that implicates the clients' rights of privacy; every person has the right to freely confer with and confide in his or her attorney in an atmosphere of trust and serenity").

28

Hilliard and Sperling Kenny "install[ed] and us[ed] pixels and other technologies" in their websites that "relay[ed]" Claimants' information to third parties while those Claimants were seeking legal assistance on Defendants' website. *Cf.* Amended Demand ¶¶ 5, 7. That represents a "material frustration to the client's" purported "objectives" in stopping website operators from sharing their browsing information to third parties using pixels. Restatement § 60 cmt. c(i).

Because Hilliard and Sperling Kenny's conduct exposes them to liability under their own legal theory, there is a significant risk that counsel's personal interests will materially limit their ability to provide loyal and independent representation, including transparent communication about their own use of pixels. McCabe Decl. ¶¶ 142–43, 152. Rule 1.7 therefore prohibits their continued representation of the claimants in the mass arbitration. *Id.* ¶ 172.

The Court should grant Marriott's motion to disqualify for this additional, independent reason.

## V. CONCLUSION

Hilliard and Sperling Kenny violated the most basic rules of the profession in continuing to represent clients despite direct conflicts of interest that Marriott identified at the outset. Those violations prejudice each of their clients and Marriott and cast a shadow over the integrity of the justice system. Marriott's motion to disqualify should be granted.

*[Remainder of Page Intentionally Blank – Signature on Following Page]*

29

Dated: March 25, 2026

                                        **WATSTEIN TEREPKA LLP**

                                        */s/ Alex Terepka*
                                        Alex Terepka (*pro hac vice*)
                                        James Ruley (Bar No. 1712140150)
                                        Logan Leonard (*pro hac vice*)
                                        Rebecca Rhym (*pro hac vice*)
                                        WATSTEIN TEREPKA LLP
                                        75 14th Street NE, Ste. 2600
                                        Atlanta, Georgia 30309
                                        (213) 839-3317
                                        alex@wtlaw.com
                                        jruley@wtlaw.com
                                        lleonard@wtlaw.com
                                        rrhym@wtlaw.com

                                        *Attorneys for Plaintiff Marriott International, Inc.*

30

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that, on March 25, 2026, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

*/s/ Alex Terepka*
Alex Terepka
