**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **MARRIOTT INTERNATIONAL, INC.** | : | |
| 7750 Wisconsin Avenue | : | |
| Bethesda, Maryland 20814 | : | |
| Montgomery County | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| **SPERLING KENNY NACHWALTER,** | : | Civil Action No. 1:26-cv-00900-MJM |
| **LLC** | : | |
| 321 North Clark Street, 25th Floor | : | |
| Chicago, Illinois 60654 | : | |
| | : | |
| & | : | |
| | : | |
| **HILLIARD, MARTINEZ & GONZALES,** | : | |
| **LLP, d/b/a HILLIARD LAW** | : | |
| 719 S. Shoreline Boulevard, Suite 100 | : | |
| Corpus Christi, Texas 78401 | : | |
| | : | |
| Defendants. | : | |

## <u>FIRST AMENDED COMPLAINT</u>

Plaintiff Marriott International, Inc. ("Marriott") brings this First Amended Complaint against Sperling Kenny Nachwalter, LLC ("Sperling Kenny") and Hilliard, Martinez & Gonzales, LLP, d/b/a Hilliard Law ("Hilliard") and alleges as follows:

**INTRODUCTION**

1.     This action arises from Defendants' breach of the fundamental professional duties that anchor our justice system. That system requires steadfast loyalty to clients "free from conflicts of interest." *Stephens v. Branker*, 570 F.3d 198, 208 (4th Cir. 2009). A lawyer is "legally and ethically required to be loyal to client interests, as distinct from his [or her] own." *Nat'l Sec. Couns. v. CIA*, 811 F.3d 22, 30 (D.C. Cir. 2016). The "very nature of the court as an institution" makes these rules essential. *United States v. Shaffer Equip. Co.*, 11 F.3d 450, 461–62 (4th Cir. 1993).

2.     Courts have an "independent interest" in ensuring the integrity of adjudicative proceedings. *See United States v. Bundy*, 2008 WL 4133857, at *3 (D. Md. Sept. 2, 2008). When lawyers create a conflict of interest "such as clearly to call in question the fair and efficient administration of justice," the lawyers must be disqualified. *Gross v. SES Americom*, 307 F. Supp. 2d 719, 723 (D. Md. 2004); *see also* Model Rules of Pro. Conduct (A.B.A. 1983) ("Model Rules") 1.7 cmt. 15; Maryland Att'ys' Rules of Pro. Conduct ("Maryland Rules") 19-301.7 cmt. 15.

3.     The Defendant law firms, Hilliard and Sperling Kenny, egregiously violated basic principles against lawyers representing clients with conflicts of interest. Their conduct compromised the integrity of nearly 7,000 cases in a mass arbitration against Plaintiff Marriott International. Worse still, those cases were brought by claimants who were exposed to Defendants' false and misleading advertisements, which claimed that Marriott "betrayed your trust," "may have captured and sold your private data," and mused: "is Marriott profiting off your personal information? . . . that isn't just wrong. It's illegal."



4.      Thousands of people purportedly hired Defendants after being exposed to advertisements like the above on social media. These claimants, many of whom were Marriott customers, are not likely to do business with Marriott ever again and seek more than $135 million in statutory damages based on their voluntary website visits. Setting aside the amount in controversy in the arbitrations, the substantial reputational and economic harm to Marriott from these false advertisements is obvious. At a minimum, Marriott has been deprived of business from thousands of current and potential customers, who are now suing the company instead of staying in its hotels. This includes an untold number of customers who saw Defendants' false advertisements and chose *not* to sue Marriott, but nevertheless have decided not to do business with Marriott again.

5. The story does not end there. Defendants filed thousands of identical arbitration demands, and made identical assertions on behalf of each of their purported clients: Marriott's website uses standard website technology, including the Meta (Facebook) Pixel. These pixel technologies share website visitors' data with third parties like Facebook. They claim the existence of pixels on Marriott's website means Marriott is guilty of violating criminal statutes against wiretapping, including the California Invasion of Privacy Act (CIPA). Marriott, they claim, therefore owes every California resident who voluntarily visited its site at least $20,000 in statutory damages that are the equivalent of civil penalties.

6. The claims are meritless. But to make matters worse, Defendants concealed that they used the *same pixels* in a *far more invasive manner* while soliciting *their own clients* to bring claims against Marriott. On their attorney-advertisement websites, they used pixels (including the Meta Pixel and tracking technologies that Marriott does not use) to collect information prospective clients submitted while seeking legal representation—and share it with third parties. Defendants then used that data to target social media ads at California residents and direct them to those solicitation websites. The cycle continued until Defendants had amassed thousands of claimants for a mass arbitration against Marriott.

7. Defendants' conduct is not just peak hypocrisy; it also created grave conflicts of interest between those claimants and their counsel. Under their own theory of liability, Defendants' clients could assert the same claims against their own counsel that they are prosecuting against Marriott. And by their account, Defendants are guilty of the same criminal violations they allege against Marriott. That is like a prosecutor pursuing charges while committing the same alleged crime. The rules of ethical attorney conduct and disqualification exist for this very purpose—to "ensur[e] that a litigant's claims or defenses are not refracted through the multifaceted prism of an

4

attorney's conflicts." *CytImmune Scis., Inc. v. Paciotti*, 2017 WL 57213, at *7 (D. Md. Jan. 5, 2017).

8.    Defendants also made themselves necessary witnesses in their clients' cases. Their testimony about their own use of pixels during attorney-client communications with those same claimants bears on the credibility of their clients' claims, the propriety of the equitable remedies they demand, and the viability of defenses such as notice and consent that both they and Marriott would predictably raise. *See* Model Rules 3.7(a); Maryland Rule 19-303.7(a).

9.    Defendants similarly put their own nearly 7,000 purported clients in an untenable position where answering questions about their counsel's conduct will be adverse to their claims. Can any of them credibly articulate a material difference between their own counsel's use of these technologies and Marriott's use of them? Their failure to do so would weigh strongly against their claims against Marriott in the mass arbitration.

10.    Defendants' resulting dual roles as advocates and witnesses whose conduct is adverse to their clients' interests pose a substantial risk of prejudice to both their clients and to Marriott. That prejudice violates basic rules of attorney ethics and calls into question the integrity of the arbitration process. *See* Ann. Model Rules of Pro. Conduct § 3.7 (10th ed. 2023); *see also* 69 Am. Jur. *Trials* 411, § 23 (1998) (testimony is "prohibited" under Model Rule 3.7 where the lawyer "was an actor whose participation in the underlying matter is material.").

11.    Defendants knew about these conflicts. Marriott's counsel raised them in writing months before they filed the mass arbitration. **Exhibit A** (A. Terepka Mar. 26, 2025, Ltr.). That is because Marriott's counsel—indeed, any "lawyer who knows that another lawyer has committed a violation of the Rules of Professional Conduct that raises a substantial question as to that lawyer's honesty, trustworthiness or fitness as a lawyer in other respects"—is required to "inform the

appropriate professional authority." *See* Model Rule 8.3(a); Maryland Rule 19-308.3 (similar); *see also* Model Code of Professional Responsibility DR 1-103(A) (requiring lawyer to "report such knowledge to a tribunal or other authority empowered to investigate or act upon such violation.").

12.    At that point, when given the chance to do the right thing, Defendants should have dropped the claims, recognizing that their own practices demonstrate the claims' lack of merit. **Exhibit A**.

13.    At a minimum, responsible, ethical counsel would have considered terminating their representation so their clients could obtain new counsel without these conflicts of interest. *Klupt v. Krongard*, 126 Md. App. 179, 209 (1999) (quoting Charles W. Wolfram, *Modern Legal Ethics* § 7.5.2(c), at 383–84 (1986)) (failing to withdraw "when it first became apparent that the lawyer would be required to testify" violates professional rules). Unconflicted counsel could offer advice about whether to pursue the same claims against Defendants that they are alleging against Marriott on behalf of their purported clients. Defendants could never give such advice without a disqualifying conflict of interest. They would be advising their nearly 7,000 clients about whether they should sue their own lawyers.

14.    Despite these glaring conflicts that Marriott raised in writing, Defendants did not remove themselves as counsel so their clients could obtain the benefit of unconflicted, loyal counsel. Nor did they notify the arbitrator of the existence of a conflict. Defendants instead ignored the conflicts their own conduct created. They put their own financial interests above their clients' interests. And they proceeded to file thousands of claims against Marriott, seeking to coerce it into a mass settlement that would personally enrich themselves. And to this day, Defendants still refuse to answer whether they have even communicated the conflict Marriott raised to their clients.

15.    Marriott has been raising these issues to Defendants in writing for over a year. But

Defendants have flippantly ignored their severe, disqualifying conflicts of interest and have never provided a meaningful response. They simply accused Marriott of making a "'you do it too' argument." That misses the point. Marriott is not doing what Defendants do. Defendants' websites use pixels in an invasive manner that disregards their clients' privacy choices and violates attorney-client confidentiality. Marriott does not do that. To be clear, Marriott firmly believes that its use of pixels is entirely lawful and that its conduct does not violate any law. *See, e.g., Doe v. Eating Recovery Center*, 806 F. Supp. 3d 1109, 1118–19 (N.D. Cal. 2025).

16.     Setting that aside, attorneys are different. They are subject to sacrosanct rules of professional ethics that hold attorneys to the highest standards of loyalty to their clients. Defendants—two law firms—have violated those rules here. They lured their own clients to make meritless claims that Marriott "betray[ed]" them by using pixels they claim are a crime. All the while, Defendants concealed from their clients that they used the same pixels in a more invasive way when their clients were seeking legal advice from them.

17.     Defendants' ethical violations created a direct, disqualifying conflict of interest, as the following question illustrates: Could Defendants advise their clients that they think they can pursue the same claims *against their own counsel* that they are pursuing against Marriott?

18.     The unethical conflicts Defendants created are "such as clearly to call in question the fair and efficient administration of justice." *Gross*, 307 F. Supp. 2d at 723. Their "substantive centrality to the issues in the case should have compelled [them] to back out at the beginning." *Abrishamian v. Wash. Med. Grp.*, 216 Md. App. 386, 407–08 (2014). And Claimants' "right to retain counsel . . . does not permit retaining an attorney with a potential conflict of interest raising the appearance of impropriety." *SEC v. Merrill*, 2019 WL 430853, at *4 (D. Md. Feb. 1, 2019). Defendants have ignored these basic rules of ethical attorney conduct.

19.     Marriott and its counsel thus had no choice. As the Fourth Circuit made clear almost fifty years ago: "any member of the bar aware of the facts justifying a disqualification of counsel is obligated to call it to the attention **of the court**." *United States v. Clarkson*, 567 F.2d 270, 272 (4th Cir. 1977) (affirming grant of disqualification motion, where the government moved to disqualify a defendant—its adversary—from representing potential fact witnesses—who were not the government's clients, either) (emphasis added). The First, Fifth, Sixth, and Eleventh Circuits are in accord. *Kevlik v. Goldstein*, 724 F.2d 844, 847 (1st Cir. 1984) ("Appellant first argues that the plaintiffs lack standing to pursue a disqualification order because only the former client . . . may raise a disqualification motion. We disagree."); *id.* at 848 ("The Fourth and Fifth Circuits have held that disqualification may rightly be sought by opposing counsel even though he/she is not representing the aggrieved client."); *Brown & Williamson Tobacco Corp. v. Daniel International Corp.*, 563 F.2d 671, 673 (5th Cir. 1977) ("Appellant has standing to seek disqualification even though it is not an aggrieved client because its attorneys are authorized to report any ethical violations committed in the case."); *Melamed v. ITT Continental Baking Co.*, 592 F.2d 290 (6th Cir. 1979) ("It is our conclusion that … [defense] counsel in this litigation had a right and arguably a duty to call the attention of the District Judge to the possible conflict of interest in this case" between plaintiff and plaintiff's counsel); *McGriff v. Christie*, 477 F. App'x 673, 676–77 (11th Cir. 2012) ("[a] party who is not a [current or] former client of opposing counsel nevertheless has standing to raise the issue of opposing counsel's conflict of interest if there is a violation of the rules which is sufficiently severe to call in question the fair and efficient administration of justice.") (cleaned up).

20.     This Court has confirmed that parties have "standing"—and, indeed, an "obligation"—to    raise    conflicts    requiring    "disqualification    of    their    opponents'

attorneys." *CytImmune*, 2017 WL 57213, at *5 n.6 (granting opposing party's motion to disqualify). That is because the "propriety" of an adversary's "filing [a] motion to disqualify cannot be questioned." *Clarkson*, 567 F.2d at 271 n.1 (citing *Estates Theatre v. Columbia Pictures Indus.*, 345 F. Supp. 93, 98 (S.D.N.Y. 1972) (rejecting argument that opposing party lacked "standing to raise the conflict of interest question" because it implicated "a matter of public interest involving the integrity of the Bar")). "In fact, a lawyer's adversary will often be in the best position to discover unethical behavior". *In re Gopman*, 531 F.2d 262, 265 (5th Cir. 1976) (cited with approval in *Clarkson*, 567 F.2d at 272 n.1). That is particularly true when attorneys conceal conflicts from their clients.

21.    Marriott therefore filed this lawsuit in this Court, because "the decision on attorney disqualification [is] one for the court and not for the arbitration panel." *SITEL Corp. v. Stonebridge Life Ins. Co.*, 2007 WL 9780537, at *3 (D. Md. July 23, 2007) (quoting *Action Air Freight, Inc. v. Pilot Air Freight Corp.*, 769 F. Supp. 899, 901 (E.D. Pa. 1991)). It is the "'court's responsibility to focus on the preservation of the integrity of the arbitration process.'" *Id.* And arbitration proceedings on the merits "have not yet begun, so deciding the issue of attorney disqualification will not disrupt the arbitration." *Id.* Defendants' violations created untenable conflicts of interest that Marriott was duty-bound to report, and that require Defendants' disqualification from the arbitration proceedings and other appropriate relief.

22.    Only a court can adjudicate the claims Marriott brings here. An enforceable agreement between the parties to arbitrate a dispute is the most fundamental requirement for arbitration. It is undisputed that Marriott and Defendants did not agree to arbitrate any of the claims in this complaint. Nor would it be practical to file thousands of motions to disqualify Defendants

in each individual arbitration that they have filed against Marriott. Doing so would also pose an obvious risk of conflicting rulings should Defendants be disqualified in some cases, but not others.

23.     Marriott also seeks damages for the harm Defendants' false and deceptive advertising campaign caused to Marriott's commercial reputation and customer relationships, including by falsely branding Marriott's standard website practices as criminal conduct to thousands of Marriott's existing and prospective customers, causing them to distrust and divert business from Marriott's services. Defendants' false and misleading advertisements are exactly what the Lanham Act, 15 U.S.C. § 1125(a), prohibits. So does the common law against intentional interference with prospective economic advantage.

24.     Marriott has also moved this Court to disqualify Defendants as counsel in the underlying mass arbitration. ECF No. 12. Its motion includes extensive support from a preeminent expert on attorney ethics whose testimony establishes that Defendants' conduct created egregious conflicts of interest for which the only remedy is disqualification. *Id*. At present, this expert testimony is unrefuted, even though Defendants could have offered contrary testimony in their defense when Marriott filed its original complaint and motion to disqualify Defendants. Defendants chose not to—and their silence remains telling. Marriott's motion will be held in abeyance pending (1) discovery relevant to the disqualification issues and (2) resolution of any motion(s) to dismiss this Amended Complaint. ECF Nos. 31–32.

**PARTIES**

25.     Plaintiff Marriott International, Inc. is a corporation organized under the laws of Delaware, with its principal place of business at Bethesda, Maryland.

26.     Defendant Hilliard, Martinez & Gonzales, LLP, d/b/a Hilliard Law is a Texas limited liability partnership with its principal office at 719 S. Shoreline Boulevard, Suite 100,

Corpus Christi, Texas. The partners of Hilliard, Martinez & Gonzales, LLP, d/b/a Hilliard Law are Robert C. Hilliard, Catherine Hilliard, T. Christopher Pinedo, Gonzalo Joseph Barrientos, Benjamin R. O'Connor, Bradford P. Klager, Alex Hilliard, and Bonnie Rickert, all of whom are citizens of the State of Texas.

27.    Defendant Sperling Kenny Nachwalter, LLC is a limited liability company organized under the laws of Delaware, with its principal office at 321 North Clark Street, 25th Floor, Chicago, Illinois, 60654. Each member of Sperling Kenny is a citizen of the States of Texas, Illinois, or Florida. The members of Sperling Kenny are Richard Alan Arnold, James T. Almon, John P. Bjork, William J. Blechman, Robert D. Cheifetz, Phillip F. Cramer, Michael G. Dickler, Steven C. Florsheim, Jeffrey T. Foreman, Eugene J. Frett, David P. Germaine, Joshua B. Gray, Scott F. Hessell, Elizabeth B. Honkonen, Eamon P. Kelly, Liza Laughlin, Mitch Macknin, Allison G. Margolies, Claire P. Murphy, Anna T. Neill, Douglas H. Patton, Scott E. Perwin, Michael A. Ponzoli, Samuel J. Randall, Lauren C. Ravkind, Matthew H. Rice, Alberto Rodriguez, Jerry Santangelo, Trevor Scheetz, Blake Sercye, Nathan A. Shev, Greg Shinall, Daniel A. Shmikler, Martin Sinclair, Matthew T. Slater, Timothy Sperling, Jonathan Stratton, and Joseph M. Vanek.

## JURISDICTION AND VENUE

28.    This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1338(a) because Marriott's federal Lanham Act claim pursuant to 15 U.S.C. § 1125(a) presents a federal question.

29.    This Court also has subject-matter jurisdiction pursuant to 28 U.S.C. § 1332(a) because this is a civil action in which the amount in controversy exceeds $75,000, and there is complete diversity of citizenship.

30.    The amount in controversy exceeds $75,000, exclusive of interest and costs:

a.      Marriott's Lanham Act claim, and related state law claims, allege that Defendants caused thousands of customers to distrust Marriott and divert their business elsewhere. The reputational harm to Marriott's brand from Defendants' conduct is calculated by millions, not thousands. And even assuming *arguendo* that the only customers who will never use Marriott again are the claimants represented by Defendants (a generous assumption given that thousands more likely saw Defendants' advertisements and chose *not* to sue Marriott), Marriott would only need to show that each claimant would have spent an average of $11.10 at some point during their life at a Marriott property, and will not do so anymore, because of Defendants' conduct. In fact, taking the average price of a hotel room in the United States ($200 per night), Marriott would only need to show that *375* of Defendants' purported 7,000 clients would have otherwise booked a single Marriott room for a single night at some point in their life, and will not do so anymore because of Defendants' conduct.

b.      Marriott also seeks relief that would prevent Defendants from representing nearly 7,000 claimants in a mass arbitration they initiated against Marriott. The economic value of that relief is measured, in part, by Defendants' financial interest in continuing that representation, including the contingency, statutory, and cost-based fees they expect to recover across thousands of arbitrations. Even the most conservative valuation places the amount in controversy far above the jurisdictional threshold: to fall below the jurisdictional threshold of $75,000, Defendants would need to be seeking less than $11.10 per claimant in fees—an amount lower than the arbitration fees alone. Defendants are seeking much more. They seek "at least $20,000" in statutory damages alone for each of their nearly 7,000 purported clients, in addition to punitive damages and attorneys' fees.

31. This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) over Marriott's state-law claim for intentional interference with prospective economic advantage because that claim forms part of the same case or controversy presented by Marriott's Lanham Act claims. Both claims arise from the same nucleus of operative facts: Defendants designed and disseminated false and misleading advertisements falsely characterizing Marriott's standard website practices as criminal conduct, targeted those advertisements at Marriott's existing and prospective customers, and thereby caused those customers to distrust and divert business away from Marriott. Resolving these claims in a single forum will promote judicial economy, convenience, and fairness to the parties.

32. This Court has personal jurisdiction over Defendants because they purposefully directed their conduct toward Marriott in Maryland, knowing that Marriott maintains its principal place of business in Bethesda, Maryland. Defendants intentionally solicited their clients to bring claims against Marriott, sent demand letters, mass-arbitration threats, and thousands of arbitration filings to Marriott's headquarters (including several bankers boxes full of demands); targeted Marriott's Maryland-based legal and business personnel; and undertook actions expressly calculated to impose substantial financial and operational burdens on Marriott in Maryland. Defendants also expressly aimed false and misleading attorney-advertising websites and social-media advertisements soliciting clients at Marriott in Maryland.

33. Marriott sustained the harms resulting from Defendants' conflicted representation—including the initiation and threatened initiation of thousands of meritless arbitration demands—in this State, where Marriott evaluated, responded to, and was forced to incur costs associated with Defendants' conduct. By intentionally directing these acts at a Maryland-based corporation and causing foreseeable injury in Maryland, Defendants have

established the requisite minimum contacts with this forum, and the exercise of personal jurisdiction comports with due process.

34. Defendants have also waived any objection to personal jurisdiction and venue by filing their first Rule 12 motion in response to Marriott's original complaint without raising those defenses. *See* Fed. R. Civ. P. 12(g)(2), 12(h)(1)(A); *see also* ECF No. 30 (Defendants' motion to dismiss).

35. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to this action occurred in Maryland. Marriott is headquartered in Bethesda, Maryland, and the harms resulting from Defendants' conflicted representation—including the initiation and threatened initiation of thousands of mass-arbitration demands—were felt at Marriott's principal place of business within this District. Defendants directed their threats, correspondence, and mass-arbitration filings to Marriott's headquarters in Maryland, where Marriott investigated, evaluated, and responded to the alleged claims.

36. Additionally, this District is the proper venue to bring this action because Marriott's Terms of Use, pursuant to which Claimants have filed the underlying mass arbitration, contains a choice of law and venue provision that designates Maryland as the forum state. Moreover, the mass arbitration is currently being administered with no physical forum by AAA employees located in various states.

37. Assignment to the Southern Division is proper under Local Rule 501.4 because the events giving rise to the claims occurred in Montgomery County, Maryland, and Marriott maintains its headquarters and principal place of business there. The injury to Marriott—including the legal, financial, and operational harms arising from Defendants' conflicted representation and mass-arbitration tactics—was centered in and sustained within the Southern Division.

38.     Defendants have also waived any objection to this venue by filing a responsive pleading to Marriott's original complaint and not raising any objection to venue. *See* Fed. R. Civ. P. 12(g)(2), 12(h)(1)(A); *see also* ECF No. 30 (Defendants' motion to dismiss).

**FACTUAL ALLEGATIONS**

**A.      Marriott's Website Respects Privacy Choices**

39.     Marriott operates one of the world's leading hospitality businesses. Through its website, Marriott.com, guests can research destinations, search for rooms, book stays, and manage reservations across more than 30 brands and over 9,700 properties in 143 countries and territories. Like virtually all modern consumer websites, Marriott.com uses standard third-party website technologies, including cookies and pixels, to support routine functions such as analytics and advertising.

40.     Marriott is transparent about these practices and takes visitors' privacy preferences seriously. Its privacy policies inform visitors that the website uses "Cookies and Similar Technologies," including "pixel tags" for advertising, analytics, and related purposes. The policies explain how these technologies operate and offer users clear privacy controls, including through browser settings and Marriott's "Tracking Preferences" and "Privacy Center" pages. Marriott also recognizes and honors universal opt-out signals some visitors install on their browsers.

41.     Visitors consent to Marriott's privacy policies by using its website. *See, e.g., Calhoun v. Google*, 349 F.R.D. 588, 595–98 (N.D. Cal. 2025) (consent to privacy policy with relevant disclosures defeats CIPA claims). Those who complete a transaction on Marriott's website also expressly consent by agreeing to its terms, which incorporate the privacy policies. *See id.*

15

**B.      Plaintiff-Side Firms File a Wave of Meritless CIPA Claims**

42.      In recent years, certain plaintiff-side firms have filed a wave of claims against businesses with consumer-facing websites under the California Invasion of Privacy Act (CIPA), a 1967 statute that criminalizes physically "tapping" telephone wires to eavesdrop on conversations. These firms claim that the routine use of widely adopted website technologies like cookies and pixels amounts to criminal "wiretapping" within the meaning of that decades-old statute. Using these claims, these firms have mass-produced thousands of lawsuits and arbitrations alleging that something as simple as a voluntary visit to a company's website exposes the company to criminal liability and tens of thousands of dollars in statutory damages for each voluntary website visit.[1]

43.      Recent federal authority has rejected that theory. For example, a federal court dismissed such allegations in *Doe v. Eating Recovery Center*, explaining that CIPA "was drafted

---

[1] Firms bringing frequent CIPA claims "primarily focus on sending a high volume of templated demand letters that are designed to trigger costly settlements before a case is filed." Allison Grande, *4 Firms Fueling Website Tracking Claims, Cyber Insurer Says*, Law360 (Nov. 5, 2025), https://www.law360.com/articles/2407428/4-firms-fueling-website-tracking-claims-cyber-insurer-says (quotations omitted). "[Their] playbook appears to involve sending the same demand letter to multiple businesses," which "often outline allegations concerning violations of [CIPA] based on the use of tracking technologies provided by TikTok, LinkedIn, X, and data brokers (among others)." *Id.* But "CIPA is a criminal statute that was enacted nearly 60 years ago to address telegraph and telephone wiretapping. CIPA's terms 'tap,' 'wire,' 'in transit' and 'read' were conceived for analog line interception, not encrypted browser-to-server interactions." David Wheeler, *Privacy Ruling Shows How CIPA Conflicts With Modern Tech*, Law360 (Jan. 30, 2026), https://www.law360.com/articles/2432218/privacy-ruling-shows-how-cipa-conflicts-with-modern-tech (footnotes omitted). Following *Doe v. Eating Recovery Center*, "Plaintiffs must show true in-transit interception, which is technically incompatible with how pixels operate." *Id.* Nevertheless, "California Invasion of Privacy Act litigation continues accelerating. CIPA exposure can reach $5,000 per violation, or three times actual damages, so plaintiffs often litigate without needing to prove monetary loss. Across the country, plaintiffs firms filed approximately 4,000 online privacy and tracking lawsuits in 2024 – a dramatic increase from prior years – targeting session replay tools, social media pixels and analytics technologies." Camilo Artiga-Purcell, *California's New Privacy Laws Demand Preparation From Cos.*, Law360 (Feb. 12, 2026), https://www.law360.com/articles/2439003/california-s-new-privacy-laws-demand-preparation-from-cos- (footnotes omitted).

with very different technology in mind" and "does not map properly onto the internet." 806 F. Supp. 3d at 1117. Because CIPA is a penal statute to which the rule of lenity applies, all "courts should generally resolve CIPA's many ambiguities in favor of the narrower interpretation." *Id.* at 1112. The court therefore held that pixels did not constitute interception "while in transit" under CIPA. *Id.* at 1117.

44.    And rightly so. Pixels are merely requests to a website visitor's browser to voluntarily share anonymized, encrypted metadata about a visit. The Third and Ninth Circuits have thus likewise held that technologies like the Meta Pixel do not intercept communications within the meaning of CIPA. *See Cole v. Quest Diagnostics*, 2025 WL 3172640, at *3 (3d Cir. Nov. 13, 2025); *Karwowski v. Gen Digit.*, 2025 WL 3002610, at *2 (9th Cir. Oct. 27, 2025) (mem.).

**C.    Defendants File an Abusive Mass Arbitration**

45.    Defendants nevertheless filed nearly 7,000 amended arbitration demands against Marriott with the American Arbitration Association ("AAA"), alleging precisely the kind of CIPA claims described above.

46.    The demands accuse Marriott of committing a "crime" by "secretly installing and using pixels" to "surreptitiously intercept" website visitors' data. Amended Demand ¶¶ 6–7. They allege that through cookies and pixels, including the Meta Pixel, Marriott "facilitat[ed] wiretapping and eavesdropping" by third parties like Facebook. *Id.* ¶¶ 7, 17. They specifically allege that those pixels shared personal information that website visitors submitted on Marriott.com, such as when booking a room. *Id.* ¶ 17.

47.    What Defendants concealed, however, is that they used the same pixels in online interactions with the same individuals—namely, their own clients.

17

48.     Defendants recruited nearly 7,000 purported clients with attorney-advertising websites soliciting claims against Marriott. Those websites used the very same pixels, including the Meta Pixel, that Defendants allege are a crime. Using client information collected with and transmitted to social media companies through those pixels, Defendants targeted social media ads at California residents. Those ads directed prospective clients to submit information through webforms designed to capture the bare minimum information necessary to complete the AAA's claimant-intake spreadsheet.

49.     Defendants' advertising campaign reached thousands of actual and prospective Marriott customers. It was also designed to cause customers to distrust Marriott's website and online booking services. By falsely portraying Marriott's standard website practices as criminal conduct that "betray[ed]" consumers' privacy, the campaign damaged Marriott's commercial reputation and goodwill with the customers upon whom its business depends, causing reputational injury and economic harm in the form of lost future business that goes far beyond the costs that Marriott has incurred defending the mass arbitration.

50.     Defendants conducted no further claimant-specific investigation, as the demands demonstrate. Aside from the claimant's name, the demands include zero claimant-specific allegations. They seek identical damages for every claimant and quadruple-count statutory damages to evade small-claims court jurisdiction, where attorneys cannot represent claimants and cannot obtain attorneys' fees.

51.     The demands also include claimants with unusable contact information and, on their face, appear to include fictitious or duplicate names and vexatious litigants whom the AAA bars from participation in its proceedings. The demands do not even allege facts establishing that a single claimant entered into an enforceable arbitration agreement with Marriott.

52.    Such defective filings are particularly abusive when used for mass arbitrations. Filing thousands of copy-paste arbitrations imposes on respondents arbitration fees—often totaling millions of dollars—just to appoint arbitrators before any of the merits of the claims are adjudicated.

53.    While mass arbitration can sometimes serve legitimate purposes, it is prone to abuse when attorneys "solicit claimants via social media and conduct little or no investigation before filing claims" in order "to magnify threatened attorneys' fees" with "a large pool of claimants." Heckman & Townsend, "Class and Mass Arbitration," *The College of Commercial Arbitrators Guide to Best Practices in Commercial Arbitration*, at 462 (5th ed. 2025).

*54*.    Circuit courts have increasingly recognized the potential for such tactics to distort arbitration into a coercive settlement mechanism rather than a forum for adjudicating bona fide disputes. *See, e.g.*, *Jones v. Starz Ent.*, 129 F.4th 1176, 1183 (9th Cir. 2025); *see also Wallrich v. Samsung*, 106 F.4th 609, 614 (7th Cir. 2024). That is so because firms like Defendants are using mass arbitrations to impose millions in fees regardless of the merits of the underlying claims.

55.    Here, if this mass arbitration proceeds, Marriott could be forced to pay millions in arbitration fees before a single merits arbitrator is appointed. In that context, filing thousands of baseless and defective copy-paste demands constitutes an intentional abuse of the arbitration process "geared more toward racking up procedural costs to the point of forcing [Marriott] to capitulate to a settlement than proving the allegations of [CIPA violations] to seek appropriate redress on the merits." *Jones*, 129 F.4th at 1183.

56.    Defendants' abuse does not end there. By employing pixels during online communications with their clients while simultaneously alleging that Marriott's use of pixels is a

19

crime, Defendants created incurable conflicts of interest and made themselves necessary and adverse witnesses in their clients' cases.

57.    This matter therefore involves a quintessential abusive mass arbitration built on meritless claims and disqualifying conflicts. Marriott now brings this suit to stop that abuse, protect the integrity of the arbitration process, and remedy the injury to Marriott's business and reputation that was caused by Defendants' false and misleading advertisements.

**D.    Defendants Create Disqualifying Conflicts of Interest by Using the Same Pixels on Their Clients—While Disregarding Their Privacy Choices**

58.    Defendants used the Meta Pixel and similar technologies on their client-solicitation websites to collect information that prospective clients submitted while seeking legal representation. The pixels transmitted that information to third parties like Facebook. They then used their clients' data to target social media ads at California residents and direct them to sites like their "Money Team Law Firm" webpage promoted by celebrity boxer Floyd Mayweather:



59. The Money Team website invited visitors to bring meritless claims in response to allegations that Marriott "broke the law by capturing" their "personal information without [their] knowledge or consent" and "betray[ed] the trust of those who relied on them." It urged visitors to "JOIN THE FIGHT!" against Marriott so Defendants could "Step into the Ring and Stand Up for Your Right to Privacy!"



60. Hilliard, Sperling Kenny, or agents they are responsible for installed a piece of code on the Money Team website called PixelYourSite Professional. That tool is designed to manage the Meta Pixel, Google Analytics, Google Ads remarketing tags, Pinterest tags, Bing tags, TikTok tags, and similar scripts. The Money Team website's code confirms that it used the Meta Pixel, TikTok pixel, Google Tag Manager, and similar technologies.

61. These pixels did not just capture and share innocuous metadata about website visits. They disclosed the *contents* of prospective clients' webform submissions. As a result, the pixels transmitted client names, contact information, and the substance of requests for legal assistance to third parties. *See generally* **Exhibit C** (Decl. of Ron Schnell).

62.    Defendants structured and operated this solicitation campaign as a commercial client-acquisition enterprise, not as informational or advocacy speech. Using the Meta Pixel and similar technologies, Defendants built custom advertising audiences from data collected about prior website visitors. They used that data to direct paid ads toward California residents who had previously interacted with Marriott online. They paid to run those ads on commercial social-media platforms such as Facebook.

63.    Defendants' use of professional, pixel-based digital marketing management tools like PixelYourSite Professional and Google Tag Manager confirms that Defendants operated their campaign using the same commercial logic as any business-to-consumer advertising effort: spend money on ads, track consumer behavior, target specific audiences, and maximize conversions.

64.    Unlike Marriott's website, Defendants' solicitation webpages neither offered visitors privacy-preference controls nor honored universal opt-out signals.

65.    Defendants thus used the same pixels they allege Marriott used, conduct they claim is not just a "betrayal" of trust, but a crime. And they did so in a far more invasive manner that disregarded user opt-out signals, during privileged attorney-client communications. *See* Maryland Rule 19-301.6(a) (prohibiting a lawyer from revealing "information relating to the representation of a client"); Maryland Rule 19-301.18(b) (applying confidentiality rule to prospective clients); *see also* Restatement (Third) of the Law Governing Lawyers ("Restatement") § 60(2) (2000) (discussing use and disclosure of client information for the lawyer's pecuniary gain).

66.    Under the legal theory they advance against Marriott, their own conduct is subject to the same potential civil and criminal liability they allege on behalf of their purported clients. That is like a prosecutor pursuing charges against a defendant while the prosecutor was committing the same alleged crime. That overlap creates a direct and disqualifying conflict of interest.

67.    The conflict is unavoidable, as this question demonstrates: Have Defendants advised their clients that they think their clients could assert the same claims against their own counsel? Regardless of the answer, Defendants created a direct, disqualifying conflict of interest. *See, e.g.*, Model Rule 1.7(a) (Rule against concurrent conflicts of interest, including those that involve the lawyer's conduct); Maryland Rule 19-301.7 (same); *see also* **Exhibit E** (Decl. of Michael McCabe).

68.    A concurrent conflict exists where there is a significant risk that a lawyer's own personal interests will materially limit their representation. *See* Model Rule 1.7(a)(2); Maryland Rule 19-301.7(a)(2). A personal-interest conflict is particularly acute where the "probity" of a lawyer's own conduct is implicated because counsel may be unable to give clients detached advice or pursue all reasonable strategies. *See* Model Rule 1.7 cmt. 10; Maryland Rule 19-301.7 cmt. 10.

69.    Here, Defendants' practices place the probity of their conduct squarely at issue. Model Rule 1.7 cmt. 10; Maryland Rule 19-301.7 cmt. 10.

70.    That conduct also creates a substantial risk that Defendants' personal and professional interests will "materially impair" their ability to represent their clients. Restatement § 125 cmt. c. Defendants face incentives to narrow their factual investigation into pixels, frame legal arguments about disclosure and consent in ways that minimize scrutiny of their own practices, and avoid discovery into their own solicitation websites—positions that may not align with their clients' best interests, which instead "would be materially and adversely affected by the lawyer's own interests" in avoiding liability. 7 Am. Jur. 2d § 182.

71.    Defendants' use of pixels on their websites soliciting clients to bring claims against Marriott alleging that such pixels are a crime created a foreseeable risk that Defendants' own

practices would become the subject of discovery and evidentiary proceedings in the underlying arbitrations.

72.     Under these circumstances, the conflict Defendants created is neither theoretical nor waivable. It strikes at their ability to provide detached advice, pursue discovery without self-interest, and litigate thousands of proceedings without their own conduct becoming an adverse and distracting issue. *See Klupt*, 126 Md. App. at 210; Model Rule 1.7 cmt. 15; Maryland Rule 19-301.7 cmt. 15 (conflict nonconsentable where a lawyer could not reasonably conclude that he or she will be able to provide competent and diligent representation).

**E.      Defendants Make Themselves Material Witnesses**

73.     Defendants also made themselves material witnesses in their clients' cases. Their own use of the same pixels during client-intake communications makes their conduct directly relevant to discovery and proof in the underlying proceedings. That created an impermissible advocate-witness conflict. Model Rule 3.7(a); Maryland Rule 19-303.7(a).

74.     Defendants' use of identical technology on their own websites is a factual issue that will require testimony from the individuals who selected, approved, configured, and installed those technologies. The only witnesses with direct, first-hand knowledge of those issues are Defendants' attorneys and those acting under their direction. *See* 69 Am. Jur. *Trials* 411, § 23 (explaining that testimony is "necessary" under Rule 3.7 "if the lawyer is the sole witness on the matter being testified, or is a tie-breaking witness, or was an actor whose participation in the underlying matter is material").

75.     That is true whether Defendants implemented those technologies directly or by directing a third-party agent, for several reasons.

24

76.     **First**, attorneys are always responsible for ensuring their own advertisements comply with the rules of professional conduct. *See* Maryland Rule 19-305.3(c)(1); Md. State Bar Ass'n Comm. on Ethics, Ethics Docket No. 2024-01 (2024) (lawyer is responsible for third-party marketing firm's advertising conduct that would violate the Rules if engaged in by a lawyer directly); *see also* Ill. State Bar Ass'n, Prof'l Conduct Advisory Op. No. 06-02 (July 2006), *affirmed* (Jan. 2010) (same principle under analogous Illinois rule); *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 464 n.22 (1978) ("solicitation by a lawyer's agents or runners would present similar problems").

77.     **Second**, Defendants have actual knowledge that their websites used pixels to share prospective clients' data with third parties. Marriott expressly informed Defendants of this issue. **Exhibit A**. They ignored it and continued to use pixels on the websites Defendants used to solicit clients to bring website privacy claims about pixels. Defendants have used the same pixels in multiple advertising websites for other matters. The consistent use of that same specialized tool across multiple of Defendants' advertising websites reflects a deliberate choice, not an accidental installation by a third party.

78.     **Third**, after Marriott raised Defendants' use of the pixels and the ensuing conflicts of interest, Defendant Hilliard launched yet another solicitation campaign, this time using advertisements that targeted consumers in connection with claims against Intuit, Inc. Once again, Hilliard used social media ads and intake websites accusing a company of criminal privacy violations through pixel and tracking technologies, while using those same technologies on its own solicitation websites. That campaign continues to this day. *See generally* **Exhibit D** (Supplemental Decl. of Ron Schnell).

79.     In each of the nearly 7,000 arbitrations, one or more attorneys Defendants employ and agents they are responsible for are material witnesses to establish key facts about their use of pixels, including: whether they used pixels to recruit a particular claimant; whether they shared a particular claimant's client-intake pixel data; what pixels they used; what triggered each pixel; how the pixels functioned; what information they transmitted; whether and to what extent any transmitted information was encrypted; what disclosures (if any) a particular claimant received notice of or consented to; and whether Defendants contend that their own practices differ in any meaningful way from the conduct they attribute to Marriott.

80.     Equally important is the untenable position Defendants have created for their nearly 7,000 clients. Their clients must answer questions about their own counsel's conduct, and the answers may be adverse to their claims. For example, Defendants' clients must answer whether they can credibly articulate a material difference between their own counsel's use of these technologies and Marriott's use of them. Their inability to do so would be strong evidence against their claims against Marriott. The "substantial conflict" created by Defendants' conduct in making themselves necessary witnesses whose testimony will be "materially adverse" to the client's interest presents a conflict that is not waivable. Maryland Rule 19-303.7 cmt. 6; Restatement § 108(3) cmt. f; *see also Klupt*, 126 Md. App. at 209.

81.     Unconflicted counsel who had not done what Defendants did would avoid this untenable conflict between client and counsel. Such counsel could provide conflict-free advice about whether to pursue pixel-privacy claims against Marriott, Hilliard, Sperling Kenny, all three, or none.

82.     The foreseeable overlap between Defendants' role as advocates and their role as necessary fact witnesses whose conduct their own clients must answer for will complicate

26

discovery, generate motion practice, and risk distorting the evidentiary record across thousands of proceedings. Model Rule 1.7 cmt. 15 and 3.7 cmt. 1; Maryland Rule 19-301.7 cmt. 15 and 19-303.7 cmt. 1; Ann. Model Rules of Pro. Conduct § 3.7 ("attorney-witness may not be a fully objective witness, causing harm to the client's cause, or the trier of fact may grant undue weight to the attorney's testimony, unfairly disadvantaging the opposing party"). That harm cannot be cured if the arbitrations proceed with Defendants as claimants' conflicted counsel.

### F.    Defendants Proceed Despite Knowing of These Conflicts

83.    Defendants proceeded with the mass arbitration despite knowing that their conduct created disqualifying conflicts of interest and made them necessary witnesses. That's because Marriott explained these issues to Defendants in writing before they filed the mass arbitration.

84.    On December 20, 2024, Defendants sent a demand letter to Marriott claiming to represent thousands of California residents who had visited Marriott's website and whose information Marriott "surreptitiously relayed, transmitted, and otherwise shared" to third parties through "pieces of electronic code" like the Meta Pixel. The letter alleged violations of CIPA and other laws and demanded that Marriott "cease and desist" its use of pixels. *See* **Exhibit B** at 3–5 (O'Connor Dec. 20, 2024, Ltr.). It further claimed that Marriott's Terms of Use "purport to require" users to submit "any dispute arising out of or related to the Sites" to arbitration before the AAA. Defendants sought discussions about a "global resolution" and threatened to file a mass arbitration if Marriott did not agree to resolve the purported claims. *Id.*

85.    Defendants sent a follow-up letter on January 16, 2025, stating that they continued to amass claimants. **Exhibit B** at 1–2 (O'Connor Jan. 16, 2025, Ltr.). They repeated the CIPA allegations, demanded statutory damages of at least $5,000 per claimant, and threatened to "begin

filing [their] clients' respective arbitration demands with the AAA pursuant to Marriott's Terms of Use" unless Marriott agreed to a mass settlement by the end of the month.

86.    After receiving Defendants' letters and reviewing the threatened arbitration demands, Marriott investigated their claims.

87.    On March 26, 2025, Marriott's counsel responded in writing, advising that Marriott had "confirmed that your clients have no viable claims against Marriott" and requesting that Defendants refrain from filing the threatened mass arbitration. *See* **Exhibit A**.

88.    For example, Marriott explained that its investigation showed that a substantial portion of the claimants had no arbitration agreement with Marriott at all. Marriott further explained that many other claimants had expressly consented to the alleged data-sharing practices by agreeing to Marriott's privacy policies, often repeatedly over many years when booking rooms.

89.    Marriott also explained that its investigation revealed that Defendants were using the very pixels they claimed were a crime on the websites they were using to solicit claimants.

90.    As Marriott explained, Defendants' use of pixels was indistinguishable from—and indeed, far more invasive than—the conduct they attribute to Marriott. Their websites urged visitors to submit information and file claims against Marriott on the premise that Marriott "broke the law by capturing" personal information "without . . . knowledge or consent" and "betray[ed] the trust" of consumers, even as their own websites used pixel technologies to collect and share data about those same individuals while they were seeking legal representation.

91.    Marriott further explained that, even though Defendants' conduct did not violate CIPA for the reasons described in the letter, it raised serious concerns because Defendants' solicitation websites appeared to transmit client and prospective-client information to third parties in connection with requests for legal representation.

92.     Marriott also identified additional websites operated by or on behalf of Hilliard Law—including Hilliard's own firm website—that appeared to use similar pixel technologies.

93.     Marriott told Defendants that their conduct had "created a direct, disqualifying conflict of interest." Marriott asked Defendants: "Will you advise your purported clients that you think they can pursue the same claims against your firm that you say they can pursue against Marriott?" **Exhibit A** at 7.

94.     Because Defendants' conduct made them foreseeable fact witnesses, Marriott advised them that it had preserved evidence concerning these practices and reminded Defendants of their obligation to do the same, "particularly because there may be relevant data about these websites that [Marriott] cannot locate or preserve." **Exhibit A** at 7.

95.     Marriott further explained that Defendants' threatened filing of thousands of arbitration demands—imposing millions of dollars in arbitration fees on Marriott regardless of the merits—would constitute "an abuse of the arbitration process" designed to coerce settlement rather than adjudicate bona fide disputes.

96.     Under these circumstances, Defendants' "substantive centrality to the issues in the case should have compelled [them] to back out at the beginning." *Abrishamian*, 216 Md. App. at 407–08. Responsible attorneys would have at least considered transferring their clients' cases to unconflicted counsel.

97.     Defendants proceeded anyway. On June 5, 2025, they filed nearly 7,000 defective, copy-paste arbitration claims, demanding "at least" $20,000 in statutory damages per claimant—more than $135 million total—based on voluntary visits to Marriott.com. They amended the demands on October 22, 2025, to assert additional claims based on the same alleged conduct.

98.     The fact that Hilliard's Intuit solicitation websites currently use the same pixels and tag management infrastructure as its own law firm website confirms that these technologies are centrally managed and deliberately used across Hilliard's advertising campaigns, not accidentally installed by third parties. *See generally* **Exhibit D**.

99.     Hilliard's decision to replicate this conduct against a second company, with full knowledge of the conflicts Marriott identified in writing, demonstrates that no amount of notice will cause Hilliard to alter its practices voluntarily. Absent judicial intervention, Hilliard will continue to prosecute conflicted representations built on the same false premise.

**G.     Marriott Promptly Filed this Action and Defendants' Abusive Mass Arbitration Remains Pending**

100.     That mass arbitration remains pending, and Marriott has already been forced to devote substantial resources to responding to it.

101.     The AAA has also appointed a Process Arbitrator to determine whether the demands met the AAA's threshold procedural requirements before any merits issues are adjudicated. Marriott submitted its opening brief on those issues in January 2026.

102.     Before briefing on whether the claimants had met the filing requirements to initiate arbitration was complete, Marriott filed this action in March 2026 to stop the tainted proceedings before anything substantive took place in the arbitration.

103.     Marriott brought this action promptly. As noted above, on March 26, 2025, Marriott put Defendants on written notice of the disqualifying conflicts of interest, giving them every opportunity to withdraw and allow their clients to retain unconflicted counsel. *See* **Exhibit A**. Months later, on June 5, 2025, Defendants filed nearly 7,000 arbitration demands against Marriott. In November 2025, the AAA appointed a Process Arbitrator to determine, before any merits issues could be adjudicated, whether the demands met threshold filing requirements. The Process

Arbitrator held a telephonic conference in December 2025 to schedule briefing on that issue. Marriott submitted its opening brief in January 2026, and Defendants submitted their response in late February 2026.

104.    Marriott filed this action in early March 2026, before briefing on whether Claimants had even met the filing requirements to initiate arbitration was complete. It did so after Defendants' brief to the Process Arbitrator—their first brief in the arbitration—made clear that they continued to refuse to take their conflicts of interest seriously, even though Marriott gave them every opportunity to address the issue. There has been no ruling on whether the claimants have met the requirements to initiate their arbitrations (or any issue in this matter). And Marriott promptly sought a stay to ensure that this Court could decide disqualification before any ruling on whether the claimants may even initiate the cases. Marriott thus acted swiftly to stop the tainted proceedings before any adjudication of any merits issue even started.

105.    In April 2026, the Process Arbitrator stayed the mass arbitration to allow this Court to address Marriott's disqualification motion. The parties thereafter stipulated to maintain that stay until the disqualification issue is resolved.

106.    Absent judicial intervention, Marriott will continue to incur substantial and escalating costs defending meritless claims in proceedings fundamentally tainted by Defendants' ethical conflicts and their role as necessary witnesses. The Court should disqualify Defendants and enjoin their continued prosecution of the mass arbitration.

**CLAIMS FOR RELIEF**

**Count I: Disqualification of Conflicted Counsel to Redress Ongoing Harm to Adjudicative Proceedings**

107. Marriott repeats and realleges the foregoing paragraphs.

108. This Count is brought as a claim to redress the harm to Marriott arising from Defendants' conflicted participation in ongoing adjudicative proceedings that directly affect Marriott's rights. "[T]he decision on attorney disqualification [is] one for the court and not for the arbitration panel," *SITEL*, 2007 WL 9780537, at *3 (quoting *Action Air Freight*, 769 F. Supp. at 901), especially because such decisions "invoke the inherent power of courts" that are "based on common law principles that largely preceded the development of formal codes of professional conduct." *Lloyd v. Baltimore Police Dep't*, 729 F. Supp. 3d 494, 500 (D. Md. 2024) (quoting Hazard et al., *Law of Lawyering* § 11.13.2).

109. Defendants violated settled law for multiple independent reasons.

110. As discussed above, Defendants are necessary witnesses in the same mass arbitration they are prosecuting against Marriott—and they knew that before filing the mass arbitration. Because Defendants were "clearly aware before the fact of the potential conflict between [their] roles as advocate and witness," the "burden shifts" to Defendants "to avoid disqualification." *Klupt*, 126 Md. App. at 207–08 (quotations omitted).

111. And because Defendants used the same tracking technologies they claim are a crime on their advertising websites to solicit their clients for a mass arbitration against Marriott, they have an incurable conflict of interest. By proving their clients' claims, Defendants would be proving claims—and alleged criminal liability—against themselves.

112. Hilliard's subsequent replication of the same conduct in connection with a campaign against Intuit—after receiving Marriott's written notice of the conflicts—forecloses any

32

argument that the conflict arose from inadvertence and confirms that it will persist and proliferate absent judicial intervention.

113. The remedy for these violations, and the others discussed above, is disqualification.

## Count II: Declaratory Judgment

114. Marriott repeats and realleges the foregoing paragraphs.

115. Marriott seeks declaratory relief to clarify the parties' rights as necessary to effectuate the equitable relief sought in Count I.

116. The Declaratory Judgment Act and the Maryland Uniform Declaratory Judgments Act provide the courts with the authority to declare the rights and other legal relations of the parties where an actual controversy exists. 28 U.S.C. § 2201; Md. Code Ann., Cts. & Jud. Proc. § 3-409(a).

117. An actual, present, and substantial controversy exists between Marriott and Defendants regarding Defendants' ability to lawfully represent the nearly 7,000 individuals on whose behalf Defendants have initiated mass arbitration demands against Marriott.

118. This controversy is immediate and non-speculative because Defendants chose to file a mass arbitration even though they knew about the disqualifying conflicts discussed above. That mass arbitration is currently pending, although it is at the preliminary stages with no merits arbitrators appointed. No merits rulings have been made.

119. As alleged above, Defendants used tracking technologies on their own client-solicitation websites to recruit claimants for the very privacy-based claims they now assert against Marriott. Under Defendants' own theory of liability, their conduct mirrors the conduct they characterize as unlawful when undertaken by Marriott. Defendants' conduct created several disqualifying conflicts of interest, violated the fundamental rules requiring loyal advocacy, and put

nearly 7,000 claimants in an untenable position where answering questions about their own counsel's conduct will be adverse to their claims against Marriott in the mass arbitration.

120. Because the conflict is non-waivable in these circumstances, continued representation of the nearly 7,000 claimants by Defendants is impermissible.

121. This conflict also threatens the fair and efficient administration of the mass arbitrations at issue. Courts have recognized that they bear an essential responsibility to ensure that attorneys preserve public confidence in the integrity of the process. Defendants' conflicted representation violates settled law.

122. Marriott seeks a declaration under 28 U.S.C. § 2201 resolving the parties' adverse legal interests and clarifying their rights and obligations. Such relief will serve a useful purpose in settling the legal issues presented and will terminate the uncertainty and controversy giving rise to this action.

123. Specifically, Marriott seeks a declaration that:

(a) Defendants have a conflict of interest that precludes them from representing claimants in the underlying mass arbitration;

(b) Defendants may not continue to represent the nearly 7,000 claimants whose arbitration demands they have filed or threatened to file; and

(c) Any further representation of those claimants by Defendants would violate applicable rules and undermine the fair administration of the arbitration proceedings.

124. Declaratory relief is proper because the controversy is concrete, immediate, and real; the parties have adverse legal interests; and the requested declaration will conclusively determine the parties' rights with respect to Defendants' conflict and disqualification, including

(a) whether Marriott is required to defend thousands of proceedings advanced by counsel who are conflicted; and (b) whether Defendants' continued prosecution is incompatible with the requirements to protect the integrity of proceedings affecting Marriott.

### Count III: Injunctive Relief

125.   Marriott repeats and realleges the foregoing paragraphs.

126.   Federal courts have inherent authority to regulate the conduct of attorneys, including the power to disqualify attorneys whose conflicts of interest threaten the fairness, integrity, or efficiency of proceedings connected to the Court's jurisdiction. *See Shaffer Equip.*, 11 F.3d at 461–62. That authority includes the power to issue injunctive relief when violations endanger the integrity of proceedings connected to the Court's jurisdiction, including related arbitral proceedings.

127.   As alleged above, Defendants used tracking technologies on their own client-solicitation websites to recruit claimants for the very privacy-based claims they now assert against Marriott. Under Defendants' own theory of liability, their conduct mirrors the conduct they characterize as unlawful when undertaken by Marriott. Defendants' conduct created several disqualifying conflicts of interest, violated the fundamental rules requiring loyal advocacy, and put nearly 7,000 claimants in an untenable position where answering questions about their own counsel's conduct will be adverse to their claims against Marriott in the mass arbitration.

128.   Although Defendants' clients have also suffered harm from their counsel's conduct, Marriott seeks injunctive relief to redress its own concrete injuries arising from Defendants' conflicted prosecution of thousands of arbitration demands.

129.   The continued representation of the nearly 7,000 claimants by conflicted counsel threatens irreparable harm to Marriott, including the risk of tainted arbitral proceedings, distorted

claims adjudication, and the coercive use of massive filing fees and procedural leverage (such as the ongoing costs associated with the mass arbitration proceedings). These harms are occurring now: Marriott has already paid the AAA initiation fee, a case number has been assigned, the parties have participated in an administrative conference call, and threshold briefing before the Process Arbitrator had begun before the stay and remains pending.

130.    Monetary damages alone cannot remedy these harms. The injuries at issue concern the propriety of counsel's representation, the integrity of mass arbitration proceedings, and the protection of thousands of individuals' rights to unconflicted representation, none of which can be adequately remedied at law. Moreover, the costs and disruptions at issue, including front-loaded arbitration fees, accelerated defense costs, and procedural unfairness cannot be unwound after thousands of proceedings move forward.

131.    The injunctive relief Marriott seeks will directly redress these harms by preventing Defendants from continuing to prosecute the arbitration demands while operating under an incurable conflict, thereby maintaining the status quo and protecting Marriott from the continued coercive imposition of front-loaded arbitration costs and from the risk that thousands of proceedings will be shaped, managed, or adjudicated under the direction of conflicted counsel.

132.    Marriott is therefore entitled to injunctive relief under Rule 65 of the Federal Rules of Civil Procedure, both to preserve the status quo pending adjudication of this action and to permanently enjoin Defendants from continuing conflicted representation.

133.    Marriott also seeks permanent injunctive relief under 28 U.S.C. § 2202, which authorizes "further necessary or proper relief" to enforce and give full effect to the declaratory judgment sought in Count II.

**Count IV: False Advertising Under the Lanham Act (15 U.S.C. § 1125(a))**

134.    Marriott repeats and realleges the foregoing paragraphs.

135.    The Lanham Act prohibits using in commerce any "false or misleading description of fact, or false or misleading representation of fact" that "in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities." 15 U.S.C. § 1125(a)(1)(B).

136.    As described above, Defendants ran a coordinated commercial campaign—comprising targeted social-media ads and attorney-advertising websites—to solicit consumers to bring claims against Marriott. Defendants' campaign was not merely litigation speech, or an advertisement incidental to litigation: instead, it was a for-profit commercial enterprise (featuring a celebrity endorsement by Floyd Mayweather) that was designed to generate substantial attention, publicity, and ultimately attorneys' fees for Defendants. It was therefore a commercial marketing campaign.

137.    Those ads told actual and prospective Marriott customers that Marriott had committed a crime by "capturing" their personal information "without their knowledge or consent" and "betray[ed] the trust [consumers] placed in them"; that "Marriott didn't just compromise [consumers'] privacy—they violated California law"; and that because of Marriott's actions, "[m]ore than 133 million people had their personal information exposed in one of the largest data breaches in history." The ads also mused: "is Marriott profiting off your personal information? . . . that isn't just wrong. It's illegal."

138.    Supreme Court authority confirms that an attorney's "procurement of remunerative employment" is commercial speech, not protected advocacy. *Ohralik*, 436 U.S. at 459. And as for-profit firms, Defendants are "presumed to have primarily economic motivations" for their speech.

*Handsome Brook Farm v. Humane Farm Animal Care*, 700 F. App'x 251, 258 (4th Cir. 2017). Defendants' use of paid, celebrity-endorsed social media advertising to target California residents is thus a textbook "organized campaign to penetrate the relevant market." *Id.* at 262.

139.    Nor could Defendants' meritless claims about supposed "privacy issues" convert their celebrity-endorsed advertisements designed to amass clients into noncommercial speech. They could have informed consumers about their rights without directing those consumers to client-enrollment webforms. Defendants cannot immunize their commercial speech by wrapping it in the language of consumer advocacy. *Cf. Bolger v. Youngs Drug Prods.*, 463 U.S. 60, 68 (1983) ("[A]dvertisers should not be permitted to immunize false or misleading product information from government regulation simply by including references to public issues.").

140.    Courts have applied the Lanham Act to law firm ads in similar circumstances. In *Diamond Resorts International v. Aaronson*, for example, a district court treated a law firm's client-solicitation website targeting consumers with claims against a hospitality company as "commercial advertising or promotion" at the pleading stage, permitted that claim to proceed to trial, and denied the defendant law firm's motion for summary judgment. No. 6:17-cv-1394, ECF No. 43 (M.D. Fla. Jan. 26, 2018); 371 F. Supp. 3d 1088 (M.D. Fla. 2019); *see also, e.g.*, *Diamond Resorts U.S. Collection Dev., LLC v. Pandora Mktg., LLC*, 656 F. Supp. 3d 1073, 1081 (C.D. Cal. 2023) (denying defendant law firm's summary judgment motion on contributory Lanham Act claim).

141.    The representations described above were false. They misled actual and prospective customers to believe that Marriott's use of standard pixel technology constituted criminal wiretapping, a betrayal of trust, and an attempt to profit off customers' personal information. They also created a misleading commercial impression by portraying Defendants as privacy advocates exposing Marriott's supposedly unlawful use of website technology, while concealing that

Defendants used the same or more invasive technologies on the very websites through which they recruited those consumers.

142. The misrepresentations went to the core of Marriott's commercial services: whether consumers could safely use Marriott.com to book and manage hotel stays without unlawful alleged misuse of their personal data.

143. The campaign was also designed to deceive. Defendants converted nearly 7,000 consumers into arbitration claimants through advertisements built around the false message that Marriott's website practices were criminal and unsafe. That scale of deception is strong evidence that the advertisements actually misled a substantial segment of their intended audience about the services provided by Marriott on its website.

144. Defendants, operating from Texas and Illinois, placed these advertisements in interstate commerce through nationwide digital platforms, targeting California residents about a Maryland company's online services.

145. Defendants' conduct was knowing and willful. They proceeded with their advertising campaign against Marriott after receiving written notice of the false and misleading nature of their representations. They have since replicated the same campaign against at least one other company.

146. Marriott has suffered, and continues to suffer, concrete injury as a direct and proximate result of Defendants' false advertising. Defendants' campaign damaged Marriott's commercial reputation and goodwill by falsely telling thousands of its existing and prospective customers (regardless of whether those customers ultimately retained Defendants to sue Marriott) that Marriott's online services were unlawful and untrustworthy. By inducing those consumers to distrust Marriott's website and booking infrastructure, and foreseeably causing them to reduce

39

their use of Marriott's digital services and withhold future business from Marriott, Defendants injured Marriott in its commercial relationships with the customers upon which its business depends. That injury is ongoing.

147.    Marriott is entitled to its actual damages, Defendants' profits attributable to the false advertising campaign, the costs of corrective advertising, and, given Defendants' knowing and willful conduct, treble damages, and an award of attorneys' fees under 15 U.S.C. § 1117.

### Count V: Intentional Interference with Prospective Economic Advantage

148.    Marriott repeats and realleges the foregoing paragraphs.

149.    Intentional interference with prospective economic advantage occurs when wrongful conduct interferes with a business's existing or anticipated economic relationships. *Bagwell v. Peninsula Reg'l Med. Ctr.*, 106 Md. App. 470, 504 (1995). The elements are (1) intentional and willful acts; (2) calculated to cause damage to the plaintiff in its lawful business; (3) done with the unlawful purpose to cause such damage without right or justifiable cause (which constitutes malice); and (4) actual damage and loss. *Id.*

150.    Defendants acted intentionally and willfully. They designed and executed a large-scale ad campaign that targeted Marriott customers, accused Marriott's services of criminal privacy violations, and urged consumers to sever their relationships with Marriott by joining litigation against it.

151.    The campaign was not incidental to any other purpose. It was specifically engineered to assemble a client base for mass arbitration claims against Marriott and to generate additional settlement pressure by deterring consumers from continuing to use Marriott's website and therefore its products and services.

152. Those acts were calculated to cause damage to Marriott in its lawful business and were independently wrongful. Defendants made false and disparaging statements of fact to Marriott's customers while knowing those statements were unsupported or false. They also filed and pursued thousands of defective arbitration demands to leverage coercive financial pressure rather than adjudicate bona fide disputes. Both acts independently satisfy the malice element.

153. The campaign damaged Marriott's economic relationships with actual and prospective customers. Defendants targeted California residents who were existing Marriott guests, Bonvoy members, and likely repeat customers: consumers with ongoing and anticipated business relationships with Marriott.

154. By falsely branding Marriott's services as criminal and unsafe, and urging consumers to "JOIN THE FIGHT!" against Marriott, Defendants' ads and websites caused or were calculated to cause consumers to divert bookings, cancel memberships, reduce hotel spending, and avoid Marriott's websites and services.

155. Marriott suffered actual economic loss in the form of lost and diverted bookings, diminished loyalty program engagement, and reputational harm to be quantified at trial. Marriott is entitled to compensatory damages, and given Defendants' knowing and willful conduct, punitive damages as well.

## PRAYER FOR RELIEF

WHEREFORE, Marriott respectfully requests that the Court enter judgment in its favor and grant the following relief:

1. A declaration pursuant to 28 U.S.C. § 2201 that:

    1. Defendants have a conflict of interest that precludes them from representing claimants in the underlying mass arbitration;

2. Defendants may not continue to represent the nearly 7,000 claimants whose arbitration demands they have filed or threatened to file; and

3. Defendants' continued representation of those individuals would violate applicable rules and undermine the fair and efficient administration of the related arbitration proceedings.

2. Temporary, preliminary, and permanent injunctive relief pursuant to Rule 65 of the Federal Rules of Civil Procedure, 28 U.S.C. § 2202, and the Court's inherent authority:

1. Immediately enjoining Defendants from further prosecuting, advancing, or participating as counsel in any pending arbitration proceedings against Marriott on behalf of the nearly 7,000 claimants referenced above, and staying those proceedings as necessary pending resolution of this action;

2. Permanently enjoining Defendants from representing, directly or indirectly, any of those claimants in any arbitration, litigation, or other proceeding against Marriott; and

3. Requiring Defendants to withdraw as counsel from all pending arbitration demands they have filed or caused to be filed on behalf of those claimants so those claimants may have the opportunity to obtain loyal, unconflicted counsel.

3. Money damages pursuant to Marriott's claims under the Lanham Act and Maryland common law, as follows:

1. Actual damages caused by Defendants' false and misleading advertising campaign in an amount sufficient to compensate Marriott for the economic and reputational harm alleged above;

2.      Disgorgement of Defendants' ill-gotten profits attributable to their false and misleading advertising campaign;

3.      The costs to Marriott of corrective advertising necessary to remedy the reputational harm Defendants caused to Marriott's services; and

4.      Treble damages reflecting the knowing and willful nature of Defendants' conduct.

4. Marriott's attorneys' fees for this action and for defending the underlying mass arbitration pursuant to 15 U.S.C. § 1117 and this Court's inherent authority.

5. Such other and further relief—legal or equitable—as the Court deems just, proper, and necessary to protect the integrity of the proceedings and the rights of all affected parties.

[*Signature on following page.*]

Dated: May 29, 2026

                                        **WATSTEIN TEREPKA LLP**

                                        */s/ Alex Terepka*
                                        Alex Terepka (*pro hac vice*)
                                        James Ruley (Bar No. 1712140150)
                                        Logan Leonard (*pro hac vice*)
                                        Rebecca Rhym (*pro hac vice*)
                                        **WATSTEIN TEREPKA LLP**
                                        75 14th Street NE, Ste. 2600
                                        Atlanta, Georgia 30309
                                        (213) 839-3317
                                        alex@wtlaw.com
                                        jruley@wtlaw.com
                                        lleonard@wtlaw.com
                                        rrhym@wtlaw.com

                                        Nathaniel Haas (*pro hac vice*)
                                        **WATSTEIN TEREPKA LLP**
                                        515 S. Flower Street, 19th Floor
                                        Los Angeles, CA 90071
                                        (213) 526-1880
                                        nhaas@wtlaw.com

                                        *Attorneys for Plaintiff*
                                        *Marriott International, Inc.*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on May 29, 2026, I caused to be electronically filed a true and correct copy of the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record.

/s/ Alex Terepka
Alex Terepka

# EXHIBIT A



Alex Terepka
Alex@wtlaw.com
213-839-3317

March 26, 2023

**<u>VIA EMAIL</u>**
Benjamin R. O'Connor
Hilliard Law
719 S. Shoreline Blvd.
Corpus Christi, TX 78401
boconnor@hilliard-law.com

   **Re:  Your Threat to Bring a Mass Arbitration Against Marriott**

Ben,

   We write to respond to the CIPA claims outlined in your letters dated December 10, 2024, and January 16, 2025, and your draft arbitration demand. We have investigated and have confirmed that your clients have no viable claims against Marriott. We therefore request that you refrain from filing the threatened mass arbitration.

   Your letters and draft demand assert that Marriott's website collected your clients' personal information through "pieces of electronic code," including the Meta Pixel, and shared that information with "one or more companies, including Meta/Facebook" without their consent, allegedly violating the California Invasion of Privacy Act ("CIPA"). You further contend that these claims are subject to arbitration under Marriott's Terms of Use.

   Based on this, you threaten to initiate nearly 4,000 individual arbitration demands, which would impose millions of dollars in arbitration fees on Marriott regardless of the merits of your client's claims. That is an intentional abuse of the arbitration process "geared more toward racking up procedural costs to the point of forcing [Marriott] to capitulate to a settlement than proving the allegations of [CIPA violations] to seek appropriate redress on the merits." *Jones v. Starz Ent., LLC*, 2025 WL 649705, at *6 (9th Cir. Feb. 28, 2025).

   Your threat to file a mass arbitration is especially abusive because you are representing purported clients who have no good faith basis to assert any claims against Marriott in arbitration. For example, many do not have an enforceable arbitration agreement with Marriott. They thus have no good faith basis to initiate any arbitration. A preliminary review of the list of purported clients you sent shows that for a substantial portion of them, Marriott has no record that they interacted with the company in a way that could create an enforceable arbitration agreement (such as making a hotel reservation or joining Marriott's loyalty program). *See, e.g., Watkins v. Carr*, 2018 WL 10741730, at *3-4 (D. Md. Jan. 12, 2018) (no arbitration agreement formed where "website users not required to click on the link to the page containing terms of use, nor required to

---

**Atlanta**
1055 Howell Mill Road, 8th Floor
Atlanta, GA 30318

**Los Angeles**
515 S. Flower Street, 19th Floor
Los Angeles, CA 90071

**Miami**
218 NW 24th Street, 3rd Floor
Miami, FL 33127

 **www.wtlaw.com**    **Alex@wtlaw.com**    **213-839-3317**

March 26, 2025
Page 2 of 7

read or assent to the terms of use in order to have access to website content"). This group of purported clients may not have interacted with the company at all or even visited its website.

That is just one example of your purported clients that have no good faith basis to assert claims against Marriott. Another example includes former Marriott guests, loyalty program members, or both, who consented to the alleged information sharing. Consent defeats all of the alleged claims. *Maghen v. Quicken Loans*, 680 F. App'x 554, 556 (9th Cir. 2017) (unpublished) (affirming denial of CIPA claim where plaintiff "demonstrated his consent" to conduct at issue); *Moledina v. Marriott Int'l,* 635 F. Supp. 3d 941, 953 (C.D. Cal. 2022) (dismissing CIPA claims based on plaintiff's consent). Many of your purported clients consented to Marriott's Privacy Statement (available at https://www.marriott.com/about/privacy.mi) in a variety of ways, like making hotel reservations or joining the rewards program.

Marriott's Privacy Statement provides: "[Marriott] may use Advertising Partners and other third-party advertising companies to serve advertisements on [its] Websites, Apps, and other websites regarding both Marriott and third-party goods and services that may interest you when you access and use the Online Services[.] To serve such advertisements, these companies place or recognize a unique cookie on your browser (including through use of pixel tags)." The Privacy Statement also informed your purported clients that "[Marriott collects] data through third-party services and products . . . which use cookies and technologies to collect and analyze data about use of the Online Services. These services also collect Data regarding the use of other websites, apps, and online resources." *Id.* The Privacy Statement further notified your purported clients that Marriott "disclose[s] Personal Data and Other Data to third-party service providers, including, for example, companies that provide website hosting, automated chat functionalities or AI-powered technologies, data analysis, payment processing, order fulfillment, information technology and related infrastructure provision, customer service, email delivery, marketing auditing, and other services."

Accordingly, prior Marriott hotel guests and loyalty program members consented to the alleged sharing of their data via Meta Pixel and other technologies long before their claims could have arisen. They thus have no viable claims under CIPA. *Smith v. Facebook, Inc.*, 745 F. App'x 8, 9 (9th Cir. 2018) (unpublished) (affirming dismissal of CIPA claims on consent grounds); *In re Yahoo Mail Litig.*, 7 F. Supp. 3d 1016, 1028–32 (N.D. Cal. 2014) (dismissing federal wiretap claim on consent grounds). In fact, many of your purported clients have made dozens of reservations over the years, consenting to Marriott's privacy policies at least as many times along the way. And many enrolled in Marriott's loyalty program years ago, again consenting to Marriott's privacy policies. These purported clients have no good faith basis to claim that Marriott "secretly install[ed] and us[ed] pixels and other technologies within its Site" (Demand ¶ 7); that it "surreptitiously relays Information to other companies" (*id.* ¶ 5); or that it "misl[ed] users as to whether and how it shares, or permits others to intercept, their Information" (*id.* ¶ 48)—especially where they consented to such information sharing over and over again. The same holds true for any of your purported clients who consented even once.

In sum, most—if not all—of your purported clients have no good faith basis to assert claims against Marriott in arbitration. They either have (a) no arbitration agreement with Marriott or (b) consented to any alleged information sharing by making reservations, joining the rewards program, and more before their claims arose.

March 26, 2025
Page 3 of 7

Next, the claims also fail because no interception occurred while the information was in transit. *See, e.g., Griffith v. TikTok, Inc.*, 2024 WL 5279224, at *10 (C.D. Cal. Dec. 24, 2024) (granting summary judgment to defendant on that basis); *Esparza v. Gen Digital Inc.*, 2024 WL 655986, at *4 (C.D. Cal. Jan. 16, 2024) (dismissing CIPA claim on that basis) (collecting cases).

The above confirms that you have no good faith basis to proceed with an abusive mass arbitration because your purported clients have no claims. But there is more. Your firm is doing far worse than you allege to its own purported clients. Your websites soliciting clients use the same pixels your purported clients allege violate CIPA. To take one example of such a website, your firm is using "The Money Team Law Firm" website promoted by famous boxer Floyd Mayweather to solicit clients to bring claims against Marriott. Below is a screenshot of part of that webpage.



There is no doubt that this is your firm's webpage because you included pictures of you and your team farther down on the same page, as shown in the screenshot below:



March 26, 2025
Page 4 of 7

Your webpage's source code indicates that your firm uses PixelYourSite Professional, which touts itself as "probably the most complex tracking tool for WordPress, managing the Facebook Pixel (now the Meta Pixel), Google Analytics, Google Ads Remarketing, Pinterest Tag, Bing Tag, the TikTok Tag, and virtually any other script." *See* https://www.pixelyoursite.com. PixelYourSite allows users to "[t]rack multiple tags with a single plugin," including "Meta Pixel (formerly the Facebook Pixel), Facebook Conversion API (CAPI), Google Analytics, Google Ads Remarketing, Pinterest, Bing, TikTok Tag with API, and ANY script." *See* https://www.pixelyoursite.com/plugins/pixelyoursite-professional.



Your webpage's source code has these pixels, as shown below. For example, here's the Meta pixel code:



Here's the TikTok pixel code:



March 26, 2025
Page 6 of 7

And here's another Meta pixel code and Google tag manager code:



In other words, your Money Team website uses the same pixels that you claim violate CIPA. Your demand alleges that "Marriott built into its Site one or more pieces of code, including one called the 'Meta Pixel,' that monitored and intercepted communications submitted by Claimant and others to Marriott using the Site." Demand ¶ 4. It further contends that "[b]y secretly installing and using pixels and other technologies within its Site, Marriott is (1) wiretapping its users itself, (2) facilitating wiretapping and eavesdropping of its users' Information, or (3) both." *Id.* ¶ 7.

By the terms of your own demand, your firm's conduct is far worse than what you claim Marriott did, for multiple independent reasons. You are luring people to make meritless claims that Marriott "broke the law by capturing" their "personal information without [their] knowledge or consent" and "betray[ed] the trust of those who relied on them." *See* https://legalsettlementexperts.com/marriott-v2/. Yet your Money Team website is using the same "pixels and other technologies" you contend are somehow a "betrayal" of trust.

Worse still, your webpage's pixels are sharing data about your purported clients with third parties *while they are requesting legal advice* from you. That does not violate CIPA for the reasons discussed above. But it does violate the Rules of Professional Conduct because your websites are using pixels to share client information with third parties. *See, e.g.,* Tex. Comm. Prof'l Ethics, Op. 673 (2018) (concluding that even inadvertently identifying clients without their consent during an informal lawyer-to-lawyer consultation for the benefit of such clients may violate the Texas Disciplinary Rules of Professional Conduct); Ill. R. Prof'l Conduct 1.6 ("A lawyer shall not reveal

information relating to the representation of a client unless the client gives informed consent . . . .”); ISBA Advisory Ops. Prof'l Conduct No. 97-01 (“No person who engages the services of a lawyer would assume that the lawyer would then offer their name to outside entities as potential customers. Many users of legal services would not want it known that they need legal services. Thus, it would be a breach of confidentiality.”).

Your conduct has also created a conflict of interest, as this question illustrates: Will you advise your purported clients that you think they can pursue the same claims against your firm that you say they can pursue against Marriott? Regardless of the answer, you have created a direct, disqualifying conflict of interest. *See, e.g.*, ABA Model Rule 1.7(a) (Rule against concurrent conflicts of interest, including those that involve the lawyer's conduct).

Your Money Team website is just one example of your firm using pixels. We found at least one other website of yours soliciting clients, www.privacyviolationclaim.com, doing the same thing. And your firm's website, www.hilliard-law.com, appears to have used pixels and similar technologies, as well. We have preserved information about these websites. You are required to do the same, particularly because there may be relevant data about these websites that we cannot locate or preserve.

Your websites soliciting clients explain how you have nearly 4,000 purported clients with meritless claims. Based on the significant number of individuals with no reservation history at Marriott, it appears you are accepting as a purported client anyone who fills out a web form with no vetting or verification. That confirms your threat to bring a mass arbitration is improperly “geared more toward racking up procedural costs to the point of forcing [Marriott] to capitulate to a settlement than proving the allegations of [CIPA violations] to seek appropriate redress on the merits.” *Jones*, 2025 WL 649705, at *6.

These are just some of the deficiencies in the draft arbitration demand that Marriott has identified so far. We understand you may not have had all of this information when you threatened to initiate a mass arbitration. However, you now have enough information to know that there is no good-faith basis to further pursue this action against Marriott. *See, e.g.*, AAA MA-2 (mass arbitration filings “must include an affirmation” from claimant's counsel “that the information provided for each individual case is true and correct”); Fed. R. Civ. Proc. 11(b) (attorney must certify that claims “not being presented for any improper purpose,” such as “needlessly increase[ing] the cost of litigation”). We therefore request that you refrain from filing the threatened mass arbitration, such that our client does not have to incur any further expenses associated with this matter. Marriott reserves all rights to seek an award of its attorneys' fees and costs incurred in this matter, and to assert counterclaims.

Sincerely,

*/s/ Alex Terepka*

Alex Terepka

cc:    Trevor Scheetz (tscheetz@sperlingkenny.com)
       Ryan Watstein (ryan@wtlaw.com)
       Abigail Howd (ahowd@wtlaw.com)

# EXHIBIT B



**HILLIARD**

LAW

January 16, 2025

<u>**VIA U.S. MAIL AND EMAIL**</u>

Marriott Law Department
Marriott International, Inc.
Attn: Rena Reiss, General Counsel
rena.reiss@marriott.com
10400 Fernwood Road
Department 52/923.30
Bethesda, MD 20817

> ***RE:    Notice of Claims Regarding Marriott's Breach of Customer Data Privacy***

Ms. Reiss/To Whom It May Concern:

I write to follow up on my prior correspondence, mailed on December 20, 2024. A copy of that letter is enclosed. As set forth therein, my firm represents more than 3,200 individuals (the number has risen since my last letter and continues to do so) who intend to assert claims against Marriott International, Inc. ("Marriott"). Our clients are California residents who used Marriott's online platform (the "Website"). Unbeknownst to our clients, and while they were using the Website, Marriott surreptitiously relayed, transmitted, and otherwise shared their personal information to and with a number of social media and advertising companies. Marriott's actions violated the law, including the California Invasion of Privacy Act, Cal. Penal Code § 630 *et seq.* ("CIPA"). Notably, under CIPA, our clients are entitled to recover $5,000 for each instance in which Marriott surreptitiously and without consent relayed their information to others, and we and our clients are informed and believe that Marriott committed several violations against each of our clients.

Marriott's Terms of Use purport to require our clients to submit their disputes for resolution via arbitration before the American Arbitration Association. We intend to do so in short order. But before we do so, we are reaching out to ask whether Marriott would like to discuss a resolution of our clients' claims without the need for litigation. **Please advise whether Marriott would like to discuss resolution of our clients' claims. If we do not hear from Marriott about any such discussion by <u>January 31, 2025</u>, we will begin filing our clients' respective arbitration demands with the AAA pursuant to Marriott's Terms of Use.** For the avoidance of doubt, our clients do not concede that Marriott's arbitration terms are valid or enforceable, and our clients reserve all rights.

By this and my prior letter, we also demand that Marriott cease and desist from relaying our clients' personal information to other companies without our clients' consent. And we again ask that Marriott preserve, and not destroy, any and all documents, records, information and other materials that may bear on our clients' claims.



Again, on behalf of our clients, we hope to hear from you soon in an effort to resolve our clients' claims without the need for formal proceedings.

Sincerely,

Benjamin R. O'Connor
Hilliard Law
boconnor@hilliard-law.com
312-858-6555

Enclosure



# HILLIARD
## LAW

December 20, 2024

<u>**VIA U.S. MAIL**</u>

Marriott Law Department
Marriott International, Inc.
Attn: Rena Reiss, General Counsel
10400 Fernwood Road
Department 52/923.30
Bethesda, MD 20817

> **RE:     *Notice of Claims Regarding Marriott's Breach of Customer Data Privacy***

Ms. Reiss/To Whom It May Concern:

Our firm represents in excess of 2,200 clients who have used Marriott International Inc.'s ("Marriott") online platform (the "Website"). Our clients are California residents who, among other things, used Marriott's Website to search for and make reservations at one or more Marriott properties. We have come to learn that—unbeknownst to our clients, and without their consent—Marriott surreptitiously relayed, transmitted, and otherwise shared their personal information to and with a number of social media and advertising companies. Marriott's conduct violates California and federal law, and our clients seek compensation from Marriott for its illegal conduct.

Specifically, we believe that Marriott designed the Website in a way that includes one or more pieces of electronic code that caused our clients' personal information to be relayed, without their knowledge or consent, to one or more other companies, including but not limited to Meta/Facebook (the "Conduct"). Our clients used the Marriott Website and, upon information and belief, were subjected to this Conduct. Marriott's Conduct is a violation of the law, including without limitation the California Invasion of Privacy Act, Cal. Penal Code § 630 *et seq.* ("CIPA"). Marriott's Conduct also constitutes common-law negligence.

Importantly, Section 631 of CIPA forbids interception of communications without the consent of all parties. The relevant provision reads in full:

> Any person who, by means of any machine, instrument, or contrivance, or in any other manner, intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively, or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system, or who willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or who uses, or attempts to use, in any manner, or for any purpose, or to



communicate in any way, any information so obtained, or ***who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section***, is punishable by a fine not exceeding two thousand five hundred dollars ($2,500), or by imprisonment in the county jail not exceeding one year, or by imprisonment pursuant to subdivision (h) of Section 1170, or by both a fine and imprisonment in the county jail or pursuant to subdivision (h) of Section 1170.

Cal. Penal Code § 631(a) (emphasis added). CIPA also forbids aiding, agreeing with, employing, or conspiring with any person to unlawfully cause or permit interception of communications by someone else without the consent of all parties thereto. *See id.* Marriott's Conduct described above constitutes such aiding, agreeing with, employing, or conspiring with another person—the companies to whom our clients' information was relayed, transmitted, or otherwise sent—to unlawfully cause or permit interception of such communication without our clients' consent. The programming underlying Marriott's Website also constitutes an improper "pen register" and/or "trap-and-trace" device, and Marriott's Conduct violates CIPA in this regard as well. *See* Cal. Penal Code §§ 638.50–638.51.

Under CIPA, our clients are entitled to recover $5,000 for each instance in which Marriott surreptitiously and without consent relayed their information to others. *See* Cal. Penal Code § 637.2(a). We and our clients are informed and believe that Marriott has committed several violations against each of our clients, and we anticipate that the precise number of violations can be identified through discovery, if needed, which we expect will confirm that Marriott may have committed more violations—perhaps myriad more—against certain or all of our clients.

Marriott's Terms of Use purport to require our clients to submit "any dispute arising out of or related to the Sites" for resolution via arbitration before the American Arbitration Association. We are prepared to litigate—and, if needed, try—our clients' claims, whether in arbitration or otherwise. Before we file claims on behalf of our clients, we are reaching out to ask whether Marriott would like to discuss a resolution of our clients' claims. **Please advise whether Marriott would like to discuss resolution of our clients' claims.**

By this letter, we also demand that Marriott cease and desist from relaying our clients' personal information to other companies without our clients' consent. We also ask that Marriott preserve, and not destroy, any and all documents, records, information and other materials that may bear on our clients' claims.

On behalf of our clients, we hope to hear from you soon in an effort to resolve our clients' claims without the need for formal proceedings.



Sincerely,

Benjamin R. O'Connor
Hilliard Law
boconnor@hilliard-law.com
312-858-6555

# EXHIBIT C

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION**

| | |
|---|---|
| **MARRIOTT INTERNATIONAL, INC.** | : |
| 7750 Wisconsin Avenue | : |
| Bethesda, Maryland, 20814 | : |
| Montgomery County | : |
| | : |
| Plaintiff, | : |
| | : |
| **v.** | : |
| | : |
| **HILLIARD, MARTINEZ & GONZALES,** | : |
| **LLP, d/b/a HILLIARD LAW** | : |
| 719 S. Shoreline Boulevard, Suite 100 | : |
| Corpus Christi, Texas 78401 | : |
| | : |
| & | : |
| | : |
| **SPERLING KENNY NACHWALTER, LLC** | : |
| 1441 Brickell Avenue, Ste 1100 | : |
| Miami, Florida 33131 | : |
| | : |
| Defendants. | : |
| | : |

### EXPERT DECLARATION OF RON SCHNELL

Executed on February 26, 2026

**TABLE OF CONTENTS**

I.      INTRODUCTION ..................................................................................................................3

II.     ASSIGNMENT .....................................................................................................................3

III.    QUALIFICATIONS AND EXPERIENCE ..........................................................................4

IV.     EXECUTIVE SUMMARY ...................................................................................................6

V.      BACKGROUND ...................................................................................................................6

    A.      How Web Browsers Interact with Websites .................................................................7

    B.      Tags and Tag Managers ...............................................................................................8

    C.      Claimants' Allegations.................................................................................................9

    D.      Claimants' Counsel's Websites .................................................................................10

VI.     CLAIMANTS' COUNSEL'S WEBSITES INTEGRATE THE SAME TYPE OF THIRD-PARTY TECHNOLOGIES AT ISSUE, DOING SO WITH MORE INVASIVE CONFIGURATIONS AND NO OPT-OUT CONTROLS ......................................................................................................................11

    A.      Methodology for Analyzing Claimants' Counsel's Websites ....................................14

    B.      Analysis of Claimants' Counsel's Websites ...............................................................15

        1)      Hilliard Law Website ...............................................................................................15

        2)      Legal Settlement Experts Website ...........................................................................19

        3)      Privacy Violation Claim Website .............................................................................21

        4)      Sperling Kenny Website ...........................................................................................22

VII.    CONCLUSION....................................................................................................................23

VIII.   APPENDIX A: CURRICULUM VITAE

IX.     APPENDIX B: EXPERT EXPERIENCE

X.      APPENDIX C: MATERIALS RELIED UPON

## I.    INTRODUCTION

1.    I, Ron Schnell, am a Distinguished Technology Fellow at Keystone.

2.    I have been retained by counsel for Marriott International, Inc., ("**Marriott**") to provide expert analysis in the pre-filing matter of *Marriott International, Inc. v. Hilliard, Martinez & Gonzales, LLP, et al.*. I have been asked to prepare an expert Declaration in response to the Amended Demands for Arbitration, filed October 22, 2025 (the "**Demands**"), and in support of Marriott's contemporaneously filed Motion to Disqualify Counsel regarding the extent to which third-party technologies are integrated on the websites operated by Hilliard, Martinez & Gonzales, LLP, and Sperling Kenny Nachwalter, LLC ("**Claimants' Counsel**"), how information flows over the Internet, and generally how advertising and analytics technologies operate.

3.    The opinions expressed in this Declaration are based on a reasonable degree of scientific certainty in my field, my research, expertise, and experience in those fields of computer science, computer software, software development, computer privacy, and user information tracking, as well as on the materials I reviewed in preparation for this Declaration, which are listed in **Appendix C**. I reserve the right to update any of my opinions if further materials are produced over the course of this litigation. Keystone provided support for the preparation of this expert Declaration under my direction and supervision, including conducting analyses at my direction which will be referenced as "my own independent testing." The opinions expressed in this report are solely my own. Keystone receives compensation for my work on this matter at a rate of $950 per hour. My compensation is not dependent upon the outcome of this case.

## II.    ASSIGNMENT

4.    I was asked to prepare a Declaration addressing the allegations presented in the Demands. The allegations asserted that Marriott integrated several different third-party technologies into their website which enabled them to "surreptitiously intercept" data transmitted by the users' browsers during the period from February 20th, 2024 to May 19th, 2025 (the **"At-Issue Period"**). My assignment was to evaluate the extent of similar types of third-party technologies integrated on hilliard-law.com ("Hilliard Law website"), privacyviolationclaim.com ("Privacy Violation Claim website"), legalsettlementexperts.com ("Legal Settlement Experts website"), and sperlingkenny.com ("Sperling Kenny website") (collectively "Claimants' Counsel's Websites").

3

## III.    QUALIFICATIONS AND EXPERIENCE

5. My professional credentials and experience are detailed in my curriculum vitae at **Appendix A**. Additionally, my testifying experience as an expert is detailed at **Appendix B**. I consider myself qualified to prepare this report, based on my academic and professional background, which I outline briefly in the following sub-paragraphs:

1) I have over 40 years of experience in the fields of computer science and software;

2) I have a master's degree in computer science from Syracuse University;

3) I have a practical knowledge of over 40 computer languages, including those that are relevant in this matter;

4) Throughout my career, I have been employed by several of the world's leading operating system companies, including (but not limited to) Bell Laboratories, IBM Corporation, and Sun Microsystems, and I was among the early researchers involved with the Arpanet, which later became the modern internet;

5) At the beginning of my career, I was employed at the Artificial Intelligence Laboratory at the Massachusetts Institute of Technology;

6) Around 1986, I worked at Bell Laboratories, where I contributed to the UNIX Operating System by writing thousands of lines of source code that formed parts of its core kernel;

7) From 1988 to 1990, I worked at IBM Corporation, where I worked on their AIX operating system for both the IBM 370 mainframe and the IBM PS/2. During this period, I served first as a programmer and later as a development manager;

8) From 2002 to 2005, I served as a Vice President at Equifax Corporation, one of the three major credit bureaus in the United States, where I led software development within the Internet Marketing division. In addition, I acted as the company's expert on e-mail delivery, overseeing the transmission of more than one billion e-mail messages each month. As a result of this expertise, I was invited to participate as a panelist at the Federal Trade Commission to discuss e-mail delivery, privacy, fraud, and delivery challenges;

9) While overseeing software development within Equifax's Internet Marketing division, I managed multiple marketing and advertising projects, including tracking pixel projects.

4

I designed the architecture, wrote code, and supervised a team of programmers responsible for developing a campaign management system that supported both content management and advertisement publishing;

10) I have also held staff and consulting positions at various other organizations, including, but not limited to, Syracuse University, Encore Computing Corporation, Harris Computer Corporation, and ITT;

11) I presently serve as an adjunct professor of computer science and was formerly a member of the advisory board for the College of Engineering and Information Science at Nova Southeastern University;

12) In addition to my corporate experience, I have founded three "start-up" companies over the course of my career, spanning from a mainframe software enterprise to a ".COM" business, which I sold to a publicly traded corporation in 2000;

13) Between 2005 and 2011, I was recruited to be the person to run the organization responsible for monitoring Microsoft Corporation (US v. Microsoft, N.Y. et al. v. Microsoft) on behalf of the United States Department of Justice and the Attorneys General for 19 states. This role gave me powers akin to a Special Master of the DC District Court, assisting the plaintiffs (the Attorneys Generals) in reporting regularly to Hon. Colleen Kollar-Kottelly in the largest antitrust case in United States history. I oversaw the daily enforcement of the Final Judgments on behalf of the plaintiffs, managing and coordinating all related activities. To fulfill these responsibilities, I hired and supervised a team of 93 individuals. A three-member committee (referred to as the Members) was appointed by the Parties and confirmed by the Court to determine the optimal operation of the organization. The Members selected me for this role due to my extensive background in managing technology companies, particularly those developing operating systems that competed with Microsoft Windows. Protective Orders and an Implementation Order restrict any additional disclosure about this matter;

14) I have overseen software projects of varying scales, ranging from custom-built applications developed for specific clients to large-scale software products serving hundreds of millions of users. I have led programming teams ranging in size from a single developer to more than one hundred, employing both agile and waterfall methodologies;

5

15) My published works are referenced as follows:

    i.    Schnell, Ron. "Hacking 101: Using Social Engineering Increases Security Attack Effectiveness." Coast Guard Journal of Safety & Security at Sea, Proceedings of the Marine Safety & Security Council 71, no. 4 (2014): 25–27. https://www.dco.uscg.mil/Portals/9/DCO    Documents/Proceedings Magazine/Archive/2014/Vol71_No4_Wint2014-15.pdf?ver=2019-12-11-161907-677, and

    ii.    Jay L. Himes, Jason Nieh & Ron Schnell, "Antitrust Enforcement and Big Tech: After the Remedy Is Ordered", 1 Stanford Computational Antitrust 64 (2021).

## IV.    EXECUTIVE SUMMARY

6.    **Claimants' Counsel's Websites integrate the same types of third-party technologies that they allege are at issue on Marriott's website, but with more invasive configurations.** My analysis of Claimants' Counsel's Websites shows that they utilize comparable client-side analytics and marketing technologies, including the Meta Pixel, with configurations that are more invasive than those they allege Marriott uses. These technologies function through the same technical mechanisms that Claimants characterize as "unlawful conduct" and a "crime" when allegedly integrated by Marriott.[1] *See, e.g.,* **Section VI** *infra.*

7.    **Claimants' Counsel's Websites do not provide built-in, user-controlled opt-out mechanisms for tracking.** Claimants' Counsel's Websites do not implement any readily accessible user-facing controls that directly govern whether third-party technologies are permitted to load on Claimants' Counsel's Websites and execute. *See, e.g.,* **Section VI** *infra.*

## V.    BACKGROUND

8.    In this section, I provide an overview of key technical concepts relevant to the technologies at issue in this case. This includes explanations of how websites and browsers function, how tags and tag managers operate to facilitate data collection, and a description of specific third-party technologies, such as the Meta Pixel, that Claimants allege are problematic when allegedly integrated into Marriott's website, even though those same types of technologies are also integrated into Claimants' Counsel's Websites.

---

[1] Demands, ¶18.

### A. How Web Browsers Interact with Websites

9. **Websites** are composed of several kinds of files, primarily HTML (Hypertext Markup Language), CSS (Cascading Style Sheets), and JavaScript, as well as various other files, collectively referred to as "assets." Assets include files such as videos, images, and PDFs that the website may rely on.[2] HTML defines the structure and content of a webpage (such as headings, paragraphs, links, and the overall layout), while CSS controls the presentation and visual styling, including colors, fonts, spacing, and page layout, to create a consistent and engaging user experience.[3] **JavaScript** is a programming language that is widely used to make webpages interactive and dynamic. Using JavaScript enables the implementation of complex features, such as enabling websites to be more responsive to user actions, updating content without reloading the page, and enabling animations or other real-time features. A website can be composed of multiple linked **webpages.**

10. A **web browser** is an application on a device that can retrieve web content and display it on that device (such as a phone or laptop) for the user.[4] Examples of web browsers include Google Chrome, Apple Safari, Mozilla Firefox, and Microsoft Edge. When a user searches for a website in their browser's search bar (such as "www.hilliard-law.com"), the browser performs a "lookup" process to identify the target website **server** where the relevant website resources (its HTML, CSS, JavaScript, and asset files) are located.[5]

11. The server and the user's browser (which acts as the **client** in the context of a "client-server" architecture) communicate with each other through a protocol called the Hypertext Transfer Protocol (HTTP).[6] These communications comprise network traffic requests (from the client) and responses (from the server) to the requests. As part of any HTTP request made by a browser, certain technical information is transmitted because it is required for the functioning of the Internet and the HTTP protocol. This includes the IP address from which the request originates (i.e., the user's device's IP address), certain URLs, cookies,[7] and a User Agent, which identifies the browser type, version, operating system, and device characteristics. In other words, this technical information is transmitted to every website visited by the user, and every banner advertisement website that appears on a website. Based

---

[2] "How the web works," Mozilla, accessed January 14, 2026, https://developer.mozilla.org/en-US/docs/Learn_web_development/Getting_started/Web_standards/How_the_web_works.

[3] "HTML: HyperText Markup Language," Mozilla, accessed January 14, 2026, https://developer.mozilla.org/en-US/docs/Web/HTML.

[4] "What is a web browser?" Firefox, accessed January 14, 2026, https://www.firefox.com/en-US/more/what-is-a-browser/.

[5] "Populating the page: how browsers work," Mozilla, accessed January 14, 2026, https://developer.mozilla.org/en-US/docs/Web/Performance/Guides/How_browsers_work.

[6] Servers and browsers may also communicate using HTTPS, which uses Transport Layer Security (TLS) to encrypt data in transit so that only the sender and intended recipient can read it.

[7] Cookies (also referred to as "HTTP cookies") are small files generated by a web server and sent to the user's web browser, which are stored locally in the browser used to visit the website.

on my experience, it has worked that way since the beginning of the World Wide Web. Depending on the browser choice and configuration, additional metadata may also be transmitted, such as language settings, screen resolution, time zone, or other elements that contribute to what is sometimes referred to as in computer science as a "browser fingerprint." These fields are automatically generated by the browser and are necessary for routing, formatting, and compatibility purposes; they are not created for the purpose of identifying a particular user.[8]

12. Once the initial connection is established by the browser to the web server for a specific webpage a user is visiting, the browser first sends data requesting website contents to the server, and only after receiving the server's response does the browser begin retrieving the various resource files that comprise the webpage and assembling them to render the page for the user. The user's browser is also responsible for executing JavaScript (through use of a JavaScript engine)[9] and other scripts received from the server that are required to carry out dynamic website functionality.

### B. Tags and Tag Managers

13. **Tags** are small snippets of code embedded within a webpage that allow organizations to collect data and analyze how users interact with the site, such as tracking page views, clicks, conversions, or other user behaviors. They are typically used for improving site experiences for users and marketing.[10] The concept of tagging is central to the operation of third-party technologies, such as the Meta Pixel, which all rely on embedded tags to collect and process data about user interactions. From my experience, I know that tagging has been used since the very beginning of advertising on the Internet, and it is what made the Internet so compelling for advertisers, resulting in most of the innovations that have made the Internet what it is today.

14. While there are several ways to implement tags, for purposes of this report I focus on the use of **tag managers** for tag installation. Tag managers enable website owners to manage tags, configurations, and load rules across different vendors (e.g., Meta) through a unified interface. Examples of tag management systems include Google Tag Manager (GTM), which Claimants' Counsel's Websites use, as I discuss further in **Section VI** *infra.*

15. Website administrators use tag managers to help efficiently test, refine, and deploy tag configurations on their websites. Tag managers typically have multiple environments, such as development (for testing),

---

[8] Roy T. Fielding, and Julian Reschke, "RFC 7231 Hypertext Transfer Protocol (HTTP/1.1): Semantics and Content," Internet Engineering Task Force, June 2014, https://doi.org/10.17487/RFC7231.
[9] "JavaScript engine," Mozilla, accessed January 14, 2026, https://developer.mozilla.org/en-US/docs/Glossary/Engine/JavaScript.
[10] "Introduction to tagging and the Google Tag," Google, accessed January 14, 2026, https://developers.google.com/tag-platform/devguides.

staging (for piloting new implementations on a small group of users), and production (the live configuration visible to end-users).[11] Through this iterative development process, multiple versions of a website's tag configuration may exist at any given time, and tag managers provide the ability to view, compare, or revert to prior configurations as needed.[12]

16. Tag managers are helpful for web administrators because they handle the work required to implement tags onto their websites, without the need for web administrators to understand how to integrate JavaScript source code onto their pages. The tag manager does this for them.

### C. Claimants' Allegations

17. Claimants allege that Marriott embedded third-party tracking technologies into the Marriott website, including the Meta Pixel and LinkedIn Insight Tag, and that these technologies caused users' interactions with the Site to be "intercepted," "monitored," or "relayed" to third parties without users' consent.[13] Claimants contend that Marriott permitted such companies to observe or collect user-submitted information while users were researching, booking, or confirming accommodations on the Marriott website.

18. More specifically, Claimants allege that Marriott installed tracking technologies associated with numerous companies and that these technologies "fire" each time a page loads, thereby transmitting user interaction data, including page visits, user inputs, and other browser-level information, to third-party platforms.[14] Claimants further assert that these technologies can capture user interactions down to specific page content, URLs, and browser attributes, and that such information is then used by third parties for advertising, profiling, or analytics purposes.

19. With respect to the Meta Pixel in particular, Claimants describe it as a snippet of JavaScript code embedded within webpages that executes in the user's browser when the page loads and transmits information back to Meta. Claimants allege that the Meta Pixel can track page views, user interactions, and certain information entered into form fields, and that Meta aggregates such information for advertising and analytics purposes. Claimants make similar allegations concerning the LinkedIn Insight

---

[11] "Manage Environments | Adobe Experience Manager." Accessed January 14, 2026.
https://experienceleague.adobe.com/en/docs/experience-manager-cloud-service/content/implementing/using-cloud-manager/manage-environments.
[12] "Publishing, Versions, and Approvals - Tag Manager Help." Accessed January 15, 2026.
https://support.google.com/tagmanager/answer/6107163?hl=en.
[13] Demands, ¶4.
[14] Demands, ¶50.

Tag, asserting that it enables tracking of visitor activity and association of such activity with LinkedIn accounts for advertising-related analytics.[15]

### D. Claimants' Counsel's Websites

20. Claimants allege that Marriott's integration of third-party technologies, such as the Meta Pixel and LinkedIn Insight Tag, results in impermissible "monitoring," "interception," or sharing of user communications.[16] At the same time, my analysis shows that Claimants' Counsel's Websites integrate many of the same categories of client-side analytics and advertising technologies, including the Meta Pixel, and in certain instances deploy them with more invasive configurations than those observed on Marriott's website. As discussed in greater detail in **Section VI** *infra*, these implementations include automatic event tracking, multiple advertising pixels, and transmission of form submission data to third-party analytics and marketing platforms.

21. In particular, the Hilliard Law website, the Privacy Violation Claim website, the Legal Settlement Experts website, and the Sperling Kenny website each incorporate third-party analytics and advertising technologies capable of tracking user interactions and, in some cases, transmitting user-entered form responses to external platforms. These technologies function through the same technical mechanisms that Claimants characterize as problematic when allegedly used by Marriott. In several instances, Claimants' Counsel's Websites enable optional automatic event tracking or integrate multiple pixels across advertising ecosystems, including Meta and TikTok, alongside analytics platforms such as Google Analytics, HubSpot, Amplitude, Unbounce, and others. As explained in **Section VI** *infra*, these implementations permit broad tracking of user interactions and conversion activity.

22. Unlike Marriott, which provides built-in, user-controlled opt-out mechanisms that allow visitors to govern whether certain third-party technologies are permitted to load and execute, Claimants' Counsel's Websites do not appear to provide such controls. In other words, while Claimants contend that Marriott's alleged integration of widely used analytics and advertising tools constitutes unlawful "interception," Claimants' Counsel deploy similar tools on their own websites, without offering corresponding consent or opt-out controls.

23. Moreover, Claimants' Counsel's Websites collect information from individuals seeking legal representation, including information that I understand may be prohibited from disclosure, based on documentation from the American Bar Association (ABA) Model Rules 1.6 and 1.18 shown to me by

---

[15] Demands, ¶4 and ¶18.
[16] Demands, ¶4.

counsel.[17] My own independent testing shows that form submissions on these sites result in user-entered data being transmitted to third-party platforms. Thus, to the extent Claimants allege that the use of client-side analytics and advertising technologies inherently constitutes impermissible disclosure of information, their own websites engage in substantially similar data flows. By attempting to demonstrate that these technologies are inherently unlawful when allegedly integrated by Marriott, Claimants would necessarily demonstrate that their own websites employ the same technologies in ways that would be subject to the same characterization by others like them.

## VI.    CLAIMANTS' COUNSEL'S WEBSITES INTEGRATE THE SAME TYPE OF THIRD-PARTY TECHNOLOGIES AT ISSUE, DOING SO WITH MORE INVASIVE CONFIGURATIONS AND NO OPT-OUT CONTROLS

24.    In this section, I examine the third-party technologies that are integrated into Claimants' Counsel's Websites. This analysis is relevant because Claimants allege that the presence and operation of certain third-party technologies on Marriott's website constitute impermissible data capture, transmission, or "unlawful conduct,"[18] while Claimants' Counsel's Websites integrate the same types of technologies they allege are at issue when used by Marriott. As discussed in this section *infra*, Claimants' Counsel deploys more of these technologies than Claimants allege Marriott uses, with more invasive configurations, and with no opt-out controls. **Table 1** *infra* summarizes the third-party technologies identified on Claimants' Counsel's Websites based on a review of webpage source code, tag-management configurations, and executed scripts.

---

[17] "Rule 1.6: Confidentiality of Information. Accessed February 24, 2026. https://www.americanbar.org/groups/professional_responsibility/publications/model_rules_of_professional_conduct/rule_1_6_confidentiality_of_information/. "Rule 1.18: Duties to Prospective Client." Accessed February 24, 2026. https://www.americanbar.org/groups/professional_responsibility/publications/model_rules_of_professional_conduct/rule_1_18_duties_of_prospective_client/.

[18] Demands, ¶18.

**Table 1:** Third-Party Technologies In Use on Claimants' Counsel's Websites

| Index | Technology | Integrated on Claimants' Counsel's Websites? |
|---|---|---|
| 1 | Meta Pixel[19],[20] | Yes, the Hilliard Law website, the Privacy Violation Claim website, and the Legal Settlement Experts website all use the Meta Pixel. In fact, the Legal Settlement Experts website had 2 Meta Pixels installed. <br><br> Notably, I saw no evidence the Meta Pixel is governed by built-in, user-controlled opt-out mechanisms or the Global Privacy Control (GPC)[21] opt-out signal on these websites. <br><br> Further, the Hilliard Law website configured the Meta Pixel to automatically capture button click events. |
| 2 | Google Analytics | Yes, including the Hilliard Law website, the Legal Settlement Experts website, and the Sperling Kenny website. <br><br> Notably, I saw no evidence Google Analytics is governed by built-in, user-controlled opt-out mechanisms or the GPC opt-out signal on these websites. |
| 3 | TikTok Pixel | Yes, including the Hilliard Law website and the Legal Settlement Experts website. <br><br> Notably, I saw no evidence the TikTok Pixel is governed by built-in, user-controlled opt-out mechanisms or the GPC opt-out signal on these websites. |
| 4 | HubSpot[22] | Yes, including the Hilliard Law website. <br><br> Notably, I saw no evidence HubSpot is governed by built-in, user-controlled opt-out mechanisms or the GPC opt-out signal on the Hilliard Law website. |

---

[19] Demands, ¶4.

[20] Meta for Developers. "Get Started - Meta Pixel - Documentation." Accessed January 14, 2026. https://developers.facebook.com/docs/meta-pixel/get-started/.

[21] "Global Privacy Control homepage," Global Privacy Control, accessed January 14, 2026, https://globalprivacycontrol.org/.

[22] "Install the HubSpot Tracking Code," HubSpot, accessed January 14, 2026. https://knowledge.hubspot.com/reports/install-the-hubspot-tracking-code.

| Index | Technology | Integrated on Claimants' Counsel's Websites? |
|-------|------------|----------------------------------------------|
| 5 | Scorpion[23] | Yes, including the Hilliard Law website.<br><br>Notably, I saw no evidence Scorpion is governed by built-in, user-controlled opt-out mechanisms or the GPC opt-out signal on the Hilliard Law website. |
| 6 | Amplitude[24] | Yes, including the Hilliard Law website.<br><br>Notably, I saw no evidence Amplitude is governed by built-in, user-controlled opt-out mechanisms or the GPC opt-out signal on the Hilliard Law website. |
| 7 | SimplyConvert[25] | Yes, including the Privacy Violation Claim website.<br><br>Notably, I saw no evidence SimplyConvert is governed by built-in, user-controlled opt-out mechanisms or the GPC opt-out signal on the Privacy Violation Claim website. |
| 8 | Unbounce[26] | Yes, including the Privacy Violation Claim website.<br><br>Notably, I saw no evidence Unbounce is governed by built-in, user-controlled opt-out mechanisms or the GPC opt-out signal on the Privacy Violation Claim website. |

25. As the discussion that follows demonstrates, Claimants' Counsel's Websites integrate the same types of technologies that Claimants characterize as problematic when allegedly used by Marriott. In addition, Claimants' Counsel's Websites integrate a greater number of such technologies, and in several cases, configure them in ways that are more invasive with respect to the actual data that are collected. Claimants' Counsel's Websites do this all while not providing users any built-in, user-controlled opt-out mechanisms.

---

[23] "Digital Marketing Solutions for Local Businesses," Scorpion, accessed January 14, 2026. https://www.scorpion.co/.
[24] "AI Analytics Platform for Modern Digital Analytics," Amplitude, accessed January 14, 2026. https://amplitude.com/.
[25] "SimplyConvert's Platform Features | Help Manage Your Intake Process." Accessed January 14, 2026. https://simplyconvert.com/features.
[26] Documentation. "How Does Unbounce Track Page Stats?" November 28, 2023. https://documentation.unbounce.com/hc/en-us/articles/360058171231-How-Does-Unbounce-Track-Page-Stats.

### A.    Methodology for Analyzing Claimants' Counsel's Websites

26.    As discussed *supra*, I examined a set of reference websites identified by counsel (the Hilliard Law, Legal Settlement Experts, Privacy Violation Claim, and Sperling Kenny websites) for purposes of investigating Claimants' Counsel's usage of third-party technologies on their own websites. My methodology for reviewing Claimants' Counsel's Websites was consistent with standard practices in web technology analysis, with adjustments made based on the availability of live versus archived content.

27.    For the Hilliard Law and Sperling Kenny websites, which are currently live as of the date of this Declaration, I conducted a direct, real-time examination of the website. This included reviewing the webpage source code and observing network activity in a browser-based inspection environment to identify the presence of third-party scripts and tag management infrastructure. I observed that the Hilliard Law website utilizes Google Tag Manager (GTM) as its tag management system. By inspecting the GTM container loaded on the page, I was able to observe which third-party scripts were actively configured to load and execute under current conditions, as I discuss further in **Section VI.B** *infra*.

28.    For the Privacy Violation Claim and Legal Settlement Experts websites, which had the publicly accessible version deactivated at the time of my review by Claimants' Counsel, my analysis was based on archived materials provided to me by counsel. These materials included preserved HTML source code for the respective homepages of each site.

29.    For the Legal Settlement Experts website, the archived source code indicates that the site also utilized GTM at the time the materials were captured. Using a controlled local sandbox environment,[27] I analyzed the archived HTML to evaluate which GTM-managed scripts were configured to load based on the captured configuration, as I discuss further in **Section VI.B** *infra*. Because the website is no longer live, I note that the GTM configuration associated with that container may have been modified after the archived snapshot was taken, and my observations are therefore based on the configuration as it is made available by way of the GTM container ID at the time of my analysis. However, I saw no evidence of such modification.

30.    For the Privacy Violation Claim website, my review was similarly based on the archived HTML source code supplied by counsel. Where third-party technologies or tag management references were present in the archived materials, I analyzed those references based on the static source code, as I discuss further in **Section VI.B** *infra*.

---

[27] A sandbox refers to a controlled local testing environment used to execute and inspect code or scripts in isolation, allowing analysis of their behavior without affecting live systems or relying on a live website.

31. Across all of Claimants' Counsel's Websites, my analysis focused on identifying the presence of tag management systems such as GTM and the third-party technologies configured to load through those systems or third-party technologies directly embedded in the website source code. Where live observation was possible, I relied on direct inspection of executed scripts and network requests; where only archived materials were available, I based my opinions on the preserved source code.

### B. Analysis of Claimants' Counsel's Websites

#### 1) Hilliard Law Website

32. My analysis of the Hilliard Law website was conducted through direct, live observation, as the website was active at the time of my review. I reviewed the webpage source code, inspected network traffic generated during user interactions, and examined the behavior of third-party scripts executed in the browser to identify the analytics and marketing technologies integrated into the site.

33. Based on my review, the Hilliard Law website implements GTM, as evidenced by the presence of a GTM container reference (GTM-KD5G76FM). Through live inspection of the GTM container and associated network activity, I observed the loading and execution of Google Analytics, indicating that the site transmits usage and interaction data to Google for analytics purposes.[28]

34. I also observed the presence of the Meta Pixel, implemented with a unique Meta Pixel identifier (Pixel ID 2061975667594973). Inspection of the Meta Pixel configuration and observed network behavior indicated that the Hilliard Law website enabled Meta's automatic event tracking feature, including "SubscribedButtonClick" events, which is associated with Meta's "Track events automatically without code" setting. This configuration causes the Meta Pixel to automatically track button interactions and associated metadata without requiring manual event instrumentation. This behavior is illustrated in **Figure 3** *infra*.[29]

---

[28] hilliard-law-homepage.har.
[29] hilliard-law-homepage.har.

**Figure 3:** Meta Pixel SubscribedButtonClick Event on Hilliard Law Website[30]



35. Further, I observed the inclusion of the TikTok Pixel, as indicated by a reference to TikTok's pixel script (https://analytics.tiktok.com/i18n/pixel/events.js) with a unique pixel identifier (D2MD3HJC77U0CGBHA6JG). The TikTok Pixel, like the Meta Pixel, is a client-side JavaScript technology used to track user interactions and conversions for advertising measurement within TikTok's platform.[31]

36. The Hilliard Law website also integrates HubSpot Analytics and Forms, which are used to collect analytics data and to process user-submitted form information.[32] During my own independent testing, I observed requests to HubSpot Analytics domains, including: https://track-na2.hubspot.com/.[33]

37. During my own independent live testing of the Hilliard Law website, I completed the contact form located in the website homepage. Upon form submission, I observed, in the network activity, that all form field contents, including user-entered contact information, were transmitted to HubSpot-controlled endpoints. This behavior is illustrated in **Figure 4** *infra*, which shows the network requests generated upon submission of the homepage form and the corresponding payload containing the form field responses. This confirms that, when the homepage form is used, the Hilliard Law website is

---

[30] hilliard-law-homepage.har.
[31] hilliard-law-homepage.har.
[32] "Install the HubSpot Tracking Code," HubSpot, accessed January 14, 2026. https://knowledge.hubspot.com/reports/install-the-hubspot-tracking-code.
[33] hilliard-law-homepage.har.

configured to transmit complete form submission data that I understand may be prohibited from disclosure to a third-party under the ABA Model Rules discussed *supra*.

**Figure 4:** Hilliard Law Website Contact Form Field Responses Shared with HubSpot[34]



38. In addition to HubSpot receiving the complete set of responses from the user in the Hilliard Law website homepage form, I also observed that submitting the homepage form also generated network requests associated with the TikTok Pixel. These network requests transmitted to TikTok also included some of the user-entered form field responses. This demonstrates that multiple third-party advertising and analytics platforms on the Hilliard Law website receive data derived from user form interactions.[35]

39. I further observed the use of Amplitude Analytics, which is an event-based analytics platform designed to track detailed user interactions and behavioral events.[36] During my own independent testing, I observed requests to Amplitude Analytics domains, including: https://api2.amplitude.com/2/httpapi.[37]

---

[34] hilliard-law-submit-homepage-form.har.
[35] hilliard-law-submit-homepage-form.har.
[36] "AI Analytics Platform for Modern Digital Analytics," Amplitude, accessed January 14, 2026. https://amplitude.com/.
[37] hilliard-law-homepage.har.

40. Finally, I observed the integration of Scorpion, a digital marketing platform operated by scorpion.co.[38] During my own independent live testing, I observed that when I completed the contact form presented through a pop-up on the Hilliard Law website (distinct from the homepage form), that form submissions resulted in network requests to Scorpion-controlled endpoints. These requests included user-entered contact information and all form field responses, indicating that the Hilliard Law website sends form submission data (which I understand may be prohibited from disclosure under the ABA Model Rules discussed *supra*) to different third-party services depending on which form interface a website visitor uses. This behavior is illustrated in **Figure 5** *infra*.

**Figure 5**: Hilliard Law Website Pop-Up Contact Form Field Responses Shared with Scorpion[39]





41. In my opinion, the Hilliard Law website integrates a broad set of third-party analytics and marketing technologies, including Meta Pixel with automatic event tracking enabled, TikTok Pixel, Google Analytics, HubSpot, Amplitude, and Scorpion, that are capable of collecting detailed user interaction data and, in some instances, user-entered form responses. These implementations demonstrate that Claimants' Counsel's own website deploys third-party technologies that are substantially similar to the technologies Claimants characterize as problematic when allegedly used on the Marriott website.

---

[38] "Digital Marketing Solutions for Local Businesses," Scorpion, accessed January 14, 2026. https://www.scorpion.co/.
[39] hilliard-law-submit-popup-form.har.

42. During my review and live testing of the Hilliard Law website, I did not observe any built-in, user-controlled opt-out mechanism that would allow visitors to prevent the loading or execution of the third-party analytics and advertising technologies described above. I did not observe a consent management platform that provided granular controls over third-party tracking, nor any mechanism that conditionally prevented these scripts from firing prior to user interaction. In my own independent testing, the third-party technologies executed automatically upon the initial page load.

43. I also tested whether the Hilliard Law website responded to the GPC opt-out signal,[40] which is an industry-recognized browser-based mechanism that allows users to communicate their preference to opt-out of certain types of data sharing. During my own independent testing, enabling the GPC opt-out signal in the browser did not prevent the loading or execution of the Meta Pixel, TikTok Pixel, HubSpot, or other third-party analytics technologies observed. In other words, the site did not appear to detect or honor the GPC opt-out signal. My own independent testing showed that Marriott's website, by contrast, detects and honors the GPC opt-out signal.

### 2)      Legal Settlement Experts Website

44. My analysis of the Legal Settlement Experts website was based on archived HTML source code and sandbox-based review of referenced third-party scripts provided by counsel, as the publicly accessible version of the website was deactivated by Claimants' Counsel at the time of my review. Accordingly, my opinions regarding Legal Settlement Experts are based on the preserved source code and the behavior of referenced tag-management resources when examined in a controlled local environment.

45. Based on my review of the archived source code, the Legal Settlement Experts website implemented GTM, as evidenced by the presence of a GTM container reference (GTM-NDPKR93).[41] Using a local sandbox to inspect the behavior of the GTM container, I observed that the configuration included Google Analytics functionality.[42] Specifically, network requests were generated to the endpoint https://www.google.com/ccm/collect, which is associated with Google Analytics data collection.[43,44] This indicates that the Legal Settlement Experts website was configured to transmit analytics data to Google.

46. The archived source code also shows that the Legal Settlement Experts website implemented multiple advertising pixels, including two distinct Meta Pixels with unique identifiers (Pixel IDs

---

[40] "Global Privacy Control homepage," Global Privacy Control, accessed January 14, 2026, https://globalprivacycontrol.org/.
[41] view-source_https___legalsettlementexperts.com_marriott-v2_.html.
[42] legalsettlementexperts-gtm-sandbox.html.
[43] "Google Analytics." Accessed January 14, 2026. https://trackers.tweasel.org/t/google/google-analytics/.
[44] legalsettlementexperts-gtm-sandbox.har.

527751453459805 and 590900750551938).[45] The presence of multiple Meta Pixel identifiers suggests that the website was configured to support tracking across more than one Meta advertising account or campaign context. Because the Legal Settlement Experts website is no longer live, I cannot determine through direct testing which specific events were configured, what parameters were included with those events, or whether user-entered form data was transmitted as part of those interactions.

47. Further, I observed the inclusion of the TikTok Pixel, as indicated by a reference to TikTok's pixel script (https://analytics.tiktok.com/i18n/pixel/events.js) with a unique pixel identifier (CQUFPH3C77U4KUI5IHI0).[46] The TikTok Pixel, like the Meta Pixel and as described *supra*, is a client-side JavaScript technology used to track user interactions and conversions for advertising measurement within TikTok's platform.

48. I also observed references to PixelYourSite, which is a WordPress plugin commonly used to manage and deploy marketing and analytics pixels across a website.[47] PixelYourSite functions as an intermediary layer that facilitates the collection and forwarding of user interaction and conversion data to multiple third-party analytics and advertising services. The presence of this plugin indicates that the Legal Settlement Experts website employed tooling specifically designed to aggregate and transmit marketing-related event data to third parties.

49. The fact that Claimants' Counsel deleted the Legal Settlement Experts website meant that I needed to rely on the source code to determine the runtime behavior of these technologies, including whether consent mechanisms were present, how load rules were applied, or what specific data elements were transmitted in practice. Archived materials and sandbox-based analysis demonstrate that the Legal Settlement Experts website integrated multiple third-party analytics and advertising technologies, through GTM, Meta Pixels, TikTok Pixel, Google Analytics, and PixelYourSite, that are capable of tracking user interactions and conversions. I saw no evidence that there were modifications to this source code over time.

50. Based on my review of the archived HTML source code and referenced scripts, I did not observe any code indicative of a consent management platform, GPC opt-out listener, or other built-in privacy controls designed to conditionally suppress or delay the execution of third-party analytics and advertising technologies based on user selection.

---

[45] view-source_https___legalsettlementexperts.com_marriott-v2_.html.
[46] view-source_https___legalsettlementexperts.com_marriott-v2_.html.
[47] PixelYourSite. "Meta Pixel (Facebook Pixel) & CAPI, Google Analytics & Ads, Pinterest, TikTok." Accessed January 14, 2026. https://www.pixelyoursite.com/.

20

51. Nothing in the archived source code suggests that the Legal Settlement Experts website was configured to provide users with granular control over third-party tracking or to detect and honor browser-level privacy preference signals. The preserved materials instead reflect direct integration of multiple third-party analytics and advertising technologies capable of executing upon page load regardless of user privacy preferences.

3) **Privacy Violation Claim Website**

52. My analysis of the Privacy Violation Claim website was similarly based on archived HTML source code provided to me by counsel, as the publicly accessible version of the website was deactivated by Claimants' Counsel at the time of my review. Accordingly, my opinions regarding the Privacy Violation Claim website are based on the preserved source code.

53. Based on my review of the archived source code, the Privacy Violation Claim website implemented the Meta Pixel, as evidenced by the presence of Meta Pixel base code containing a unique Meta Pixel identifier (Pixel ID 2322062124834819).[48] The source code also includes an explicit event invocation ("fbq("track", "SubmitApplication");") which indicates that the website was configured to fire a Meta Pixel event when a user submitted an application through the site.[49] Unlike the default Meta Pixel configuration, this event suggests that the Privacy Violation Claim website was intentionally configured to track application submission activity. Because the website is no longer live, I am unable to determine through testing what specific parameters, if any, were included with this event or whether user-entered form responses were transmitted as part of that tracking.

54. In addition to the Meta Pixel, the archived source code shows that the Privacy Violation Claim website integrated Unbounce tracking and analytics, as indicated by the presence of a published Unbounce JavaScript bundle (e.g., https://builder-assets.unbounce.com/published-js/main.bundle-b74b26c.z.js).[50] Unbounce is a landing-page and conversion-tracking platform that is commonly used to monitor user interactions, form submissions, and conversion performance on marketing pages. [51,52,53] The inclusion of this script indicates that the Privacy Violation Claim website was configured to collect and analyze user interaction and conversion data through Unbounce-managed workflows as well.

---

[48] view-source_https___www.privacyviolationclaim.com.html.
[49] view-source_https___www.privacyviolationclaim.com.html.
[50] view-source_https___www.privacyviolationclaim.com.html.
[51] Documentation. "How Does Unbounce Track Page Stats?" November 28, 2023. https://documentation.unbounce.com/hc/en-us/articles/360058171231-How-Does-Unbounce-Track-Page-Stats.
[52] Documentation. "How to Set up Conversion Tracking for Unbounce Forms in GA4." February 6, 2024. https://documentation.unbounce.com/hc/en-us/articles/14849865721364-How-to-Set-up-Conversion-Tracking-for-Unbounce-Forms-in-GA4.
[53] Park, Paul. "Using Analytics to Measure Your Landing Page Performance." Unbounce, September 29, 2023. https://unbounce.com/conversion-rate-optimization/using-analytics-to-measure-your-landing-page-performance/.

55. I also observed references to SimplyConvert, which is an additional analytics and conversion-tracking platform designed to collect, process, and report on customer interactions and lead-generation activity.[54] The presence of SimplyConvert-related scripts in the archived source code (e.g., https://simplyconvert.com/app/embed/{timestamp}/load.js which then points to https://simplyconvert.com/app/embed/"+version+"/"+simplyconvert_hash+"/embed.js, where the Privacy Violation Claim website's SimplyConvert hash is 37525ab5534007c7c9b243404aab69f0) indicates that the Privacy Violation Claim website integrated multiple third-party services capable of consuming and analyzing user-submitted information for reporting and conversion measurement purposes.[55]

56. As with the Legal Settlement Experts website, the fact that Claimants' Counsel deleted the Privacy Violation Claim website meant that I needed to rely on the source code to determine the runtime behavior of these technologies, including whether user consent mechanisms were present, or what load rules or configuration settings governed their execution. Archived source code demonstrates that the Privacy Violation Claim website implemented third-party technologies, such as the Meta Pixel, Unbounce, and SimplyConvert, which are capable of tracking application submissions and other user interactions. I saw no evidence that there were modifications to this source code over time.

57. Based on my review of the archived HTML source code and referenced scripts, I did not observe any code indicative of a consent management platform, GPC opt-out listener, or other built-in privacy controls designed to conditionally suppress or delay the execution of third-party analytics and advertising technologies based on user selection.

58. Nothing in the archived source code suggests that the Privacy Violation Claim website was configured to provide users with granular control over third-party tracking or to detect and honor browser-level privacy preference signals. The preserved materials instead reflect direct integration of multiple third-party analytics and advertising technologies capable of executing upon page load regardless of user privacy preferences.

4)      **Sperling Kenny Website**

59. My analysis of the Sperling Kenny website was conducted through direct, live observation, as the website was active at the time of my review. I reviewed the webpage source code, inspected network

---

[54] "SimplyConvert's Platform Features | Help Manage Your Intake Process." Accessed January 14, 2026.
https://simplyconvert.com/features.
[55] view-source_https___www.privacyviolationclaim.com.html.

traffic generated during user interactions, and examined the behavior of third-party scripts executed in the browser to identify the analytics and marketing technologies integrated into the site.

60. Based on my review, the Sperling Kenny website implements Google Analytics. Through live inspection of the network activity, I observed the loading and execution of a Google Analytics tag (G-N1B5JXFEZ0), indicating that the site transmits usage and interaction data to Google for analytics purposes.[56]

61. During my review and live testing of the Sperling Kenny website, I did not observe any built-in, user-controlled opt-out mechanism that would allow visitors to prevent the loading or execution of Google Analytics. I did not observe a consent management platform that provided granular controls over third-party tracking, nor any mechanism that conditionally prevented Google Analytics from firing prior to user interaction. In my own independent testing, Google Analytics executed automatically upon the initial page load.

62. I also tested whether the Sperling Kenny website responded to the GPC opt-out signal,[57] which, as I discussed *supra*, is an industry-recognized browser-based mechanism that allows users to communicate their preference to opt-out of certain types of data sharing. During my own independent testing, enabling the GPC opt-out signal in the browser did not prevent the loading or execution of Google Analytics. In other words, the site did not appear to detect or honor the GPC opt-out signal. Importantly, as I also noted *supra*, my own independent testing showed that Marriott's website, by contrast, detects and honors the GPC opt-out signal.

## VII.    CONCLUSION

63. Applying a consistent technical methodology across Claimants' Counsel's Websites, my analysis demonstrates that Claimants' Counsel's Websites integrate many of the same types of third-party analytics and marketing technologies that they allege are problematic when allegedly used by Marriott, and in some instances deploy those technologies in more invasive configurations. Through live testing and archived source-code review, I observed that Claimants' Counsel's Websites utilize multiple advertising pixels, analytics platforms, and conversion-tracking tools capable of collecting user interaction data and, in certain cases, user-entered form responses that may be prohibited from disclosure under the ABA Model Rules discussed *supra*. Indeed, Claimants' Counsel's Websites integrate these third-party technologies without providing industry-standard, built-in, user-controlled opt-out mechanisms.

---

[56] sperling-kenny-homepage.har.
[57] "Global Privacy Control homepage," Global Privacy Control, accessed January 14, 2026, https://globalprivacycontrol.org/.

I declare under penalty of perjury, under the laws of the United States of America, that the foregoing is true and correct. Executed on this 26th day of February 2026 in Miami, Florida.

Ron Schnell

_____

26 February 2026

24

**RON SCHNELL**
**DISTINGUISHED TECHNOLOGY FELLOW**

3170 NW 125th Way, Sunrise, FL 33323
Mobile (954) 682-7822 – rschnell@keystone.ai

## Executive Profile

Accomplished executive with a history of running large technology organizations, from early stage startups to large divisions of S&P 500 corporations. Strategic consultant and forward-thinking technology and architecture expert, with a unique understanding of the low-level "bits" (as a former kernel programmer) as well as the business rules and implications. Successful at managing diverse engineers and stakeholders, while digging in and writing code where necessary.

40+ years of experience in technology, 30+ years of executive experience, 40+ years of experience in Artificial Intelligence.  Founder of 3 startups, one with exit to a public company. Early architect of UNIX kernel.  Special Master experience and Monitorship experience. Knowledge and coding experience of most computer languages, including many assembly languages.

## Technical Expertise

- Artificial Intelligence/Machine Learning
- Advertising/Tracking Pixels
- BIPA/VPPA
- Source Code Analysis
- Software Project Management/Remediation/Analysis
- Blockchain (Private/Public)
- OS Kernel

- Device Drivers
- Very Large Database Architecture and Analysis
- Healthcare Software
- Autonomous Driving Software
- Breach Investigation/Remediation
- Forensic Analysis
- Bid Protest Analysis
- Patent Analysis (IPR/District Court)

## Professional Experience

**Distinguished Technology Fellow**
March 2025 – Present
**Keystone Strategy**

Testifying and consulting expert in high-profile litigations, including those with industry-leading technology companies.  Conducts analyses and develops expert opinions and reports as a domain expert on litigations, including through source code reviews in many languages, assessments of data transfer to third parties, and architecture reviews.  Advises and serves as an expert on software trade secret and IP litigations, and data privacy litigations, including those

1

Appendix A - Ron Schnell Curriculum Vitae

involving BIPA, VPPA, CIPA, and wiretapping claims.  Gives testimony in Federal Court, State Court, Depositions and Arbitrations.

**Managing Director**
September 2013 – March 2025
**Berkeley Research Group**

Testifying and consulting expert in highly-technical litigation and large-scale corporate and board level consulting.  Gives testimony in Federal Court, State Court, Depositions and Arbitrations.  Writes expert reports as an independent expert for litigation.  Technical advisory consulting work for all types of companies and boards of directors.  Litigation support includes source code reviews in many languages, architecture review, and advice on software trade secret and copyright issues.

**President**
February 2005 – Present
**Quogic, Inc.** – Ft. Lauderdale, FL

Perform per-project consulting for corporate clients, which have included:
**Intel Corporation** (via Berkeley Research Group) – Board/executive level strategic consulting
**AEther, LLC** – Inflight entertainment system architecture and development
**Virgin America Airlines** – Inflight entertainment system architecture
**BidKind, LLC** – Charity auction site architecture and development management
**HockeyTech, Inc.** – Sports management software architecture and development
**Several law firms** as testifying and consulting expert witness

**Adjunct Professor of Computer Science, Board Member: Graduate School of Computer Science**
August 2013 – Present
**Nova Southeastern University,** Ft. Lauderdale, FL

Classes in Cyber Security and Operating Systems

**President**
August 2012 to August 2013
**Invenstar, LLC** – Boca Raton, FL

Ran day-to-day operations of hardware and software manufacturing company in the point-of-sale space for retail establishments.  Architected cloud-based point-of-sale system and managed all developers.

**General Manager - Chief Executive**
May 2005 to August 2011
**Technical Committee** – Bellevue, WA and Palo Alto, CA

Ran day-to-day operations (as chief executive) of private corporation ordered to be formed by the United States Courts. This corporation was tasked with monitoring Microsoft Corp., ensuring their compliance with the Final Judgments in the US v. Microsoft/NY v. Microsoft antitrust case filed in 1998. Daily interaction with Microsoft executive and senior staff, Microsoft competitors

Appendix A - Ron Schnell Curriculum Vitae

and partners, Attorneys General/Deputies for multiple states, Assistant Attorneys General for the United States, and representatives from other countries. Was responsible for responding to potential complaints from 3rd parties.  Hired over 90 people to work in 3 offices.

**Vice President**
April 2002 to January 2005
**Equifax Corporation** – Boca Raton, FL

Head of software development, network relations, privacy and data security, new product development, and data enhancement delivery technology for the Internet Marketing division of Equifax, at the time a 105-year-old company. Was responsible for architecting software products, B-to-B processes, and assigning personnel. Responsible for long-term planning for strategy and expenditures. Interfaced with key people at vendors, clients, and service providers. Oversaw integration of major corporate acquisitions, creating efficiencies in technologies and personnel.  Created partnerships and was liaison with companies including AOL, Yahoo, and Microsoft. Headed team that coordinated data enhancement of client databases, and delivered enhanced data to those clients. Implemented processes, quality controls, project planning and client interfaces by technical staff. Chairperson of committee that made decisions on types of marketing accepted, approval for types of clients/messages, and responses to complaints. Performed integration of several acquired companies, including technical integration as well as integration of staff and other efficiencies of scale.  Spoke on behalf of Equifax at the Federal Trade Commission (FTC) on *spam* and anti-spam technology.

**Senior Vice President, Chief Technology Officer**
February 2000 to February 2002
**Voice and Wireless Corp** – Minneapolis, MN

Responsible for all technology decisions for the public company that acquired Mail Call, Inc. in 2000. Made product decisions, architected product enhancements, and recommended technology direction. Oversaw acquisitions of other technology companies. Participated in due diligence for potential acquisitions, and interfaced with other potential buyers of technology. Spoke at shareholder meetings and other shareholder events.

**Founder, President, Chief Technology Officer**
May 1997 to February 2002
**Mail Call, Inc.** – Pembroke Pines, FL

Founder of corporation providing a service to business consumers, allowing them to retrieve and manage their E-Mail over the phone. Performed project design, project management, data privacy and security, all software programming and testing. Negotiated contracts with all partners, including GTE, Verizon, Concentric Networks, Net2Phone, IDT, Earthlink, Casio, Knight-Ridder, T-Mobile (Voicestream) and others.  Managed all staff.  Implemented exit strategy by negotiating buyout by Voice and Wireless Corp.

**President**
February 1994 to January 2003
**Driver Aces, Inc** –Miami, FL

President of corporation specializing in developing device drivers for the UNIX operating system. Performed project design, project management, driver design, driver authoring, driver testing, customer contact, sales, and staff management. Customers included Sun Microsystems, IBM, Digital Equipment, SCO, Lucent Technologies, and others. Drivers were for

3

Appendix A - Ron Schnell Curriculum Vitae

high-speed networking devices, including fast Ethernet, token-ring, and fiber-optic, SCSI devices, RAID controllers, serial devices, parallel devices, and pseudo-devices.  Managed staff of developers.

**Consultant - Kernel Programmer**
January 1992 to June 1995
**Sun Microsystems** – Los Angeles, CA

Worked in the Peripherals Engineering group, Multiprocessor group, and Device Driver group. Was responsible for various programming and testing on Solaris 2.1, 2.4, 2.5, and 2.5.1. Wrote kernel and driver code for Solaris x86, Sparc, and PowerPC. Performed bug-fixing, authoring of system software, kernel enhancement, and device driver authoring for high-performance network and serial drivers. Was responsible for development of device driver porting kit. Wrote a book entitled Solaris 2.1 Guide to Porting SVR4.0 Device Drivers for x86. Worked with Independent Hardware Vendors on getting device drivers ported to Solaris. Re-wrote existing network drivers to improve network performance and to add multiprocessor/multithreaded functionality.

**Principal Member of Technical Staff**
September 1991 to December 1992
**Encore Computer Corp.** – Ft. Lauderdale, FL

Worked on new massively parallel hardware, developing UMAX V in the kernel development group. Developed device drivers for new memory cards, fixed kernel bugs, worked in a team implementing RPC system, and worked on tcp/ip network code for use on a proprietary network.

**Founder, President**
March 1990 to June 1991
**Secure Online Systems, Inc.** – Los Angeles, CA

President and founder of a software company that developed and marketed system management software for UNIX, specializing in data security. Designed packages, then managed development project. Investigated strategic relationships in order to create channels of distribution. Managed office staff including programming and marketing. Designed and oversaw creation of product brochures. Wrote new device drivers, kernel modifications, applications in X-windows including Motif, TCP/IP applications, database applications, and screen management routines.

**Consultant - Development manager and kernel programmer**
September 1988 to February 1990
**IBM Corp.** – Los Angeles, CA

Worked on AIX/370 and AIX PS/2. Was site lead architect and made many design decisions affecting the end product. Worked on kernel, commands, customer support, and applications. Supervised 15 programmers and testers who reported directly to me. Implemented new device drivers, fixed many bugs, made changes to TCP/IP layer, hired new employees, made OS POSIX compliant, and taught several classes. Also worked on internals of TCF (transparent computing facility) on site at Locus Computing Corporation.

**Consultant - Kernel Programmer**
May 1987 to September 1988

4

Appendix A - Ron Schnell Curriculum Vitae

**AT&T Bell Laboratories** – Summit, NJ

Worked on the UNIX project, developing UNIX System V release 4.0, in kernel development group. Developed new "filesystem independent boot" feature and a new filesystem type; fixed performance, security, and fault types of bugs in UNIX kernel; wrote a new hard disk device driver; oversaw software development contracted out to remote sites; acted as a mentor to new employees; was part of the design and architecture teams dealing with firmware and machine diagnostics; and interacted directly with Sun Microsystems on joint software development.

**Academia and Education**

| | |
|---|---|
| **Syracuse University** | Master of Science, Computer Science |
| **Nova Southeastern University** | Adjunct Professor of CS (present) |
| | Board, Graduate School of CS (past) |
| **YPO Palm Beach** | Education Chair, Vice Chapter Chair (past) |
| **YPO Southeast US and Caribbean Region** | Education Chair (past) |

**Personal Information**

- Instrument rated pilot for 35 years; donates pilot time and aircraft to Angel Flight
- Arbitrator since 2000 for the state of Florida, hearing and deciding cases several times a month, usually for the Lemon Law
- Wrote freeware text adventure game that ships with all modern versions of the UNIX Operating System, including Mac OS
- Captain – US Polo Bears – International Segway Polo Team

5

# Ron Schnell

## EXPERT EXPERIENCE (TESTIMONY ONLY)

*Openrisk, LLC v. **Microstrategy Services Corporation** (**Robbins, Russell, Englert, Orseck, Untereiner & Sauber**) 1:15-cv-01451 (Eastern District of Virginia) (Misappropriation of trade secret/Copyright Infringement)

*Openrisk, LLC v. **Microstrategy Services Corporation** (**Robbins, Russell, Englert, Orseck, Untereiner & Sauber**) 1:14-cv-01244 (Eastern District of Virginia) (Misappropriation of trade secret/Copyright Infringement)

*Cincinnati Insurance Company v **Actuate Corporation** (**Tucker Ellis LLP**) 1:12-cv-00338 (Southern District of Ohio) (Software licensing)

†**Opal Labs Inc.** (**Markowitz Herbold PC**) v. Sprinklr, Inc. et al 3:18-cv-01192 (Oregon) (Misappropriation of Trade Secret)

†Shirmel Gumbs-Heyliger v. **Military Personnel Services, Corp.** (**Sanford Amerling & Associates**) 1:12-cv-00078 (US Virgin Islands) (Wrongful termination)

†United States of America v. **Sinovel Wind Group Co., LTD, Su Liying, Zhao Haichun, and Dejan Karabasevic** (**Alston & Bird**) 3:2013-cr-00084 (Wisconsin) (Theft of trade secret, Economic Espionage)

†**Kim Peter Tillman** (**Gunster**) v. Advanced Public Safety, Inc. and Trimble Navigation Limited 9:2015-81782 (Southern District of Florida) (Software - Whistleblower Act)

†**Couple Up Plus LLC** (**Astigarraga Davis**) v. SDSOL Technlogies, LLC. AAA Case No. 01-14-0001-3682 (Software contract breach)

*Sigma 3 et. al v. Ouenes et. al (**Retained directly by the Arbitrator, Judge Susan Sousson**) AAA Case No. 01-16-0005-4951 (Misappropriation of Trade Secret)

***Advanced Dentistry of Plantation, P.A.** (**Schulman Law Group**) v. Brown & Brown of Florida, Inc. CACE15007317 (05) 17th Judicial Circuit, Broward County, FL (Insurance - cause of loss - computer failure)

†Oracle America, Inc. et al. v. **Hewlett Packard Enterprise Company** (**Gibson, Dunn & Crutcher**) 3:16-cv-01393 (Northern District of California) (Copyright Infringement)

Appendix B - Ron Schnell Expert Experience

†**Nuance Communications, Inc** (**Weil, Gotshal & Manges**) v. IBM Corporation 7:16-cv-05173 (Southern District of New York) (Software licensing)

*Google, Inc. v. **Spring Ventures, Ltd.** (**Meister Seelig & Fein**) IPR2017-01653 (Inter Partes Review) (Patent Infringement)

*Gates Corporation v. **CRP Industries, Inc.** (**McCARTER & ENGLISH, LLP**) 1:16-cv-01145 (District of Colorado) (Misappropriation of Trade Secret)

†Michael Reed v. **SBM Site Management (Seyfarth Shaw, LLP)** AAA Case No. 01-18-0002-0952 (Breach of Contract)

*Dolby Laboratories Licensing Corporation et al v. **Adobe Inc. (Arnold & Porter)** 4:18-cv-01553 (Northern District of California) (Copyright Infringement)

*M-I L.L.C v. **Q'Max Solutions, Inc. et al (BoyarMiller)** 4:2018-cv-01099 (Southern District of Texas) (Misappropriation of Trade Secret)

***Aon PLC et al (Littler Mendelson)** v. Infinite Equity, Inc. et al 1:19-cv-07504 (Northern District of Illinois) (Misappropriation of Trade Secret)

*TPI Cloud Hosting, Inc. v. **Keller Williams Realty, Inc. (Norton Rose Fulbright)** 1:19-cv-808 (Western District of Texas) (Misappropriation of Trade Secret)

*Vanderbilt University v. **Scholastic, Inc. et al (Weil, Gotshal & Manges, Frankfurt, Kurnit, Klein & Selz, P.C., Neal & Harwell, PLC)** 3:18-cv-00046 (Middle District of Tennessee) (Breach of Contract)

†4DD Holdings  et al v. **United States of America** 15-945C (Court of Federal Claims) (Software License)

†Calsep, Inc. v. **Ashish Dabral et al (Boyar Miller)** 4:19-cv-01118 (Southern District of Texas) (Misappropriation of Trade Secret)

***HumanTouch, LLC (Ward & Berry)** v. United States of America 16-561C (Court of Federal Claims) (Breach of Contract)

*Paycargo, LLC v. CargoSprint, LLC et al **(Appointed as Special Master)** 20-cv-22885, (Southern District of Florida) (Misappropriation of Trade Secret)

***MedImpact Healthcare Systems, Inc. (Jones Day)** v. IQVIA, Inc. 3:19-cv-01865, (Southern District of California) (Misappropriation of Trade Secret)

2

**Appendix B - Ron Schnell Expert Experience**

*Better Holdco, Inc. (Friedman Kaplan)** v. Beeline Loans, Inc. 1:20-cv-08686 (Southern District of California) (Misappropriation of Trade Secret)

†John C. Depp, II v. **Amber Laura Heard (Charlson Bredehoft Cohen & Brown, P.C.)** CL-2019-2911 (Circuit Court of Fairfax County, Virginia) (Defamation of Character)

*Broadband iTV, Inc. v. **Orrick Herrington & Sutcliffe, LLP et al (Long & Levit LLP)** 21STCV16407 (Superior Court of California, County of Los Angeles) (Breach of Fiduciary Duty and Negligence)

*Ruben A. Luna et al (Robbins Geller Rudman & Dowd)** v. Carbonite, Inc. et al 19-cv-11662 (District of Massachusetts) (Shareholder Derivative)

*OSGHC, LLC v. **Nomi Health, Inc. (Baker Botts) DC-22-03963** (District Court, Dallas County, TX) (Breach of Contract)

*Webroot, Inc., et al (King & Spalding)** v. AO Kaspersky Lab, et al 6:22-cv-00243 (Western District of Texas) (Patent Infringement)

†ISIS Solutions, Inc. v. **Aurora Predictions, LLC (Fortis Law)** 1200055354 (JAMS Arbitration) (Misappropriation of Trade Secret)

†Everett Bloom et al v. **Zuffa, LLC et al (Paul Hastings)** 2:22-cv-00412 (District of Nevada) (Video Privacy Protection Act – Pixel case)

*Bernadine Griffith et al v. **TikTok, Inc. and ByteDance, Inc. (Wilson Sonsini, Morgan Lewis)** 5:23-cv-964 (Central District of California) (California Invasion of Privacy Act – Pixel case)

*Lucinda Jackson et al v. **Fandom, Inc. (Tyz Law Group)** 4:22-cv-04423 (Northern District of California) (Video Privacy Protection Act – Pixel case)

*Angela Hogan et al v. **Amazon.com, Inc. (Morgan Lewis)** 1:21-cv-05336 (Northern District of Illinois) (Biometric Information Privacy Act – BIPA)

*United States of America v. **H&R Block, Inc. (Jones Day)** 9427 (Federal Trade Commission) (Software Architecture and Data Analysis)

*Adstra, LLC v. **Kinesso, LLC and Acxiom, LLC (Greenberg Traurig)** 1:24-cv-02639 (Southern District of New York) (Misappropriation of Trade Secret, Breach of Contract – Database)

†**Midjourney, Inc. (Cooley)**  v. CommerceOwl, Inc. 01-24-0009-2603 (International Arbitral Tribunal) (Breach of Contract)

**Appendix B - Ron Schnell Expert Experience**

†Vivek Shah v. **Hipcamp, Inc.** 5220010083 (JAMS Arbitration) (California Invasion of Privacy Act – Pixel case)

*Ingraham, Williams et al v. **Capital One Financial Corp et al (Covington)** 3:24-cv-05985 (Northern District of California) (CIPA, CPPA – Pixel case)

***Spotlight Ticket Management, Inc. (Hunton Andrews Kurth**) v. Concierge Live 2:24-cv-00859 (Central District of California) (False Advertising)

---

* Testified at deposition
†Testified at trial, evidentiary hearing, or live arbitration

Appendix C – Materials Relied Upon

## X.    APPENDIX C: MATERIALS RELIED UPON

| Citation |
|---|
| Amended Demand for Arbitration Letter, October 22, 2025. |
| hilliard-law-homepage.har. (Schnell) |
| hilliard-law-submit-homepage-form.har. (Schnell) |
| hilliard-law-submit-popup-form.har. (Schnell) |
| legalsettlementexperts-gtm-sandbox.har. (Schnell) |
| legalsettlementexperts-gtm-sandbox.html. (Schnell) |
| view-source_https___legalsettlementexperts.com_marriott-v2_.html. |
| view-source_https___www.privacyviolationclaim.com.html. |
| "AI Analytics Platform for Modern Digital Analytics," Amplitude, accessed January 14, 2026. https://amplitude.com/. |
| "Digital Marketing Solutions for Local Businesses," Scorpion, accessed January 14, 2026. https://www.scorpion.co/. |
| "Install the HubSpot Tracking Code," HubSpot, accessed January 14, 2026. https://knowledge.hubspot.com/reports/install-the-hubspot-tracking-code. |
| "Global Privacy Control homepage," Global Privacy Control, accessed January 14, 2026, https://globalprivacycontrol.org/. |
| "Google Analytics." Accessed January 14, 2026. https://trackers.tweasel.org/t/google/google-analytics/. |
| "How the web works," Mozilla, accessed January 14, 2026, https://developer.mozilla.org/en-US/docs/Learn_web_development/Getting_started/Web_standards/How_the_web_works. |
| "HTML: HyperText Markup Language," Mozilla, accessed January 14, 2026, https://developer.mozilla.org/en-US/docs/Web/HTML. |
| "Introduction to tagging and the Google Tag," Google, accessed January 14, 2026, https://developers.google.com/tag-platform/devguides. |
| "JavaScript engine," Mozilla, accessed January 14, 2026, https://developer.mozilla.org/en-US/docs/Glossary/Engine/JavaScript. |
| "Manage Environments \| Adobe Experience Manager." Accessed January 14, 2026. https://experienceleague.adobe.com/en/docs/experience-manager-cloud-service/content/implementing/using-cloud-manager/manage-environments. |
| "Populating the page: how browsers work," Mozilla, accessed January 14, 2026, https://developer.mozilla.org/en-US/docs/Web/Performance/Guides/How_browsers_work. |
| "Publishing, Versions, and Approvals - Tag Manager Help." Accessed January 15, 2026. https://support.google.com/tagmanager/answer/6107163?hl=en. |
| "SimplyConvert's Platform Features \| Help Manage Your Intake Process." Accessed January 14, 2026. https://simplyconvert.com/features. |
| "What is a web browser?" Firefox, accessed January 14, 2026, https://www.firefox.com/en-US/more/what-is-a-browser/. |
| Documentation. "How Does Unbounce Track Page Stats?" November 28, 2023. https://documentation.unbounce.com/hc/en-us/articles/360058171231-How-Does-Unbounce-Track-Page-Stats. |
| Documentation. "How to Set up Conversion Tracking for Unbounce Forms in GA4." February 6, 2024. https://documentation.unbounce.com/hc/en-us/articles/14849865721364-How-to-Set-up-Conversion-Tracking-for-Unbounce-Forms-in-GA4. |
| Meta for Developers. "Get Started - Meta Pixel - Documentation." Accessed January 14, 2026. https://developers.facebook.com/docs/meta-pixel/get-started/. |
| Park, Paul. "Using Analytics to Measure Your Landing Page Performance." Unbounce, September 29, 2023. https://unbounce.com/conversion-rate-optimization/using-analytics-to-measure-your-landing-page-performance/. |

1

**Appendix C – Materials Relied Upon**

| Citation |
|---|
| PixelYourSite. "Meta Pixel (Facebook Pixel) & CAPI, Google Analytics & Ads, Pinterest, TikTok." Accessed January 14, 2026. https://www.pixelyoursite.com/. |
| Roy T. Fielding, and Julian Reschke, "RFC 7231 Hypertext Transfer Protocol (HTTP/1.1): Semantics and Content," Internet Engineering Task Force, June 2014, https://doi.org/10.17487/RFC7231. |
| "Rule 1.6: Confidentiality of Information. Accessed February 24, 2026. https://www.americanbar.org/groups/professional_responsibility/publications/ model_rules_of_professional_conduct/rule_1_6_confidentiality_of_information/. |
| "Rule 1.18: Duties to Prospective Client." Accessed February 24, 2026. https://www.americanbar.org/groups/professional_responsibility/publications/ model_rules_of_professional_conduct/rule_1_18_duties_of_prospective_client/. |

In addition to the materials listed above, I further incorporate herein all other documents and information referenced in the Demand Letter dated October 22, 2025, and exhibits thereto.

# EXHIBIT D

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **MARRIOTT INTERNATIONAL, INC.** | : | |
| 7750 Wisconsin Avenue | : | |
| Bethesda, Maryland 20814 | : | |
| Montgomery County | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| **v.** | : | |
| | : | |
| **SPERLING KENNY NACHWALTER,** | : | Civil Action No. 1:2026-cv-00900 (mdd) |
| **LLC** | : | |
| 321 North Clark Street, 25th Floor | : | |
| Chicago, Illinois 60654 | : | |
| | : | |
| & | : | |
| | : | |
| **HILLIARD, MARTINEZ & GONZALES,** | : | |
| **LLP, d/b/a HILLIARD LAW** | : | |
| 719 S. Shoreline Boulevard, Suite 100 | : | |
| Corpus Christi, Texas 78401 | : | |
| | : | |
| Defendants. | : | |

## <u>SUPPLEMENTAL EXPERT DECLARATION OF RON SCHNELL</u>

Executed on May 29, 2026

**TABLE OF CONTENTS**

I.     INTRODUCTION ................................................................................................................... 3

II.    ASSIGNMENT ..................................................................................................................... 3

III.   EXECUTIVE SUMMARY ................................................................................................... 4

IV.    THE CURRENT, PUBLICLY AVAILABLE, LIVE VERSIONS OF CLAIMANTS' COUNSEL'S ADDITIONAL WEBSITES STILL INTEGRATE THE SAME TYPE OF THIRD-PARTY TECHNOLOGIES AT ISSUE, DOING SO WITH MORE INVASIVE CONFIGURATIONS AND NO OPT-OUT CONTROLS ..................................................................................................... 5

    A.    METHODOLOGY FOR ANALYZING CLAIMANTS' COUNSEL'S ADDITIONAL WEBSITES ....................................... 7

    B.    ANALYSIS OF CLAIMANTS' COUNSEL'S ADDITIONAL WEBSITES ......................................................... 7

        1)    Hilliard Law Website ........................................................................................................ 7

        2)    Intuit Lawsuit Website ...................................................................................................... 17

        3)    Shield Legal Assistance Website Intuit Lawsuit Page ........................................................ 19

V.     REMOVING THIRD-PARTY TECHNOLOGIES ON CLAIMANTS' COUNSEL'S WEBSITES IS NOT A TECHNICAL BURDEN ................................................................... 20

VI.    CONCLUSION .................................................................................................................... 20

VII.   APPENDIX A: MATERIALS RELIED UPON .............................................................................

## I.    INTRODUCTION

1.    I, Ron Schnell, am a Distinguished Technology Fellow at Keystone.

2.    I have been retained by counsel for Marriott International, Inc., ("**Marriott**") to provide supplemental expert analysis in the pre-filing matter of *Marriott International, Inc. v. Hilliard, Martinez & Gonzales, LLP, et al.*. I have also been asked to prepare a Supplemental Declaration in response to the Amended Demands for Arbitration, filed October 22, 2025 (the "**Demands**"), and in support of Marriott's contemporaneously filed Motion to Disqualify Counsel regarding the extent to which third-party technologies are integrated on the websites operated by Hilliard, Martinez & Gonzales, LLP, and Sperling Kenny Nachwalter, LLC ("**Claimants' Counsel**").

3.    The opinions expressed in this Declaration are based on a reasonable degree of scientific certainty in my field, my research, expertise, and experience in those fields of computer science, computer software, software development, computer privacy, and user information tracking, as well as on the materials I reviewed in preparation for this Declaration, which are listed in **Appendix A**. I reserve the right to update any of my opinions if further materials are produced over the course of this litigation. Keystone provided support for the preparation of this expert Declaration under my direction and supervision, including conducting analyses at my direction which will be referenced as "my own independent testing." The opinions expressed in this report are solely my own. Keystone receives compensation for my work on this matter at a rate of $950 per hour. My compensation is not dependent upon the outcome of this case.

## II.    ASSIGNMENT

4.    I was asked to prepare a Supplemental Declaration addressing the additional websites currently operated by Claimants' Counsel which serve as advertisements for other matters where Claimants' Counsel is soliciting prospective clients' and sharing information with third parties. In the original Demands for the matter against Marriott, allegations asserted that Marriott integrated several different third-party technologies into their website which enabled them to "surreptitiously intercept" data transmitted by the users' browsers.

5.    Since my previous Declaration dated February 24, 2026 in this pre-filing matter, Hilliard Law has asserted that "[n]owhere does Marriott allege a plausible basis for concluding that either firm [including Hilliard Law] even knew a pixel was installed, much less that each firm [including Hilliard Law] deployed any pixels itself." My assignment was to evaluate that assertion by assessing the extent of similar types of third-party technologies integrated on the current, publicly available, live versions of

https://www.hilliard-law.com/practice-areas/mass-torts/intuit-turbo-tax/ ("Hilliard Law Website Intuit Lawsuit Page"), https://www.hilliard-law.com/contact-us/ ("Hilliard Law Website Contact Page"), https://intuitlawsuit.com/ ("Intuit Lawsuit Website"), and https://shieldlegalassistance.com/intuit-privacy-lawsuits/ ("Shield Legal Assistance Website Intuit Lawsuit Page") (collectively "Claimants' Counsel's Additional Websites").

## III.    EXECUTIVE SUMMARY

6.    **The current, publicly available, live versions of Claimants' Counsel's Additional Websites are integrating the same types of third-party technologies that they allege are at issue on Marriott's website, but with more invasive configurations**. In other words, although Claimants' Counsel states that they had no knowledge of their own use of pixels despite my previous Declaration, my analysis shows Claimants' Counsel continues to use pixels to this day. These technologies function through the same technical mechanisms that Claimants characterize as "unlawful conduct" and a "crime" when allegedly integrated by Marriott.[1] *See, e.g.,* **Section IV** *infra.*

7.    **The current, publicly available, live versions of Claimants' Counsel's Additional Websites do not provide built-in, user-controlled opt-out mechanisms for tracking.** Claimants' Counsel's Additional Websites actively do not implement any readily accessible user-facing controls that directly govern whether third-party technologies are permitted to load on Claimants' Counsel's Additional Websites and execute. *See, e.g.,* **Section IV** *infra.*

8.    **This Supplemental Declaration addresses Hilliard Law's assertion that "Nowhere does Marriott allege a plausible basis for concluding that either firm even knew a pixel was installed, much less that each firm deployed any pixels itself."[2]** That assertion is demonstrably incorrect as to websites operated by Hilliard Law. My previous Declaration dated February 24, 2026 identified the presence and operation of third-party tracking technologies on Claimants' Counsel's Websites, including Google Analytics and the Meta Pixel, among other third-party technologies. My testing in this Supplemental Declaration of Claimants' Counsel's Additional Websites confirms that, despite being informed by me several months ago, the current, publicly available, live versions of the Hilliard Law Website Intuit Lawsuit Page and Contact Page still integrate the same Google, Meta, and TikTok third-party technologies previously identified, as well as additional third-party technologies including HubSpot and Scorpion. Additionally, other websites operated by Hilliard Law, including the Intuit Law

---

[1] Demands, ¶18.

[2] Defendants' Joint Brief (1) In Support Of Their Motion To Dismiss And (2) In Opposition To Marriott's Motion To Disqualify.

Website and the Shield Legal Assistance Website Intuit Lawsuit Page, actively use similar third-party technologies. *See, e.g.,* **Section IV** *infra.*

9.  **The continued presence of these third-party technologies on Claimants' Counsel's Additional Websites is not explained by any technical burden associated with removing them.** Based on my experience, I know that removing a client-side third-party pixel, analytics script, or tag from a website generally requires only removing the small snippet of code on the website as per the instructions of the pixel or turning off the tag manager by clicking on a single checkbox on the tag manager website. This is a straightforward website administration task that can typically be completed in a matter of seconds by someone with access to the website source code or tag management system. *See, e.g.,* **Section V** *infra.*

## IV.    THE CURRENT, PUBLICLY AVAILABLE, LIVE VERSIONS OF CLAIMANTS' COUNSEL'S ADDITIONAL WEBSITES STILL INTEGRATE THE SAME TYPE OF THIRD-PARTY TECHNOLOGIES AT ISSUE, DOING SO WITH MORE INVASIVE CONFIGURATIONS AND NO OPT-OUT CONTROLS

10.  In this section, I examine the third-party technologies that are integrated into Claimants' Counsel's Additional Websites. I performed this analysis because Claimants allege that the presence and operation of certain third-party technologies on Marriott's website constitute impermissible data capture, transmission, or "unlawful conduct,"[3] while Claimants' Counsel's Additional Websites integrate the same types of technologies they allege are at issue when used by Marriott. Additionally, Claimants' Counsel asserts that as of February 24, 2026, they did not know pixels were installed on their websites. As discussed in this section *infra*, Claimants' Counsel deploys more of these technologies than Claimants allege Marriott uses, with more invasive configurations, and with no opt-out controls. **Table 1** *infra* summarizes the third-party technologies identified on Claimants' Counsel's Additional Websites based on a review of webpage source code, tag management configurations, and executed scripts.

---

[3] Demands, ¶18.

5

**Table 1:** Third-Party Technologies In Use on Claimants' Counsel's Additional Websites

| Index | Technology | Integrated on Claimants' Counsel's Additional Websites? |
|---|---|---|
| 1 | Meta Pixel[4,5] | Yes, including the Hilliard Law Website Intuit Lawsuit Page, the Hilliard Law Website Contact Page, and the Shield Legal Assistance Website Intuit Lawsuit Page.<br><br>Notably, I saw no evidence the Meta Pixel is governed by built-in, user-controlled opt-out mechanisms or the Global Privacy Control (GPC)[6] opt-out signal on these websites.<br><br>Further, the Hilliard Law Website Intuit Lawsuit Page and the Hilliard Law Website Contact Page configured the Meta Pixel to automatically capture button click events. |
| 2 | Google Analytics | Yes, the Hilliard Law Website Intuit Lawsuit Page, the Hilliard Law Website Contact Page, the Intuit Lawsuit Website, and the Shield Legal Assistance Website Intuit Lawsuit Page all use Google Analytics.<br><br>Notably, I saw no evidence Google Analytics is governed by built-in, user-controlled opt-out mechanisms or the GPC opt-out signal on these websites. |
| 3 | TikTok Pixel | Yes, including the Hilliard Law Website Intuit Lawsuit Page and the Hilliard Law Website Contact Page.<br><br>Notably, I saw no evidence the TikTok Pixel is governed by built-in, user-controlled opt-out mechanisms or the GPC opt-out signal on these websites. |
| 4 | HubSpot[7] | Yes, including the Hilliard Law Website Intuit Lawsuit Page and the Hilliard Law Website Contact Page.<br><br>Notably, I saw no evidence HubSpot is governed by built-in, user-controlled opt-out mechanisms or the GPC opt-out signal on the Hilliard Law website. |
| 5 | Scorpion[8] | Yes, including the Hilliard Law Website Intuit Lawsuit Page and the Hilliard Law Website Contact Page.<br><br>Notably, I saw no evidence Scorpion is governed by built-in, user-controlled opt-out mechanisms or the GPC opt-out signal on the Hilliard Law website. |

11. As the discussion that follows demonstrates, the current, publicly available, live versions of Claimants' Counsel's Additional Websites integrate the same types of technologies that Claimants characterize as problematic when allegedly used by Marriott. In addition, Claimants' Counsel's Additional Websites integrate a greater number of such technologies, and in several cases, configure them in ways that are

---

[4] Demands, ¶4.
[5] Meta for Developers. "Get Started - Meta Pixel - Documentation." Accessed May 20, 2026.
https://developers.facebook.com/docs/meta-pixel/get-started/.
[6] "Global Privacy Control homepage," Global Privacy Control, accessed May 20, 2026, https://globalprivacycontrol.org/.
[7] "Install the HubSpot Tracking Code," HubSpot, accessed May 20, 2026. https://knowledge.hubspot.com/reports/install-the-hubspot-tracking-code.
[8] "Digital Marketing Solutions for Local Businesses," Scorpion, accessed May 20, 2026. https://www.scorpion.co/.

6

more invasive with respect to the actual data that are collected. Claimants' Counsel's Additional Websites do this all while not providing users any built-in, user-controlled opt-out mechanisms.

### A. Methodology for Analyzing Claimants' Counsel's Additional Websites

12. As discussed *supra*, I examined a set of reference websites identified by counsel for purposes of investigating Claimants' Counsel's continued usage of third-party technologies on their own websites. My methodology for reviewing Claimants' Counsel's Additional Websites was consistent with standard practices in web technology analysis.

13. For each of the websites, which are all currently live as of the date of this Supplemental Declaration, I conducted a direct, real-time examination of the website. This included reviewing the webpage source code and observing network activity in a browser-based inspection environment to identify the presence of third-party scripts and tag management infrastructure.

14. Across all of Claimants' Counsel's Additional Websites, my analysis focused on identifying the presence of tag management systems such as GTM and the third-party technologies configured to load through those systems or third-party technologies directly embedded in the website source code. Because live observation was possible for each of these websites, I relied on direct inspection of executed scripts and network requests to form my opinions.

### B. Analysis of Claimants' Counsel's Additional Websites

#### 1) Hilliard Law Website

15. My analysis of the current, publicly available, live version of the Hilliard Law Website Intuit Lawsuit Page and Contact Page was conducted through direct, live observation, as the website was active at the time of my review. I reviewed the webpage source code, inspected network traffic generated during user interactions, and examined the behavior of third-party scripts executed in the browser to identify the analytics and marketing technologies integrated into the site.

i. Intuit Lawsuit Page

16. Based on my review, the current, publicly available, live version of the Hilliard Law Website Intuit Lawsuit Page still uses the same GTM container as the one identified in my previous Declaration (GTM-KD5G76FM). Through live inspection of the GTM container and associated network activity, I

7

observed the loading and execution of Google Analytics (G-8D03YQM1E2), indicating that the site transmits usage and interaction data to Google for analytics purposes.[9]

17. I also observed the presence of the same Meta Pixel still in use on the current, publicly available, live version of the Hilliard Law Website Intuit Lawsuit Page as the one identified in my previous Declaration (Pixel ID 2061975667594973). Inspection of the Meta Pixel configuration and observed network behavior indicated that the Hilliard Law Website Intuit Lawsuit Page utilizes Meta's automatic event tracking feature, including "SubscribedButtonClick" events, which is associated with Meta's "Track events automatically without code" setting. This configuration causes the Meta Pixel to automatically track button interactions and associated metadata without requiring manual event instrumentation. This behavior is illustrated in **Figure 1** *infra.* [10]

---

[9] hilliard-law-intuit-lawsuit.har.
[10] hilliard-law-intuit-lawsuit.har.

**Figure 1:** Meta Pixel SubscribedButtonClick Event on Hilliard Law Website Intuit Lawsuit Page[11]



18. Further, I observed the presence of the same TikTok Pixel still in use on the current, publicly available, live version of the Hilliard Law Website Intuit Lawsuit Page as the one identified in my previous Declaration (Pixel ID D2MD3HJC77U0CGBHA6JG). As discussed in my previous Declaration, he TikTok Pixel, like the Meta Pixel, is a client-side JavaScript technology used to track user interactions and conversions for advertising measurement within TikTok's platform.[12]

19. The current, publicly available, live version of the Hilliard Law Website Intuit Lawsuit Page also still integrates HubSpot Analytics and Forms, which are used to collect analytics data and to process user-

---

[11] hilliard-law-intuit-lawsuit.har.
[12] hilliard-law-intuit-lawsuit.har.

submitted form information.[13] During my own independent testing, I observed requests to HubSpot Analytics domains, including: https://track-na2.hubspot.com/.[14]

20. During my own independent live testing of the current, publicly available, live version of the Hilliard Law Website Intuit Lawsuit Page, I completed the pop-up email contact form pinned to the bottom of page, as illustrated in **Figure 2**. Upon form submission, I observed, in the network activity, that all form field contents, including user-entered contact information, were transmitted to Scorpion, a digital marketing platform operated by scorpion.co.[15] These requests included user-entered contact information and all form field responses, confirming that the current, publicly available, live version of the Hilliard Law Website Intuit Lawsuit Page sends form submission data (which I understand may be prohibited from disclosure, based on documentation from the American Bar Association (ABA) Model Rules 1.6 and 1.18 shown to me by counsel,[16] as discussed in my previous Declaration) to third-party. This behavior is illustrated in **Figure 3** *infra*.[17]

**Figure 2**: Hilliard Law Website Intuit Lawsuit Page Pop-Up Contact Form[18]



---

[13] "Install the HubSpot Tracking Code," HubSpot, accessed May 20, 2026. https://knowledge.hubspot.com/reports/install-the-hubspot-tracking-code.

[14] hilliard-law-intuit-lawsuit.har.

[15] "Digital Marketing Solutions for Local Businesses," Scorpion, accessed May 20, 2026. https://www.scorpion.co/.

[16] "Rule 1.6: Confidentiality of Information. Accessed May 20, 2026. https://www.americanbar.org/groups/professional_responsibility/publications/model_rules_of_professional_conduct/rule_1_6_confidentiality_of_information/. "Rule 1.18: Duties to Prospective Client." Accessed May 20, 2026. https://www.americanbar.org/groups/professional_responsibility/publications/model_rules_of_professional_conduct/rule_1_18_duties_of_prospective_client/.

[17] hilliard-law-intuit-lawsuit.har.

[18] https://www.hilliard-law.com/practice-areas/mass-torts/intuit-turbo-tax/.

**Figure 3:** Hilliard Law Website Intuit Lawsuit Page Pop-Up Contact Form Field Responses Shared with Scorpion[19]



21. In addition to receiving form submission responses, Scorpion also receives data when a user clicks on the webpage, regardless of where the click occurs. During my own independent testing of the current, publicly available, live version of the Hilliard Law Website Intuit Lawsuit Page, I observed network requests to Scorpion being generated in response to click activity on the page which included the exact coordinates on the page where the user clicked. These requests were not limited to clicks on the contact form or on any particular button. Instead, Scorpion received click-event data even when the click occurred anywhere on the webpage, for every single click. This confirms that Scorpion's technology is configured by Hilliard Law to invasively collect user-interaction event data from the page, in addition to receiving the contents of submitted form fields. This behavior is illustrated in **Figure 4**.[20]

---

[19] hilliard-law-intuit-lawsuit.har.
[20] hilliard-law-intuit-lawsuit.har.

**Figure 4:** Hilliard Law Website Intuit Lawsuit Page Click Events Shared with Scorpion[21]

22. Based on my analysis, the current, publicly available, live version of the Hilliard Law Website Intuit Lawsuit Page still integrates a broad set of third-party analytics and marketing technologies, including Meta Pixel with automatic event tracking enabled, TikTok Pixel, Google Analytics, HubSpot, and Scorpion, that are capable of collecting detailed user interaction data and, in some instances, user-entered form responses. These implementations demonstrate that Claimants' Counsel's own website still deploys third-party technologies that are substantially similar to the technologies Claimants characterize as problematic when allegedly used on the Marriott website.

23. During my review and live testing of the current, publicly available, live version of the Hilliard Law Website Intuit Lawsuit Page, I did not observe any built-in, user-controlled opt-out mechanism that would allow visitors to prevent the loading or execution of the third-party analytics and advertising technologies described above. I did not observe a consent management platform that provided granular controls over third-party tracking, nor any mechanism that conditionally prevented these scripts from firing prior to user interaction. The footer of the webpage where this mechanism would typically be made available is illustrated in **Figure 5**. In my own independent testing, the third-party technologies executed automatically upon the initial page load.

---

[21] hilliard-law-intuit-lawsuit.har.

**Figure 5:** Hilliard Law Website Intuit Lawsuit Page Footer Options[22]



24. I also tested whether the current, publicly available, live version of the Hilliard Law Website Intuit Lawsuit Page responded to the GPC opt-out signal,[23] which is an industry-recognized browser-based mechanism that allows users to communicate their preference to opt-out of certain types of data sharing. During my own independent testing, enabling the GPC opt-out signal in the browser still did not prevent the loading or execution of the Meta Pixel, TikTok Pixel, Scorpion, or other third-party analytics technologies observed. In other words, the site did not appear to detect or honor the GPC opt-out signal. As discussed in my previous Declaration, my own independent testing showed that Marriott's website, by contrast, detects and honors the GPC opt-out signal.

    ii.    Contact Page

25. Based on my review, the current, publicly available, live version of the Hilliard Law Website Contact Page still uses the same GTM container as the one identified in my previous Declaration and *supra* for the Intuit Lawsuit Page (GTM-KD5G76FM). Through live inspection of the GTM container and associated network activity, I observed the loading and execution of Google Analytics (G-8D03YQM1E2), indicating that the site transmits usage and interaction data to Google for analytics purposes.[24]

---

[22] https://www.hilliard-law.com/practice-areas/mass-torts/intuit-turbo-tax/.
[23] "Global Privacy Control homepage," Global Privacy Control, accessed May 20, 2026, https://globalprivacycontrol.org/.
[24] hilliard-law-contact.har.

13

26. I also observed the presence of the same Meta Pixel still in use on the current, publicly available, live version of the Hilliard Law Website Contact Page as the one identified in my previous Declaration and *supra* for the Intuit Lawsuit Page (Pixel ID 2061975667594973). Inspection of the Meta Pixel configuration and observed network behavior indicated that the Hilliard Law Website Contact Page also utilizes Meta's automatic event tracking feature, including "SubscribedButtonClick" events.[25]

27. Further, I observed the presence of the same TikTok Pixel still in use on the current, publicly available, live version of the Hilliard Law Website Contact Page as the one identified in my previous Declaration and *supra* for the Intuit Lawsuit Page (Pixel ID D2MD3HJC77U0CGBHA6JG).[26]

28. The current, publicly available, live version of the Hilliard Law Website Contact Page also still integrates HubSpot Analytics and Forms. During my own independent testing, I observed requests to HubSpot Analytics domains, including: https://track-na2.hubspot.com/.[27]

29. During my own independent live testing of the current, publicly available, live version of the Hilliard Law Website Contact Page, I completed the primary contact form on the page, as illustrated in **Figure 6**. Upon form submission, I observed, in the network activity, that all form field contents, including user-entered contact information, were transmitted to HubSpot. These requests included user-entered contact information and all form field responses, confirming that the current, publicly available, live version of the Hilliard Law Website Contact Page sends form submission data (which I understand may be prohibited from disclosure under the ABA Model Rules discussed in my previous Declaration) to third-party. This behavior is illustrated in **Figure 7** *infra.*[28]

---

[25] hilliard-law-contact.har.

[26] hilliard-law-contact.har.

[27] hilliard-law-contact.har.

[28] hilliard-law-contact.har.

14

**Figure 6:** Hilliard Law Website Contact Page Contact Form[29]



**Figure 7:** Hilliard Law Website Contact Page Pop-Up Contact Form Field Responses Shared with HubSpot[30]



---

[29] https://www.hilliard-law.com/contact-us/.
[30] hilliard-law-contact.har.

```
▾Request Payload      View source
  ▾{contactFields: {email: "patrick.star.official@gmail.com", firstName: "Patrick", lastName: "Star",…},…}
    collectedFormAction: "/contact-us/"
    collectedFormClasses: "loading"
    collectedFormId: "Form_ContactV2BG"
   ▾contactFields: {email: "patrick.star.official@gmail.com", firstName: "Patrick", lastName: "Star",…}
      email: "patrick.star.official@gmail.com"
      firstName: "Patrick"
      lastName: "Star"
      phone: "(630) 702-9888"
    formSelectorClasses: ".loading"
    formSelectorId: "#Form_ContactV2BG"
   ▾formValues: {How can we help you?: "Need more information", Are you a new client?: "Yes",…}
      Are you a new client?: "Yes"
      How can we help you?: "Need more information"
      Please make a selection.: "callcenterpnc@hilliard-law.com; jvasquez@hilliard-law.com; etabor@hilliard-law.com; j
   ▾labelToNameMap: {How can we help you?: "ContactV2BGForm$ITM0$Message",…}
      Are you a new client?: "ContactV2BGForm$ITM0$LeadType"
      How can we help you?: "ContactV2BGForm$ITM0$Message"
      Please make a selection.: "ContactV2BGForm$ITM0$AttorneyEmail"
    pageTitle: "Contact Us | Hilliard Law"
    pageUrl: "https://www.hilliard-law.com/contact-us/"
    portalId: 44225990
    token: -588153552
    type: "SCRAPED"
    utk: "ae2eb2c78f1e4da5e41ac9125307dd06"
    uuid: "c7045bf7-a876-463d-81c7-abca6aafc2b6"
    version: "collected-forms-embed-js-static-1.4733"
```

30. In addition, similar to the Intuit Lawsuit Page discussed *supra*, on the current, publicly available, live version of the Hilliard Law Website Contact Page I observed Scorpion receiving data when a user clicks on the webpage, regardless of where the click occurs. This network request similarly includes the exact coordinates on the page where the user clicked. These requests were not limited to clicks on the contact form or on any particular button. Instead, Scorpion received click-event data even when the click occurred anywhere on the webpage, for every single click. This confirms that Scorpion's technology is configured by Hilliard Law to collect user-interaction event data from the page more broadly, on more than one page of the Hilliard law website.[31]

31. Based on my analysis, the current, publicly available, live version of the Hilliard Law Website Contact Page still integrates a broad set of third-party analytics and marketing technologies, including Meta Pixel with automatic event tracking enabled, TikTok Pixel, Google Analytics, HubSpot, and Scorpion, that are capable of collecting detailed user interaction data and, in some instances, user-entered form responses. These implementations demonstrate that Claimants' Counsel's own website still deploys third-party technologies that are substantially similar to the technologies Claimants characterize as problematic when allegedly used on the Marriott website.

---

[31] hilliard-law-contact.har.

32. During my review and live testing of the current, publicly available, live version of the Hilliard Law Website Contact Page, I did not observe any built-in, user-controlled opt-out mechanism that would allow visitors to prevent the loading or execution of the third-party analytics and advertising technologies described above. I did not observe a consent management platform that provided granular controls over third-party tracking, nor any mechanism that conditionally prevented these scripts from firing prior to user interaction. The footer of the webpage where this mechanism would typically be made available is the same as **Figure 5** *supra*. In my own independent testing, the third-party technologies executed automatically upon the initial page load.

33. I also tested whether the current, publicly available, live version of the Hilliard Law Website Contact Page responded to the GPC opt-out signal. During my own independent testing, enabling the GPC opt-out signal in the browser still did not prevent the loading or execution of the Meta Pixel, TikTok Pixel, HubSpot, or other third-party analytics technologies observed. In other words, the site did not appear to detect or honor the GPC opt-out signal. As discussed in my previous Declaration and *supra*, my own independent testing showed that Marriott's website, by contrast, detects and honors the GPC opt-out signal.

### 2) **Intuit Lawsuit Website**

34. My analysis of the current, publicly available, live version of the Intuit Lawsuit Website was conducted through direct, live observation, as the website was active at the time of my review. I reviewed the webpage source code, inspected network traffic generated during user interactions, and examined the behavior of third-party scripts executed in the browser to identify the analytics and marketing technologies integrated into the site.

35. Importantly, as of the filing of this Supplemental Declaration, the Intuit Lawsuit Website is labeled as being under construction, as illustrated in **Figure 8**. Nonetheless, third-party scripts are still loaded and executed on the website. Clicking the "Get notified when we relaunch" button does not prompt for any contact information to stay informed about website updates.

**Figure 8:** Intuit Law Website Landing Page[32]



36. Based on my review, the current, publicly available, live version of the Intuit Lawsuit Website uses a GTM container (GTM-TT93DBJT), similar to the Hilliard Law website pages discussed in **Section IV.B.1** *supra*. Through live inspection of the GTM container and associated network activity, I observed the loading and execution of Google Analytics (G-MZTZX0LSW0), indicating that the site transmits usage and interaction data to Google for analytics purposes.[33]

37. Based on my analysis, the current, publicly available, live version of the Intuit Lawsuit Website actively integrates a third-party analytics technology, Google Analytics, which is capable of collecting detailed user interaction data. These implementations demonstrate that Claimants' Counsel's own website actively deploys third-party technologies that are substantially similar to the technologies Claimants characterize as problematic when allegedly used on the Marriott website.

38. During my review and live testing of the current, publicly available, live version of the Intuit Lawsuit Website, I did not observe any built-in, user-controlled opt-out mechanism that would allow visitors to prevent the loading or execution of the third-party analytics and advertising technologies described above. I did not observe a consent management platform that provided granular controls over third-party tracking, nor any mechanism that conditionally prevented these scripts from firing prior to user interaction. In my own independent testing, the third-party technologies executed automatically upon the initial page load.

---

[32] https://intuitlawsuit.com/.
[33] intuit-lawsuit.har.

39. I also tested whether the current, publicly available, live version of the Intuit Lawsuit Website responded to the GPC opt-out signal. During my own independent testing, enabling the GPC opt-out signal in the browser still did not prevent the loading or execution of Google Analytics. In other words, the site did not appear to detect or honor the GPC opt-out signal. As discussed in my previous Declaration and *supra*, my own independent testing showed that Marriott's website, by contrast, detects and honors the GPC opt-out signal.

### 3)    **Shield Legal Assistance Website Intuit Lawsuit Page**

40. My analysis of the current, publicly available, live version of the Shield Legal Assistance Website Intuit Lawsuit Page was conducted through direct, live observation, as the website was active at the time of my review. I reviewed the webpage source code, inspected network traffic generated during user interactions, and examined the behavior of third-party scripts executed in the browser to identify the analytics and marketing technologies integrated into the site.

41. Based on my review, the current, publicly available, live version of the Shield Legal Assistance Website Intuit Lawsuit Page uses two GTM containers (GTM-5QF7792 and GTM-5QF7792), similar to the Hilliard Law website pages discussed in **Section IV.B.1** *supra*. Through live inspection of the GTM container and associated network activity, I observed the loading and execution of Google Analytics (G-X0BMR1NXFR), indicating that the site transmits usage and interaction data to Google for analytics purposes.[34]

42. I also observed the presence of a Meta Pixel in use on the current, publicly available, live version of the Shield Legal Assistance Website Intuit Lawsuit Page (Pixel ID 537944601657713).

43. Based on my analysis, the current, publicly available, live version of the Shield Legal Assistance Website Intuit Lawsuit Page integrates multiple third-party analytics and marketing technologies, including Meta Pixel and Google Analytics, that are capable of collecting detailed user interaction data. These implementations demonstrate that Claimants' Counsel's own website actively deploys third-party technologies that are substantially similar to the technologies Claimants characterize as problematic when allegedly used on the Marriott website.

44. During my review and live testing of the current, publicly available, live version of the Shield Legal Assistance Website Intuit Lawsuit Page, I did not observe any built-in, user-controlled opt-out mechanism that would allow visitors to prevent the loading or execution of the third-party analytics and advertising technologies described above. I did not observe a consent management platform that

---

[34] shield-legal-assistance.har.

provided granular controls over third-party tracking, nor any mechanism that conditionally prevented these scripts from firing prior to user interaction. In my own independent testing, the third-party technologies executed automatically upon the initial page load.

45. I also tested whether the current, publicly available, live version of the Shield Legal Assistance Website Intuit Lawsuit Page responded to the GPC opt-out signal. During my own independent testing, enabling the GPC opt-out signal in the browser still did not prevent the loading or execution of Google Analytics or the Meta Pixel. In other words, the site did not appear to detect or honor the GPC opt-out signal. As discussed in my previous Declaration and *supra*, my own independent testing showed that Marriott's website, by contrast, detects and honors the GPC opt-out signal.

## V.   REMOVING THIRD-PARTY TECHNOLOGIES ON CLAIMANTS' COUNSEL'S WEBSITES IS NOT A TECHNICAL BURDEN

46. Third-party analytics and marketing technologies such as Google Analytics, the Meta Pixel, the TikTok Pixel, HubSpot, and Scorpion are client-side technologies that are integrated into webpages through scripts, tags, or tag management systems, as discussed in Section V of my previous Declaration. As a technical matter, removing or disabling these technologies generally requires removing the small snippet of code on the website as per the instructions of the pixel or turning off the tag manager by clicking on a single checkbox on the tag manager website. These are routine website administration tasks.

47. Based on my experience, once the relevant script, tag, or tag manager configuration is identified, disabling the technology can typically be completed in seconds. The task does not require redesigning the website, modifying its core functionality, or changing the substance of the content displayed to users. It is also easily reversible if the website operator later decides to restore the technology.

48. Accordingly, the continued presence of the Google, Meta, TikTok, HubSpot, and Scorpion technologies on Claimants' Counsel's Additional Websites is not explained by any technical burden associated with removing or disabling them. From a technical perspective, the third-party technologies I identified in my previous Declaration on Claimants' Counsel's Websites could have been promptly disabled.

## VI.   CONCLUSION

49. Applying a consistent technical methodology across Claimants' Counsel's Additional Websites, my analysis demonstrates that Claimants' Counsel's Additional Websites integrate many of the same types of third-party analytics and marketing technologies that they allege are problematic when allegedly used by Marriott, and in some instances deploy those technologies in more invasive configurations. Through live testing, I observed that Claimants' Counsel's Additional Websites utilize multiple advertising pixels,

20

analytics platforms, and conversion-tracking tools capable of collecting user interaction data and, in certain cases, user-entered form responses that may be prohibited from disclosure under the ABA Model Rules discussed in my previous Declaration. Indeed, Claimants' Counsel's Additional Websites integrate these third-party technologies without providing industry-standard, built-in, user-controlled opt-out mechanisms.

50. These findings also directly rebut Claimants' Counsel's assertion that Marriott lacks a plausible basis for concluding that Claimants' Counsel's knew that pixels were installed and deployed on the websites they operate. My previous Declaration dated February 24, 2026 also identified the presence and operation of third-party tracking technologies on Claimants' Counsel's Websites, including Google Analytics and the Meta Pixel, among other third-party technologies. Claimants' Counsel was therefore on notice of those active technologies. Nevertheless, my current testing confirms that the current, publicly available, live versions of the Hilliard Law Website Intuit Lawsuit Page and Contact Page still integrate the same Google, Meta, TikTok, HubSpot, and Scorpion third-party technologies previously identified. My testing further confirms that other websites operated by Hilliard Law, including the Intuit Law Website and the Shield Legal Assistance Website Intuit Lawsuit Page, actively use similar third-party technologies. Accordingly, Claimants' Counsel's assertion is not consistent with the current technical evidence.

51. The continued operation of these third-party technologies on Claimants' Counsel's Additional Websites is not explained by technical burden. Disabling or removing client-side pixels, analytics scripts, and similar tags is a routine website administration task that can typically be completed in seconds by removing the small snippet of code on the website as per the instructions of the pixel or turning off the tag manager by clicking on a single checkbox on the tag manager website.

I declare under penalty of perjury, under the laws of the United States of America, that the foregoing is true and correct. Executed on this 29th day of May 2026 in Seattle, Washington.

Ron Schnell

_____

29 May 2026

Appendix A – Materials Relied Upon

### VII.    APPENDIX A: MATERIALS RELIED UPON

| Citation |
| --- |
| Amended Demand for Arbitration Letter, October 22, 2025. |
| Defendants' Joint Brief (1) In Support Of Their Motion To Dismiss And (2) In Opposition To Marriott's Motion To Disqualify. |
| hilliard-law-intuit-lawsuit.har. (Schnell) |
| hilliard-law-contact.har. (Schnell) |
| intuit-lawsuit.har. (Schnell) |
| shield-legal-assistance.har. (Schnell) |
| "Digital Marketing Solutions for Local Businesses," Scorpion, accessed May 20, 2026. https://www.scorpion.co/. |
| "Global Privacy Control homepage," Global Privacy Control, accessed May 20, 2026, https://globalprivacycontrol.org/. |
| "Install the HubSpot Tracking Code," HubSpot, accessed May 20, 2026. https://knowledge.hubspot.com/reports/install-the-hubspot-tracking-code. |
| Meta for Developers. "Get Started - Meta Pixel - Documentation." Accessed May 20, 2026. https://developers.facebook.com/docs/meta-pixel/get-started/. |
| "Rule 1.6: Confidentiality of Information. Accessed May 20, 2026. https://www.americanbar.org/groups/professional_responsibility/publications/model_rules_of_professional_conduct/rule_1_6_confidentiality_of_information/. |
| "Rule 1.18: Duties to Prospective Client." Accessed May 20, 2026. https://www.americanbar.org/groups/professional_responsibility/publications/model_rules_of_professional_conduct/rule_1_18_duties_of_prospective_client/. |

In addition to the materials listed above, I further incorporate herein all other documents and information referenced in the Demand Letter dated October 22, 2025, and exhibits thereto.

# EXHIBIT E

Docusign Envelope ID: 0B9B68EF-4F24-8AFF-82D7-8A3DBC307E04

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION**

|  |  |
|---|---|
| **MARRIOTT INTERNATIONAL, INC.** | **:** |
| 7750 Wisconsin Avenue | **:** |
| Bethesda, Maryland 20814 | **:** |
| Montgomery County | **:** |
|  | **:** |
| Plaintiff, | **:** |
|  | **:** |
| **v.** | **:** |
|  | **:** **Civil Action No. 1:26-cv-900-MJM** |
| **SPERLING KENNY NACHWALTER, LLC** | **:** |
| 321 North Clark Street, 25th Floor | **:** |
| Chicago, Illinois 60654 | **:** |
|  | **:** |
| & | **:** |
|  | **:** |
| **HILLIARD, MARTINEZ & GONZALES,** | **:** |
| **LLP, d/b/a HILLIARD LAW** | **:** |
| 719 S. Shoreline Boulevard, Suite 100 | **:** |
| Corpus Christi, Texas 78401 | **:** |
|  | **:** |
| Defendants. | **:** |

**<u>EXPERT DECLARATION OF MICHAEL E. MCCABE, JR.</u>**

Executed on March 25, 2026

1

**TABLE OF CONTENTS**

I.      INTRODUCTION ............................................................................................. 1

II.     PERSONAL BACKGROUND AND QUALIFICATIONS.................................. 1

III.    COMPENSATION ........................................................................................... 5

IV.     INFORMATION CONSIDERED .................................................................... 5

V.      EXECUTIVE SUMMARY .............................................................................. 5

VI.     BASIS FOR TESTIMONY ............................................................................. 6

VII.    SUMMARY OF FACTS CONSIDERED ....................................................... 7

        A.      The AAA Demand ................................................................... 7

        B.      Communications Between Counsel for Claimants and Marriott ................ 11

        C.      The Expert Declaration of Ron Schnell ........................................ 17

                1.      Hilliard Law Website ............................................ 19

                2.      Legal Settlement Experts Website .......................... 20

                3.      Privacy Violation Claim Website ........................... 21

                4.      Sperling Kenny Website ......................................... 22

                5.      Mr. Schnell's Conclusion ....................................... 22

VIII.   OVERVIEW OF LAW REGARDING ATTORNEY
        DISQUALIFICATION .................................................................................... 22

IX.     CLAIMANTS' COUNSEL'S MATERIAL LIMITATION
        CONFLICT OF INTEREST ........................................................................... 24

        A.      Claimants' Counsel's Material Limitation Includes
                Their Inability To Advise Their Own Clients And
                Prospective Clients About Claims They May Advance
                Against Claimants' Counsel Under The Theories
                Alleged In The Demand ................................................................ 33

        B.      Claimants' Counsel's Exposure to Alleged Criminal Liability .................. 34

C.      The Conflicts Are Not Waivable, And
        There Is No Evidence Of Informed Consent ............................................... 37

D.      The Duty of Client Communication
        Also Supports The Conflict of Interest ........................................................ 41

X.      THE ADVOCATE-WITNESS RULE SIMILARLY CONFIRMS
        CLAIMANTS' COUNSEL'S CONFLICTS OF INTEREST .............................. 47

Docusign Envelope ID: 0B9B68EF-4F24-8AFF-82D7-8A3DBC307E04

## I.    INTRODUCTION

I, Michael E. McCabe, Jr., hereby declare:

1.    I am over 18 years of age and am competent to testify as to the matters set forth herein.

2.    I have been retained by counsel for Marriott International, Inc., to provide expert analysis in the matter of *Marriott International, Inc. v. Sperling Kenny Nachwalter, LLC, et al.* I have been asked to prepare an expert Declaration in response to the Amended Demands for Arbitration, filed October 22, 2025, and in support of Marriott's contemporaneously filed Motion to Disqualify Counsel regarding ethical issues arising from the conduct of Hilliard, Martinez & Gonzales, LLP and Sperling Kenny Nachwalter, LLC, including their operation of a client-solicitation website, issuance of demand letters, filing of the Demands, and continued prosecution of the arbitrations.

## II.    PERSONAL BACKGROUND AND QUALIFICATIONS

3.    I completed my undergraduate studies at the University of Maryland College Park in 1985 with a Bachelor of Science in Mechanical Engineering.  From 1985-1989, I was employed as an engineer for the National Aeronautics and Space Administration (NASA)'s Goddard Space Flight Center (GSFC), in Greenbelt, Maryland.

4.    I attended the University of Baltimore School of Law, receiving my Juris Doctor in law with high honors in May 1992. I am a member in good standing of the Supreme Court of Maryland (1992), the District of Columbia Court of Appeals (1993), and the Supreme Court of Virginia (2009). I am also a member in good standing of the United States District Courts for the District of Maryland, the District of Columbia, and the Eastern and Western Districts of Virginia. In addition, I am a member in good standing of the United States Courts of Appeals for the First, Fourth, District of Columbia, and Federal Circuits and the Supreme Court of the United States.

1

Docusign Envelope ID: 0B9B68EF-4F24-8AFF-82D7-8A3DBC307E04

Since 1993, I have been registered to practice in patent matters before the United States Patent and Trademark Office as a patent attorney.

5.      From 1992-1995, I was employed as an associate for Shapiro & Olander, P.C., a general practice law firm in Baltimore, Maryland.  My focus was on corporate civil litigation matters in federal and state court. After becoming a registered patent attorney, I also began representing clients in patent, trademark and copyright matters, in addition to other types of commercial litigation matters.

6.      In 1995, I joined Lowe, Price, LeBlanc & Becker ("Lowe"), an intellectual property specialty law firm in Alexandria, Virginia. At Lowe, my focus was on litigation before federal courts around the country in false advertising, patent, trademark and copyright litigation. In 1998, the Lowe firm dissolved and I joined the Washington, D.C. office of McDermott, Will & Emery as a partner, where I focused my practice on representing clients in patent litigation.

7.      I left McDermott in June 1999 to join the law firm then known as Oblon, Spivak, McClelland, Maier & Neustadt, P.C. ("Oblon") in Alexandria, Virginia, where I was a partner. I worked with Oblon until 2011. During my time at Oblon, I regularly represented clients in intellectual matters before various district courts.

8.      In 2000, Oblon formed a Risk Management Committee (or "RMC") to advise the Oblon firm management and attorneys on matters relating to compliance with their ethical duties and professional obligations, including pursuant to the rules of professional conduct. As a member and then Chair of the Oblon RMC, I regularly consulted with and advised firm attorneys, firm management, paraprofessionals and other relevant professionals (such as insurance industry experts and risk management consultants) on ethics matters, including compliance with the Rules of Professional Conduct. I served as the Chair of the RMC from 2002 until 2011.

2

9.      As one part of my role with the RMC, I represented Oblon firm practitioners in ethics investigations before, *inter alia*, the Virginia State Bar, District of Columbia Bar, and the Office of Enrollment and Discipline (OED) of the United States Patent and Trademark Office (USPTO).[1]

10.      In August 2011, I became a partner of Funk & Bolton, P.A. ("Funk & Bolton") in its Baltimore, Maryland office. At Funk & Bolton, I founded that firm's Attorney Ethics Practice Group and my practice focused on representing attorneys in ethics investigations and disciplinary proceedings. The matters involved alleged violations of the USPTO's ethics rules (which were initially modeled after the ABA Model Code of Professional Responsibility and which were amended in 2014 to track the ABA Model Rules of Professional Conduct). I also represented clients in ethics inquiries conducted by the Maryland, Virginia, and District of Columbia bars.

11.      I left Funk & Bolton in March 2017 to form my own law firm, McCabe Law LLC, where I continued my focus on representing attorneys involved in ethics matters and disciplinary proceedings primarily involving alleged violations of the USPTO's Rules of Professional Conduct. I have also represented attorneys in ethics investigations before other jurisdictions, including one

---

[1] At the time I began my ethics practice, the ethics rules in Virginia (as well as Maryland and the District of Columbia) were modeled in large part after the American Bar Association Model ***Rules*** Of Professional Conduct ("ABA Model Rules"). Until 2014, the USPTO's ethics rules were modeled after the ABA Model ***Code*** of Professional Responsibility ("ABA Model Code"), which was the immediate predecessor to the ABA Model Rules. In 2014, in an effort to maintain consistency with the states (nearly all of which by then had adopted their own ethics rules based on the ABA Model Rules), the USPTO amended its ethics rules to follow in large part the ABA Model Rules. In 2018, California became the last jurisdiction in the United States to adopt legal ethics rules based at least in part on the ABA Model Rules.  Moreover, some courts have adopted the ABA Model Rules verbatim as their own rules of professional conduct. *See, e.g.*, Del. Dist. Ct. L.R. 83.6(d) ("all attorneys admitted or authorized to practice before this Court . . . shall be governed by the Model Rules of Professional Conduct of the American Bar Association ('Model Rules'), as amended from time to time.").

Docusign Envelope ID: 0B9B68EF-4F24-8AFF-82D7-8A3DBC307E04

ethics matter before the United States District Court for the District of Maryland.

12.     In August 2020, McCabe Law merged with Emil Ali, P.C., and we formed McCabe & Ali, LLP ("McCabe Ali"). I serve as the Managing Partner of McCabe Ali. My practice at McCabe Ali focuses on representing attorneys in ethics matters primarily involving the USPTO's ethics rules (which as noted above are modeled after the ABA Model Rules).

13.     I have in the course of my career represented hundreds of attorneys in licensing and ethics-related matters involving alleged violations of the rules of professional conduct.

14.     In 2014, I created *IPethics and INsights* (www.ipethicslaw.com), a law blog dedicated to analyzing new cases, legal issues, commentary, and developments in the fields of ethics, malpractice, disqualification and similar issues of interest to intellectual property attorneys. McCabe Ali continues publishing the *IPethics and INsights* blog.

15.     In 2011, I was appointed by the Supreme Court of Virginia to serve a three-year term (from 2011-2014) as a member of the teaching faculty for the Virginia State Bar's Harry L. Carrico Professionalism Course, which is a mandatory ethics course required for all newly-admitted members of the Virginia State Bar. Appointment to the faculty of the VSB's Professionalism Course is highly selective. I have since been re-appointed by the Supreme Court of Virginia to serve two additional three-year terms (from October 1, 2019-September 30, 2022, and currently from October 1, 2023 until September 30, 2026) as a member of the teaching faculty for the Virginia State Bar's Professionalism Course.

16.     In addition to my service to the Bar, I have served as either the Chairman (2018-2021) or Vice Chair (2016-2018, and 2021-2022) of the Ethics and Professional Responsibility Committee of the Intellectual Property Law Section (IPLS) of the American Bar Association (ABA), where we focused on ethics issues. The ABA-IPLS is one of the largest voluntary bar

4

Docusign Envelope ID: 0B9B68EF-4F24-8AFF-82D7-8A3DBC307E04

organizations in the U.S. for intellectual property professionals.

17.    I regularly speak on ethics issues at international, national, and local professional conferences, and I provide in-house lectures and training to law firms and corporate legal departments on topics related to compliance with ethics rules, risk management, and lawyers' professional obligations.

18.    I have given expert testimony previously in federal and state court proceedings on issues specifically regarding attorney compliance with their ethical duties pursuant to the rules of professional conduct.

19.     My *curriculum vitae*, including the list of publications that I have authored and cases in which I have testified as an expert witness by report, declaration, deposition or at trial, is attached hereto as Exhibit 1.

## III.    COMPENSATION

20.    McCabe Ali was engaged by Watstein Terepka LLP and is being compensated at the billing rate of $850 per hour that it charges for its services as an expert witness in connection with the matters addressed in this Declaration. It expects to be compensated at the same rate for its time spent testifying by deposition or at trial. McCabe Ali's compensation is not in any way contingent or dependent on the outcome of this litigation.

## IV.    INFORMATION CONSIDERED

21.    The documents and information I have considered are identified in Exhibit 2 to this Declaration and are discussed herein.

## V.    EXECUTIVE SUMMARY

22.    **Claimants' Counsel have a material limitation conflict of interest with those clients who engaged with Claimants' Counsel's Websites**.  Based on the legal theories alleged in the Demand, Claimants' Counsel's Websites integrate the same types of third-party analytics

5

Docusign Envelope ID: 0B9B68EF-4F24-8AFF-82D7-8A3DBC307E04

and tracking technology (including the Meta Pixel) that Claimants allege violate California criminal and civil law when used by Marriott. Consequently, Claimants' Counsel have a conflict of interest with their own clients because there is a significant risk that Claimants' Counsel's ability to consider, recommend, or carry out an appropriate course of action for Claimants is materially limited due to Claimants' Counsel's significant personal interest in avoiding liability to their own clients based upon the same theories alleged in the Demand. Unconflicted counsel, by contrast, would be able to advise their clients that they have the same claims against Claimants' Counsel that they have alleged against Marriott. *See* Section IX, *infra*.

23. **Claimants' Counsel are likely to be necessary fact witnesses in the AAA action, thereby precluding them from serving as arbitration counsel based upon the advocate-witness rule of ethics.** The ethics rules prohibit a lawyer from serving as an advocate at a trial when the attorney is likely to be a necessary witness. The attorneys at Claimants' Counsel's law firms would likely be necessary fact witnesses at the AAA action on a number of material fact issues, including: to establish their responsibility for Claimants' Counsel's websites; actions taken upon learning that their websites include the same functionality and technical features they allege in the Demand violate California law; and communications with Claimants and Marriott's counsel regarding Claimants' Counsel's own liability to Claimants based upon the theories alleged in the Demand. Claimants' Counsel similarly put their clients in the conflicted position that they must answer questions about their own counsel's conduct, and the answers may be adverse to their claims. *See* Section X, *infra*.

## VI.    BASIS FOR TESTIMONY

24. The basis for my testimony and opinions include: (a) the materials identified above; (b) my background, training, and working experience for over 33 years as an attorney, including over 20 years advising lawyers and law firms on compliance with their professional and ethical

6

Docusign Envelope ID: 0B9B68EF-4F24-8AFF-82D7-8A3DBC307E04

obligations; (c) my knowledge of and experience in the field of attorney ethics, including my knowledge of and experience with the ABA Model Rules of Professional Conduct (RPCs) and state law ethics codes modeled after the ABA Model Rules; and (d) my knowledge of, and experience with, issues relating to lawyer conflicts of interest under state and federal rules of ethics, including attorney disqualification.

25.     My testimony may also be informed by case law, bar opinions, and other guidance. My testimony also may be based in part on other sources of information identified in this Declaration.

## VII.    SUMMARY OF FACTS CONSIDERED

26.     I received a number of documents from Watstein Terepka. Exhibit 2. The following facts are summarized and/or derived from those documents. I assume the veracity of these facts for purposes of the opinions set forth below.

### A.    The AAA Demand

27.     I understand that on or about October 22, 2025, an Amended Demand for Arbitration was filed with the American Arbitration Association ("AAA") by a Claimant, a resident and citizen of California, against Marriott, a Delaware corporation with its principal place of business in Bethesda, Maryland.  Demand ¶¶ 10-11. I understand the Amended Demand is representative of approximately 7,000 other AAA Demands filed by Claimants' Counsel alleging the same claims against Marriott.

28.     The Demand alleges that "Claimant and others utilized Marriott's online platform (the 'Site') to research, book, and/or confirm accommodations at Marriott properties." *Id.* ¶¶ 1, 10. Pursuant to Marriott's Terms of Use of the Site, "Marriott purports to force all users of the Site to agree to binding arbitration before the" AAA. *Id.* ¶ 13.

Docusign Envelope ID: 0B9B68EF-4F24-8AFF-82D7-8A3DBC307E04

29.    The Demand alleges that "Marriott built into its Site one or more pieces of [computer] code, including one called the 'Meta Pixel,' that monitored and intercepted communications submitted by Claimant and others to Marriott using the Site." *Id.* ¶ 4. According to the Demand, "Marriott installed numerous pixels and tracking technologies within its Site, including tracking technologies associated with at least 23 companies" (such as Adobe, Alphabet (Google), Amazon, and Meta (formerly Facebook), among others). *Id.* ¶ 16.

30.    The Demand further alleges that "Marriott surreptitiously relays Information to other companies regardless of whether a user has any relationship with those other companies and regardless of whether the user has *ever even visited* those companies' websites. For example, Marriott's Site monitors, intercepts and relays Information to Meta regardless of whether a user has a Facebook or Instagram account." *Id.* ¶ 5.

31.    The Demand goes on to explain the alleged functionality of the "Meta Pixel," which is "a piece of computer code embedded on webpages" and how Meta uses third-party websites— including Marriott's Site—to track users as they use those webpages. *Id.* ¶ 23. For example, "[t]he Meta Pixel can track and log each time a user visits a webpage, how the user interacts with the page (*e.g.*, what buttons or links the user clicks), and the Information the user  inputs into the webpage (*e.g.*, by typing Information into a textbox), all the way down to the exact date and time when a user visited or interacted with a webpage." *Id.* ¶ 25.

32.    According to the Demand, the Meta Pixel "takes the Information it tracks and sends that information to Meta, along with Information regarding the user's Internet protocol address" and "other data used to 'fingerprint,' and uncover the identities of, users." *Id.* ¶ 28. Meta then uses that information to "improve its advertising business by developing and refining user profiles" and develop "tools that allows Meta to provide a highly targeted advertising platform to companies

8

Docusign Envelope ID: 0B9B68EF-4F24-8AFF-82D7-8A3DBC307E04

that advertise through Meta." *Id.* ¶ 31.

33.     The Demand asserts "Marriott embedded the Meta Pixel and other tracking technologies within Marriott's site." *Id.* ¶ 34. According to the Demand, "Marriott's secret surveillance of its users is not limited to *only* those users who actually complete a booking using the Site, nor is it limited to users who have a Marriott account. Instead, Marriott's unlawful conduct extends to *any* user who visits a webpage within the Site that contains one or more Meta Pixels, LinkedIn tracking technologies, and/or other tracking technologies." *Id.* ¶ 45.

34.     The Demand asserts that "Claimant provided Information to Marriott with the belief that the communication was private, and that Information provided to Marriott would not be intercepted or eavesdropped upon by others." *Id.* ¶ 51. The Demand alleges that "Claimant did not consent to having communications and interactions with Marriott tracked, monitored or relayed to other companies." *Id.* ¶ 52. The Demand avers "it appears some or all of the Information Claimant has shared with Marriott through the Site has been monitored, intercepted and relayed to other companies." *Id.* ¶ 53.

35.     The Demand alleges that pursuant to California criminal law, the "non-consensual intercepting of, and eavesdropping on, communications without all parties' consent" violates the California Invasion of Privacy Act, Cal. Penal Code § 630 *et seq.* ("CIPA"). *Id.* ¶ 6.

36.     In particular, the Demand avers that by "secretly installing and using pixels and other technologies within its Site," without its user's consent, Marriott "surreptitiously and willfully monitored, intercepted, and relayed to Meta, LinkedIn, and other companies the contents or meaning of Claimant's messages, reports and/or communications with Marriott without Claimant's consent." *Id.* ¶ 62.

37.     The Demand asserts four separate causes of action against Marriott.

38.     In Count I, the Demand alleges that through its usage of the Meta Pixel and other tracking technologies on its Site, Marriott violated California criminal law—specifically, Cal. Penal Code § 631(a). *Id.* ¶¶ 7, 60-72. In Count I, the Demand seeks: (a) an order enjoining Marriott from "continuing to engage in the unlawful conduct set forth herein" pursuant to Cal Penal Code § 637.2(b); (b) "an order awarding Claimant $5,000 per violation" pursuant to Cal Penal Code § 637.2(a); and (c) an award of attorney's fees and costs. *Id.* ¶¶ 73-74 & Count I (damages clause).

39.     In Count II, the Demand alleges that the Meta Pixel and other tracking technologies on Marriott's website constitute a "pen register" and "trap and trace device" as those terms are defined under the CIPA at, respectively, Cal. Penal Code § 638.50(b) & § 638.50(c). *Id.* ¶¶ 77-78.

40.     The Demand alleges in Count II that Marriott's conduct violated California criminal law—specifically, Cal. Penal Code § 638.51. *Id.* ¶¶ 80-84. In Count II, the Demand seeks: (a) an order enjoining Marriott from "continuing to engage in the unlawful conduct set forth herein"; (b) "an order awarding Claimant $5,000 per violation"; and (c) an award of attorney's fees and costs. *Id.* Count II (damages clause).

41.     The Demand further alleges, in Count III, a common law claim of negligence.  In particular, Count III alleges that Marriott was negligent in failing to exercise reasonable care to protect Claimant's "Information" from unauthorized disclosure to Meta and other third parties, causing a loss of privacy and "the time and resources spent investigating and responding to Marriott's violations of Claimant's rights." *Id.* ¶¶ 87-94. In Count III, the Demand seeks: (a) an order enjoining Marriott from "continuing to engage in the unlawful conduct as set forth herein"; (b) "an order awarding Claimant all available relief, including nominal damages, compensatory damages, punitive damages, restitution, and/or any other relief permitted by law; and (c) an award of attorney's fees and costs. *Id.*, Count III (damages clause).

Docusign Envelope ID: 0B9B68EF-4F24-8AFF-82D7-8A3DBC307E04

42.     Finally, the Demand alleges, in Count IV, that Marriott's collection, usage, and sharing of Claimant's information to third parties without his consent violates California civil law—specifically, the California Consumer Privacy Act, Cal. Civ. Code § 1798.100 *et seq.* (the "CCPA"). *Id.* ¶¶ 96-106. In Count IV, the Demand seeks: (a) an order enjoining Marriott from "continuing to engage in the unlawful conduct set forth herein"; (b) "an order awarding Claimant not less than $100 and not more than $750 in monetary damages for each instance in which Claimant's information was relayed" to companies using tracking technology; and (c) an award of attorney's fees and costs. *Id.*, Count IV (damages clause).

43.     The Demand bears the signature block of attorneys from two law firms as counsel for Claimant: (1) Robert C. Hilliard and Benjamin R. O'Connor of Hilliard Law in Corpus Christi, Texas; and (2) Joseph Vanek and Trevor K. Scheetz of Sperling Kenny Nachwalter, LLC in Chicago, Illinois.

**B.     Communications Between Counsel for Claimants and Marriott**

44.     As noted above, I understand that the Demand is substantively identical to other demands made by the same lawyers and law firms against Marriott on behalf of other individuals alleged to be residents or citizens of California who have allegedly used Marriott's website

45.     In a January 16, 2025 letter from Hilliard Law to Marriott's General Counsel, which references and encloses a letter from Hilliard Law to Marriott on December 20, 2024, Mr. O'Connor indicates that "my firm represents more than 3,200 individuals (the number has risen since my last letter and continues to do so)[2] who intend to assert claims against Marriott International, Inc." *See* Jan. 16, 2025 correspondence at 1. The January 16 letter further states that "Our clients are California residents who used Marriott's online platform (the 'Website')". *Id.*

---

[2] As stated in the December 20, 2024 letter from Hilliard Law, the firm at that time was representing "in excess of 2,200 clients." December 20, 2024 correspondence at 1.

11

Docusign Envelope ID: 0B9B68EF-4F24-8AFF-82D7-8A3DBC307E04

46.     The January 16, 2025 letter states that "Unbeknownst to our clients, and while they were using the Website, Marriott surreptitiously relayed, transmitted, and otherwise shared their personal information to and with a number of social media and advertising companies. Marriott's actions violated the law, including the California Invasion of Privacy Act, Cal. Penal Code § 630 *et seq.* ("CIPA"). Notably, under CIPA, our clients are entitled to recover $5,000 for each instance in which Marriott surreptitiously and without consent relayed their information to others, and we and our clients are informed and believe that Marriott committed several violations against each of our clients." *Id.*

47.     The January 16, 2025 letter indicates that "Marriott's Terms of Use purport to require our clients to submit their disputes for resolution via arbitration before the American Arbitration Association" and that "We intend to do so in short order." *Id.* The January 16 letter asks if Marriott "would like to discuss a resolution of our clients' claims without the need for litigation." The January 16 letter also states that if a response is not received by January 31, 2025, **"we will begin filing our clients' respective arbitration demands with the AAA pursuant to Marriott's Terms of Use."** *Id.* (bold in original).

48.     In a letter on March 26, 2025,[3] Mr. Terepka of Watstein Terepka responded to Mr. O'Connor's December 20, 2024 and January 16, 2025 letters. Mr. Terepka's March 26 correspondence copied Trevor Scheetz of Sperling Kenny Nachwalter. Mr. Terepka wrote that "We have investigated and have confirmed that your clients have no viable claims against Marriott" and requested that "you refrain from filing the threatened mass arbitration." March 26, 2025 correspondence at 1. The March 26 correspondence raises a number of issues.

---

[3] The letter I received and reviewed bears a date of March 26, **2023**, which I assume to be a typographical error in the year since it is responding to Mr. O'Connor's letters from December 2024 and January 2025.

Docusign Envelope ID: 0B9B68EF-4F24-8AFF-82D7-8A3DBC307E04

49.    First, the March 26 letter states that the threat to initiate "nearly 4,000 individual arbitrations" is "an intentional abuse of the arbitration process" and asserts that "[a] preliminary review of the list of purported clients you sent shows that for a substantial portion of them, Marriott has no record that they interacted with the company in a way that would create an enforceable arbitration agreement (such as making hotel reservations or joining Marriott's loyalty program)." *Id.* at 1.

50.    Second, the March 26 letter states that the list of claimants "includes former Marriott guests, loyalty program members, or both, who consented to the alleged information sharing." *Id.* at 2. The letter claims that "Many of your purported clients consented to Marriott's Privacy Statement." *Id.* The letter quotes a portion of the Marriott Privacy Statement and asserts that "prior Marriott hotel guests and loyalty program members consented to the alleged sharing of their data via Meta Pixel and other technologies long before their claims could have arisen. They thus have no viable claims under CIPA." *Id.* (citing cases).

51.    Third, the March 26 letter avers that "the claims also fail because no interception occurred while the information was in transit." *Id.* at 3 (citing cases).

52.    Fourth, the March 26 letter alleges that "Your firm is doing far worse than you allege to its own purported clients." *Id.* In particular, Mr. Terepka states that "Your websites soliciting clients use the same pixels your purported clients allege violate CIPA." *Id.* Mr. Terepka states as "one example" is Claimants' Counsel "using 'The Money Team Law Firm' website promoted by famous boxer Floyd Mayweather to solicit clients to bring claims against Marriott." The letter provides the following screenshot from the website:

*[Image on Following Page]*

13

Docusign Envelope ID: 0B9B68EF-4F24-8AFF-82D7-8A3DBC307E04



53.     The screenshot from the "The Money Team Law Firm" website above includes a "short online survey" entitled "Do I Have a Case?" The website states that "By clicking the "Do I Qualify" button, you agree to the Terms and Conditions [hyperlinked] and Privacy Policy [hyperlinked] and authorize The Money Team Law Firm to contact you." *Id.*

54.     The March 26 letter also includes what is asserted to be another screenshot from "The Money Team Law Firm" website and states "There is no doubt that this is your firm's webpage because you included pictures of you and your team farther down on the same page, as shown in the screenshot below:"



Docusign Envelope ID: 0B9B68EF-4F24-8AFF-82D7-8A3DBC307E04

55.     I note that the above photos on The Money Team Law Firm website appear to be the same photos presently on Hilliard Law's website.[4] According to Hilliard Law's website, Robert C. Hilliard and Catherine Hilliard are both "partners" and "owners" of Hilliard Law, and Mr. O'Connor is identified as a firm partner.

56.     The March 26 letter states that "The Money Team Law Firm" website's source code "indicates that your firm uses 'PixelYourSite Professional,' which touts itself as 'probably the most complex tracking tool for WordPress, managing the Facebook Pixel (now the Meta Pixel), Google Analytics, Google Ads Remarketing, Pinterest Tag, Bing Tag, the TikTok Tag, and virtually any other script.'" *Id.* at 4. The March 26 letter alleges "Your webpage's source code has these pixels" and provides a copy of "the Meta Pixel code" from The Money Team Law Firm website. *Id.* at 5.

57.     The March 26 letter further alleges:

In other words, your Money Team website uses the same pixels that you claim violate CIPA. Your demand alleges that "Marriott built into its Site one or more pieces of code, including one called the 'Meta Pixel,' that monitored and intercepted communications submitted by Claimant and others to Marriott using the Site." Demand ¶ 4. It further contends that "[b]y secretly installing and using pixels and other technologies within its Site, Marriott is (1) wiretapping its users itself, (2) facilitating wiretapping and eavesdropping of its users' Information, or (3) both." Id. ¶ 7.

By the terms of your own demand, your firm's conduct is far worse than what you claim Marriott did, for multiple independent reasons. You are luring people to make meritless claims that Marriott "broke the law by capturing" their "personal information without [their] knowledge or consent" and "betray[ed] the trust of those who relied on them." See https://legalsettlementexperts.com/marriott-v2/. Yet your Money Team website is using the same "pixels and other technologies" you contend are somehow a "betrayal" of trust.

Worse still, your webpage's pixels are sharing data about your purported clients

---

[4] Compare with: https://www.hilliard-law.com/attorneys/robert-c-hilliard/ (Robert C. Hilliard); https://www.hilliard-law.com/attorneys/catherine-hilliard/ (Catherine Hilliard); and https://www.hilliard-law.com/attorneys/benjamin-r-o-connor/ (Benjamin R. O'Connor).

15

with third parties while they are requesting legal advice from you. That does not violate CIPA for the reasons discussed above. But it does violate the Rules of Professional Conduct because your websites are using pixels to share client information with third parties.

*Id.* at 6.

58.     The March 26 letter also avers that "Your conduct has created a conflict of interest" with Hilliard Law's clients. *Id.* at 7. It asks: "Will you advise your purported clients that you think they can pursue the same claims against your firm that you say they can pursue against Marriott?" *Id.* (citing ABA Model Rule 1.7(a)).

59.     On April 25, 2025, Mr. O'Connor responded by email to the March 26 letter.

60.     As for the assertion that The Money Team Law Firm website operates the same way as Marriott's, the April 25 email states:

To start, you are simply wrong as a factual matter when you assert that any of our websites include code similar to the code on Marriott's site, and your contention appears to misunderstand or intentionally misrepresent the kind of conduct that would trigger liability under CIPA. Nor do our websites violate any law or any Rule of Professional Conduct. Further, and speaking of Rules of Professional Conduct, we are concerned by your threat not because it has merit (it doesn't), but because it appears to be an effort by Marriott to dissuade our clients from bringing meritorious claims—the factual basis for which Marriott apparently does not dispute—by trying to scare off their lawyers with meritless threats of bar referrals. Threatening an accusation of an ethical violation in an effort to gain advantage in a legal dispute is, itself, a clear violation of applicable ethics rules. That Marriott felt the need to resort to meritless threats of ethical violations in an effort to scare off meritorious claims only confirms for us that Marriott is concerned about the violations we allege.

*Id.* at 2.

61.     On May 19, 2025, Mr. Terepka replied to Mr. O'Connor's April 25 email, copying Mr. Scheetz and others.

16

Docusign Envelope ID: 0B9B68EF-4F24-8AFF-82D7-8A3DBC307E04

62.     The May 19 response further states that the April 25 email "fails to substantively respond to the point that your firm has done far worse than your purported clients allege on its 'Money Team Law Firm' website. You instead just claim that's 'simply wrong as a factual matter' without any explanation." *Id.* at 2.

63.     The May 19 response further notes that "Equally telling is your firm's decision to take down its Money Team advertising shortly after receiving Marriott's letter. None of this means Marriott agrees with any of your allegations or that it raises this point as a 'scare tactic,' as you claim. Marriott raises it to show the abusive hypocrisy of your threat to bring a mass arbitration without conducting a basic factual investigation. The question you have refused to answer therefore stands: Have you advised your purported clients that you think they can pursue the same claims against your firm that you say they can pursue against Marriott?" *Id.* at 3.

### C.     <u>The Expert Declaration of Ron Schnell</u>

64.     In connection with my opinions, I have considered a February 26, 2026, Expert Declaration of Ron Schnell, Marriott's technical expert witness. Mr. Schnell's declaration opines on "the extent to which third-party technologies are integrated on the websites operated by Hilliard, Martinez & Gonzales, LLP, and Sperling Kenny Nachwalter, LLC (**'Claimants' Counsel'**), how information flows over the Internet, and generally how advertising and analytics technologies operate." Schnell Decl. ¶ 2 (emphasis in original).

65.     Mr. Schnell states that according to the Demand, "Marriott integrated several different third-party technologies into their website which enabled them to 'surreptitiously intercept' data transmitted by the users' browsers during the period of February 20, 2024 to May 19, 2025 (the '**At-Issue Period**.')." *Id.* ¶ 4 (emphasis in original). Mr. Schnell indicates that, "My assignment was to evaluate the extent of similar types of third-party technologies integrated on hilliard-law.com ('Hilliard Law website'), privacyviolationclaim.com ('Privacy Violation Claim

17

website'), legalsettlementexperts.com ('Legal Settlement Experts website'), and sperlingkenny.com ('Sperling Kenny website') (collectively, 'Claimants' Counsel's Websites')." *Id.*

66. According to Mr. Schnell, his "analysis of Claimants' Counsel's Websites shows that they utilize comparable client-side analytics and marketing technologies, including the Meta Pixel, with configurations that are more invasive than those they allege Marriott uses." *Id.* ¶ 6. Mr. Schnell further opines that, "These technologies function through the same technical mechanisms that Claimants characterize as 'unlawful conduct' and a 'crime' when allegedly integrated by Marriott." *Id.; see also id.* ¶¶ 24-62.

67. Mr. Schnell further opines that "Claimants' Counsel's Websites do not implement any readily accessible user-facing controls that directly govern whether third-party technologies are permitted to load on Claimants' Counsel's Websites and execute." *Id.* ¶ 7.

68. According to Mr. Schnell's declaration, the Hilliard Law website, Privacy Violation Claim website, Legal Settlement Experts website, and Sperling Kenny website "each incorporate third-party analytics and advertising technologies capable of tracking user interactions and, in some cases, transmitting user-entered form responses to external platforms. These technologies function through the same technical mechanisms that Claimants characterize as problematic when allegedly used by Marriott." *Id.* ¶ 21.

69. Mr. Schnell opines that "Unlike Marriott, which provides built-in, user-controlled opt-out mechanisms that allow visitors to govern whether certain third-party technologies are permitted to load and execute, Claimants' Counsel's Websites do not appear to provide such controls." *Id.* ¶ 22.

18

70.    Mr. Schnell also opines that "[m]y own independent testing shows that form submissions on [Claimants' Counsel's Websites] result in user-entered data being transmitted to third-party platforms." *Id.* ¶ 23. Thus, according to Mr. Schnell, "By attempting to demonstrate that these technologies are inherently unlawful when allegedly integrated by Marriott, Claimants would necessarily demonstrate that their own websites employ the same technologies in ways that would be subject to the same characterization by others like them." *Id.*

### 1.    Hilliard Law Website

71.    Mr. Schnell's declaration describes his analysis of the Hilliard Law website.  He observed that the Hilliard Law website uses "Google Tag Manager" (or "GTM") as its tag management system. *Id.* ¶ 32.

72.    Mr. Schnell "observed the loading and execution of Google Analytics" on the Hilliard Law website, "indicating that the site transmits usage and interaction data to Google for analytics purposes." *Id.* ¶ 33. Mr. Schnell also identified the following additional analytics platforms on the Hilliard Law website: HubSpot, Scorpion, and Amplitude. *Id.* ¶¶ 21, 24, 32-36.

73.    Mr. Schnell indicates in his declaration that he did his own testing by completing a contact form on the Hilliard Law website homepage. Upon submitting the form—which would include user-entered information—he observed that the form field contents were "transmitted to HubSpot controlled endpoints." *Id.* ¶ 37. He stated that HubSpot received "the complete set of responses from the user in the Hilliard Law website homepage form." *Id.* ¶ 38.

74.    Mr. Schnell also observed "that submitting the homepage form also generated network requests associated with the TikTok Pixel" and that "[t]hese network requests transmitted to TikTok also included some of the user-entered form field responses" thereby showing that "multiple third-party advertising and analytics platforms on the Hilliard Law website receive data from user form interactions." *Id.* ¶ 38.

19

75.    Mr. Schnell also observed Amplitude Analytics, "an event-based analytics platform designed to track detailed user interaction and behavioral events," on the Hilliard Law website. *Id.* ¶ 39. He also observed Scorpion on the Hilliard Law website and found that when he completed a contact form on a pop-up on that website, the form submissions "resulted in network requests to Scorpion-controlled endpoints.  These requests included user-entered contact information and all form field responses, indicating that the Hilliard Law website sends form submission data . . . to different third-party services depending on which form interface a website visitor uses." *Id.* ¶ 40.

76.    Mr. Schnell concluded that the Hilliard Law website's integration of these third-party analytics and marketing technologies are able to collect user interaction data and, in some cases, user-entered form responses in a manner that is "substantially similar to the technologies Claimants characterize as problematic when allegedly used on the Marriott website." *Id.* ¶ 41.

77.    Mr. Schnell also did not observe any "built-in, user-controlled opt-out mechanism that would allow visitors to prevent the loading or execution of the third-party analytics and advertising technologies" associated with the Hilliard Law website. *Id.* ¶ 42.

## 2.    Legal Settlement Experts Website

78.    Mr. Schnell's declaration also describes his analysis of the Legal Settlement Experts archived website source code. *Id.* ¶¶ 44-51.

79.    He observed this website also implemented the GTM tag management system. *Id.* ¶ 45.  Mr. Schnell observed the Legal Settlement Experts website source code was "configured to transmit analytics data to Google." *Id.*; *see also* ¶ 24.

80.    Mr. Schnell also identified the Meta Pixel and TikTok Pixel on the Legal Settlement Experts archived website source code. *Id.* ¶¶ 24, 46, 47. He also observed a plug-in called "PixelYourSite" which indicated that this website "employed tooling specifically designed to aggregate and transmit marketing-related event data to third parties." *Id.* ¶ 48.

81.     From Mr. Schnell's review of archived source code and scripts for the Legal Settlement Experts website, he "did not observe any code indicative of" a feature that would "suppress or delay the execution of third-party analytics and advertising technologies based on user selection." *Id.* ¶ 50.

### 3.     Privacy Violation Claim Website

82.     Mr. Schnell's declaration also describes his analysis of the Privacy Violation Claim archived website source code. *Id.* ¶¶ 52-58.

83.     Mr. Schnell identified the Meta Pixel on the Privacy Violation Claim archived website source code. *Id.* ¶¶ 24, 53.

84.     He also observed that the Privacy Violation Claim website archived source code included Unbounce, which he describes as a tracking and analytics script that indicates the website "was configured to collect and analyze user interaction and conversion through Unbounce-managed workflows." *Id.* ¶ 54. He also observed references in the archived source code to "SimplyConvert," which "indicates that the Privacy Violation Claim website integrated multiple third-party services capable of consuming and analyzing user-submitted information for reporting and conversion measurement purposes." *Id.* ¶ 55

85.     Mr. Schnell further observed in the archived source code for the Privacy Violation Claim website implemented third-party technologies, "such as the Meta Pixel, Unbounce, and SimplyConvert, which are capable of tracking application submissions and other user interactions." *Id.* ¶¶ 24, 56.

86.     From Mr. Schnell's review of archived source code and scripts for the Privacy Violation Claim website, he "did not observe any code indicative of" a feature that would "suppress or delay the execution of third-party analytics and advertising technologies based on user selection." *Id.* ¶ 57.

21

Docusign Envelope ID: 0B9B68EF-4F24-8AFF-82D7-8A3DBC307E04

### 4.    Sperling Kenny Website

87.    Mr. Schnell's declaration also describes his analysis of the Sperling Kenny website. *Id.* ¶¶ 24, 59-62.

88.    Mr. Schnell found that the Sperling Kenny website "implements Google Analytics . . . indicating that the site transmits usage and interaction data to Google for analytics purposes." *Id.* ¶ 60.

89.    From Mr. Schnell's review of Sperling Kenny website, he "did not observe any built-in, user-controlled opt-out mechanism that would allow visitors to prevent the loading or execution of Google Analytics." *Id.* ¶ 61.

### 5.    Mr. Schnell's Conclusion

90.    Mr. Schnell concludes that Claimants' Counsel's Websites "integrate many of the same types of third-party analytics and marketing technologies that they allege are problematic when allegedly used by Marriott, and in some instances deploy these technologies in more invasive configurations." *Id.* ¶ 63.

91.    Mr. Schnell opines that "Claimants' Counsel's Websites utilize multiple advertising pixels, analytics platforms, and conversion-tracking tools capable of collecting user interaction data and, in certain cases, user-entered form responses" and that they do so "without providing industry-standard, built-in, user-controlled opt-out mechanisms." *Id.*

## VIII.    OVERVIEW OF LAW REGARDING ATTORNEY DISQUALIFICATION

92.    Although my opinion cites to law, including cases and rules from various jurisdictions, I do so only to the extent that the law provides a foundation for my opinions expressed in this matter. It is not my intention to supplant the role of the Court.

93.    This Court has observed, in the context of motions to disqualify counsel, that "[o]ne of the Court's duties and responsibilities is to ensure that attorneys who appear before it preserve the public's confidence in the judicial system."[5]

94.    A disqualification motion is "a serious matter" which must be decided on a case-by-case basis.[6] The moving party "bears a 'high standard of proof' to show that disqualification is warranted."[7]

95.    When deciding a motion to disqualify, this Court has stated that courts must "avoid overly-mechanical adherence to disciplinary canons at the expense of litigants' rights freely to choose their counsel."[8] Nevertheless, "'there must be a balance between a client's free choice of counsel and the maintenance of the highest ethical and professional standards in the legal community.'"[9]

96.    This Court has further stated that a court's power to disqualify counsel derives in part from "the necessity to preserve public confidence in fairness and integrity of judicial proceedings."[10] In the District of Maryland, the Court considers a motion to disqualify counsel "as part of its supervisory power over members of the bar with a view toward preventing the

---

[5] *Buckley v. Airshield Corp.*, 908 F. Supp. 299, 303-04 (D. Md. 1995) (citing *Tessier v. Plastic Surgery Specialists, Inc.,* 731 F. Supp. 724, 729 (E.D. Va. 1990)); *see also Rogers v. Pittston Co.*, 800 F. Supp. 350, 353 (W.D. Va. 1992).

[6] *Buckley*, 908 F. Supp. at 304.

[7] *Id.*

[8] *Sheaffer v. Farm Fresh, Inc.*, 966 F.2d 142, 146 (4th Cir.), *cert. denied*, 506 U.S. 1021 (1992).

[9] *Buckley*, 908 F. Supp. at 304 (quoting *Tessier*, 731 F. Supp. at 729 ("the right of one to retain counsel of his choosing is 'secondary in importance to the Court's duty to maintain the highest ethical standards of professional conduct to insure and preserve trust in the integrity of the bar.'")); *see also Cytimmune Scis., Inc. v. Paciotti*, 2017 U.S. Dist. LEXIS 4511, *18–19 (D. Md. Jan. 5, 2017) (granting motion to disqualify all counsel for material limitation conflict of one attorney and imputing conflict to entire firm).

[10] *W.R. Grace & Co. v. Gracecare, Inc.*, 152 F.R.D. 61, 65 (D. Md. 1993).

Docusign Envelope ID: 0B9B68EF-4F24-8AFF-82D7-8A3DBC307E04

'appearance of impropriety.' All doubts are resolved in favor of disqualification."[11]

97.    This Court has held "when the Court must make a disqualification determination upon difficult facts, it does not weigh the circumstances with hair splitting-nicety but, in the proper exercise of supervisory power over the members of the bar and with a view of preventing the appearance of impropriety, it is to resolve all doubts in favor of disqualification."[12]

98.    In the Fourth Circuit, disqualification based upon an alleged conflict of interest should be undertaken only upon a showing by the moving party that an "actual or likely" conflict of interest exists, rather than a "mere possibility of a conflict."[13] Finally, "[t]here is no set procedure for assessing a disqualification motion; rather, 'the method of conducting the inquiry is within the discretion of the judge[.]'"[14] An evidentiary hearing is not required so long as the trial court concludes there will be an adequate record of the disqualification issue for appellate review.[15]

## IX.    CLAIMANTS' COUNSEL'S MATERIAL LIMITATION CONFLICT OF INTEREST

99.    For purposes of this Declaration, I have considered the ethical standards set forth in the Maryland Rules of Professional Conduct, the California Rules of Professional Conduct, and the ABA Model Rules of Professional Conduct.

---

[11] *Id.* (citing *United States v. Clarkson,* 567 F.2d 270, 273 n.3 (4th Cir. 1977)).

[12] *Buckley*, 908 F. Supp. at 304, citing *Clarkson,* 567 F.2d at 273 n.3 (internal quotation marks and citations omitted).

[13] *Richmond Hilton Assocs. v. City of Richmond*, 690 F.2d 1086, 1089 (4th Cir. 1982).

[14] *Fenzel v. Group2Software, LLC,* 2014 U.S. Dist. LEXIS 177549, *7 (D. Md. Dec. 29, 2014).

[15] *Id.* at *7-8 (citations omitted).

100.    Under the Maryland and California Rules of Professional Conduct, as well as under the ABA Model Rules of Professional Conduct, lawyers are required to avoid conflicts of interest with, among others, their current clients.[16] A lawyer may have a conflict with a current client if, among other reasons, "there is a significant risk" that the lawyer's representation of their client "will be materially limited" by the attorney's responsibilities to another client, a former client, a third person, or the lawyer's own personal interests.[17]

101.    The ethics rules further provide that "an attorney may represent a client if: (1) the attorney reasonably believes that the attorney will be able to provide competent and diligent representation to each affected client; (2) the representation is not prohibited by law; (3) the representation does not involve the assertion of a claim by one client against another client represented by the attorney in the same litigation or other proceeding before a tribunal; and (4) each affected client gives informed consent, confirmed in writing."[18]

102.    The comments to the ethics rules provide guidance on a "material limitation" conflict of interest as follows:

> Even where there is no direct adverseness, a conflict of interest exists if there is a significant risk that an attorney's ability to consider, recommend or carry out an appropriate course of action for the client will be materially limited as a result of the attorney's other responsibilities or interests. For example, an attorney asked to represent several individuals seeking to form a joint venture is likely to be materially limited in the attorney's ability to recommend or advocate all possible positions that each might take because of the attorney's duty of loyalty to the others. The conflict in effect forecloses alternatives that would otherwise be available to the client. The mere possibility of subsequent harm does not itself require disclosure and consent. The critical questions are the likelihood that a difference in interests will eventuate and, if it does, whether it will materially interfere with the attorney's independent professional judgment in considering alternatives or foreclose courses

---

[16] Md. Rules of Prof. Conduct ("Md. Rules") 19-301.7 and 19-301.8; Cal. Rule Prof. Conduct ("Cal. Rule") 1.7 and 1.8; ABA Model Rule 1.7 and 1.8.

[17] Md. Rule 19-301.7(a)(2); Cal. Rule 1.7(b); ABA Model Rule 1.7(a)(2).

[18] Md. Rule 19-301.7(b); ABA Model Rule 1.7(b); Cal. Rule 1.7(d).

Docusign Envelope ID: 0B9B68EF-4F24-8AFF-82D7-8A3DBC307E04

of action that reasonably should be pursued on behalf of the client.[19]

103.    One type of "material limitation" conflict exists when a lawyer has a "personal interest" conflict, which arises when "The attorney's own interests . . . have an adverse effect on representation of a client. For example, if the probity of an attorney's own conduct in a transaction is in serious question, it may be difficult or impossible for the attorney to give a client detached advice."[20]

104.    Applying these standards to the facts and information summarized above, in my opinion, Claimants' Counsel have a material limitation conflict of interest with those clients who engaged with Claimants' Counsel through any of the following websites:  the Hilliard Law website; the Legal Settlement Experts website; the Privacy Violation Claim website; or the Sperling Kenny website (collectively, "Claimants' Counsel's Websites").

105.    Specifically, as explained above, the Demand alleges that users of Marriott's website provide "detailed and sensitive information to Marriott when using the Site."  Based on the information I have considered, Claimants' Counsel's Websites integrate the same types of third-party analytics and tracking technologies that Claimants allege, via Claimants' Counsel,

---

[19] Md. Rule 19-301.7 cmt. [8]; ABA Model Rule 1.7 cmt. [8].  The comments to the California material limitation conflict rule state: "Even where there is no direct adversity, a conflict of interest requiring informed written consent under paragraph (b) exists if there is a significant risk that a lawyer's ability to consider, recommend or carry out an appropriate course of action for the client will be materially limited as a result of the lawyer's other responsibilities, interests, or relationships, whether legal, business, financial, professional, or personal. . . . The critical questions are the likelihood that a difference in interests exists or will eventuate and, if it does, whether it will materially interfere with the lawyer's independent professional judgment in considering alternatives or foreclose courses of action that reasonably should be pursued on behalf of each client. The risk that the lawyer's representation may be materially limited may also arise from present or past relationships between the lawyer, or another member of the lawyer's firm, with a party, a witness, or another person who may be affected substantially by the resolution of the matter."  Cal. Rule 1.7 cmt. [4].

[20] Md. Rule 19-301.7 cmt. [10]; ABA Model Rule 1.7 cmt. [10].

Docusign Envelope ID: 0B9B68EF-4F24-8AFF-82D7-8A3DBC307E04

violate California law when allegedly used by Marriott.

106.    Based on the legal theories alleged in the Demand, Claimants' Counsel's Websites collect and share confidential client or confidential prospective client information with third parties, including Meta (using the Meta Pixel) and TikTok (using the TikTok Pixel). Claimants' Counsel's Websites further incorporate third-party analytics platforms that enable third parties to track client and prospective client input and interactions, including Google Analytics, HubSpot, Amplitude, Simply Convert, and PixelYourSite.

107.    Claimants' Counsel's conduct would result in those clients or prospective clients who engaged or interfaced with Claimants' Counsel via one or more of the Claimants' Counsel's Websites having causes of action against their own counsel that Claimants themselves have alleged in the Demand against Marriott.

108.    Based on these facts, there is a significant risk that Claimants' Counsel's ability to consider, recommend or carry out an appropriate course of action for Claimants is materially limited as a result of Claimants' Counsel's significant personal interest in avoiding liability to their clients based upon the same theories that are alleged in the Demand.

109.    Unconflicted counsel could provide independent advice about whether Claimants should assert the same claims they allege against Marriott against Claimants' Counsel. Claimants' Counsel, on the other hand, have a personal interest in avoiding any such personal liability to those Claimants who utilized any of Claimants' Counsel's Websites.

110.    For example, according to the allegations made by Claimants' Counsel in Count I of the Demand, Claimants' Counsel's own usage of the Meta Pixel, TikTok Pixel, Google Analytics, HubSpot, Scorpion, Amplitude, Simply Convert, Unbounce, and/or PixelYourSite technologies on Claimants' Counsel's Websites would also support a claim by Claimants that

27

Claimants' Counsel violated Cal. Penal Code § 631(a).

111.    Likewise, based on the allegations in Count II of the Demand, Claimants' Counsel's own usage of the Meta Pixel, TikTok Pixel, Google Analytics, HubSpot, Scorpion, Amplitude, Simply Convert, Unbounce, and/or PixelYourSite technologies on Claimants' Counsel's Websites would also support a claim by Claimants that Claimants' Counsel used a "pen register" and "trap and trace device" in violation of Cal. Penal Code § 638.51.

112.    Still further, based on the allegations in Count III of the Demand, Claimants' Counsel's own usage of the Meta Pixel, TikTok Pixel, Google Analytics, HubSpot, Scorpion, Amplitude, Simply Convert, Unbounce, and/or PixelYourSite technologies on Claimants' Counsel's Websites would also support a claim by Claimants that Claimants' Counsel were negligent in failing to exercise reasonable care to protect Claimants' "Information" from unauthorized disclosure to Meta, TikTok, Google, and other third parties, causing a loss of privacy and breach of client confidentiality.

113.    Finally, based on the allegations in Count IV of the Demand, Claimants' Counsel's collection, usage, and sharing of Claimants' confidential and/or private information with third parties via the Meta Pixel, TikTok Pixel, Google Analytics, HubSpot, Scorpion, Amplitude, Simply Convert, Unbounce, and/or PixelYourSite technologies on Claimants' Counsel's Websites, without client knowledge or consent, violates the CCPA (California Consumer Privacy Act, Cal. Civ. Code § 1798.100 *et seq.*). All of these claims, according to Claimants' allegations, are predicated on the undisclosed sharing of confidential information entered via a website with a third-party through a pixel, tag, or similar technology.

114.    Under each theory that Claimants' Counsel have alleged against Marriott on behalf of Claimants, those Claimants who engaged with Claimants' Counsel's Websites would likewise have damages from, and remedies against, Claimants' Counsel—including claims for monetary damages, injunctive relief, and attorney's fees.

115.    Indeed, based on Claimants' own legal theory in the Demand against Marriott that the undisclosed disclosure of information via the Meta Pixel violates multiple provisions of California law, then Claimants' Counsel's own conduct vis-à-vis their own clients (i.e. the Claimants) in Counsels' own undisclosed sharing of Claimant confidences with third parties through the usage of the Meta Pixel, TikTok Pixel, Google Analytics, HubSpot, Scorpion, Amplitude, Simply Convert, Unbounce, and/or PixelYourSite technologies on Claimants' Counsel's Websites exposes them to the following claims from their own clients and/or prospective clients:

- CIPA civil claims;
- CIPA criminal charges;
- Malpractice suits;
- Disciplinary proceedings;
- Reputational harm; and
- Disqualification.

116.    Moreover, as explained by Mr. Schnell's Declaration, those individuals who interacted with Claimants' Counsel's Websites were not able to "opt out" of Claimants' Counsel's sharing of their information with third parties.

117.    Unlike Marriott, which is not a law firm, lawyers like Claimants' Counsel have ethical obligations to maintain in confidence and not share with undisclosed third parties any "information relating to the representation of a client unless the client gives informed consent,[21]

---

[21] The term "informed consent" means "the agreement by a person to a proposed course of conduct after the lawyer has communicated adequate information and explanation about the material risks

29

the disclosure is impliedly authorized in order to carry out the representation or the disclosure is permitted by paragraph (b)."[22] Moreover, under Rule 1.6, "A lawyer shall make reasonable efforts to prevent the inadvertent or unauthorized disclosure of, or unauthorized access to, information relating to the representation of a client."[23]

118.    The comments to Rule 1.6 explain that "A fundamental principle in the client-lawyer relationship is that, in the absence of the client's informed consent, the lawyer must not reveal information relating to the representation." The guarantee of protecting client confidential information "contributes to the trust that is the hallmark of the client-lawyer relationship" and encourages the client to "seek legal assistance and to communicate fully and frankly with the lawyer even as to embarrassing or legally damaging subject matter." [24]

---

of and reasonably available alternatives to the proposed course of conduct." *See* ABA Model Rule 1.0(e); Md. Rule 19-301.0(f) (same).  Under the California Rules, "informed consent" means "a person's agreement to a proposed course of conduct after the lawyer has communicated and explained: (i) the relevant circumstances and (ii) the material risks, including any actual and reasonably foreseeable adverse consequences of the proposed course of conduct." Cal. Rule 1.0.1(e).

[22] ABA Model Rule 1.6(a); Md. Rule 19-301.6(a) (same).  The wording of the California Rule is somewhat different but reaches the same result—it provides that "A lawyer shall not reveal information protected from disclosure by Business and Professions Code section 6068, subdivision (e)(1) unless the client gives informed consent, or the disclosure is permitted by paragraph (b) of this rule." Cal. Rule 1.6(a). Under Cal. Bus. & Prof. Code 6068(e)(1), "It is the duty of an attorney to do all of the following . . . To maintain inviolate the confidence, and at every peril to himself or herself to preserve the secrets, of his or her client."

[23] ABA Model Rule 1.6(c); *see also* Md. Rule 19-301.6 cmt. [19] ("An attorney must act competently to safeguard information relating to the representation of a client against inadvertent or unauthorized disclosure by the attorney or other persons who are participating in the representation the client or who are subject to the attorney's supervision.").

[24] ABA Model Rule 1.6 cmt. [2]; Md. Rule 1.6 cmt. [2] (same); *see also* Cal. Rule 1.6 cmt. [1] ("A lawyer's duty to preserve the confidentiality of client information involves public policies of paramount importance . . . Preserving the confidentiality of client information contributes to the trust that is the hallmark of the lawyer-client relationship").

Docusign Envelope ID: 0B9B68EF-4F24-8AFF-82D7-8A3DBC307E04

119.    The confidentiality rule "applies not only to matters communicated in confidence by the client but also to all information relating to the representation, whatever its source. The lawyer may not disclose such information except as authorized or required by the Rules of Professional Conduct or other law."[25]

120.    A client's identity—such as their name, phone number, and email address, as well as information provided by a client to a lawyer regarding whether the client may have a claim—is "information relating to the representation" that lawyers are required to maintain as confidential and may not share with third parties absent "informed consent" or an exception that would otherwise excuse such disclosure.[26]

121.    Furthermore, none of the exceptions set forth in Rule 1.6 would excuse the non-informed consent disclosure of client information to third parties through the usage of the Meta Pixel, TikTok Pixel, Google Analytics, HubSpot, Scorpion, Amplitude, Simply Convert,

---

[25] ABA Model Rule 1.6 cmt. [3]; Md. Rule 1.6 cmt. [3] (same); Cal. Rule 1.6 cmt. [2] ("The principle of lawyer-client confidentiality applies to information a lawyer acquires by virtue of the representation, whatever its source, and encompasses matters communicated in confidence by the client . . .").

[26] *Peebles v. Simmons Hanly Conroy LLC*, 2023 Cal. App. Unpub. LEXIS 6085, *16-17 (2d Ct. of App Oct. 13, 2023) ("revealing the names of women who responded to the [attorney's] advertisement would "reveal the nature of a medical problem, ordinarily considered a confidential communication."); NYSBA Ethics Op. 1240 (April 11, 2022) ("Insofar as clients' names constitute confidential information, a lawyer must make reasonable efforts to prevent the unauthorized access of others to those names, whether stored as a paper copy in a filing cabinet, on a smartphone, or in any other electronic or paper form. To that end, before an attorney grants access to the attorney's contacts, the attorney must determine whether any contact – even one – is confidential within the meaning of Rule 1.6(a). A contact could be confidential because it reflects the existence of a client-attorney relationship which the client requested not be disclosed or which, based upon particular facts and circumstances, would be likely to be embarrassing or detrimental to the client if disclosed."); Phil. Bar Ass'n Ethics Op. 91-31 (Dec. 1991) (Past Professional Guidance opinions, the last being No. 87-12, indicate that in situations comparable to yours, you must first obtain the permission of your clients, preferably in writing, before you may disclose the names and addresses of your clients to your bank. Should your clients refuse to give such permission you are obligated to protect their request for confidentiality, and cannot reveal information that can be linked specifically to them.")

Unbounce, and/or PixelYourSite technologies on Claimants' Counsel's Websites.

122.    For example, under the circumstances herein presented, there is no legitimate need based on any solicitation or form in Claimants' Counsel's Websites to disclose a client's personally-identifying information, or information as to whether the named individual may have a claim against Marriott, to any third party. Such a disclosure is not necessary "in order to carry out the representation." Thus, this is not a situation where a lawyer could legitimately assert he or she has the "implied authority" to share a client's identity, personal contact information, or answers to questions as to whether or not they may have a claim against Marriott, to third parties via the usage of the Meta Pixel and similar technologies on Claimants' Counsel's Websites.

123.    The fact that the persons providing information to counsel via Claimants' Counsel's Websites are not yet the lawyers' clients does not alter the requirement for Claimants' Counsel to maintain the information any prospective client provided to them through Claimants' Counsel's Websites as confidential. This is because lawyers also owe duties of confidentiality to their "prospective clients." A "prospective client" is "[a] person who consults with a lawyer about the possibility of forming a client-lawyer relationship with respect to a matter."[27]

124.    Under the prospective client rule, "[e]ven when no client-lawyer relationship ensues, a lawyer who has learned information from a prospective client *shall not use or reveal* that information," with one exception that has no applicability here.[28]  The comments to Rule 1.18

_____

[27] *See* ABA Model Rule 1.18(a); Md. Rule 19-301.18(a) (same); Cal. Rule 1.18(a) ("A person who, directly or through an authorized representative, consults a lawyer for the purpose of retaining the lawyer or securing legal services or advice from the lawyer in the lawyer's professional capacity is a prospective client.").

[28] The exception is "as Rule 1.9 would permit with respect to information of a former client." ABA Model Rule 1.18(b); see also Md. Rule 19-301.18(b) (same); Cal. Rule 1.18(b) ("Even when no lawyer-client relationship ensues, a lawyer who has communicated with a prospective client shall not use or reveal information protected by Business and Professions Code section 6068(e) and Rule 1.6 that the lawyer learned as a result of the consultation . . ."). None of the individuals who

explain that "Whether communications, including written, oral, or electronic communications, constitute a consultation depends on the circumstances. For example, a consultation is likely to have occurred if a lawyer, either in person or through the lawyer's advertising in any medium, specifically requests or invites the submission of information about a potential representation without clear and reasonably understandable warnings and cautionary statements that limit the lawyer's obligations, and a person provides information in response."[29]

**A.**   **Claimants' Counsel's Material Limitation Includes Their Inability To Advise Their Own Clients And Prospective Clients About Claims They May Advance Against Claimants' Counsel Under The Theories Alleged In The Demand**

125.   Not only did Claimants' Counsel share their clients' confidential information with third parties without their clients' informed consent, they also put themselves in an untenable position where their own clients could bring the same allegations against their own counsel as they assert against Marriott.

126.   As discussed above, Claimants could assert civil claims based on the same technology against their lawyers, under Claimants' theory as alleged in the Demand. As further evidence of the material limitation conflict is the fact that, under the circumstances presented, the "probity" of Claimants' Counsel's own conduct is, at the very least, "in serious question."

127.   To be clear, I understand that Marriott denies liability for the claims alleged in the Demand, but that is beside the point for my opinion. Regardless of the merits, Claimants could assert against Claimants' Counsel the theories alleged in the Demands. That puts their interests in direct conflict with the interests of their clients and materially limits Claimants' Counsel's ability

---

revealed their personal, confidential information via Claimants' Counsel's Websites are understood to be "former clients" of the law firms or lawyers involved. Even if they were, no reason exists justifying disclosure of their confidential information to third parties.

[29] ABA Model Rule 1.18 cmt. [2].

to provide full, unconflicted legal advice to their clients about their rights and remedies.

128.    Under these circumstances, it may be difficult or impossible for Claimants' Counsel to give Claimants detached, objective, and unbiased legal advice, including as to the Claimants' own right to bring the same or similar claims in the Demand against Claimants' Counsel themselves. Claimants' Counsel would have a significant personal interest in avoiding liability to their own clients based on the same theories alleged in the Demand. On the other hand, Claimants themselves would have an interest in establishing liability against their lawyers for the same claims alleged against Marriott.

129.    These facts further demonstrate that Claimants' Counsel's "ability to recommend or advocate all possible positions" that Claimants "might take" is materially limited by their own personal interest. Indeed, a Claimant who is properly and objectively being represented would be informed by unconflicted counsel of the panoply of rights and claims that such clients could assert against Claimants' Counsel. "The conflict" Claimants' Counsel's conduct created "in effect forecloses alternatives that would otherwise be available to the client."[30]

**B.    Claimants' Counsel's Exposure to Alleged Criminal Liability**

130.    Furthermore, although I do not opine on whether any of Claimants' sundry legal theories in Counts I-IV of the Demand are legally correct, it is noteworthy that certain of those claims arise under California criminal law. Therefore, it is evident that applying the same theory in the Demands to Claimants' Counsel would allow a California prosecutor to bring criminal charges against Counsel under CIPA.

---

[30] Md. Rule 19-301.7 cmt. [8]; ABA Model Rule 1.7 cmt. [8].

131.    That conduct by the lawyer also is evidence of the lawyers' material limitation conflict of interest. While Claimants are entitled to have objective and independent advice as to their legal rights, information on whether their own counsel violated the criminal laws is material to the representation. That is particularly the case where, as here, the Claimants themselves would be the victims of Claimants' Counsel's criminal acts (as alleged in the Demand).

132.    In fact, under the ethics rules of Maryland and California, as well as pursuant to the ABA Model Rules, it is a violation of the Rules of Professional Conduct for a lawyer to "commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects."[31]

133.    The comments to ABA Model Rule 8.4 relating to the "criminal act" rule explain:

> Many kinds of illegal conduct reflect adversely on fitness to practice law, such as offenses involving fraud and the offense of willful failure to file an income tax return. However, some kinds of offenses carry no such implication. Traditionally, the distinction was drawn in terms of offenses involving "moral turpitude." That concept can be construed to include offenses concerning some matters of personal morality, such as adultery and comparable offenses, that have no specific connection to fitness for the practice of law. Although a lawyer is personally answerable to the entire criminal law, a lawyer should be professionally answerable only for offenses that indicate lack of those characteristics relevant to law practice. Offenses involving violence, dishonesty, breach of trust, or serious interference with the administration of justice are in that category. A pattern of repeated offenses, even ones of minor significance when considered separately, can indicate indifference to legal obligation.[32]

134.    Regarding the "criminal act" rule, the comments to the California Rules of Professional Conduct (Rule 8.4) explain that:

> A lawyer may be disciplined for criminal acts as set forth in Business and Professions Code sections 6101 et seq.,[33] or if the criminal act constitutes "other

---

[31] ABA Model Rule 8.4(b); Cal. Rule 8.4(b); Md. Rule 19-308.4(b).

[32] ABA Model Rule 8.4 cmt. [2].

[33] *See, e.g.*, Cal. Bus. & Prof. Code § 6106 ("The commission of any act involving moral turpitude, dishonesty or corruption, whether the act is committed in the course of his relations as an attorney

35

Docusign Envelope ID: 0B9B68EF-4F24-8AFF-82D7-8A3DBC307E04

misconduct warranting discipline" as defined by California Supreme Court case law. (*See In re Kelley* (1990) 52 Cal.3d 487 [276 Cal. Rptr. 375].)[34]

135.    Under California law, "moral turpitude" (which is included within the scope of Cal. Bus. & Prof. Code § 6106) is defined by the purpose of the ethics rules: "to protect the public, to promote confidence in the legal system, and to maintain high professional standards."[35] Criminal conduct outside the practice of law may reveal moral turpitude "if it shows a deficiency in any character trait necessary for the practice of law (such as trustworthiness, honesty, fairness, candor, and fidelity to fiduciary duties) or if it involves such a serious breach of a duty owed to another or to society, or such a flagrant disrespect for the law or for societal norms, that knowledge of the attorney's conduct would be likely to undermine public confidence in and respect for the legal profession."[36]

136.    Notably, it is not necessary for a lawyer to be convicted, or even charged with, a crime for the lawyer to violate Rule 8.4(b).[37]

137.    The alleged conduct, which based on Claimants' theory violates California criminal law, presents a "significant risk" that the representation of "one or more" Claimants will be "materially limited" by the attorneys' personal interest in avoiding prosecution (as well as civil claims brought by their clients).

---

or otherwise, and whether the act is a felony or misdemeanor, constitutes a cause for disbarment or suspension.").

[34] Cal. Rule 8.4 cmt. [3].

[35] *In re Lesansky*, 25 Cal. 4th 11, 16 (Cal. Sup. Ct. 2001).

[36] *Id.* (defining "moral turpitude" for criminal acts outside the practice of law).

[37] *See, e.g., Att'y Grievance Comm'n v. Smith*, 950 A.2d 101 (Md. 2008) (lawyer who left voicemail message for trial witness and falsely represented himself as police officer violated Rule 8.4(b) even though convictions reversed).

Docusign Envelope ID: 0B9B68EF-4F24-8AFF-82D7-8A3DBC307E04

138.     Based upon the claims alleged in the Demand, and the lawyers' own conduct vis-à-vis their clients, the Claimants' counsel's "ability to consider, recommend or carry out an appropriate course of action for the client" will be materially (or substantially) limited "as a result of the attorney's other responsibilities or interests." Those "other interests" include avoidance of criminal and civil liability to their clients.[38]

### C.     The Conflicts Are Not Waivable, And There Is No Evidence Of Informed Consent

139.     While some conflicts of interest are potentially waivable, the conflicted counsel must "reasonably believe" that they will be able to provide competent and diligent representation to each affected client. In my opinion, under the circumstances presented in this matter, no objective lawyer in the position of Claimants' Counsel reasonably would believe they could provide competent and diligent representation to each affected client.

140.     As a threshold matter, I am unaware of any information suggesting that any of Claimants' Counsel have received informed consent, confirmed in writing, from any of those Claimants who engaged with any of Claimants' Counsel's Websites.

141.     Informed consent could not waive Claimants' Counsel's conflicts in any event. As explained by the *Restatement of the Law Governing Lawyers*, "some conflicts of interest preclude adverse representation even if informed consent is obtained."[39]

142.     Unconflicted lawyers would be able to fully and candidly advise their clients regarding their right to bring similar claims asserted in the Demand against Claimants' Counsel themselves. Unconflicted counsel would be able to competently and diligently advise those Claimants who utilized Claimants' Counsel's websites of their rights to file civil claims, criminal

---

[38] Md. Rule 19-301.7 cmt. [8]; ABA Model Rule 1.7 cmt. [8].

[39] *Restatement (Third) of the Law Governing Lawyers*, § 122 cmt. g.

charges, and potentially even bar grievances against Claimants' Counsel.

143.    Such fundamental differences could reasonably and foreseeably lead to some of the Claimants being opposed to other of the Claimants over Claimants' Counsel's conduct. Some of the clients may wish to aggressively pursue their own counsel, while others might not wish to do so. Either way, they are entitled to unconflicted advice about the matter.

144.    As the *Restatement* explains, "In some situations, however, joint representation would be objectively inadequate despite a client's voluntary and informed consent."[40] For example, a conflict of interests among the members of a class action "might render a lawyer's representation . . . inadequate despite informed consent by the class representative."[41]

145.    In my opinion, even if there was "informed consent" (and I have seen no evidence of such consent), the conflict of interest amongst the various Claimants—some of whom may wish to aggressively pursue action against their own lawyers, and others who may not—renders this conflict unwaivable.

146.    Claimants' Counsel find themselves in a Catch-22: by proving the alleged claims against Marriott, they would also be proving the same claims against themselves.

147.    Claimants' Counsel are thus materially limited in the type of advice they can give to their clients in their arbitration proceedings against Marriott because they would be interested in not exposing themselves to the same civil and criminal liability to their clients.

---

[40] *Restatement* at § 122 cmt. g(iv).

[41] *See id.*

Docusign Envelope ID: 0B9B68EF-4F24-8AFF-82D7-8A3DBC307E04

148.    Moreover, Claimants' Counsel's own actions wherein they have engaged in the same alleged misconduct through their websites would reasonably affect Claimants' Counsel's approach to the litigation. For example, Claimants' Counsel's own exposure to their clients could materially impact their approach to the litigation by encouraging them to settle claims brought by Claimants who *did* interact with the Websites to avoid or limit self-exposure to those Claimants.[42] As the *Restatement* further explains, "when the representation involves the same matter or the matters are significantly related, it may be more difficult for the lawyer to provide adequate legal assistance to multiple clients."[43]

149.    The *Restatement* also confirms that "[d]ecisions holding that a conflict is nonconsentable often involve facts suggesting that the client, who is often unsophisticated in retaining lawyers, was not adequately informed or was incapable of adequately appreciating the risks of the conflict."[44] Based on the information I have considered, it does not appear that any of the thousands of Claimants have been apprised of the issues regarding Claimants' Counsel's websites.  For example, as addressed above, when the issue was raised by counsel for Marriott, the response from Claimants' Counsel was that Marriott's lawyers were simply incorrect. That response suggests Claimants' Counsel has not sought or obtained an informed consent waiver from any of the Claimants.

---

[42] *See, e.g.*, Cal. Rule 1.7 cmt. [4] ("The critical questions are the likelihood that a difference in interests exists or will eventuate and, if it does, whether it will materially interfere with the lawyer's independent professional judgment in considering alternatives or foreclose courses of action that reasonably should be pursued on behalf of each client.").

[43] *Restatement,* § 122 cmt. g(iv).

[44] *Id.*

39

150.    Second, the waiver must not be prohibited by law.  While Counsel may be able to get a client's consent to a lawyer's civil law violation (under the theory alleged in the Amended Demands), Counsel has no ability to have their client "waive" counsel's potential criminal liability—particularly where the client is the victim of the lawyer's criminal act by their own counsel's theory.[45] A potential criminal claim places the "probity" of the attorney's own conduct in serious question, thereby making it difficult if not impossible to render detached, objective legal advice.

151.    In my opinion, Claimants' Counsel's allegations against Marriott place "the probity" of Claimants' Counsel's own conduct at issue in this proceeding and would create a conflict in which Counsel's personal interest in avoiding civil and criminal liability is directly at odds with Claimants' interests in establishing liability. It also places Claimants' Counsel's clients into two separate classes—one set with potential criminal and civil claims against Counsel, and the other without such claims.  A reasonably objective lawyer would consider these circumstances to be a non-consentable conflict of interest.

152.    In my opinion, truly independent and non-conflicted lawyers would at the very least communicate with all Claimants regarding whether some of those Claimants have a right to bring CIPA and the related claims in the Demand not only against Marriott but against Counsel as well for engaging in the same conduct.

153.    It would also be reasonable to conclude that even disclosure of the issue to Claimants would cause at least some of them to question the competency and loyalty of their own counsel. Assuming the lawyers' usage of Claimants' Counsel's websites violates California

---

[45] *See* ABA Model Rule 1.7 cmt. [10] ("if the probity of an attorney's own conduct in a transaction is in serious question, it may be difficult or impossible for the attorney to give a client detached advice"); *see also* Md. Rule 19-301.7 cmt. [10] (same).

Docusign Envelope ID: 0B9B68EF-4F24-8AFF-82D7-8A3DBC307E04

criminal and civil law, that would mean that at least some portion of the clients are themselves the victims of their counsels' own conduct by their counsels' own legal theory. Moreover, some number of the clients themselves would, under that theory, have the identical claims for violations of California criminal and civil law against their own lawyers and their law firms as they have asserted against Marriott. Those clients who interfaced with Claimants' Counsel's websites also have potential claims sounding in legal malpractice, breach of fiduciary duty, and breach of contract against their own lawyers based on those lawyers' own legal theories.

### D.    The Duty of Client Communication Also Supports The Conflict of Interest

154.    Closely related to the lawyer's duty to avoid conflicts of interest is the lawyer's duty to communicate with their clients.  All states have rules, derived from the ABA Model Rules, requiring disclosure of material facts to the client concerning the representation. ABA Model Rule 1.4 provides in part that a lawyer must "keep the client reasonably informed about the status of the matter" and "explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation."[46] Additionally, a lawyer is required to "promptly inform the client of any decision or circumstance with respect to which the client's informed consent" is required.[47] As noted above, "informed consent" is one of the requirements needed for a lawyer to get a client's waiver of the lawyer's conflict of interest.

155.    The Maryland Rules of Professional Conduct include these same communication requirements.[48]

---

[46] *See* ABA Model Rule 1.4(a)(3) and (b).

[47] ABA Model Rule 1.4(a)(1).

[48] *See* Md. Rule 19-301.4(a)(1), (a)(3) and (b).

156.    Similarly, California Rule of Professional Conduct 1.4 requires a lawyer to "keep the client reasonably informed about significant developments relating to the representation" and "explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation.[49] The California rules similarly require a lawyer to "promptly inform the client of any decision or circumstance with respect to which disclosure or the client's informed consent is required by these rules or the State Bar Act."

157.    Rule 1.4 (on client communications) has been interpreted in conjunction with Rule 1.7 (on conflicts of interest) to require that the lawyer inform their client when the client may have a malpractice claim, because the information is necessary to permit the client to make informed decisions regarding the representation and as part of the lawyer's duty to get informed consent to waive a conflict of interest.[50] In my opinion, such a communication was required at least as of when Claimants' Counsel received the March 26, 2025 letter from counsel for Marriott regarding the Meta Pixel issues in the Money Team law firm website solicitation.

158.    My opinion regarding the duty to communicate is informed by ABA Formal Opinion 481, which confirms the duty to communicate the lawyers' material errors applies to the lawyers' current clients (although not their former clients).[51] Whether a lawyer's error is "material" to a given representation is determined from an objective standard. The test is whether a disinterested lawyer would conclude that the lawyer's error is: "(a) reasonably likely to harm or prejudice a client; or (b) of such a nature that it would reasonably cause a client to consider

---

[49] *See* Cal. Rule 1.4(a)(3) and (b).

[50] *See* Benjamin P. Cooper, *The Lawyer's Duty to Inform His Client of His Own Malpractice*, 61 Baylor Law Rev. 174, 184 (2009).

[51] *See* ABA Formal Op. 481 (Apr. 17, 2018).

terminating the representation even in the absence of harm or prejudice."[52] An error causes "harm or prejudice to the client" if the error results in financial loss to the client, substantial delay in achieving the client's objectives, or material disadvantage to the client's position.[53]

159.    ABA Formal Opinion 481 further states that an error that does not harm or prejudice a client may still be a material error if it could cause the client to lose confidence in the lawyer's ability to perform the representation with competence, diligence, or loyalty.[54]

160.    Assuming the foregoing facts are true, in my opinion, the lawyers for Claimants were required under their duty to communicate to disclose their own culpability under their own legal theory. Clients would have a legitimate need to know that they may have a claim against their own lawyers. And the fact that the lawyers face such exposure reasonably could affect how they approach the litigation, and whether their independent professional judgment is affected by their own interests in avoiding liability to their clients.

161.    My opinion is also informed by California law.  California's courts have recognized a lawyer's duty to disclose acts of malpractice to their affected clients.[55] The California State Bar's Standing Committee on Professional Responsibility and Conduct ("COPRAC") has advised that a lawyer's duty to communicate requires that lawyers disclose to their clients the material facts potentially giving rise to any legal malpractice claim against the attorney.[56]

---

[52] *Id.* at 2.

[53] *Id.* at 3.

[54] *Id.* at 4.

[55] *Neel v. Magana, Olney, Levy, Cathcart & Gelfand* 6 Cal.3d 176, 188-189 (1971) ("The duty of a fiduciary embraces the obligation to render a full and fair disclosure to the beneficiary of all facts which materially affect his rights and interests."); *Beal Bank, SSB v. Arter & Hadden, LLP*, 42 Cal.4th 503, 514(2007) ("attorneys have a fiduciary obligation to disclose material facts to their clients, an obligation that includes disclosure of acts of malpractice.").

[56] *See* COPRAC Formal Op. 2009-178 at 4.

Docusign Envelope ID: 0B9B68EF-4F24-8AFF-82D7-8A3DBC307E04

162.    In a subsequent opinion, COPRAC found that "[a]n error potentially giving rise to a legal malpractice claim is a 'significant development relating to the representation'" requiring disclosure under California Rule 1.4.[57] California ethics guidance in COPRAC Formal Op. 2019-197 states that acts of malpractice create a conflict of interest between a lawyer and their client pursuant to the lawyer's duty of loyalty; such acts must be disclosed in order for the client to provide their informed written consent to continue the representation.[58]

163.    As explained in COPRAC Formal Op. 2019-197, "An error potentially giving rise to a legal malpractice claim is a 'significant development relating to the representation.' Other authorities generally support this view."[59]

164.    In my opinion, as discussed above, an error existed that potentially gave rise to a legal malpractice claim against Claimants' Counsel. COPRAC Formal Op. 2019-197 further states: "The attorney is not permitted to provide legal advice to the client on the merits of any such claim; to do so would be to provide legal advice to the client on an issue on which the attorney's interests squarely conflict with the client's. Instead, as more fully described below, under rules 1.4 and 1.7(b), the attorney has a duty to disclose the conflict and the resulting limitations on her ability to advise the client. The attorney should also consider advising the client to consult independent counsel concerning the circumstances."[60] I am unaware of any evidence that any such client

---

[57] COPRAC Formal Op. 2019-197 at 3–4 (internal quotes modified).

[58] *See id.* at 5 ("Thus, where there is a significant risk that a lawyer's representation of a client may be materially limited by the lawyer's personal interests, including interests that are actually or potentially adverse to the client's interests, a conflict of interest exists, which would require informed written consent and compliance with rule 1.7(d)") (citing Cal. Rule 1.4(a)(1).

[59] *See id.* at 3–4 (citing with approval ABA Formal Op. No. 481 (2018); *Restatement (Third) of the Law Governing Lawyers* § 20 cmt c. (2000); New Jersey Supreme Court Advisory Committee on Professional Ethics Op. No. 684 (1998)).

[60] *Id.* at 4.

Docusign Envelope ID: 0B9B68EF-4F24-8AFF-82D7-8A3DBC307E04

communication has occurred.

165.    The March 26, 2025 letter from Marriott's Counsel advised Claimants' Counsel that "Your firm is doing far worse than you allege to its own purported clients." The March 26 letter stated, "Your websites soliciting clients use the same pixels your purported clients allege violate CIPA." The March 26 letter avers "Your webpage's source code indicates that your firm uses 'PixelYourSite Professional,' which touts itself as 'probably the most complex tracking tool for WordPress, managing the Facebook Pixel (now the Meta Pixel), Google Analytics, Google Ads Remarketing, Pinterest Tag, Bing Tag, the TikTok Tag, and virtually any other script.'" *Id.* at 4. The March 26 letter alleges "Your webpage's source code has these pixels" and provides a copy of what is purported to be "the Meta Pixel code" from The Money Team Law Firm website. *Id.* at 5.

166.    The March 26 letter further alleges:

By the terms of your own demand, your firm's conduct is far worse than what you claim Marriott did, for multiple independent reasons. You are luring people to make meritless claims that Marriott "broke the law by capturing" their "personal information without [their] knowledge or consent" and "betray[ed] the trust of those who relied on them." See https://legalsettlementexperts.com/marriott-v2/. Yet your Money Team website is using the same "pixels and other technologies" you contend are somehow a "betrayal" of trust.

*Id.* at 6.

167.    The letter continues, "Worse still, your webpage's pixels are sharing data about your purported clients with third parties while they are requesting legal advice from you. That does not violate CIPA for the reasons discussed above. But it does violate the Rules of Professional Conduct because your websites are using pixels to share client information with third parties."

45

Docusign Envelope ID: 0B9B68EF-4F24-8AFF-82D7-8A3DBC307E04

168. The March 26 letter also states that "Your conduct has created a conflict of interest" with Hilliard Law's clients. *Id.* at 7.

169. Even assuming Claimants' Counsel believed that the statements in the March 26 letter were not true, they still had, in my opinion, an ethical obligation to communicate Marriott's counsel's allegations to all of the respective Claimants.

170. Pursuant to Rule 1.4, lawyers must "promptly" inform their clients "of any decision or circumstance with respect to which the client's informed consent" is required, and to keep their clients "reasonably informed about the status of the matter." Even if Claimants' Counsel disagrees with the statements made in the March 26 letter, that would not obviate the ethical duty to communicate opposing counsel's allegations to their clients. The clients were and are entitled to know about these allegations, and counsel could use that communication as an opportunity to either assuage their clients' concerns or otherwise to explain the matter such that the clients could make informed decisions about the representation—including whether they wished to terminate the representation or seek independent counsel. As addressed above, such client communication also is necessary in order to obtain the clients' informed consent under Rule 1.7.

171. Unconflicted counsel would, at a minimum, consider terminating their representation to enable Claimants to engage new counsel who were not subject to a conflict of interest. Unconflicted counsel would be in the best position to advise Claimants regarding their rights as to Claimants' Counsel's usage of their confidential information using substantially the same technical features that Claimants have asserted violated California law when utilized by Marriott. Hilliard and Sperling Kenny, on the other hand, would be unable to (and appear not to have) advised their approximately 7,000 clients regarding their rights to bring claims against their lawyers and law firms.

172. For all the reasons summarized above, it is my expert opinion, based upon my consideration of the evidence that has been made available to me, that the lawyers representing Claimants in their respective AAA Demand have a material limitation conflict pursuant to Rule 1.7(a)(2).

## X. THE ADVOCATE-WITNESS RULE SIMILARLY CONFIRMS CLAIMANTS' COUNSEL'S CONFLICTS OF INTEREST

173. The Rules of Professional Conduct prohibit a lawyer from serving as an advocate in a case in which the lawyer is also a necessary witness.[61] For example, Maryland Rule 19-303.7 and ABA Model Rule 3.7 state:

(a) An attorney[62] shall not act as advocate at a trial in which the attorney is likely to be a necessary witness unless:

(1) the testimony relates to an uncontested issue;

(2) the testimony relates to the nature and value of legal services rendered in the case; or

(3) disqualification of the attorney would work substantial hardship on the client.

(b) An attorney may act as advocate in a trial in which another attorney in the attorney's firm is likely to be called as a witness unless precluded from doing so by Rule 19-301.7 (1.7) or Rule 19-301.9 (1.9).

174. Similarly, California Rule 3.7 states:

(a) A lawyer shall not act as an advocate in a trial in which the lawyer is likely to be a witness unless:

(1) the lawyer's testimony relates to an uncontested issue or matter;

(2) the lawyer's testimony relates to the nature and value of legal services rendered in the case; or

---

[61] ABA Model Rule 3.7; Md. Rule 19-303.7.

[62] ABA Model Rule 3.7 uses the word "lawyer" rather than "attorney" but is otherwise substantively identical to Maryland Rule 19-303.7 and California Rule 3.7.

(3)     the lawyer has obtained informed written consent from the client.

175.    As noted in subpart (b), the witness-advocate rule does not preclude other attorneys in the testifying attorneys' law firm from serving as trial counsel, *provided that* there is no conflict of interest under Rule 1.7 (current clients) or Rule 1.9 (former clients).[63]

176.    The comments to Maryland Rule 3.7 explain:

*Conflict of Interest*--[6] In determining if it is permissible to act as advocate in a trial in which the attorney will be a necessary witness, the attorney must also consider that the dual role may give rise to a conflict of interest that will require compliance with Rules 19-301.7 (1.7) or 19-301.9 (1.9). For example, if there is likely to be substantial conflict between the testimony of the client and that of the attorney, the representation involves a conflict of interest that requires compliance with Rule 19-301.7 (1.7). This would be true even though the attorney might not be prohibited by section (a) of this Rule from simultaneously serving as advocate and witness because the attorney's disqualification would work a substantial hardship on the client. . . . The problem can arise whether the attorney is called as a witness on behalf of the client or is called by the opposing party. Determining whether or not such a conflict exists is primarily the responsibility of the attorney involved. If there is a conflict of interest, the attorney must secure the client's informed consent, confirmed in writing. In some cases, the attorney will be precluded from seeking the client's consent. See Rule 19-301.7 (1.7). See Rule 19-301.0 (g) (1.0) for the definition of "confirmed in writing" and Rule 19-301.0 (f) (1.0) for the definition of "informed consent."

177.    The California Rules of Professional Conduct similarly proscribe a lawyer from acting as an advocate at a trial in which the lawyer is likely to be a necessary witness, and also indicates that the prohibition is imputed to other lawyers in the lawyer's firm if there is a conflict of interest under Rule 1.7 or 1.9.[64]

---

[63] Comment [7] to Md. Rule 19-303.7 explains:

Section (b) of this Rule provides that an attorney is not disqualified from serving as an advocate because an attorney with whom the attorney is associated in a firm is precluded from doing so by section (a) of this Rule. If, however, the testifying attorney would also be disqualified by Rule 19-301.7 (1.7) or Rule 19-301.9 (1.9) from representing the client in the matter, other attorneys in the firm will be precluded from representing the client by Rule 19-301.10 (1.10) unless the client gives informed consent under the conditions stated in Rule 19-301.7 (1.7).

[64] *See* Cal. Rule 3.7.

Docusign Envelope ID: 0B9B68EF-4F24-8AFF-82D7-8A3DBC307E04

178. Based on the above, attorneys from Hilliard Law and Sperling Kenny are likely to be necessary witnesses in the AAA action. Their testimony would not relate to an uncontested issue or matter—in fact, the lawyers from those firms, in their response to Marriott's March 26 letter, denied that the Money Team website includes the same functionality or features that the Demand asserts is included in Marriott's website. Moreover, the anticipated testimony would not relate to the nature or value of legal services rendered.

179. The lawyers at Claimants' Counsel's law firms would be necessary fact witnesses for a number of reasons.

180. First, they would be necessary to establish their responsibility for the websites, including the design and implementation of the websites, the use of pixels on those websites, and whether their use of pixels on their websites is materially different from Marriott's alleged use of those pixels.

181. Second, they would be necessary witnesses for what they did upon receiving Marriott's counsel's March 26 letter identifying their conflicts of interest, including whether changes were made to the websites they are responsible for, and if so, what changes were made and why—including websites that were taken down or otherwise disabled after the receipt of Marriott's counsel's letter.

182. Third, they would be necessary witnesses regarding their response to Marriott's counsel's March 26 letter, including the basis for their denial that their websites operate in the same manner and include the same relevant technical features that they allege in the Demand violate California law when used by Marriott.

49

183.   Fourth, they would be necessary witnesses regarding whether and when they communicated with their thousands of clients regarding the issue identified in Marriott's counsel's letter, if at all.

184.   Fifth, they would be necessary witnesses regarding whether, when and how they obtained their clients' informed consent to continue the representation after they were on notice of the issue concerning their own websites, including whether they communicated the information provided in Marriott's counsel's March 26 letter to their clients.

185.   As stated above, it is my opinion that the lawyers from both firms representing Claimants have a conflict of interest pursuant to Rule 1.7. Therefore, under subpart (b) to Rule 3.7, it is not just the testifying lawyers who would be prohibited from acting as an advocate at trial. The conflict under Rule 1.7 would be imputed to the other attorneys in their respective law firms.[65]

186.   Their testimony would likely conflict with the interests of their clients. The reasons for such potential conflicts are as set forth in the preceding section. Additionally, the testimony of Claimants' Counsel could undermine the claims raised in the Demand.

187.   These facts further support my opinion that Claimants' Counsel are necessary witnesses. They are first-hand witnesses regarding the operation of the website and whether it operates in the same way as they have alleged Marriott's website operates. Their testimony may undermine the credibility of their clients' own claims, and may give support to affirmative defenses.

---

[65] *See* Cal. Rule 1.10(a) ("While lawyers are associated in a firm, none of them shall knowingly represent a client when any of them practicing alone would be prohibited from doing so by rules 1.7 or 1.9 . . . ."); Md. Rule 19-301.10(a) (same); ABA Model Rule 1.10(a) (same).

50

188.    Equally important is the unreasonable position Hilliard and Sperling Kenny have created for their nearly 7,000 clients. Their clients must answer questions about their own counsel's conduct, and the answers may be adverse to their claims. For example, Hilliard and Sperling Kenny's clients must answer whether they can credibly articulate a material difference between their own counsel's use of these technologies and Marriott's use of them. Their inability to do so likely would be prejudicial evidence against their claims against Marriott.

189.    Under Rule 3.7, "[w]hen the attorney in question is so clearly aware before the fact of the potential conflict between his roles as advocate and witness, then the scrutiny usually applied to an opposing party's motion for disqualification is unnecessary, and the burden shifts to the attorney in question."[66] In such circumstances, "the burden is on the [conflicted] lawyer to establish an exception to the Rule if he or she is to avoid disqualification."[67]

190.    As discussed at length above, Marriott informed Claimants' Counsel of their conflict of interest—which they should have been aware of in any event—before they proceeded to file the Demands. They have also continued to prosecute the arbitrations against Marriott.

191.    In my opinion, Claimants' Counsel were aware or should have been aware that they had placed their own conduct at issue in the arbitrations by March 26, 2025, when Marriott identified in a detailed letter the conflicts arising out of Claimants' Counsel's use of the same pixels that they allege in the Demand violate California law when Marriott uses them. Thus, their "substantive centrality to the issues in the case should have compelled [them] to back out at the beginning," before they filed the Demands.[68]

---

[66] *Klupt v. Krongard*, 126 Md. App. 179, 207 (1999).

[67] *Id.* at 207–08 (quoting Ann. Model Rules of Prof. Conduct 359 (3d ed. 1996) (annotations to Rule 3.7)).

[68] *Abrishamian v. Wash. Med. Grp, P.C.*, 216 Md. App. 386, 407–08 (2014).

192.    In my opinion, the benefits to Claimants from unconflicted counsel outweigh any hardship they may have if disqualified. Only unconflicted counsel would be in a position to advise their clients regarding various potential claims they have against Claimants' Counsel, and the effect that their conduct has had on Claimants' Demands against Marriott. In addition, I understand that the arbitrations are in their early stages, further mitigating any claim of hardship.

193.    Based on the foregoing, it is my further opinion that counsel are necessary witnesses whose conduct must be considered in light of Rule 3.7.

194.    My opinions expressed herein are based on the information presently known or made available to me. I reserve the right to modify my opinions herein based upon additional information.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: March 25, 2026

Signed by:

*Michael Edward McCabe Jr.*
8A585562A6F4496...
Michael E. McCabe, Jr.

Docusign Envelope ID: 0B9B68EF-4F24-8AFF-82D7-8A3DBC307E04

# EXHIBIT 1

Docusign Envelope ID: 0B9B68EF-4F24-8AFF-82D7-8A3DBC307E04

# Michael Edward McCabe, Jr.
## McCabe Ali LLP
9233 Fall River Lane, Potomac, MD 20854
mike@mccabeali.com; (301) 798-1110
Blog: www.IPethicsLaw.com
Website: www.mccabeali.com

## LEGAL EXPERIENCE:

Experienced counselor, advocate and expert witness in the field of Intellectual Property Law, focused on the representation of patent and trademark attorneys, registered patent agents, IP and General Practice law firms, corporate counsel, and federal government employees involving legal ethics matters and disciplinary proceedings before the U.S. Patent and Trademark Office and in state and federal court proceedings. Represented hundreds of patent and trademark practitioners in confidential ethics investigations or disciplinary proceedings brought by the USPTO Office of Enrollment and Discipline. Decades of Intellectual Property and commercial litigation experience for multi-national corporate clients in patent and trademark related cases before federal courts in many jurisdictions. Nationally-recognized speaker on legal ethics and regulatory compliance, particularly relating to Intellectual Property law. Credited as a leading attorney in matters involving application of rules of ethics in the practice of patent and trademark law.

## INTELLECTUAL PROPERTY ETHICS & USPTO BAR DISCIPLINE DEFENSE:

**McCabe Ali LLP**, Intellectual Property (IP) Ethics Law, Potomac, MD        2020 to Present
**McCabe Law LLC**, Intellectual Property (IP) Ethics Law, Potomac, MD        2017-2020

- Managing Partner and Co-Founder of practice as registered Patent Attorney to better serve IP clients with proactive risk management counsel by ensuring that business and legal affairs are compliant with applicable federal and state Rules of Professional Conduct
- Utilize knowledge as prior Officer and Director of multinational IP Law Firm to assist clients, including in-house corporate counsel and law firms, in formulating best practices within their organizations regarding risk management, avoidance of conflicts of interest, proper identification of clients, and management oversight responsibilities
- Expert in representing clients involved in USPTO Ethics Investigations and commended for detailed knowledge in unique and complex niche of ethics within IP law, including prosecution and litigation matters
- Consultant for internal law firm and corporate investigations pertaining to risk management, ethics compliance, and professional liability
- Provide expert witness consulting and testifying services on USPTO ethics rules and practices and procedures before the Office of Enrollment and Discipline (OED)
- Defend lawyers and patent agents charged with ethics violations in disciplinary enforcement actions brought by the USPTO, state and federal courts, including matters involving allegations of breach of fiduciary duty, lack of competency, unauthorized practice of law, conflicts of interest, duties to clients and courts, inequitable conduct and violation of the

1

Docusign Envelope ID: 0B9B68EF-4F24-8AFF-82D7-8A3DBC307E04

duty of candor, Rule 11 violations, sanctions, disqualification motions, litigation misconduct, patent and trademark prosecution misconduct, lawyer mobility issues, personal misconduct and criminal convictions

- Recognized as dynamic speaker, authoritative commentator, and published author on ethical and legal issues in practice of intellectual property law

**Funk & Bolton, PA**, General Practice Law Firm                                           2011-2017
*Partner & Attorney Ethics Practice Group Founder*

- Created and initiated practice group in general practice law firm focused on representation of patent and trademark lawyers in ethics counseling, government investigations, and formal disciplinary proceedings against IP practitioners
- Hired by U.S. Department of Justice as Special Ethics Counsel to represent a federal government patent attorney accused by the USPTO of unethical conduct
- Publicly commended by prominent legal commentators for launching first-ever niche-focused law blog concentrating on intellectual property and legal ethics, which addresses new developments, interpretations, resources, and best practices in informative and user-friendly format
- Published chapter by American Bar Association in multiple editions of reference book regarding confidentiality and the attorney-client privilege in the practice of IP law
- Represented institutional clients in patent and other commercial claims before federal courts and administrative agencies

**Oblon, Spivak, LLP,** Intellectual Property Law, Alexandria, VA                        1999-2011
*Partner, Director & Risk Management Chair*

- Represented domestic and foreign clients in patent litigation involving diverse areas of technology, drafted opinions relating to patent validity and infringement, and prepared and prosecuted patent applications before the USPTO
- Promoted by senior management to Risk Management Committee Chair to manage firm's functions in legal ethics, professional responsibility, risk management, and malpractice avoidance to ensure PTO, federal and state ethics compliance
- Served as Arbitrator in binding proceeding to resolve ownership dispute of IP rights between competing clients through review of legal briefs, documentary evidence and witness testimony to reach appropriate decision
- Elected to Shareholder and Board of Directors due to trusting reputation for liaison and discretion with strong analytical and communication skills to serve interests of attorneys and firm
- Recognized as Intellectual Property expert through IP published works and speaking engagements in legal and academia communities (see below list)

**McDermott, Will & Emery**, *Partner,* IP Litigation, Washington, DC                    1995-1999
     **(**Merged with Lowe, Price, LeBlanc & Becker**)**
**Shapiro & Olander**, *Associate,* General Practice, Baltimore, MD                      1992-1995

- Represented corporate and individual clients in litigating patent, trademark, and copyright disputes before federal district courts and the International Trade Commission

2

Docusign Envelope ID: 0B9B68EF-4F24-8AFF-82D7-8A3DBC307E04

- Initiated IP Department (at Shapiro) to represent inventors and companies in patent and trademark clearances, opinions, applications, IP licensing rights, and employer contract protocols for ownership of intellectual property

### ENGINEERING WORK EXPERIENCE:

**NASA / Goddard Space Flight Center**, Greenbelt, MD                    1985-1989
Advanced Development and Flight Experiments Section
*Mechanical Engineer*
- Conducted ground-based and microgravity testing aboard the Space Shuttle of new types of two-phase capillary pump loop heat transfer systems for integration in the International Space Station, analyzed performance data, worked with other NASA centers, and delivered recommendations to senior NASA management
- Served as Goddard representative in collaboration with U.S. Air Force to jointly test and develop high-power spacecraft thermal management systems, and authored and presented technical paper on project results at international engineering conference

### HONORS/AWARDS:

- Seven-time Chair or Vice-Chair, **ABA-IP Law Section Ethics and Professional Resp. Committee (**Chair, 2018-21; Vice Chair, 2016-18 & 2021-23)
- Chair, **ABA-IP Law Section Professional Issues Division** (Aug. 2023-Present)
- Vice Chair, **ABA-IP Law Section Professional Issues Division (**2021-23)
- Chair, Ethics Subcommittee of the **American Intellectual Property Law Association Patent Agents Committee** (2021-2023)
- Appointed by ABA President to **Lawyer Assistance Programs Advisory Commission** (2023-Present)
- Liaison, **ABA Pro Bono Committee**, ABA-IP Law Section (2019-Present)
- Liaison, **SOC Committee on Ethics and Professionalism,** ABA-IP Law Section (2018-19)
- Member, **ABA Working Group** on Resolution 10A (2019)
- Pro Bono Service Honor Roll – **Virginia Access to Justice Commission of Supreme Court of Virginia** (2022-2023; 2023-2024)
- Named as one of **World's Leading IP Strategists** by Intellectual Asset Management (2018)
- Rated **"AV Preeminent Peer Review"** (2018-Present)
- **Maryland Super Lawyers** for Professional Liability: Defense (2018-Present)
- **Washington DC Best Lawyer's List** for patent and intellectual property law and litigation (2014-Present)
- Named Baltimore **"Patent Lawyer of the Year"** by *Best Lawyers* (2015)
- Awarded **"Best Legal Blog of 2016"** for niche and specialty area- *IP Ethics and Insights*

### EDUCATION / LICENSING:

**University of Baltimore School of Law**, Baltimore, MD, Juris Doctor, 1992 (evening division)
*Magna cum laude* (top 5%)
- Law Review Staff; U.S. National Moot Court Competition (Team Captain)

3

Docusign Envelope ID: 0B9B68EF-4F24-8AFF-82D7-8A3DBC307E04

- *American Jurisprudence* book award for highest grades in Civil Procedure, Torts, Criminal Law and Constitutional Law

**University of Maryland**, College Park, MD.
Bachelor of Science in Mechanical Engineering – 1985

**Professional Licenses:**
- Maryland (1992), District of Columbia (1993) and Virginia (2009)
- U.S. District Courts – Maryland, District of Columbia, E.D. Virginia and W.D. Virginia
- U.S. Court of Appeals – First, Fourth, D.C. and Federal Circuits
- Supreme Court of the United States
- USPTO Registered Patent Attorney (No. 37,182)

## TEACHING / LECTURING EXPERIENCE:

**Johns Hopkins University**, Baltimore, MD                                          2014-2020
- *Guest Lecturer* – Introduction to Patent Law

**Antonin Scalia Law School - George Mason University**, Arlington, VA    2008-2011
- *Guest Lecturer* – Advanced Patent Law
- *Adjunct Professor* – Design Patent Law

**Virginia State Bar Professionalism Course**, Arlington, VA                  2011-2014;
- *Faculty* – Appointed by Virginia Supreme Court (three 3-year terms)       2019-2022;
                                                                             2023-2026

Teach ethics and professional responsibility course to new Virginia State Bar members. Lead specialty practice section on ethics in the practice of intellectual property law.

## SPEECHES / PRESENTATIONS:

- *Double-Booked?  Untangling Conflicts in Patent Prosecution*, webinar presented to **Banner & Witcoff** (Feb. 26, 2026) (co-speaker)

- *Regulation, Risk & Resilience: The Nexus Between Professional Liability, Duty of Competence & Practitioner Well-Being*, webinar presented by **American Intellectual Property Law Association** (Feb. 10, 2026) (panelist)

- *Patent Prosecution Malpractice: Minimizing the Risk of Claims – Recognizing and Eliminating Problem Behavior, Identifying Client Conflicts, Court Treatment*, webinar presented by **Strafford** (Nov. 13, 2025) (co-speaker)

- **Virginia State Bar Harry L. Carrico Professionalism Course**, faculty and co-leader of IP breakout section for new VSB members, George Mason University, Fairfax, VA (Aug. 15, 2025)

4

Docusign Envelope ID: 0B9B68EF-4F24-8AFF-82D7-8A3DBC307E04

- *Navigating Ethical Minefields in Patent and Trademark Law: Challenges, Liabilities, and the Role of Artificial Intelligence in IP*, presented at **50th Annual Intellectual Property Law Institute,** Traverse City, MI (July 18, 2025) (speaker)

- *Concurrently and Ethically Representing Companies, Owners, and Employees in the Same Matter*, webinar presented by **Strafford** (June 17, 2025) (panelist)

- *AI in IP Practice: Ethical Considerations and Requirements*, presented at **AIPLA 2025 Spring Meeting**, Minneapolis, MN (May 15, 2025) (moderator)

- *Paragraph IV Disputes: A Scenario Based Discussion on Emerging Ethical Quandries for Hatch-Waxman Practitioners*, presented at **ACI 21st Annual Paragraph IV Disputes**, New York, NY (April 30, 2025) (panelist)

- *Innovative Risk Strategies for the Modern IP Landscape,* webinar presented at **CNA Lawyers Professional Responsibility Risk Control** (Mar. 27, 2025) (panelist)

- *Fraud With Errors: Avoiding Both Egregious and Unintentional Ethics Issues*, presented at **Alt Legal 2025 I Love Trademarks Conference,** New York, NY (Mar. 18. 2025) (speaker)

- *Ethics Issues for IP and Other Attorneys: Best Practices for Avoiding Common Mistakes*, webinar presented at **Licensing Executive Society USA & Canada** (Feb. 6, 2025) (speaker)

- *IP Protection for Athletes, Gaming and Sports Betting*, presented at **ABA 2024 Intellectual Property Section & Forum on Entertainment and Sports Industries Joint Meeting**, Las Vegas, NV (Nov. 14, 2024) (moderator and conference coordinator)

- *Latest Developments on Ethics and Discipline for the Licensing Attorney*, presented at **D.C. Chapter of Licensing Executive Society USA & Canada**, Potomac, MD (Nov. 6, 2024) (speaker)

- *Ethics and Malpractice in IP Prosecution and Litigation: Best Practices for Avoiding Trouble*, presented at **Virginia State Bar Intellectual Property Section Annual Meeting**, Richmond, VA (Oct. 18, 2024) (speaker)

- *Ethics for the Hatch-Waxman Practitioner*, **ACI 10th Anniversary Paragraph IV Disputes Master Symposium**: **The ANDA Litigation Strategy Symposium for Brand Name and Generics**, Chicago, IL (Oct. 16, 2024) (speaker)

- *Ethics Committee Panel on Duty of Candor Before USPTO**, webinar presented at **Boston IP Law Association** (Oct. 4, 2024) (speaker)

- *Ethics Considerations and Trends in Patent and Trademark Matters Before the USPTO*, webinar presented exclusively for **Johnson & Johnson** (Sept. 26, 2024) (speaker)

5

Docusign Envelope ID: 0B9B68EF-4F24-8AFF-82D7-8A3DBC307E04

- **Virginia State Bar Harry L. Carrico Professionalism Course**, faculty and co-leader of IP breakout section for new VSB members, George Mason University, Fairfax, VA (Aug. 14, 2024)

- *Latest Developments in U.S.-China Trademark Ethics and USPTO Discipline*, presented at **Ken Port Memorial Lecture Series, Mitchell Hamline School of Law,** Saint Paul, MN (June 20, 2024) (panelist)

- *Sanctions and Discipline at the USPTO: Best Practices for Staying Out of Trouble*, presented at **2024 IP Owners Annual Spring Summit, Intellectual Property Owners Association**, Washington, D.C. (Mar. 7, 2024) (speaker)

- *The Ethics of Errors & Top 10 Tips*, webinar presented to **Cohen & Gresser LLP** (Nov. 16, 2023) (speaker)

- *Patent Prosecution Malpractice: Minimizing the Risk of Claims*, webinar presented by **Strafford** (Oct. 23, 2023) (speaker)

- *The USPTO's War Against Unauthorized Practice of Patent and Trademark Law by Foreign Associates: Best Practices for Protecting Yourself and Your Clients from Sanctions and Discipline,* presented at **ABA International Law Section Fall Conference 2023**, Yonsei University, Seoul, South Korea (Oct. 11, 2023) (moderator)

- **Virginia State Bar Harry L. Carrico Professionalism Course**, faculty and co-leader of IP breakout section for new VSB members, Alexandria, VA (Oct. 4, 2023)

- *Risk, Regulation & Resilience: Sound Strategies for Your IP Practice*, webinar hosted by **Continental Casualty Company Inc. and Herbert L. Jamison and Company, LLC** (June 22, 2023) (speaker)

- *Recent Ethics Enforcement Trends in Patent and Trademark Matters Before the USPTO*, presented at **Boston Intellectual Property Law Association Third Annual Symposium**, Boston, MA (May 4, 2023) (speaker)

- *Signing Away Your License: USPTO's Vigorous Enforcement of "Personal" Signature Rules and Pre-Filing Duties Under 37 C.F.R. 11.18*, webinar presented to **Ledig, Voit & Mayer, Ltd.** (Apr. 13, 2023) (speaker)

- *Managing IP Malpractice Risks*, presented at **2023 ABA-IP Law Section Annual Meeting**, Washington, D.C. (Apr. 12, 2023) (moderator)

- *Mentoring 101: A Guide for IP Practitioners in Any Stage of Your Career*, presented at **2023 ABA-IP Law Section Annual Meeting**, Washington, D.C. (Apr. 11, 2023) (moderator)

Docusign Envelope ID: 0B9B68EF-4F24-8AFF-82D7-8A3DBC307E04

- **Virginia State Bar Harry L. Carrico Professionalism Course**, faculty and co-leader of IP breakout section (with Judge Michael Nachmanoff, E.D. Va.) for new VSB members, Alexandria, VA (March 14, 2023)

- *Practicing Law Across Borders: Managing Legal & Ethical Risks of Multijurisdictional Practice,* webinar presented for the **ABA-IPLS Ethics and Professional Responsibility and Law Practice Management Committees** and **ABA-International Law Section Life Science and Health Committee** (Mar. 13, 2023) (speaker)

- *OED's War Against Rule 11.18 Violations and the Unauthorized Practice of Law: Navigating Ethics Minefields and Avoiding USPTO Discipline*, presented at **IP Summit 2023 - Utah State Bar IP Section**, Salt Lake City, UT (Feb. 24, 2023) (speaker)

- *No Treats for You: Ethics and Malpractice Issues for IP Practitioners and Transactional Attorneys*, webinar presented for the **Licensing Executive Society** (Nov. 2, 2022) (speaker)

- *Creating and Running an Ethical IP Law Firm: A Survival Guide for Patent and Trademark Practitioners*: *Part 1*, webinar presented for the **American Intellectual Property Law Association** (Oct. 6, 2022) (speaker)

- *Current Ethics Issues for Patent and Trademark Practitioners Before the USPTO*, presented at **33rd Annual Virginia Intellectual Property Section Seminar 2022**, Richmond, VA (Sept. 30, 2022) (speaker)

- **Virginia State Bar Harry L. Carrico Professionalism Course**, faculty and leader of IP breakout section for 2020-22 new VSB members, Alexandria, VA (Sept. 28, 2022)

- *Hot IP Ethics Issues for Patent and Trademark Lawyers at the USPTO*, presented at **47th Annual Intellectual Property Law Institute** for **The Institute for Continuing Legal Education of the State Bar of Michigan**, Mackinac Island, MI (July 23, 2022) (speaker)

- *Dabbling in Trademark Law: A Primer on Ethics and Malpractice Risks for the Occasional IP Practitioner*, webinar presented for the **American Bar Association Center for Professional Responsibility** (July 18, 2022) (speaker)

- *Five Things You Should Know About Running a Successful Patent Practice*, webinar presented as part of **Harrity & Harrity Minority Firm Incubator 2.0** (July 12, 2022) (speaker)

- *Current Trends in OED Actions*, webinar presented at **2022 Electronic and Computer Patent Law Summit** for **the American Intellectual Property Law Association** (June 16, 2022) (speaker)

- *Ethical Considerations for Life Sciences Patent Lawyers*, presented at **ACI's 20th Advanced Summit on Life Science Patents**, Harvard Club, New York, NY (June 2, 2022) (panelist)

7

- *Common Ethical Issues in Patent Prosecution: Conflicts and Fee Sharing*, webinar presented for the **American Intellectual Patent Law Association Patent Agents Committee** (February 17, 2022) (speaker)

- *Ethics in Trade Secret Cases and Before the USPTO*, presented at 2021 Annual Meeting of the **American Intellectual Property Law Association**, National Harbor, MD (Oct. 29, 2021) (moderator)

- *Avoiding Discipline at the USPTO: Recent Developments in Patent and Trademark Ethics*, webinar presented by **Lawline** (Oct. 25, 2021) (panelist)

- *Ethics for IP Practitioners Part II: Avoiding Discipline Before the USPTO*, webinar presented to the **22nd Annual Virginia Intellectual Property Legal Institute** (Oct. 22, 2021) (speaker)

- *Risk, Regulation & Reality – Best Practices for You and Your IP Firm*, webinar presented to **Schwegman Lundberg Woessner, P.A.** (Oct. 19, 2021) (speaker)

- *Ethics for U.S. IP Counsel Working with Foreign Associates*, webinar presented at **2021 ABA-Intellectual Property Law Section IP Fall Institute** (Sept. 30, 2021) (moderator)

- *Ethics of IP Attorney Marketing and Advertising*, webinar presented to **Alt Legal Connect 2021** (Sept. 13, 2021) (speaker)

- *Conflicts of Interest in Patent Prosecution: Ethical Problems and Their Solutions*, webinar presented to the **Japan Patent Attorney Association – American Intellectual Property Law Association Joint Meeting** (Aug. 19, 2021) (speaker)

- *Entry Into an International World: The Civil Trade Secrt Case Morphs into a Criminal Trade Secret Case*, webinar presented to the **Georgia Bar IP Section** (July 13, 2021) (speaker)

- *Trademark Representation Risks: Best Practices for Reducing Malpractice and Ethics Complaints*, webinar presented for **Strafford CLE** (May 6, 2021) (speaker)

- *Current Ethics Issues and Developments for Trademark Attorneys*, webinar presented for **Snell & Wilmer LLP** (May 4, 2021) (speaker)

- *Ethics Traps for Patent Agents: Avoiding USPTO Discipline*, webinar presented for the **American Intellectual Property Law Association** (Jan. 21, 2021) (speaker)

- *Navigating Common Pitfalls in IP Practice*, webinar presented for **Oregon State Bar IP Section** (Nov. 6, 2020) (speaker)

- *Ethics Issues Relating to Working Remotely*, webinar presented for the **American Intellectual Property Law Association** (Nov. 5, 2020) (panelist)

Docusign Envelope ID: 0B9B68EF-4F24-8AFF-82D7-8A3DBC307E04

- *Patent Prosecution Malpractice: Minimizing the Risk of Claims*, webinar presented for **Strafford CLE** (July 14, 2020) (speaker)

- *Reducing Stress and Avoiding Mistakes in the Post-COVID-19 Era*, webinar presented for the **ABA-Intellectual Property Law Section Spring CLE** (June 18, 2020) (moderator)

- *The USPTO's Focus on Declarations*, webinar presented for the **2020 ABA-Intellectual Property Law Section Annual Meeting** (June 1, 2020) (moderator)

- *Ethics for IP Lawyers*, presented at **State Bar for Arizona Sixth Annual CLE in the Garden**, Phoenix, AZ (Feb. 25, 2020) (speaker)

- *Harry L. Carrico Virginia State Bar Professionalism Course*, presented on **General Ethics and Intellectual Property Ethics**, McLean, VA (Jan. 8, 2020) (speaker)

- *Recent Developments in Patent and Trademark Ethics*, presented at **2019 Intellectual Property Law and E-Commerce Seminar, Iowa State Bar Association**, Des Moines, IA (Dec. 17, 2019) (speaker)

- *Avoiding Conflicts of Interest and Other Ethical Dilemmas on the IP Bridge*, presented at **Sixth Annual Meeting of the Center for the Protection of Intellectual Property, Antonin Scalia Law School, George Mason University**, Arlington, VA (Oct. 4, 2019) (speaker)

- *Inadvertent Disclosure and Waiver of Privilege: Legal and Ethical Dilemmas for the IP Practitioner*, presented at the **American Bar Association IP Law Section Fall Meeting**, San Antonio, TX (Oct. 3, 2019) (speaker)

- *2019 IP Ethics and Risk Management Update*, **Avoiding Common Conflicts of Interest in IP Law Practice**, webinar sponsored by **CNA Intellectual Property / Lawyers Professional Liability Webinar Series** (June 26, 2019 and Sept. 27, 2019) (speaker)

- *Navigating Conflicts and Other Ethical Dilemmas in IP Law Practice*, in-house CLE presented to **McDonnell Boehnen Hulbert & Berghoff LLP**, Chicago, IL (June 21, 2019) (speaker)

- *Ethics Issues for IP Counsel Working Through Foreign Associates and Intermediaries*, in-house CLE presented to **Loeb & Loeb LLP**, Chicago, IL (June 20, 2019) (speaker)

- *Navigating Conflicts of Interest in Patent and Trademark Law,* webinar presented to the **Virginia State Bar Intellectual Property Law Section** (May 9, 2019) (speaker)

- *Trademark Representation Risks: Best Practices for Reducing Malpractice and Ethics Complaints*, webinar sponsored by **Strafford CLE** (May 8, 2019) (speaker)

9

Docusign Envelope ID: 0B9B68EF-4F24-8AFF-82D7-8A3DBC307E04

- *Intellectual Property Malpractice – The Parade of Horribles*, presented via phone to the **Tennessee Intellectual Property Law Association 2019 Spring Symposium**, Nashville, TN (May 3, 2019) (speaker)

- *Ethics for the IP Practitioner*, presented at the **Washington State Bar Association 24th Annual Intellectual Property Institute**, Seattle, WA (Apr. 17, 2019) (speaker)

- *The Rocks and Hard Places for IP Practitioners*, presented at **2019 ABA-IP Law Annual Meeting and 34th Annual Intellectual Property Law Conference**, Arlington, VA (Apr. 12, 2019) (moderator)

- *Disqualification: Lessons from Recent Cases*, webinar sponsored by **IPO Chat Channel** (Apr. 10, 2019) (speaker)

- *Introduction to Patent Law,* guest lecture at **Johns Hopkins University – Carey Business School**, Baltimore, MD (Apr. 3, 2019) (speaker)

- *2019 IP Ethics and Risk Management Update*, **Avoiding Common Conflicts of Interest in IP Law Practice**, webinar sponsored by **CNA Intellectual Property / Lawyers Professional Liability Webinar Series** (Mar. 27, 2019) (speaker)

- *Patent Prosecution Malpractice: Minimizing the Risk of Claims*, webinar sponsored by **Strafford CLE Webinars** (Feb. 21, 2019) (speaker)

- *Attorney Wellness and Competency*, moderator of panel discussion, presented to **the Giles S. Rich American Inns of Court and the George Washington University School of Law**, Washington, D.C. (Feb. 19, 2019) (moderator)

- *Getting Physical: The Ethics of Attorney-Client Sexual Relations*, presented at **2019 AIPLA Mid-Winter Institute**, Tampa, FL (Feb. 2, 2019) (speaker)

- *2018 IP Ethics and Risk Management Update*, webinar sponsored by **CNA Intellectual Property / Lawyers Professional Liability Webinar Series** (Dec. 12, 2018) (speaker)

- *The Ethics of Legal Process Outsourcing for the IP Attorney*, presented to **Cincinnati Intellectual Property Law Association**, Cincinnati, OH (Dec. 11, 2018) (speaker)

- *No Candy for You: Tricky Ethics Issues for IP Lawyers*, presented at **UT Law 23rd Annual Advanced Patent Law Institute**, Austin, TX (Nov. 1, 2018) (speaker)

- *Conflicts of Interest in Intellectual Property Law*, presented at **Intellectual Property Owners Association Annual Meeting**, Chicago, IL (Sept. 25, 2018) (speaker)

- *2018 IP Ethics and Risk Management Update*, webinar sponsored by **CNA Intellectual Property / Lawyers Professional Liability Webinar Series** (Sept. 6, 2018) (speaker)

10

Docusign Envelope ID: 0B9B68EF-4F24-8AFF-82D7-8A3DBC307E04

- *The 7 Habits of Highly Ethical IP Lawyers*, presented at **13th Annual Door County (Wisconsin) Intellectual Property Academy**, Sturgeon Bay, WI (July 19, 2018) (speaker)

- *Exploring Ethical Requirements When Working Through the Patent and Trademark Practice*, presented at **ACI's 4th Annual Post Grant PTO Proceedings**, Washington, D.C. (July 18, 2018) (speaker)

- *Evaluating Ethical Concerns for the Biosimilars Industry*, presented at **ACI's 9th Annual Summit on Biosimilars**, New York, NY (June 26, 2018) (speaker)

- *Ethical Issues for IP Lawyers*, in-house ethics seminar presented for **Hauptman Ham, LLP**, Alexandria, VA (May 30, 2018) (speaker)

- *2018 IP Ethics and Risk Management Update*, webinar sponsored by **CNA Intellectual Property / Lawyers Professional Liability Webinar Series** (May 21, 2018) (speaker)

- *Social Media Policies for Law Firms*, presented at the **ABA Section of Taxation 2018 Annual Meeting**, Washington, D.C. (May 12, 2018) (speaker)

- *Multijurisdictional Practice and the Modern IP Attorney*, presented at the **ABA-IP Law Section 33rd Annual Intellectual Property Law Conference**, Arlington, VA (Apr. 19, 2018) (speaker)
- *Ethical Considerations for Teleworking and Multijurisdictional Practice for the IP Lawyer*, presented at **Oregon Patent Law Association (OPLA) – Salishan Patent Law Conference**, Gleneden Beach, OR (Apr. 14, 2018) (speaker)

- *2018 IP Ethics and Risk Management Update*, webinar sponsored by **CNA Intellectual Property / Lawyers Professional Liability Webinar Series** (Mar. 26, 2018) (speaker)

- *Ethics Before the PTAB*, presented at **2018 PTAB Bar Association Annual Conference**, Washington, DC (Mar. 23, 2018) (speaker)

- *Risky Business – Ethical Issues & Professional Considerations for Young Lawyers*, webinar sponsored by **ABA-Young Lawyers Action Group (YLAG) and ABA-IP Section Ethics and Professional Responsibility Committee (**Mar. 9, 2018) (speaker)

- *Brave New World: Technology Advances Create Ethical Risks for IP Attorneys*, presented at **13th Annual Advanced Patent Law Institute – The University of Texas School of Law**, Alexandria, VA (**Mar. 1, 2018) (speaker)

- *IP and Technology: Ethical Risks*, presented at **2018 Utah IP Summit – Intellectual Property Section of the Utah State Bar**, Salt Lake City, UT (Feb. 23, 2018) (speaker)

- *Conflicts of Interest in IP Law: Ethical Problems & Their Solutions*, in-house ethics seminar presented for **Pillsbury Winthrop Shaw Pittman**, McLean VA (Feb. 6, 2018) (speaker)

11

Docusign Envelope ID: 0B9B68EF-4F24-8AFF-82D7-8A3DBC307E04

- *What Every IP Lawyer Should Know About Conflicts of Interest*, in-house ethics seminar presented for **Birch Stewart Kolasch Birch**, Fairfax, VA (Jan. 31, 2018) (speaker)

- *Ethics Issues in PTAB Proceedings*, a 90-minute ethics webinar sponsored by the **American Intellectual Property Law Association** (Dec. 13, 2017) (speaker)

- *Keeping the Lights on and the OED off Your Back: Ethical Conduct in the Practice of IP Law*, a two-hour ethics presented at **2017 Iowa State Bar Association eCommerce & Intellectual Property Seminar**, Des Moines, IA (Dec. 1, 2017) (speaker)

- *Outsourcing Patent Work: Avoiding Pitfalls*, a webinar sponsored by **Intellectual Property Owners Association (IPO)** (Nov. 16, 2017) (speaker)

- *Tales from the OED Crypt: Scary (and True) Stories About Ethics & Discipline at the PTO* and *Ethics Issues in Dealing with Foreign Associates and Foreign Clients*, two speeches presented at **IPRP 2017 Fall Seminar, Washington, D.C. (Nov. 1, 2017)** (speaker)

- *Advanced Intellectual Property Ethics for the IP Practitioner*, broadcast live by **Lawline**, New York, NY (Oct. 26, 2017) (speaker)

- *Ethics in the Practice of Patent and Trademark Law*, presented at **2017 American Bar Association IP Law Section IP West Program**, Long Beach, CA (Oct. 12, 2017) (speaker)

- *An Intellectual Property Ethics Roundtable Discussion*, presented to **Boston Patent Law Association Ethics Committee**, Boston, MA (Oct. 2, 2017) (speaker)

- *Conflicts of Interest for the IP Practitioner*, presented at **27th All Ohio Annual Institute on Intellectual Property**, Cincinnati, OH (Sept. 13, 2017) and Cleveland, OH (Sept. 14, 2017) (speaker)

- *Patent Counsel Ethical Engagement and Disengagement Letters*, sponsored by **Strafford Webinars** (July 27, 2017) (speaker)

- *The Ethics of Working Remotely: Preventing Problems Before They Happen*, a 90-minute webinar sponsored by the **American Intellectual Property Law Association** (June 21, 2017) (speaker)

- *When Good Lawyers Go Bad: Common Ethics Mistakes by IP Practitioners*, a webinar sponsored by the **Association of Intellectual Property Firms** (June 20, 2017) (speaker)

- *Identifying and Resolving Ethical Conflicts of Interest in Patent Prosecution*, a webinar sponsored by the **American Bar Association Landslide Webinar Series (**Apr. 18, 2017) (speaker)

Docusign Envelope ID: 0B9B68EF-4F24-8AFF-82D7-8A3DBC307E04

- *IP Ethics Panel Discussion*, presented at the **ABA Section of Intellectual Property Law, 32nd Annual Intellectual Property Law Conference**, Arlington, VA (Apr. 6, 2017) (speaker)

- *Advice of Counsel Defense in Patent Litigation: Protecting Attorney-Client Privilege*, sponsored by **Strafford Webinars** (Mar. 16, 2017) (speaker)

- *Surviving the Perfect Protostorm: An Anthology of Recent IP Malpractice Decisions*, presented at **Washington State Bar Association 22nd Annual IP Institute**, Seattle, WA (Mar. 10, 2017) (speaker)

- *Bringing Home the Bacon: It's All About the Clients*, presented at **Maryland State Bar Association's Law Office Management Assistance** program, Baltimore, MD (Mar. 4, 2017) (speaker)

- *Mind Your Manners! Or, Ethics and Inequitable Conduct Before the PTAB*, presented at the **PTAB Bar Association Inaugural Conference**, Washington, DC (Mar. 3, 2017) (speaker)

- *Recent Developments in IP Malpractice Litigation*, presented at the **2017 Utah IP Summit CLE Symposium**, Salt Lake City, UT (Feb. 24, 2017) (speaker)

- *So You Want to Live in Timbuktu? Ethical Considerations for the IP Practitioner Working in a Virtual Law Office*, presented at the **2017 American Intellectual Property Law Association – Mid-Winter Institute**, Ft. Lauderdale, FL (Feb. 4, 2017) (speaker)

- *The Dangers of Dabbling: IP Ethics Issues at the USPTO*, presented at the **2016 Iowa State Bar Annual Intellectual Property Law Seminar,** Des Moines, IA (Dec. 2, 2016) (speaker)

- *Ain't Misbehavin: Avoiding Ethical Problems at the USPTO*, live broadcast presented by **LawLine**, New York, NY (Oct. 28, 2016) (speaker)

- *Legal Ethics for the Paraprofessional–What You Don't Know Can Hurt You*, presented at **The National Association for Legal Professionals 2016 Education Conference and National Forum**, Nashville, TN (Oct. 7, 2016) (speaker)

- *Why Me? Ethical Issues in IP Law and Avoiding USPTO Discipline*, presented at **The Carolina Patent, Trademark & Copyright Law Association Fall Meeting,** Kiawah Island, SC (Sept. 23, 2016) (speaker)

- *IP Ethics Panel***,** presented at the **American Conference Institute Paragraph IV Master Disputes Symposium,** Chicago, IL **(**Sept. 20, 2016) (speaker)

Docusign Envelope ID: 0B9B68EF-4F24-8AFF-82D7-8A3DBC307E04

- *Hack This: Cyber Security Practices and Ethical Duties for IP Law Firms* and *Risky Business: Ethical Challenges Facing IP Law Firm Management*, two speeches presented at the **Association of Legal Administrators 2016 Intellectual Property Conference for Legal Professionals**, Washington, DC (Sept. 15, 2016) (speaker)

- *Hot Ethics Topics for the Patent Practitioner*, ethics webinar sponsored by **Iowa State Bar Association** (September 13, 2016) (speaker)

- *Recent Developments at the USPTO Office of Enrollment and Discipline*, presented at the **Attorneys' Liability Assurance Society Patent Consultation Group Roundtable,** Chicago, IL **(**August 4, 2016) (speaker)

- *Legal Ethics and Professional Responsibility: Avoiding Conflicts of Interest, Maintaining Confidentiality, and other Special Concerns for the Biosimilars Space*, presented at the **ACI Biosimilars Summit,** New York, NY (June 15, 2016) (speaker)

- *The Ethics of Outsourcing Legal Services and Functions*, presented at the **Practicing Law Institute 10th Annual Patent Law Institute,** San Francisco, CA (May 5, 2016) and New York, NY (Apr. 14, 2016) (speaker)

- *Conflicts and Ethical Issues in IP Practice*, a two-hour ethics program presented at the **Arizona Bar IP Section Meeting, Second Annual CLE in the Gardens**, Phoenix, AZ (Apr. 8, 2016) (speaker)

- *Roger Boisjoly and the Ethical Lessons Learned from the Space Shuttle Challenger Disaster*, keynote speech presented at the **2016 University of Maryland Order of the Engineer** induction ceremony, College Park, MD **(**Mar. 29, 2016) (keynote speaker)

- *Deja Vu All Over Again – Recurring Ethics Issues in IP Law***,** a two-hour ethics CLE presented at the **Washington State Bar Association Spring 2016 IP Institute**, Seattle, WA **(**Mar. 11, 2016) (speaker)

- *The Duty of Candor to the Tribunal*, a panel discussion moderated by Michael E. McCabe, Jr. at the George Washington University School of Law for the **Giles S. Rich American Inns of Court**, Washington, DC (Feb. 23, 2016) (moderator)

- *Conflicts of Interest in Patent Prosecution after Maling v. Finnegan*, a webinar sponsored by the **Intellectual Property Owners Association** (Feb. 10, 2016) (speaker)

- *Gotcha! Fee-Shifting in IP Litigation Can Trigger OED Ethics Investigation and USPTO Discipline*, presented at the **American Intellectual Property Law Association Mid-Winter Institute**, La Quinta, CA (Jan. 30, 2016) (speaker)

14

Docusign Envelope ID: 0B9B68EF-4F24-8AFF-82D7-8A3DBC307E04

- *Issues in IP Ethics*, presented at a meeting of the **Houston Intellectual Property Lawyer's Association**, Houston, TX (Nov. 17, 2015) (speaker)

- *IP Ethics and Risk Management*, presented at **IPRP Fall 2015 Seminar**, New York, NY (Nov. 9, 2015) (speaker)

- *IP Ethics – Recent Developments*, an in-house firm-wide ethics seminar presented to **McCarter & English, LLP,** Boston, MA (Oct. 16, 2015) (speaker)

- *Breaking Good–Essentials for the Ethical IP Attorney*, presented at the **American Bar Association IP Law Section Annual Meeting**, Chicago, IL (July 31, 2015) (speaker)

- *Subject Matter Conflicts in IP Practice*, presented at the **Association of Professional Responsibility Lawyers Annual Meeting**, Chicago, IL (July 31, 2015) (speaker)

- *Ethics in IP*, presented at a meeting of the **New Jersey Intellectual Property Law Association (NJIPLA),** Iselin, NJ (Dec. 10, 2014) (speaker)

- *Ethical Issues in Patent and Trademark Practice: A Practitioner's Guide to the USPTO's New Ethics Rules and Responding to OED Disciplinary Investigations*, presented live and by video at **Virginia CLE**, Charlottesville, VA (Apr. 4, 2013) (speaker)

- *Recent Developments in Intellectual Property Prosecution and Litigation Ethics*, webinar sponsored by the **Virginia State Bar Intellectual Property Section** (May 10, 2011) (speaker)

- *Recent Trends in Inducing Infringement and Divided Infringement*, webinar sponsored by **Managing Intellectual Property** (Dec. 2010) (speaker)

- *The Growing Popularity of the International Trade Commission as a Preferred Forum for Enforcing U.S. Patent Rights*, presented at **Domestic Impact of Intellectual Property in a Global Economy Symposium** sponsored by University of Baltimore School of Law (Mar. 26, 2010) (speaker)

- *Attorney-Client Privilege in Patent Proceedings - Strategies for Preserving Confidential Communications*, webinar sponsored by **Insurance Law and Litigation Reporter of Strafford Publications** (June 2008) (speaker)

- *Navigating the Risks of Inequitable Conduct*, keynote speech presented at **CNA's Fourth Forum on Addressing the Risks of Intellectual Property Practice** (May 2007) (keynote speaker)

- *Understanding the Discovery Process in U.S. Patent Litigation*, presented at **EuroLegal Conference**, London, England (Oct. 1, 2002) (speaker)

15

Docusign Envelope ID: 0B9B68EF-4F24-8AFF-82D7-8A3DBC307E04

**PUBLICATIONS REGARDING INTELLECTUAL PROPERTY / ETHICS:**

- Michael E. McCabe, Jr. and Lindsey Corbin, *Ethical Considerations When IP Lawyers Outsource Paralegal Services*, Vol. 17, Issue 4, ABA Section of Intellectual Property **Landslide Magazine** (July/Aug 2025)

- Michael E. McCabe, Jr., *The Lawyers' Social Contract: The Ethical Ties that Bind the Legal Profession*, Vol. 16, Issue 4, ABA Section of Intellectual Property **Landslide Magazine** (July/Aug 2024)

- Michael E. McCabe, Jr. and Tracy L. Kepler, *Dibble Dabble Double Trouble: Mitigating the Risks of Dabbling in Your Law Practice,* 2023 Issue 3, **In Practice . . . with CNA – A Practitioner's Perspective on Emerging Legal Trends** (June 2023)

- Co-creator of *Creating and Running an Ethical IP Law Firm: A Survival Guide for Patent and Trademark Practitioners*, a monthly webinar series sponsored by the **American Intellectual Property Law Association** (first part presented Oct. 6, 2022)

- Michael E. McCabe, Jr. and Emil J. Ali, *Balancing Newly Divergent State, USPTO Ethics Rules*, co-authored by, published in **Law360** (Sept. 23, 2020)

- Michael E. McCabe, Jr., *Avoiding USPTO Discipline: Five Recommendations for Patent Agents,* Vol. 2, Issue 3, **The Agent**, an AIPLA Patent Agents Committee Publication (Sept. 18, 2020)

- Michael E. McCabe, Jr., *5 Things IP Practitioners Should Do to Avoid U.S. Patent and Trademark Office Discipline*, **NWSidebar**, a publication of the Washington State Bar Association (July 22, 2019)

- Michael E. McCabe, Jr., *Are Your Firm's Foreign Associate Practice's Ethical?* Vol. 29, Issue 1, **Michigan IPLS Proceedings**, a quarterly journal published by the Intellectual Property Law Section of the Michigan State Bar (Feb. 2018)

- *Maryland Conflict of Interest Law*, Vol. 27, Issue 2, **DRI Happenings – The Newsletter of the Life, Health and Disability Committee** (June 7, 2016)

- Michael E. McCabe, Jr., *Representing Clients with Diminished Capacity*, published in **Wealth Management.com** (Oct. 19, 2015)

- Michael E. McCabe, Jr., *The Rat Rule in IP Litigation—A Threat to Report Another's Unethical Conduct for Strategic Advantage is Unethical and May be Illegal*, Vol. 21, No. 5, **IP Litigator** (Sept./Oct. 2015)

- Michael E. McCabe, Jr., *USPTO No Safe Haven for Suspended or Disbarred Attorneys*, Vol. 21, No. 4, **IP Litigator** (July/Aug. 2015)

- Michael E. McCabe, Jr., *Ethics are Not Just for Lawyers – The Legal Duties of Law Firm Paraprofessionals*, published in **@Law, the NALS Magazine for Legal Professionals** (Summer 2015)

- Michael E. McCabe, Jr., *USPTO is on the Lookout for Ethical Misconduct*, published in **Law360** (May 26, 2015)

- Michael E. McCabe, Jr., *IP Counsel Who Blindly Follow Client "Instructions" Risk Losing Law License*, published in Vol. 21, No. 3, **IP Litigator** (May/June 2015)

- Michael E. McCabe, Jr., *USPTO's New Ethics Rocket Docket for Attorney Discipline*, published in **Law360** (Oct. 30, 2013)

- *Attorney-Client Privilege and Work-Product Immunity in Patent Litigation*, chapter 17 in **The Attorney-Client Privilege in Civil Litigation – Protecting and Defending Confidentiality** (5th ed., 2012; 4th ed. 2008) (American Bar Association)

- *Recent Developments in Patent Law and their Impact on the Pharmaceutical and Biotechnology Industries*, Vol. 19, No. 2 **University of Baltimore Intellectual Property Law Journal** (Spring 2011) and speech (March 2011)

- *Richardson v. Stanley Works, Inc.*, **Maryland State Bar Association, Intellectual Property Section** (June 2010 Annual Meeting)

- *Egyptian Goddess Puts Teeth Back in US Industrial Design Rights*, **Intellectual Property Watch** (Nov. 12, 2008)

- *A Renewed Interest by the Supreme Court in the Field of Patent Law: eBay v. MercExchange and KSR v. Teleflex*, Vol. 44, No. 1 **Computer Law Reporter** (Sept. 2006) and Vol. 7 **Internet Law & Business** (Sept. 2006)

- *Look Again! Capitalizing on IP Assets*, **Trademark World: The Price of IP** (May 2006) (published in Europe)

- *May a Practitioner Both Act as a Counsel in an Interference and Testify as to His or Her Diligence In Preparing an Application?*, Vol. 13, No. 3 **Intellectual Property Today** (Mar. 2006)

- *Back in the Box - Retiring the Adverse Inference Rule*, Issue 168 **Patent World** (Dec. 2004/Jan. 2005) (published in Europe)

- *Impact of the CAFC's Knorr-Bremse Decision and Answers to Japanese Companies' Most Important Questions About Opinions of Counsel in U.S. Patent Litigation*, Vol. 54, No. 13 **Intellectual Property Management** (Dec. 2004) (translated into Japanese/published in Japan)

17

Docusign Envelope ID: 0B9B68EF-4F24-8AFF-82D7-8A3DBC307E04

- *Understanding Discovery in U.S. Patent Litigation*, **Patent World**, a three-part series No. 147 (Nov. 2002); No. 148 (Dec. 2002/Jan. 2003); No. 149 (Feb. 2003/Mar. 2003)

- Michael E. McCabe, Jr., *Attorney-Client Privilege and Work Product Immunity in Patent Litigation*, book chapter published in Anthony B. Askew and Elizabeth C. Jacobs **2001 Intellectual Property Law Update** (Aspen Law & Business) (Jun. 2001)

- *Ethical and Local Rule Restrictions on Investigations of Potential Jurors and Post-Trial Contact with Jurors*, **ABA-IP Law Section** (Dec. 1995)

- **IPethics & INsights**, a law blog published by McCabe Ali LLP and predecessor organizations (2014-present), www.ipethicslaw.com

## QUOTED AS LEGAL AUTHORITY IN MEDIA:

- *"One Firm" or Separate Entities? Vereins' Growth Bumps into Conflicts, Liability Concerns*, **Law.com** (Feb. 23, 2024)

- *Coke's Quest to Disqualify Paul Hastings Faces Big Hurdles*, **Law.com** (May 3, 2023)

- *IP Ethics Atty Urges Justices to Take Up Standards Case*, **Law360** (Jan. 5, 2021)

- *The Biggest Legal Ethics Moments of 2020*, **Law 360** (Dec. 11, 2020)

- *IP Firm Founders Predict "Onslaught" of Ethics Issues for Lawyers Under Pressure*, **Reuters** (Aug. 12, 2020)

- *Full Fed. Circ. Asked to Rethink Voiding IP in Ethanol MDL*, **Law360** (Apr. 15, 2020)

- *Fed. Cir. Inequitable Conduct Case Alarms IP Ethics Attys*, **Law360** (Mar. 11, 2020)

- *$32M Dentons Verdict Could Put Vereins in the Crosshairs*, **Law360** (Feb. 25, 2020)

- G. W. Jordan III, *A New Frontier in Patent Bar Ethics*, Vol. 12, No. 2, **ABA Section of Intellectual Property Law Landslide Magazine** (November/December 2019)

- *Patent Lawyer Fights Identity Theft Over Fraudulent USPTO Filings from China*, **Corporate Counsel** (Mar. 4, 2019)

- *How Law Firms Can Avoid Conflicts Involving Corporate Affiliates*, **Law360** (Mar. 1, 2019)

- *Lawyers Warn Employees About Social Media Use*, **Bloomberg Law** (Sept. 11, 2018)

- *Drafting and Implementing Social Media Policies for Law Firms*, **Bloomberg Law** (May 30, 2018)

18

Docusign Envelope ID: 0B9B68EF-4F24-8AFF-82D7-8A3DBC307E04

- *California Adopts Modified ABA Model Rules*, **Bloomberg Law** (May 11, 2018)

- *Lawyers Have an Ethical Duty to Safeguard Confidential Information in the Cloud*, **ABA Journal** (April 2018)

- *Legal Combat – When Companies Sue Their Outside Counsel, It Can Be One Brouhaha*, **Corporate Counsel** (Mar. 2018)

- *USPTO Trying Out Diversion for Struggling Practitioners*, **Bloomberg BNA** (Nov. 15, 2017)

- *Patent Office Unveils Program for Attorneys with Addiction Issues*, **Reuters Legal** (Nov. 5, 2017)

- *Did McKool Smith Violate Prosecution Bar in High-Profile Patent Case?*, **The Recorder** (Sept. 15, 2017)

- *Ex L'Oreal Atty Faces Tough Road in Wrongful Firing Case*, **IP Law360** and **Legal Ethics 360** (July 31, 2017)

- *Greenberg Traurig Agrees to Withdraw from Case in Which it was Faced with Conflict of Interest*, **The American Lawyer Daily Business Review** (May 24, 2017)

- *USPTO Suspends Former Niro Junior IP Attorney for 18 Months*, **The American Lawyer** (Mar. 6, 2017)

- *Dispute Between USPTO and Controversial Trademark Filer Ends*, **World Trademark Review** (Feb. 21, 2017)

- *IP Atty-Client Privilege Faces Challenges After Halo*, **Law360** (Jan. 20, 2017)

- *A New Front in the IP Wars*, **The American Lawyer** (Dec. 2016)

- *Is It Disrespectful to Send an Associate to Court? Maybe Not*, **Law.Com** (Sept. 27, 2016)

- *Order Disqualifying Dentons is Vacated, Leaving Verein Conflicts Issue Unresolved*, Vol. 21, No. 8 **ABA/BNA Lawyers' Manual on Professional Conduct** (Apr. 20, 2016)

- *Texas Ruling Sets High Bar for Patent Malpractice Claims*, **Law360** (Mar. 30, 2016)

- *5 Tips to Avoid IP Malpractice Suits*, **Law360** (Nov. 20, 2015)

Docusign Envelope ID: 0B9B68EF-4F24-8AFF-82D7-8A3DBC307E04

## PRIOR EXPERT TESTIMONY/DECLARATION

Expert Report (March 16, 2026 ) in Confidential Arbitration Proceeding before the American Arbitration Association

Expert Deposition (March 11, 2026) and Expert Report (October 13, 2025) in *Wells Richmond Stecker v. **Dority & Manning, P.A., et al.***, Case No. 6:24-cv-04415-DCC, United States District Court for the District of South Carolina

Expert Declaration in ***The Trustees of Columbia University in the City of New York** v. Gen Digital, Inc et al.*, Case No. 24-1244, United States Court of Appeals for the Federal Circuit (June 4, 2022)

Expert Trial Testimony (March 23, 2023); Expert Deposition (June 21, 2022); and Expert Report (June 14, 2022) in ***Thomas Ward** v. Commscope, Inc.*, Case No. 3:21-CV-370-H-DEB, United States District Court for the Southern District of California

Expert Deposition Testimony (Dec. 9, 2022); Supp. Expert Report (Oct. 29, 2022); Expert Report (Jan. 8, 2022) in *Inexian Corporation, f/k/a Plowshare Technologies, Inc. v. **Venable LLP***, Case No. 24-C-21-00200, Baltimore City Circuit Court

Expert Declaration in *The Florida Bar v. **John H. Faro***, Case No. SC18-1279, Supreme Court of Florida (Dec. 3, 2020)

Trial Testimony (non-expert) in *Attorney Grievance Comm'n of Maryland v. **Samuel Sperling** et al.*, Misc. Docket AG Nos. 40 & 76, before Judge H. Patrick Stringer, Circuit Court of Baltimore County, Maryland (Aug. 22, 2017), appointed by Maryland Court of Appeals, decision of the Maryland Supreme Court published at 459 Md. 194, 185 A.3d 76 (May 21, 2018)

Deposition Testimony (non-expert) in *Attorney Grievance Comm'n of Maryland v. **Samuel Sperling,** et al.* Misc. Docket AG Nos. 40 & 76, Circuit Court of Baltimore County, Maryland (April 10, 2017)

20

Docusign Envelope ID: 0B9B68EF-4F24-8AFF-82D7-8A3DBC307E04

# EXHIBIT 2

Docusign Envelope ID: 0B9B68EF-4F24-8AFF-82D7-8A3DBC307E04

**EXHIBIT 2**

Amended Demand for Arbitration captioned *Harvey Abrams v. Marriott International, Inc.* before the American Arbitration Association (October 22, 2025)

Expert Declaration of Ron Schnell captioned *Marriott International, Inc. v. Hilliard, Martinez & Gonzales, LLP, d/b/a Hilliard Law, et al.* (February 26, 2026)

Letter from Benjamin R. O'Connor to Marriott Law Department (December 20, 2024)

Letter from Benjamin R. O'Connor to Marriott Law Department (January 16, 2025)

Letter from Alex Terepka to Benjamin R. O'Connor cc Trevor Scheetz, Ryan Watstein and Abigail Howd (March 26, 2025)

Email from Benjamin O'Connor to Alex Terepka cc Lindsay Ballard, Trevor Scheetz, Ryan Watstein, Abigail Howd and Liana Barrera (April 25, 2025)

Letter from Alex Terepka to Benjamin R. O'Connor cc Trevor Scheetz, Ryan Watstein, Abigail Howd and Logan Leonard (May 19, 2025)

Completed Lead Form Pages

Privacy Policy Claims Review - https://privacypolicy.claims-review.com

Sign-Up Link - https://casehq.com/?id=1a04c729-ff4b-11ef-94ba-0a870352fb4f 1/

Terms and Conditions - https://simplyconvert.com/terms-and-conditions

Marriott Privacy Violation Claim Facebook Ad

CCPA Privacy Notice – Legal Settlement Experts - https://legalsettlementexperts.com/ccpa-privacy-notice/

Money Team Webpage - Do I Have A Case?

Money Team Webpage – Join the Fight

Money Team Webpage - https://legalsettlementexperts.com/marriott-v2/

Privacy Policy – Legal Settlement Experts - https://legalsettlementexperts.com/privacy-policy-2/

Privacy Policy – Legal Settlement Experts - https://legalsettlementexperts.com/privacy-policy-3/

Privacy Violation Website.png (May 27, 2025)